**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BRITISH BANKERS' ASSOCIATION; BBA ENTERPRISES, LTD; BBA LIBOR, LTD; CITIGROUP, INC.; CITIBANK, N.A.; COÖPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK, B.A.; CREDIT SUISSE GROUP AG; CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG; HSBC HOLDINGS PLC; HSBC BANK USA, N.A.; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; LLOYDS BANKING GROUP, PLC; LLOYDS TSB BANK PLC; HBOS PLC; SOCIÉTÉ GÉNÉRALE; THE NORINCHUKIN BANK; ROYAL BANK OF CANADA; THE ROYAL BANK OF SCOTLAND GROUP PLC; THE ROYAL BANK OF SCOTLAND PLC; THE BANK OF TOKYO-MITSUBISHI UFJ, LTD; UBS AG; WESTLB AG; and PORTIGON AG,<br><br>Defendants. | **AMENDED COMPLAINT**[1]<br><br>**Case No. 1:13-cv-03952-NRB**<br><br>**MDL No: 2262**<br><br>**ECF CASE**<br><br>**JURY TRIAL DEMANDED** |

[1] This Amended Complaint, which was authorized by the Court's order of September 5, 2014 (MDL Doc. 638), supersedes the Amended Complaint filed and served on July 22, 2013, to which, by agreement, Defendants were not required to respond.

# TABLE OF CONTENTS

Page

NATURE OF THE CASE .... 4

JURISDICTION AND VENUE .... 10

PARTIES .... 12

BACKGROUND .... 21

A. Interest Rate Fundamentals .... 21

B. The Role of Indices and Benchmarks in Financial Markets .... 23

C. The Role of Interest-Rate Benchmarks in Lending .... 27

D. The Role of Interest-Rate Benchmarks in Derivatives .... 28

E. Development of bbaLIBOR™ .... 32

F. Calculation of bbaLIBOR™ .... 33

G. bbaLIBOR™ Governance .... 36

H. Defendants' Knowledge of bbaLIBOR™'s Importance .... 39

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™ .... 42

A. Systematic bbaLibor™ Depression .... 42

B. Harmful Effects of the Unlawful Conduct .... 57

C. Barclays Admissions .... 62

D. UBS Admissions .... 63

E. RBS Admissions .... 65

F. Rabobank Admissions .... 65

G. Lloyds and HBOS Admissions .... 66

H. Freddie Mac Could Not Have Discovered the Fraud and Collusion Before Barclays' Disclosures in 2012 .... 69

COUNT I: VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS) .... 72

Agreement .... 72

Restraint of Trade .... 79

Antitrust Injury and Damages .... 84

Rule of Reason .... 85

A. Relevant Market: USD Short-Term Interest-Rate Benchmarks .... 86

B. Relevant Market: OTC USD Interest-Rate Derivatives .... 91

C. Relevant Market: USD Floating-Rate Retail Loans ........ 93
D. Relevant Market: USD Floating-Rate MBS ........ 95
COUNT II: BREACH OF CONTRACT (DEFENDANT BANK OF AMERICA)........ 96
COUNT III: BREACH OF CONTRACT (DEFENDANT BARCLAYS)........ 98
COUNT IV: BREACH OF CONTRACT (DEFENDANT CITIBANK, N.A.)........ 100
COUNT V: BREACH OF CONTRACT (DEFENDANT CREDIT SUISSE) ........ 102
COUNT VI: BREACH OF CONTRACT (DEFENDANT DEUTSCHE BANK)........ 104
COUNT VII: BREACH OF CONTRACT (DEFENDANT HSBC) ........ 105
COUNT VIII: BREACH OF CONTRACT (DEFENDANT RBS)........ 107
COUNT IX: BREACH OF CONTRACT (DEFENDANT UBS) ........ 109
COUNT X: FRAUD (ALL DEFENDANTS)........ 111
COUNT XI: TORTIOUS INTERFERENCE WITH CONTRACT (ALL DEFENDANTS) ... 116
PRAYER FOR RELIEF ........ 117
JURY DEMAND ........ 117

# TABLE OF FIGURES

Figure 1: Vanilla Interest-Rate Swap ........ 29
Figure 2: Relationship Between Product Markets ........ 32
Figure 3: bbaLIBOR™ Processes ........ 36
Figure 4: Overnight USD bbaLIBOR Submissions ........ 45
Figure 5: Difference Between 3M USD bbaLIBOR and 3M Eurodollar Bid Rate ........ 60
Figure 6: Comparison of bbaLIBOR™ Submissions ........ 75

## NATURE OF THE CASE

1. This Complaint arises from what has been characterized as the most costly commercial banking scandal in history.[2] Over a period of years, Defendants collectively manipulated and depressed bbaLIBOR™, an interest-rate benchmark, incorporated into trillions of dollars in interest-rate derivatives, floating-rate loans, floating-rate mortgage-backed securities ("MBS"), and other financial products, that played a fundamentally important role in financial systems throughout the world. According to the Defendant British Bankers' Association ("BBA"), bbaLIBOR™ represented the average interest rate paid in the London interbank-loan market by a panel of the largest and most reputable commercial banks in the world. The Defendant banks comprised the panel for bbaLIBOR™ for U.S. Dollar ("USD") interbank loans (the "Bank Defendants"), and every working day the Bank Defendants submitted to the BBA the interest rates that purportedly represented the rates at which they would be offered USD interbank loans in a competitive market. As shown below, the Bank Defendants were not only contributors to USD bbaLIBOR™, they were among the most important members of the Defendant BBA, active participants in the committees that oversaw bbaLIBOR™, and the most important users of the benchmark in downstream financial markets—such as the markets for USD interest-rate derivatives, floating-rate loans, and floating-rate MBS.

2. The BBA represented that bbaLIBOR™ was a "simple, transparent benchmark [that is] a reliable indicator of the state of the money markets, and one of the most reliable barometers of risk in the global economy,"[3] promoted bbaLIBOR™ as "the world's most

[2] *The Worst Banking Scandal Yet?*, Bloomberg (July 12, 2012), http://www.bloomberg.com/news/2012-07-12/the-worst-banking-scandal-yet-.html.

[3] BBA, 2010 Annual Report, at 25 (2010).

important number,"[4] and claimed that bbaLIBOR™ represented competitive interest rates in the market for unsecured interbank loans.

3. In truth, however, Defendants[5] acted collectively to secretly deviate from the rules published by the BBA and to coordinate the Bank Defendants' USD bbaLIBOR™ submissions at interest rates below the rates at which they would be offered loans in the interbank market. Defendants subverted the competitive process by agreeing to (1) misrepresent the manner in which USD bbaLIBOR™ was calculated, (2) hold USD bbaLIBOR™ out as a reliable benchmark calculated and governed according to its published rules, and (3) conceal their agreements (collectively the "Unlawful Agreements") to create the façade that USD bbaLIBOR™ reliably served its intended purpose. This misconduct caused USD bbaLIBOR™ to be systematically depressed below the rates that would have been submitted and published but for the Unlawful Agreements. The Bank Defendants engaged in this conduct both to hide their institutions' financial problems and to artificially boost their profits. Defendants participated in this scheme to foreclose competition in the market for USD interest-rate benchmarks. But for the conspiracy, market participants in a competitive market would have known that USD bbaLIBOR™ was not functioning as a reliable and predictable interest-rate benchmark and would have sought alternatives to incorporate into financial instruments. Had the market participants done so, that demand would have created overwhelming incentives for Defendants to strictly adhere to the published rules for USD bbaLIBOR™, and to continue to improve that interest-rate benchmark to meet user needs and the forces of competition. Otherwise, market

[4] *Id.*; Press Release, BBA, BBA LIBOR: The World's Most Important Number Now Tweets Daily (May 21, 2009), *available at* http://www.ccrmagazine.com/index.php?option=com_content&task=view&id=1276.

[5] The term "Defendants" includes both the Defendant BBA and the Bank Defendants.

participants would have switched to an alternative interest-rate benchmark, thus relegating USD bbaLIBOR™ to irrelevancy.

4. Defendants' fraud and collusion must be viewed in the context of the basic business model for banks, which is to borrow low and lend high.[6] A bank's profitability rests on its ability to attract money through customer deposits and short-term wholesale funds[7] (short-term loans, sometimes secured by collateral and sometimes not, issued by financial institutions to other financial institutions).[8] In the absence of collusion, banks compete for short-term wholesale funds by attempting to negotiate for the lowest interest rate. By agreeing to create the false impression that they all had similar levels of credit risk, the Bank Defendants effectively agreed to limit competition in the market for unsecured wholesale funds. In the absence of collusion, banks with lower credit risk compete for unsecured wholesale funds based, in part, on their respective credit ratings. But for the conspiracy, banks with higher credit risk and lower ratings would have been forced to pay higher interest rates for short-term wholesale funding, and therefore would have acted to shed risky assets that affected their credit ratings.[9]

5. The collusion also gave the Bank Defendants an unfair competitive advantage in the markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS. Interest-rate derivatives are financial contracts in which one party trades payments over time on a principal

[6] *See, e.g.*, Richard Posner, *Is Banking Unusually Corrupt and, If So, Why? Posner*, The Becker-Posner Blog (July 22, 2012), http://www.becker-posner-blog.com/2012/07/is-banking-unusually-corrupt-and-if-so-why-posner.html/.

[7] *See, e.g.*, William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Fixing Wholesale Funding to Build a More Stable Financial System, Remarks at the New York Bankers Association's 2013 Annual Meeting & Economic Forum, The Waldorf Astoria, New York City (Feb. 1, 2013), *available at* http://www.newyorkfed.org/newsevents/speeches/2013/dud130201.html.

[8] *See, e.g.*, *Your Mortgage and the Markets*, BBA (March 7, 2012), http://www.angelnews.co.uk/article.jsf?articleId=13024 ("Banks are competing for savers' funds, pushing the cost of this funding even higher as they offer more attractive rates.").

[9] *See* Dudley, *supra* note 7.

amount, referred to as a "notional value," in exchange for interest payments determined by an interest-rate benchmark. Floating-rate loans allow borrowers to make interest-rate payments based on an interest-rate benchmark rather than a fixed rate. An MBS is a security backed by a pool of mortgages that pays cash flows determined by a fixed or floating interest rate. A floating-rate MBS pays cash flows determined by an interest-rate benchmark. In the case of interest-rate derivatives, floating-rate loans, and floating-rate MBS, prices in a competitive market are expressly based on the published rules of the designated interest-rate benchmark. Those rules, and the benchmark provider's promise that they will be reliably applied, form the core of any transaction in which the interest-rate benchmark is incorporated as a price term. The Bank Defendants included the largest and most important issuers of interest-rate derivatives, floating-rate loans, and floating-rate MBS. The Bank Defendants had significant market power in each of these markets and a strong influence over the interest-rate benchmark(s) that would be incorporated into those derivatives, loans, and MBS.

6. Unlike all other market participants, Defendants knew that the published USD bbaLIBOR™ rules were a façade because the Bank Defendants had collectively determined to deviate from those rules to systematically depress USD bbaLIBOR™. Alternative benchmark providers and other participants in markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS were unaware of the Unlawful Agreements. The Bank Defendants injected false information into the markets and used that false information to benefit themselves by foreclosing competition and charging artificially high prices for USD interest-rate derivatives, floating-rate loans, and floating-rate MBS.

7. Defendants engaged in this fraudulent and collusive conduct on a daily basis from August 2007 through at least May 2010, and the effects of Defendants' conduct continued

through at least 2011. Defendants have no legitimate justification for their anticompetitive conduct. While some Defendants have admitted unlawful conduct, most of the facts remain known only to Defendants and the regulatory agencies investigating bbaLIBOR™. Investigators are still piecing together what one publication called a "breathtaking portrait of avarice and deceit."[10] The former Chairman of the United States Federal Reserve, Alan Greenspan, stated: "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities. You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[11]

8. Plaintiff, The Federal Home Loan Mortgage Corporation ("Freddie Mac"), is a government-sponsored enterprise ("GSE") chartered by Congress with a public mission to provide liquidity, stability, and affordability to the United States housing market. Freddie Mac serves the secondary mortgage market by providing a stable supply of money for lenders (including some of the Bank Defendants), which lowers mortgage interest rates for millions of consumers. Freddie Mac plays a vital role in the United States economy by moderating cyclical swings in the housing sector, equalizing the flow of mortgage funds regionally throughout the United States, and ensuring the availability of mortgage funds in a variety of economic conditions. Freddie Mac increases opportunities for affordable home ownership and rental housing for low- and moderate-income families across the nation.

---

[10] *The Worst Banking Scandal Yet?*, *supra* note 2. As William Dudley, the President and CEO of the New York Federal Reserve Bank, recently stated with respect to the bbaLIBOR™ investigation: "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner." William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* http://www.ny.frb.org/newsevents/speeches/2014/dud141002.html.

[11] Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

9. Throughout the 2000s, Freddie Mac generated income through investment activities. Freddie Mac purchased financial products that incorporated USD bbaLIBOR™ as an interest-rate benchmark and sought to generate attractive returns through a disciplined approach to interest-rate risk and capital management. Freddie Mac used derivative financial instruments to balance its funding mix and to economically hedge forecasted issuance of debt and foreign-currency exposure. As Defendants were aware, Freddie Mac, during the relevant time period, was among the largest purchasers of mortgages and holders of MBS in the United States and engaged in interest-rate transactions with billions of dollars in notional value every year. Freddie Mac reasonably relied on Defendants' fraudulent and collusive misrepresentations in entering into financial transactions tied to USD bbaLIBOR™.

10. Defendants' unlawful conduct, as described in this Complaint, caused substantial losses to Freddie Mac. For example, in 2008 alone, Freddie Mac entered into, among other things, hundreds of interest-rate swap transactions in which Freddie Mac agreed to pay counterparties (both Bank Defendants and others) interest payments based on a negotiated fixed rate, in exchange for interest payments based on USD bbaLIBOR™ ("pay-fixed swaps") with billions of dollars in notional value. Similarly, Freddie Mac purchased billions of dollars of MBS in which coupon payments, or the interest paid on the underlying collateral, were determined by USD bbaLIBOR™. Freddie Mac reasonably expected that competitive market forces—and not a secret agreement among Bank Defendants—would determine USD bbaLIBOR™ and, consequently, the value of interest-rate swaps and MBS tied to USD bbaLIBOR™. Freddie Mac's losses flowed directly from the harms to competition caused by the fraud and collusion alleged in this Complaint. Freddie Mac brings this action in the United

States District Court for the Eastern District of Virginia to recover the losses it suffered as a result of this unlawful conduct.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the claims under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337. This Court also has subject matter jurisdiction under 12 U.S.C. § 1452(f), which grants district courts of the United States original jurisdiction over all civil cases in which Freddie Mac is a party.

12. This Court has subject matter jurisdiction over the state-law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

13. This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Sections 1 and 4 of the Virginia Long-Arm Statute (Va. Code. Ann. § 8.01-328.1). Defendants have deliberately and purposefully availed themselves of the privilege of conducting business in the United States and in the Eastern District of Virginia. Defendants are either incorporated in and maintain their principal places of business in the United States, or maintain significant ongoing operations in the United States. Certain Defendants also maintain a substantial corporate presence in the Eastern District of Virginia, including, but not limited to, sales offices and agents that promote, manage, and operate Defendants' businesses and provide significant sales and promotional support.

14. Further, as discussed more fully below, all Defendants conspired to artificially depress USD bbaLIBOR™ for interbank loans, and thereby intentionally directed their unlawful conduct at the United States, including the Eastern District of Virginia. Defendants performed acts in furtherance of their unlawful conspiracy within the Eastern District of Virginia and

elsewhere in the United States. Moreover, Defendants' unlawful conduct foreclosed competition and caused other harm within the United States, and specifically within the Eastern District of Virginia, Freddie Mac's principal place of business. Defendants are sophisticated market participants that knew, or reasonably should have known, that their fraudulent and collusive depression of USD bbaLIBOR™ would produce substantial and foreseeable effects in the United States and in the Eastern District of Virginia.

15. As described below, in furtherance of the Unlawful Agreements, certain Defendants entered into contracts with Freddie Mac in the Eastern District of Virginia and made payments to Freddie Mac in the Eastern District of Virginia that were determined by the fraudulent USD bbaLIBOR™ rates, and therefore hundreds of millions or billions of dollars less than the payments that would have been made in the absence of the fraud and conspiracy. All Defendants knew that USD bbaLIBOR™ was a key component of standardized derivatives and loan contracts or other documentation used in the Eastern District of Virginia and elsewhere. Because of Freddie Mac's size, importance, and presence in these markets, Defendants knew, or should have known, of these contracts and payments to Freddie Mac. Defendants therefore purposefully availed themselves of the privilege of conducting activities in the United States, and in the Eastern District of Virginia, in connection with the unlawful activities described in this Complaint.

16. Venue is proper in the Eastern District of Virginia pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391. Defendants maintain offices or agents, transact business, or can be found within the Eastern District of Virginia. The interstate commerce giving rise to the claims described in this Complaint was carried out, in part, within the Eastern District of Virginia. Defendants performed acts in furtherance of their conspiracy

within the Eastern District of Virginia and elsewhere that were intended to affect, and did affect, Freddie Mac and others located within the Eastern District of Virginia.

## PARTIES

17. Freddie Mac is a GSE located at 8200 Jones Branch Drive in McLean, Virginia.

18. Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina, with numerous corporate offices and branches in the Eastern District of Virginia. Bank of America was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Several subsidiaries of Bank of America engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia, including Defendant Bank of America, N.A. (the successor-in-interest to NationsBank, N.A.), a Delaware corporation headquartered in Charlotte, North Carolina, which engaged in pay-fixed swaps with Freddie Mac in the Eastern District of Virginia. On information and belief, Bank of America participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

19. Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. Barclays was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Barclays operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[12] Barclays engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia. On information and belief, Barclays participated in the unlawful

[12] *See Barclays in the USA*, Barclays, http://www.barclays.com/about-barclays/around-the-world/usa.html (last visited Oct. 1, 2014).

conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

20. The BBA is a trade association based in the United Kingdom. Throughout the 2000s, the BBA owned bbaLIBOR™. The BBA was governed by a Board, which officially met four times per year, comprised of the BBA Chief Executive and the Chief Executives of a number of Bank Defendants. Through 2010, the Foreign Exchange and Money Markets ("FX & MM") Committee of the BBA—whose members included representatives of at least several Bank Defendants—had sole responsibility for all aspects of the functioning and development of LIBOR. The BBA claimed that the FX & MM Committee was an entity independent of the Bank Defendants. Defendant BBA Enterprises, Ltd. was a wholly owned subsidiary of the BBA located in London. In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR, Ltd., to house bbaLIBOR™. One published report has stated that the BBA created BBA LIBOR, Ltd. to help shield the BBA from potential liability arising from the misconduct alleged in this Complaint.[13]

21. As set forth more fully below, the BBA advertised bbaLIBOR™ in the United States and in the Eastern District of Virginia, and solicited business in the United States. In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the United States Patent and Trademark Office, located in the Eastern District of Virginia at 600 Dulany Street, Alexandria, Virginia (Registration No. 3212218). The BBA electronically communicated news and information through Internet websites (e.g., www.bba.org, www.bbalibor.org), the Thomson Reuters website (www.reuters.com), the Wall Street Journal, and through other data vendor

[13] *See* David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

websites including International Data Corp. ("IDC"), which maintains an office in Alexandria, Virginia.[14] The BBA published, or caused to be published, bbaLIBOR™ data to more than a million computer screens around the world, including in the United States and, on information and belief, in the Eastern District of Virginia.[15] In 2009, the BBA launched a Twitter social media news feed to bypass the print media[16] because interest in bbaLIBOR™ had soared "since so many loans are linked to it."[17] The BBA also maintained a Facebook page accessible from the Eastern District of Virginia (https://www.facebook.com/BritishBankers). On information and belief, the BBA participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

22. Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation headquartered in New York, New York, with numerous corporate offices and branches in the Eastern District of Virginia. Citigroup or its wholly owned subsidiary, Defendant Citibank, N.A., which is headquartered in New York, New York, was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Several wholly owned subsidiaries of Citigroup engaged in financial transactions incorporating bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia, including Defendant Citibank, N.A. On information and belief, Citigroup participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

---

[14] *See, e.g.*, *Frequently Asked Questions (FAQs)*, BBA Libor, https://web.archive.org/web/20110303121338/http://www.bbalibor.com/bbalibor-explained/faqs (last visited Oct. 1, 2014); *Worldwide Offices*, IDC, http://www.idc.com/about/wwoffices.jsp#.UTkzDo6BBMY (last visited Oct. 1, 2014).

[15] *See Frequently Asked Questions (FAQs)*, *supra* note 14.

[16] *See BBA LIBOR*, Capital Markets Bull., June 2009, at 5, *available at* http://hb.betterregulation.com/external/Capital%20Markets%20Bulletin%20-%20June%2009.pdf.

[17] The World's Most Important Number Now Tweets Daily, *supra* note 4.

23. Defendant Coöperative Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands. Rabobank was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Rabobank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[18] On information and belief, Rabobank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

24. Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland. Credit Suisse was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Several subsidiaries of Credit Suisse engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia, including Defendant Credit Suisse International (f/k/a Credit Suisse First Boston International). Credit Suisse operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[19] On information and belief, Credit Suisse participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

25. Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany, with subsidiaries and affiliates located in the Eastern District of Virginia. Deutsche Bank was at all relevant times a member of the USD

---

[18] *See, e.g.*, *Rabobank Group United States of America*, Rabobank Grp., https://www.rabobank.com/en/locate-us/americas/usa.html (last visited Oct. 1, 2014).

[19] *See, e.g.*, *Office Locator*, Credit Suisse, https://www.credit-suisse.com/who_we_are/en/office_locator.jsp (last visited Oct. 1, 2014).

bbaLIBOR™ panel of banks. Several subsidiaries of Deutsche Bank engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia. Deutsche Bank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[20] On information and belief, Deutsche Bank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

26. Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England, with numerous corporate offices and branches in the Eastern District of Virginia. HSBC was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Several subsidiaries of HSBC engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in Virginia, including Defendant HSBC Bank USA, N.A, a national banking association with its main office in McLean, Virginia.[21] HSBC operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[22] On information and belief, HSBC participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

27. Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a Delaware corporation headquartered in New York, New York, with numerous corporate offices and branches in the

---

[20] *See, e.g.*, *Location Finder*, Deutsche Bank, https://secure.deutsche-bank.de/cc/locationsfinder/en/welcome2.do?country=USA (last visited Oct. 1, 2014).

[21] *See, e.g.*, *Fact Sheet*, HSBC Bank USA, Nat'l Ass'n, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000000/content/new_usshared/shared_fragments/pdf/hbus_factsheet_0912.pdf (last visited Oct. 1, 2014).

[22] *See, e.g.*, *Country Contacts*, HSBC Holdings plc, http://www.hsbc.com/about-hsbc/structure-and-network/country-contacts#USA (last visited Oct. 1, 2014).

Eastern District of Virginia. J.P. Morgan was at all relevant times a member of the USD bbaLIBOR™ panel of banks. J.P. Morgan wholly owns Defendant J.P. Morgan Chase Bank, N.A., a national banking association principally located in Columbus, Ohio with numerous offices and branches in the Eastern District of Virginia. Several wholly owned subsidiaries of J.P. Morgan engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia. On information and belief, J.P. Morgan participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

28. Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") by Defendant Lloyds TSB Bank plc. Prior to 2009, HBOS and Lloyds TSB Bank plc were members of the USD bbaLIBOR™ panel of banks. Lloyds joined the USD bbaLIBOR™ panel of banks upon its formation in 2009. Lloyds operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[23] On information and belief, Lloyds participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

29. Defendant Société Générale is a French banking corporation, headquartered in Paris, France. Société Générale replaced HBOS on the USD bbaLIBOR™ panel on February 9, 2009. Société Générale operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States, including in the Eastern

[23] *See, e.g.*, *International Locations*, Lloyds Banking Grp., http://www.lloydsbank-careers.com/view/263/international-locations.html (last visited Oct. 1, 2014).

District of Virginia.[24] On information and belief, Société Générale participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

30. Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan. Norinchukin was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Norinchukin maintains a branch office in New York, New York.[25] Norinchukin is one of Japan's largest institutional investors and is one of Japan's largest hedge funds. Norinchukin operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States. On information and belief, Norinchukin participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

31. Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Canada, with numerous corporate offices and branches in the Eastern District of Virginia and elsewhere in the United States. RBC was at all relevant times a member of the USD bbaLIBOR™ panel of banks. RBC operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[26] On information and belief, RBC participated in the unlawful conduct alleged in this

---

[24] *See, e.g.*, *Our Locations*, Société Générale Grp., http://www.societegenerale.com/en/about-us/our-businesses/our-locations (last visited Oct. 1, 2014).

[25] *See, e.g.*, *Global Network*, The Norinchukin Bank, http://www.nochubank.or.jp/en/about/globalnetwork.html (last visited Oct. 1, 2014).

[26] *See, e.g.*, *RBC Companies*, RBC Bank, http://www.rbcbank.com/about-rbc-bank/rbc-companies/index.html (last visited Oct. 1, 2014).

Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

32. Defendant The Royal Bank of Scotland Group, plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland, with numerous corporate offices and branches in the Eastern District of Virginia and elsewhere in the United States. RBS was at all relevant times a member of the USD bbaLIBOR™ panel of banks. Several subsidiaries of RBS engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia, including Defendant The Royal Bank of Scotland plc. RBS operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[27] On information and belief, RBS participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

33. Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") is a Japanese subsidiary of Mitsubishi UFJ Financial Group, Inc. and is headquartered in Tokyo, Japan. BTMU was at all relevant times a member of the USD bbaLIBOR™ panel of banks. BTMU operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[28] On information and belief, BTMU participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

---

[27] *See, e.g.*, *Where We Do Business*, RBS, http://www.rbs.com/about/worldwide-locations.html (last visited Oct. 1, 2014).

[28] *See, e.g.*, *Global Network—The Americas*, Bank of Tokyo-Mitsubishi UFJ, http://www.bk.mufg.jp/global/globalnetwork/americas/index.html (last visited Oct. 1, 2014).

34. Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. UBS was at all relevant times a member of the USD bbaLIBOR™ panel of banks. UBS was formed in 1998 through the merger of Swiss Bank Corporation and the Union Bank of Switzerland. Several subsidiaries of UBS engaged in financial transactions incorporating USD bbaLIBOR™ with Freddie Mac in the Eastern District of Virginia. UBS operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[29] On information and belief, UBS participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

35. Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany. Defendant Portigon AG is a German company headquartered in Dusseldorf, Germany that acquired WestLB AG in 2009. Prior to 2009, WestLB AG was a member of the USD bbaLIBOR™ panel of banks. Portigon joined the USD bbaLIBOR™ panel of banks after acquiring WestLB AG. This Complaint refers to WestLB AG and Portigon AG, collectively, as "WestLB." WestLB operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[30] On information and belief, WestLB participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

---

[29] *See, e.g.*, *UBS Location Finder*, UBS, http://apps1.ubs.com/locationfinder/searchForm.do?GeoEntityId=3&GeoEntityType=3 (last visited Oct. 1, 2014).

[30] *See, e.g.*, *Our Locations*, Portigon Fin. Servs., http://www.portigon.com/cm/content/portigon/i/en/ueber-portigon/standorte.html (last visited Oct. 1, 2014).

36. The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by their officers, directors, agents, employees, or representatives while actively engaged in the management of Defendants' businesses or affairs.

37. Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to Freddie Mac and which cannot at present be named as Defendants in this action, may have participated as co-conspirators with Defendants in the unlawful conduct alleged in this Complaint, and/or performed substantial acts and made statements in the Eastern District of Virginia in furtherance of the alleged violations.

38. At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of each other, and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

## BACKGROUND

### A. Interest Rate Fundamentals

39. Absent collusion, interest rates are set in arms-length negotiations between a lender with cash and a borrower in need of cash. The interest rate charged by the lender is the price the lender charges to let the borrower use the cash for a period of time. An interest rate has two basic components: the "risk-free rate," which represents the return that a lender will expect for losing access to its funds for a period of time (i.e. the time value of money), and a "risk premium," which compensates the lender for the risk that the borrower will not fully repay the loan on time. Absent collusion, and all else being equal, lenders will charge a higher risk premium to borrowers with lower relative creditworthiness.

40. In a competitive market, the interest rate that banks pay for short-term wholesale funds is negotiated at arm's length and accounts for the factors described above. For example, all else being equal, a bank that receives a credit downgrade will have to pay higher interest rates for short-term wholesale funds than it would have to pay absent the downgrade.[31] Short-term wholesale loans can be secured or unsecured. Unsecured wholesale loans are backed only by the borrowing bank's creditworthiness. During the relevant period, Defendants held out bbaLIBOR™ as a reliable index that measured competitive interest rates for unsecured interbank loans, which market participants referred to as the bank's "cost of funds."32

41. By the mid-2000s, the London interbank market had been a major source of cash for banks seeking to fund USD loans for more than 30 years. The London interbank market enabled banks in need of cash to obtain USD deposits ("Eurodollar deposits"), either on an overnight basis or for fixed terms (typically, one, two, three, or six months), from banks with excess cash.

42. A bank's "liquidity" is determined by the amount of cash that it has, or can raise quickly, to pay off its debts.[33] Banks also compete in the capital markets for longer-term assets. Longer-term assets, such as residential mortgages, tend to pay higher rates of return[34] but are less "liquid" than cash. A bank's profitability rests on its ability to attract money through customer

---

[31] *See, e.g.*, Barclays PLC, Annual Report 2009, at 130-32 (2009), *available at* http://www.barclays.com/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2009/barclays-plc-annual-report-2009.pdf.

[32] *See, e.g.*, Martin Wheatley, *The Wheatley Review of LIBOR: Final Report* 82 (2012), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf (hereinafter "Wheatley Final Report").

[33] An asset is liquid if the market in which it is traded has many buyers and sellers and the asset is bought and sold frequently with low transaction costs. All else equal, the more liquid an asset is relative to alternative assets, the greater the demand will be for that asset and, consequently, it will be priced higher. Frederic S. Mishkin, The Economics of Money, Banking, and Financial Markets 90 (3d. ed. 2013).

[34] For example, mortgage lenders sometimes charge a premium over bbaLIBOR™, usually in the form of a set rate on top of bbaLIBOR™.

deposits and short-term assets and to invest (lend) that money in longer-term assets that pay higher interest rates.

**B. The Role of Indices and Benchmarks in Financial Markets**

43. An index is a statistical measure, typically of price or quantity, calculated from a representative set of underlying data.[35] Index providers invest significant amounts of time and money to develop and market financial indices. The market for financial indices is competitive, with providers differentiating their indices through incremental improvements and innovation.[36] As stated by an association representing the benchmark industry: "A well-functioning benchmark industry is one in which index administrators have an incentive to invest continuously in innovation . . . . Without this incentive, innovation and competition in the industry is likely to decrease."[37]

44. By providing reliable information to market participants, financial indices promote what economists refer to as "price discovery"—the process by which parties to a transaction come to an agreement on a price for a given product. In economics, "perfect competition" involves a market in which, among other things, buyers and sellers equally have all of the same information about the market. All else being equal, when consumers are deprived of

[35] *Commission Staff Working Document, Impact Assessment Accompanying the Document Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 1, SWD (2013) 336 final (Sep. 18, 2013).

[36] *See, e.g.*, BlackRock, *Response to Consultation Document on the Regulation of Indices* 17 (Nov. 29, 2012), *available at* https://www2.blackrock.com/webcore/litService/search/getDocument.seam?source=LITLIST &contentId=1111178048&venue=pub_ind (hereinafter "BlackRock Resp.").

[37] Deutsche Börse Group, *White Paper on the Benchmark Industry* 16-17 (Dec. 2013), *available at* https://deutsche-boerse.com/dbg/dispatch/en/binary/gdb_content_pool/imported_files/public_files/10_downloads/11_about_us/Public_Affairs/The_benchmark_industry_1213.pdf (hereinafter "*The Benchmark Industry*"); *see also* BlackRock Resp., *supra* note 36, at 17 ("We note that significant investment and research is involved in creating and calculating indices and it is a competitive market place with providers differentiating through incremental improvements and innovation.").

information or given false information about a product, they will receive lower quality and higher prices than when they are provided full and accurate information.

45. If an index is used as a reference price for a financial instrument or a financial contract, it becomes a benchmark.[38] There are four main types of players in benchmark markets: (1) those that contribute the data ("contributors"); (2) administrators who provide the benchmark ("providers"); (3) institutions that issue products that incorporate the benchmark ("issuers"); and (4) end users.

46. Absent collusion, the forces of competition choose financial benchmarks.[39] Thus, providers in a competitive market will only succeed in creating commercially viable benchmarks if they provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs.[40] If a benchmark does

[38] *Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 2, COM (2013) 641 final (Sept. 18, 2013) (hereinafter "EC Proposal"); Wheatley Final Report, *supra* note 32, at 54.

[39] *See, e.g.*, Argus Media, *Response to Consultation Document on the Regulation of Indices* 15, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/argus_en.pdf (last visited Oct. 1, 2014) (hereinafter "Argus Resp.") ("[T]he choice of benchmarks for financial contracts must be largely market driven."); BDEW, *Position Paper on European Commission's Consultation Document on the Regulation of Indices* 2 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/—2012/ benchmarks/registered-organisations/bdew-en_en.pdf ("[M]arket participants know best, which index is efficient and fits best for their needs."); Blackrock Resp., *supra* note 36, at 15 (competition gives end-users options "and the recourse to change providers if governance and transparency are deemed to be insufficient"); Euribor-EBF, *Response to the European Commission Consultation Document on the Regulation of Indices* 21 (Nov. 28, 2012), *available at* http://www.emmi-benchmarks.eu/assets/files/D2161C-2012-Euribor-EBF%20response%20to%20 the%20EC%20Consultation%20on%20the%20Regulation%20of%20Indices_clean.pdf; Fed'n Bancaire Francaise, *Response to the European Commission Consultation Document for the Regulation of the Production and Use of Indices* 3, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/ fbf_en.pdf (last visited Oct. 1, 2014) ("[T]he choice of alternative benchmarks should be market-led, with users choosing the best alternatives for their needs."); Fin. Watch, *Response to Consultation Document on the Regulation of Indices* 16 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/ benchmarks/registered-organisations/finance-watch_en.pdf ("A self-regulation principle will state that competition will let the 'best' benchmarks impose themselves."). Even the BBA has advocated for choice in the market for interest-rate benchmarks. *See* BBA, LIBOR—Update (Mar. 5, 2012) , *available at* http://www.betterregulation. com/doc/2/128582 (quoting Ian Mair, then Chairman of the London Money Market Ass'n, as saying that "[i]t is important that all market participants have a choice of benchmarks").

[40] *See* Markit, *Response to Consultation Document on the Regulation of Indices* 11 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/markit_en.pdf

not command the confidence of all participants in the market, parties will cease to use it. As one index provider recently wrote: "Absent fraud and collusion . . . financial markets, investors, consumers and government agencies will efficiently rout poorly constructed benchmarks and condemn . . . illogical/ill-conceived uses of benchmarks."[41]

47. Because the actual market or economic reality is likely to change over time, benchmark providers in a competitive market regularly reassess key terms of, and inputs to, a financial benchmark to ensure that the benchmark still provides a reliable representation of the actual market or economic reality that the benchmark is intended to measure.[42] Recent proposals to improve bbaLIBOR™ include provisions to (a) compare unsecured interbank loan interest rates to actual transaction data and (b) reference other forms of wholesale funding.

48. In a competitive market, issuers and end users choose financial benchmarks based on how they weigh various quality factors.[43] First, will the benchmark serve its intended purpose?[44] If not, issuers and end users will not use it.

49. Second, is the benchmark anchored in observable transactions or high quality data? Absent collusion, issuers and users demand input data that is sufficient to represent the

---

(hereinafter "Markit Resp."); *The Benchmark Industry*, *supra* note 37, at 15 ("Indices are only beneficial if users can trust them fully.").

[41] Russell Indexes, *Response to Consultation Document on the Regulation of Indices* 9 (July 2012), *available at* https://www.russell.com/documents/indexes/eu-commission-consultation-response.pdf; *see also* BlackRock Resp., *supra* note 36, at 3 ("[B]ecause of competition and innovation in the marketplace, index providers will be incentivised through market forces to ensure their products are of a certain quality and viable indices for the end investor.").

[42] Bd. Int'l Org. Sec. Comm'ns [IOSCO], *Financial Benchmarks Consultation Report*, at 25, IOSCO Doc. CR01/13 (Jan. 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD399.pdf (hereinafter "IOSCO Consultation Report"); EC Proposal, *supra* note 38, at 8.

[43] *See* ICAP, *Response to the European Commission Consultation on the Regulation of Indices* 4 (Nov. 27, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/icap_en.pdf (hereinafter "ICAP Resp.").

[44] EC Proposal, *supra* note 38, at 2.

actual market or economic reality that the benchmark is intended to measure.[45] For interest-rate benchmarks in particular, users want input data that is formed by competitive supply and demand conditions.[46]

50. Third, does the benchmark provide a clearly defined calculation methodology that users can replicate and predict? Transparency as to what benchmarks measure and their most relevant characteristics are critical because they allow issuers and end users to make correct assessments about whether to choose a particular benchmark.[47] Market transparency is a "core principle" because "the market demands it."[48]

51. Fourth, will the benchmark be published by a provider with high professional standards and proven experience and does the benchmark have controls in place to deter manipulation and ensure that rates are properly calculated in accordance with the published

---

[45] *Id.* at 15-16; Wheatley Final Report, *supra* note 32, at 55-56.

[46] IOSCO, *Principles for Financial Benchmarks: Final Report*, at 10, 20, 33, IOSCO Doc. FR07/13 (July 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf (hereinafter "IOSCO Principles"); Market Participants Grp. on Reforming Interest Rate Benchmarks, Final Report 28 (Mar. 2014) ("Rates should be based on prices formed by competitive supply and demand and anchored in observable transactions.").

[47] *See, e.g.*, *The Benchmark Industry*, *supra* note 37, at 5-6 (index should be fully replicable and completely transparent); AFG, *Response to the European Commission's Consultation on the Regulation of Indices* 3 (Nov. 29, 2012); Amundi, *Answer to E.C.'s Consultation Document on the Regulation of Indices* 2 (Nov. 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/amundi_en.pdf; Wheatley Final Report, *supra* note 32, at 55-56.

[48] S&P Dow Jones Indices, *Response to Consultation Document on the Regulation of Indices* ¶ 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/s-p-dow-jones-indices_en.pdf ; Markit Resp., *supra* note 40, at 11 ("[C]ommercial benchmark providers will only succeed in creating commercially viable products if they manage to provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs."); *The Benchmark Industry*, *supra* note 37, at 15 ("End customers . . . need transparency about the index methodology to understand what the index is measuring."); Barclays, *Response to the Wheatley Review of Libor: Initial Discussion Paper* 2 (Sept. 6, 2012) ("It is essential that the market has access to benchmarks that are well-constructed, transparent, and that inspire the confidence of both market participants and regulators.") Transparency enhances investor protection. EC Proposal, *supra* note 38, at 9.

methodology? If not, issuers and end users will avoid the benchmark as insufficiently trustworthy.[49]

52. Absent collusion, "if benchmarks are found wanting, the market will migrate towards an alternative through choice."[50] As a result, absent a conspiracy, providers seek to provide the most reliable and accurate indices "in order to retain a competitive advantage in the marketplace."[51]

### C. The Role of Interest-Rate Benchmarks in Lending

53. Lenders can offer loans at fixed or floating rates. In a fixed-rate loan, the interest rate stays the same through the term of the loan. As the term increases, however, so does the risk that market-wide interest rates will go up, leaving the lender with an asset paying below market rates. In a competitive market, the price of a fixed-rate loan reflects these risks.

54. In a floating-rate loan, the interest rate can change over time as determined by an agreed-upon benchmark. This allows the lender to initially accept a (typically) lower floating rate that would adjust upwards in case the credit environment deteriorated or for a variety of other reasons.

55. Lenders in a competitive market should gravitate toward interest-rate benchmarks that reliably represent a bank's actual cost of funds because that enables them to pass those costs

---

[49] *See, e.g.*, Wheatley Final Report, *supra* note 32, at 55-56; Argus Resp., *supra* note 39, at 2 ("Continued commercial success in this competitive marketplace is directly related to the integrity of an organisation's services.").

[50] ICAP Resp., *supra* note 43, at 9.

[51] Index Indus. Ass'n, *Response to Consultation Document—Regulation of Indices* 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/index-industry-association_en.PDF.

on to borrowers and lock in a profit. For example, a lender may offer a 20-year loan at its cost-of-funds plus a margin.[52]

**D. The Role of Interest-Rate Benchmarks in Derivatives**

56. As compared to a fixed-rate loan, a floating-rate loan reduces a lender's risk that interest rates will increase (and increases the risk that rates will decrease), but it transfers that same risk to borrowers. The market for interest-rate derivatives provides a way for borrowers to transfer interest-rate risk to third parties for a price. An interest-rate derivative is a derivative where the underlying asset is the right to pay or receive a principal amount of money at a given interest rate. For example, a borrower may accept a floating-rate loan tied to an interest-rate benchmark and contemporaneously enter into a contract with a third party where the borrower agrees to make fixed-rate payments in exchange for floating interest rates tied to the same benchmark—an interest-rate swap. Through this "hedging" strategy, the borrower has effectively converted its floating-rate loan into a fixed-rate one. The ability to hedge is increased if the same interest-rate benchmark is incorporated into the swap and the floating-rate loan because it synchronizes changes in the interest rates.

57. This synchronization creates a "network effect" in which a product tends towards dominance because its utility increases with the number of people that use it.[53] For example, a consumer's demand for a telephone network increases with the number of other users on the network whom she can call or from whom she can receive calls. In industries characterized by

---

[52] *See, e.g.*, Wheatley Final Report, *supra* note 32, at 44 ("The use of a benchmark such as LIBOR allows lenders to use it as a barometer of the inter-bank funding market to base the margin to be applied to its customers.").

[53] *See, e.g.*, *id.* at 46, 76; European Comm'n, *Consultation Document on the Regulation of Indices: A Possible Framework for the Regulation of the Production and Use of Indices Serving as Benchmarks in Financial and Other Contracts* 19 (Sept. 5, 2012), *available at* http://ec.europa.eu/internal_market/consultations/docs/2012/benchmarks/consultation-document_en.pdf.

network effects, competing networks can "tip" so that if one network overtakes the other, the other becomes insignificant.[54]

58. During the conspiracy period, the vast majority of interest-rate swaps were traded over-the-counter ("OTC"). Since June 2013, Dodd-Frank legislation has mandated that interest-rate swaps are traded on exchanges, such as the Chicago Mercantile Exchange ("CME") and Intercontinental Exchange ("ICE"). Exchange-traded swaps are standardized financial instruments, with pre-defined notional values, repayment dates, benchmarks, and length.

**Figure 1: Vanilla Interest-Rate Swap**




59. The advantage of OTC swaps was that they could be adjusted to meet a user's needs, for example by synchronizing the payment dates and duration within a loan. OTC swaps were typically negotiated pursuant to a standardized Master Agreement that was developed by the International Securities and Derivatives Association ("ISDA"). Many of the Bank Defendants served on ISDA's Board of Directors and had other prominent roles in that trade association.[55] A swap contract is negotiated for an agreed-upon term—10 years, for example—with pre-defined dates on which the interest rates are calculated and payments made (known as "payment dates"). Assuming simultaneous payment dates, the interest payments are "netted" out and the "loser" pays its counterparty the difference between the fixed- and floating-rate payments. For example, if on the first payment date, application of the fixed interest rate to the

---

[54] *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 393 (4th ed. 2005).

[55] *See, e.g.*, 2011 Board of Directors, International Swaps & Derivatives Ass'n, Inc., http://www.isda.org/wwa/bod.html (last visited on Oct. 1, 2014).

notional results in a payment due of $10,000 and application of the predefined benchmark interest rate to the notional results in a payment due of $9,000, then the fixed-rate payer must pay the difference ($1,000) to its counterparty.

60. In the OTC interest-rate swap market, broker/dealers function as market makers. A small set of dealers dominated the market for OTC USD interest-rate derivatives during the conspiracy period. According to a July 2010 ISDA market survey, the largest 14 broker/dealers held 82% of all interest-rate derivatives by notional amount.[56] Of these 14 largest dealers, 10 were Bank Defendants: Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS.[57] Similarly, the top five bank holding companies in the United States—Bank Defendants Bank of America, JP Morgan, Citigroup, and HSBC, and non-Defendant Goldman-Sachs—accounted for more than 95% of all OTC swaps and derivatives transactions in the United States during the conspiracy period.[58]

61. As Defendant UBS has acknowledged, in interest-rate swap transactions, "the benchmark is a price, not an index."[59] OTC dealers quote prices for interest-rate swaps in two parts: (1) an interest-rate benchmark and (2) a fixed interest rate. In the absence of collusion, the fixed rate is calculated to provide the same value today (net present value or "NPV") of the expected cash flows from the quoted benchmark over the life of the swap. The fixed-rate payer calculates the expected cash flows by applying the published rules of the quoted benchmark to

---

[56] David Mengle, *Concentration of OTC Derivatives Among Major Dealers*, ISDA Research Notes, July 2010, *available at* www.isda.org/researchnotes/pdf/ConcentrationRN_4-10.pdf.

[57] *See id.*

[58] *See* Office of the Comptroller of the Currency, OCC's Quarterly Report on Bank Trading and Derivatives Activities: First Quarter 2009, *available a*t http://www.occ.gov/news-issuances/news-releases/2009/nr-occ-2009-72a.pdf (last visited Oct. 1, 2014). In the first quarter of 2009, Bank Defendants JP Morgan, Bank of America, and Citigroup collectively earned more than $6 billion in trading revenue from interest-rate derivative positions. *See id.*

[59] UBS, *Re: Consultation Document on the Regulation of Indices* 3 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/ubs_en.pdf.

the predicted market conditions over the length of the swap. For example, for a three-year swap, the counterparty would use bbaLIBOR™'s published rules to predict competitive interbank interest rates over the three-year period and use those predictions to determine the NPV of those interest-rate payments.[60]

62. For example, assume that on January 1, 2014, an OTC dealer offers a three-year swap where the floating rate is indexed to 3-month USD bbaLIBOR™ on a notional $10 million with payment dates at the end of each year. Applying the USD bbaLIBOR™ methodology, a potential counterparty will predict the floating-rate payments on each payment date and then calculate the NPV of those payments. If the NPV of the quoted fixed rate exceeds the NPV of the quoted benchmark, then the swap would be over-priced. In other words, the price of the swap is expressly predicated on the USD bbaLIBOR™ published rules and application of those rules to expected market conditions.

63. Thus, the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS are inextricably intertwined in that: (a) interest-rate benchmarks serve as a component of the prices of interest-rate derivatives and floating-rate loans; (b) interest-rate derivatives and floating-rate loans require a reliable interest-rate benchmark; (c) network effects support adoption of a single standard interest-rate benchmark for interest-rate derivatives, floating-rate loans, and floating-rate MBS; and (d) the value of an interest-rate benchmark is fundamentally determined by its suitability as a pricing component in interest-rate derivatives and floating-rate loans. Holders of floating-rate MBS (whose prices incorporate interest-rate benchmarks) also seek to hedge their risks through interest-rate derivatives (whose prices likewise incorporate interest-rate benchmarks, which further reinforce

[60] *See* Wheatley Final Report, *supra* note 32, at 45.

the network-effect nature of the market for interest-rate benchmarks. The relationship among these product markets is graphically depicted in Figure 2 below.

**Figure 2: Relationship Between Product Markets**




**E. Development of bbaLIBOR™**

64. The origin of bbaLIBOR™ can be traced to 1969, when a Greek banker arranged an $80 million syndicated loan to the Shah of Iran.[61] At the time, lenders in global markets did not have access to a uniform benchmark that would reflect their cost of funds. Instead, lending syndicates offered loans with interest rates that were renegotiated every three or six months to reflect changing market conditions.

65. The banker, who worked for the London branch of Manufacturer's Hanover (now part of JP Morgan), devised a formula whereby a group of major reference banks within each

[61] Kirstin Ridley & Huw Jones, *Insight: A Greek Banker, the Shah and the Birth of Libor*, Reuters (Aug. 7, 2012), http://www.reuters.com/article/2012/08/08/us-banking-libor-change-idUSBRE87702320120808.

syndicate agreed to report their funding costs shortly before a loan rollover date. The weighted average of these rates, rounded to the nearest 1/8th percent plus a spread for profit, became the price of the loan for the next period. The banker named this rate the London interbank offer rate. Within a few years, this version of "Libor" evolved from a measure used to price individual loans to a much broader benchmark for deals worth hundreds of billions of dollars a year. As demand for loans surged, demand for interest-rate derivatives followed.

66. In the mid-1980s, the banks using the informal "Libor" asked the BBA to devise a benchmark to act as a reference point for pricing derivatives and interest-rate swaps, and to make benchmarking more transparent and objective.[62] The BBA agreed and, working with other parties such as the Bank of England, renamed the benchmark bbaLIBOR.

**F. Calculation of bbaLIBOR™**

67. During the 2000s, the BBA licensed bbaLIBOR™ for 15 maturities (from overnight to 12 months) and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Pound Sterling, Japanese Yen, New Zealand Dollar, Swedish Krona, and USD). The BBA's licensees included vendors located in the United States.[63]

68. The BBA represented that it chose the banks, including the Bank Defendants, that would contribute submissions ("Contributor Banks") based on their scale of market activity, credit rating, and perceived expertise in the currency concerned.[64] The BBA stated that it

---

[62] Michael R. Koblenz, et al., *LIBOR: Everything You Ever Wanted to Know But Were Afraid to Ask*, 6 J. Bus., Entrepreneurship & L. 281, 283 (2013), *available at* http://digitalcommons.pepperdine.edu/cgi/viewcontent.cgi?article=1094&context=jbel.

[63] *Licensing*, BBA Libor, http://web.archive.org/web/20111210044943/http://www.bbalibor.com/licencing (last visited Oct. 1, 2014). The BBA's licensing records do not appear to be publicly available. The BBA has access to this license information. Plaintiff Freddie Mac does not.

[64] *The Basics*, BBA Libor, https://web.archive.org/web/20130130191334/http://www.bbalibor.com/bbalibor-explained/the-basics (last visited Oct. 1, 2014). Many, if not all of the Bank Defendants were, during the relevant time period, contributors to other bbaLIBOR™ panels as well as the USD bbaLIBOR™ panel.

intended the selection criteria to show that Contributor Banks would have the best and most accurate knowledge of interbank borrowing costs for each currency. Only the Contributor Banks knew what the rates really were in the opaque interbank loan market.[65]

69. The BBA's published rules (its methodology) governed the way that Contributor Banks were required to determine their submissions, and Contributor Banks purported to agree to abide by those rules in order to remain on the bbaLIBOR™ panel of banks. In 1998, the FX & MM Committee decided that a universal definition of a prime bank could no longer be given and, in response to user demand, changed the definition to the one that was used through the 2000s and continues to exist today: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[66]

70. The published rules required each Contributor Bank to submit rates: (a) without reference to rates contributed by other Contributor Banks; (b) determined by the Contributor Bank's staff primarily responsible for management of a bank's cash, rather than its derivative trading book; (c) without reference to the pricing of any derivative financial instrument; and (d) that represented the rates it "would be offered funds."[67] The BBA intended for these rules to

---

[65] The term "opaque" is often used in financial markets as an antonym for "transparent." Transparent financial markets are those in which much is publicly known about prices and volumes of financial transactions. *See Transparency and Over-the-counter Derivatives*, ISDA, Research Notes, 2009, *available at* http://www.isda.org/researchnotes/pdf/isda-research-notes1.pdf. Transparent financial markets promote price discovery and are therefore considered to be more efficient than opaque markets. Commercial banks have superior access to information in the financial markets and use that information for profit through their activity in OTC derivative markets. *See, e.g.*, U.S. C.F.T.C. Chairman Gary Gensler, Remarks at the OTC Derivatives Reform, Consumer Federation of America Financial Services Conference (Dec. 3, 2009), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-22.

[66] Until 1998, banks submitted quotes to the BBA answering the question: "At what rate do you think interbank term deposits will be offered by one prime bank to another prime bank for a reasonable market size today at 11 am?"

[67] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Div., U.S. Dep't Justice, Appendix A, Statement of Facts ¶ 7 (Dec. 18, 2012) (hereinafter "UBS SOF"), attached as Exhibit 1 and incorporated into this Complaint by reference; *The Basics*, *supra* note 64; *Setting bbalibor*, BBA Libor, https://web.archive.org/web/20120902014345/http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Oct. 1, 2014); *Definitions*, BBA Libor,

show that the inputs to bbaLIBOR™ reflected competitive interest rates in the market for unsecured interbank loans.[68] In its 2010 Annual Report, the BBA identified bbaLIBOR™'s three main strengths as: (1) its simplicity; (2) its transparency (because it purportedly published all of the information needed to understand bbaLIBOR™ including the instructions given to contributing banks); and (3) it was "market led."[69]

71. In addition, the BBA claimed that it was independent of the Contributor Banks and that it would aggressively monitor compliance with the published rules. For example, in 2008, the BBA stated that the bbaLIBOR™ process is overseen by an "independent committee of market participants."[70]

72. Contributor Banks electronically communicated their bbaLIBOR™ submissions every London business day to the BBA's agent, Thomson Reuters, by 11:10 a.m. London Time. The BBA's published rules stated that Contributor Banks were not to know the bbaLIBOR™ rates submitted by other Contributor Banks during this submission window.[71]

73. USD bbaLIBOR™ was calculated by throwing out the four highest and four lowest submissions, and then averaging the remaining eight submissions. This average constituted the bbaLIBOR™ "fixing."[72] Thomson Reuters, as an agent for the BBA, then electronically communicated the bbaLIBOR™ fixings to licensees, including the Wall Street

---

https://web.archive.org/web/20130205220303/http://www.bbalibor.com/bbalibor-explained/definitions (last visited Oct. 1, 2014).

[68] Wheatley Final Report, *supra* note 32, at 55. One of the key characteristics for a credible benchmark rate is that the benchmark should "clearly convey the economic realities of the underlying interest it seeks to measure to its users." IOSCO Consultation Report, *supra* note 42, at 10.

[69] BBA, 2010 Annual Report, *supra* note 3, at 25.

[70] BBA, *Understanding the Construction and Operation of BBA LIBOR* 1 (June 10, 2008), *available at* http://www.aciforex.org/docs/markettopics/20080610__BBA_comments_on_Libor_fixing.pdf.

[71] *Id*.

[72] In the parlance of commercial banks, a rate submission for LIBOR was referred to as a "submission" and the LIBOR rate that the BBA published was known as the "fixing."

Journal, and Bloomberg News by midday, London Time.[73] The Wall Street Journal and Bloomberg News published bbaLIBOR™ 24 hours after the BBA first published it. The individual bbaLIBOR™ submissions for each Bank Defendant were also transmitted through the BBA's licensed data vendors. Figure 3 below presents the BBA's graphic depiction of the bbaLIBOR™ process.[74]

**Figure 3: bbaLIBOR™ Processes**




## G. bbaLIBOR™ Governance

74. Through 2010, the FX & MM Committee had sole responsibility for all aspects of the functioning and development of bbaLIBOR™.[75] Thirteen "active market practitioners"

---

[73] *See Frequently Asked Questions (FAQs)*, *supra* note 14.

[74] *The Basics*, *supra* note 64.

[75] *See, e.g.*, Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; U.K. House of Commons Treasury Comm., *Fixing LIBOR: Some Preliminary*

comprised the FX & MM Committee.[76] The BBA claimed that the FX & MM Committee was an "independent body."[77] The BBA did not disclose the names of the members of the FX & MM Committee,[78] but UBS and RBS have both admitted in connection with their settlements with government regulators that they had representatives on the FX & MM Committee.[79] On information and belief, other Bank Defendants also served on the FX & MM Committee. The chair and two deputy chairs of the FX & MM Committee were representatives from Contributor Banks.[80] FX & MM Committee members met at least every two months at undisclosed locations to discuss bbaLIBOR™.[81] The FX & MM Committee did not publish official minutes.[82]

75. The BBA employed a full-time manager to supervise on a day-to-day basis all aspects of bbaLIBOR™'s calculation and dissemination to the marketplace. The manager was purportedly responsible for ensuring that all bbaLIBOR™ processes met the highest standards. The bbaLIBOR™ manager acted as an executive on the FX & MM Committee and was responsible for informing the FX & MM Committee about issues pertaining to bbaLIBOR™. The BBA and its agents monitored the Contributor Banks' individual submissions in real-time.

---

*Findings*, Second Report of Session 2012-13, Vol. I, at 5 (Aug. 18, 2012), *available at* http://www.publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/481.pdf.

[76] *Understanding BBA LIBOR*, BBA Libor, https://web.archive.org/web/20130511195637/http://www.bba.org.uk/media/article/understanding-bba-libor (last visited Oct. 1, 2014).

[77] *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny: Proposals Agreed by the FX & MM Committee § 1.6 (Nov. 17, 2008), *available at* www.bbalibor.com/download/4025.

[78] Enrich & Colchester, *supra* note 13.

[79] UBS SOF, *supra* note 67, ¶ 85; Fin. Servs. Auth., Final Notice to UBS AG ¶ 122 (Dec. 19, 2012), attached as Exhibit 2 and incorporated into this Complaint by reference; Fin. Servs. Auth., Final Notice to the Royal Bank of Scotland ¶ 89 (Feb. 6, 2013) (hereinafter "RBS Final Notice"), attached as Exhibit 3 and incorporated into this Complaint by reference.

[80] LIBOR Governance and Scrutiny, *supra* note 77, § 1.11.

[81] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg (Aug. 21, 2012), http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[82] *Id.*

When one Contributor Bank submitted rates that seemed out of line with other submissions, the BBA or its agents would contact the outlier Contributor Bank to "confirm" the submission—for example, "Everyone else is coming in a good bit under that."[83]

76. In April 2005, the BBA hired John Ewan, a 29-year-old financial researcher with a biology degree and no apparent prior experience managing a financial benchmark, to serve as the bbaLIBOR™ manager.[84] Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has claimed that he was hired to put bbaLIBOR™ on a secure commercial footing and that in his first two years he increased revenue more than tenfold, introduced new products, obtained European Union, United States and Japanese trademarks for bbaLIBOR™, and successfully negotiated contracts with the derivatives exchanges, all of the major data vendors, and hundreds of other users.[85]

77. Mr. Ewan claims that he was responsible for developing and maintaining relationships with all stakeholders in bbaLIBOR™, including keeping them apprised of changes to the benchmark and the markets it tracks.[86] Mr. Ewan also claims to have cultivated "excellent relationships at a senior level" with most major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[87]

78. On January 1, 2010, more than a year after learning that regulators were investigating bbaLIBOR™ (but long before the information was publicly available), the BBA

---

[83] Donald MacKenzie, *What's in a Number?*, London Rev. Books, Sep. 25, 2008, at 11-12, *available at* http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number.

[84] *John Ewan Public Profile*, LinkedIn, https://www.linkedin.com/pub/john-ewan/5/490/627 (last visited Oct. 1, 2014). Mr. Ewan left the BBA in the summer of 2012.

[85] Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012, http://www.thesun.co.uk/sol/homepage/news/money/4441913/Mr-Libor-quits.html.

[86] *John Ewan Public Profile*, *supra* note 80.

[87] *Id*.

modified its structure. It created a new entity, BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark. As noted above, one report suggested that the BBA created BBA LIBOR, Ltd. to limit the BBA's liability for expected claims relating to bbaLIBOR™. The FX & MM Committee continued to oversee bbaLIBOR™. Despite this change in structure, the processes and procedures followed by Contributor Banks and the BBA in calculating and publishing bbaLIBOR™ remained the same.

79. On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in bbaLIBOR™ rate setting. As Martin Wheatley, head of the United Kingdom's Financial Services Authority ("FSA"), explained at the time, "the BBA acts as the lobby organisation for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[88] In February 2013, the BBA agreed to cede control of bbaLIBOR™ to a new operator. On January 31, 2014, the BBA handed over responsibility for the administration of bbaLIBOR™ to Intercontinental Exchange Benchmark Administration, Ltd.[89]

**H. Defendants' Knowledge of bbaLIBOR™'s Importance**

80. As evidenced by the following quote from the BBA, Defendants understood the importance of bbaLIBOR™ to the global economy and actively promoted bbaLIBOR™ as a key benchmark rate.

> BBA LIBOR is by far the most widely referenced interest rate index in the world. Its importance goes beyond that of inter bank lending and touches everyone from large international conglomerates to small borrowers. It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR. Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA

[88] Wheatley Final Report, *supra* note 32, at 21.

[89] *Disclaimer*, BBA Libor, http://www.bbalibor.com/disclaimer (last visited Oct. 1, 2014).

> LIBOR. It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges. It is written into standard derivative and loan documentation such as the ISDA terms and is also used for an increasing range of retail products.[90]

81. Financial instruments that incorporated USD bbaLIBOR™ were priced based on the express understanding that Defendants would adhere to the BBA's published methodology for the benchmark. Market participants, including Freddie Mac, reasonably relied on Defendants' representations that bbaLIBOR™ was, and would be, honestly and reliably calculated according to the published rules. Indeed, the BBA acknowledged in 2008 that bbaLIBOR™ "has always been relied on by the market as a reliable benchmark" of borrowing costs.[91]

82. Defendant Barclays has admitted that each bbaLIBOR™ submission conveyed information to market participants about the Contributor Bank's costs of borrowing unsecured funds, the liquidity conditions and stress in the money markets, and each Contributor Bank's ability to borrow funds in particular markets.[92] Defendant Barclays further admitted that the market information conveyed by bbaLIBOR™ submissions "affect[ed] or tend[ed] to affect the prices" of financial products that incorporated bbaLIBOR™ as the interest-rate benchmark.[93]

83. Because a Contributor Bank's bbaLIBOR™ submissions should correspond to the cost of money for that Contributor Bank, market participants could perceive a Contributor Bank's bbaLIBOR™ submission as an indicator of that Contributor Bank's financial health and liquidity. For example, if a Contributor Bank's bbaLIBOR™ submission was relatively high as

---

[90] *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 70, at 3.

[91] Press Release, BBA, Libor Gets Enhanced Governance and Scrutiny Procedures (Dec. 17, 2008), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-gets-enhanced-governance-and-scrutiny-procedur.

[92] *See In re Barclays plc*, No. 12-25, 2012 WL 2500330, at *22 (C.F.T.C. June 27, 2012).

[93] *Id.*

compared to other Contributor Banks, that submission would have suggested that the Contributor Bank presented a credit risk and had potential liquidity problems. Commercial banks with liquidity problems have trouble attracting business and could find themselves prohibited from working with institutions such as Freddie Mac.

84. Because the Contributor Banks were purportedly among the world's largest and most financially sound commercial banks, market participants valued bbaLIBOR™ as a floor for the borrowing rate of other less creditworthy institutions and individuals.[94]

85. Though bbaLIBOR™ developed into the industry standard, other reference rates existed throughout the relevant period. For example, brokers such as Tullet Prebon and Tradition Financial Services provided data on various interest-rate benchmarks, as did the data providers Bloomberg and Depository Trust & Clearing Corp. ("DTCC").

86. In March 2012, the BBA responded to published reports about an investigation into bbaLIBOR™ by insisting that it and the Contributing Banks were "committed to the continuing evolution of Libor so that it adapts to meet the changing market and user requirements and general expectations."[95] The BBA quoted Ian Mair, then Chairman of the London Money Market Association, as saying "It is important that all market participants ***have a choice*** of benchmarks."[96] Following Barclays' admission of bbaLIBOR™ manipulation, the

[94] David Hou & David Skeie, Fed. Res. Bank of N.Y., LIBOR: Origins, Economic Crisis, Scandal, and Reform 3 (March 2014), *available at* http://www.ny.frb.org/research/staff_reports/sr667.pdf.

[95] LIBOR—Update, *supra* note 39.

[96] *Id.* (emphasis added).

BBA again stated that it was committed to providing a benchmark that had the support of all users.[97]

87. Following Barclays' disclosure, multiple providers have sought to enter the market for interest-rate benchmarks, such as the DTCC, which offers the General Collateral Finance ("GCF") Repo Index (which has gained the support of numerous market participants). This restored competition in the market for interest-rate benchmarks has also led to the introduction of new financial products, such as futures and options contracts linked to repo rate indices and overnight indexed swap ("OIS") rates.

## FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™

### A. Systematic bbaLibor™ Depression

88. In 2007, the United States economy endured a housing correction. As a result, the market found itself unable to value certain illiquid assets, while creditors demanded additional collateral for secured short-term wholesale funds and became increasingly reluctant to offer unsecured short-term funding. One major financial institution, UK-based Northern Rock, collapsed in late 2007 when it was unable to roll over the short-term funding on which it relied to finance its operations. These events increased the demand for, and reduced the supply of, cash.

89. Many of the Bank Defendants faced some of the same problems that Northern Rock faced in that they held illiquid assets and relied on short-term wholesale funding to meet their regular obligations. During this time, many of the Bank Defendants were net borrowers, meaning that they financially benefited from reductions in short-term interest rates. For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from

---

[97] Press Release, BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor (Aug. 18, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-statement-regarding-the-treasury-committees-prelim.

trades tied to bbaLIBOR™ because bbaLIBOR™ was lower than predicted by competitive market forces (and, lower than bbaLIBOR™ would have been had it been calculated according to its published methodology).[98] Similarly, Bank of America reported that it was "liability sensitive to LIBOR" and net interest income would increase substantially if short-term interest rates fell by 100 basis points while long-term rates remained the same.[99] Bank of America further stated that it held a notional amount of more than $50 billion in receive fixed/pay floating interest-rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive floating interest-rate swaps.[100]

90. On Thursday, August 9, 2007, the Bank Defendants submitted overnight USD bbaLIBOR™ rates that were significantly higher than the prior day. Overnight USD bbaLIBOR™ rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD bbaLIBOR™ at its highest level since 2001. Because these increases were not coincidental with changes in the rates charged by central banks, the media speculated that the increase in USD bbaLIBOR™ indicated that the Bank Defendants were afraid to lend to each other and that major losses for Bank Defendants and others were on the horizon.

91. On August 9, 2007, after the bbaLIBOR™ submissions were electronically published for that day, a UBS executive sent an internal email to a senior manager, a manager, and others stating that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets. Fixing risk and [profit and loss] thereof is

[98] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

[99] Bank of Am., 2008 Annual Report, at 88-90 (2008), *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

[100] *Id.* at 91 tbl.42.

secondary priority for now."[101] UBS employees understood this secret directive to apply to all bbaLIBOR™ currencies.[102]

92. By August 16, 2007, all of the Bank Defendants dropped their submissions significantly. The initial differences were consistent with the fact that the Bank Defendants had different credit ratings and presented different risks for unsecured short-term wholesale lenders.[103] UBS, for example, lowered its overnight USD bbaLIBOR™ submission by 90 basis points. Figure 4 below plots the overnight USD bbaLIBOR™ submissions for the Bank Defendants from August 7, 2007 through August 28, 2007. As can be seen in Figure 4, bbaLIBOR™ submissions showed significant differences in early August but then showed significant uniformity by the end of the month. This pattern is consistent with allegations that the Bank Defendants began colluding on USD bbaLIBOR™ in August 2007.

[101] UBS SOF, *supra* note 67, ¶ 105.

[102] *Id.* ¶ 108.

[103] *See, e.g.*, Wheatley Final Report, *supra* note 32, at 79 ("[I]t could be argued that, in the current environment inter-bank lending rates are dominated by credit risk and there is a large dispersion in the perceived creditworthiness of banks.").

**Figure 4: Overnight USD bbaLIBOR Submissions**




93. During this same time period, the BBA issued a press release titled "Key Facts about LIBOR" in which the BBA falsely stated that bbaLIBOR™ "closely reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."[104]

94. On August 20, 2007, RBS' London-based head of money markets trading and the person responsible for USD bbaLIBOR™ submissions, Paul Walker, reportedly telephoned RBS' head of short-term markets for Asia, Scott Nygaard, in Tokyo, to discuss how banks were

[104] Press Release, BBA, Key Facts About BBA LIBOR (Aug. 10, 2007), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-falls-on-central-bank-intervention/.

using bbaLIBOR™ to profit on its movements rather than submitting rates that honestly reflected their perceived costs of borrowing. Mr. Walker is quoted as telling Mr. Nygaard: "People are setting to where it suits their book. . . . LIBOR is what you say it is."[105] Senior RBS managers reportedly knew that, at least as of August 2007, the Bank Defendants were systematically rigging LIBOR.[106]

95. Also in August 2007, senior managers at Barclays instructed their USD bbaLIBOR™ submitters to lower their USD bbaLIBOR™ submissions so that they would stay "within the pack" and be nearer to the depressed rates of other Bank Defendants rather than rates that were consistent with the BBA's definition of bbaLIBOR™.[107] In one internal Barclays email, a Barclays employee noted that Lloyds' USD bbaLIBOR™ submission was artificially low.[108] Similarly, in October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[109]

96. Barclays' directive to stay "within the pack" with other Bank Defendants remained in place, and was repeated, through at least 2009. Barclays has admitted that its USD bbaLIBOR™ submissions were false because they were lower than what Barclays would otherwise have submitted and contrary to the definition of bbaLIBOR™.[110]

---

[105] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg (Dec. 13, 2012), http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

[106] *Id.*

[107] Nonprosecution Agreement Between U.S. Dep't of Justice, Criminal Div. Fraud Section and Barclays Bank plc, Appendix A, ¶ 37 (June 26, 2012) (hereinafter "Barclays SOF"), attached as Exhibit 4 and incorporated into this Complaint by reference.

[108] Email to Pat Leising (Aug. 28, 2007, 11:27), attached as Exhibit 5 and incorporated into this Complaint by reference.

[109] Email to Jason Miu (Oct. 3, 2007, 07:34), attached as Exhibit 6 and incorporated into this Complaint by reference.

[110] Barclays SOF, *supra* note 107, ¶ 36.

97. On November 29, 2007, a Barclays manager contacted a representative of the BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the Bank Defendants.[111] The Barclays manager explained that the Bank Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."[112] The Barclays manager specifically identified certain other Bank Defendants that were submitting bbaLIBOR™ rates lower than where those banks could actually get funds.[113]

98. On November 30, 2007, a representative of Barclays and the FSA had a private discussion. The Barclays representative internally wrote that he did not disclose to the FSA that "'we're not posting where we think we should.'"[114] On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that s/he was submitting Dollar LIBOR "lower than s/he would have set if given a 'free hand,'" and that the Bank Defendants, including Barclays, were submitting false and dishonest submissions.[115]

99. On March 5, 2008, the FSA asked Barclays what it was paying for funding in certain currencies.[116] A Barclays manager stated internally that s/he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to bbaLIBOR™.[117] A Barclays bbaLIBOR™ submitter agreed that if s/he responded

---

[111] *Id.* ¶ 43.

[112] *Id.*

[113] *Id.*

[114] *Id.* ¶ 45.

[115] *Id.*

[116] *Id.* ¶ 46.

[117] *Id.*

with "the honest truth" it might open a "can of worms."[118] Barclays responded to the FSA that it was paying for one-year USD at bbaLIBOR™ "flat," which was untrue.[119]

100. On April 11, 2008, a Barclays employee told an employee of the Federal Reserve Bank of New York ("NY Fed") that he was aware of Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[120] The Barclays employee said that Barclays could not borrow money at the rates submitted by other Bank Defendants and that "if we can't borrow money at that rate, then no one else could really. . . . I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[121]

101. On Wednesday, April 16, 2008, the Wall Street Journal published an article questioning the accuracy of bbaLIBOR™.[122] The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we will take action to preserve the reputation and standing in the market of our rates."[123] The article states that bbaLIBOR™ was to be on the agenda of an upcoming BBA board meeting.[124]

---

[118] *Id.*

[119] *Id.*

[120] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the N.Y. Fed*, Apr. 11, 2008, at 7, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/ibor/April_11_2008_transcript.pdf, *attachment to* Press Release, Fed. Reserve Bank of N.Y., New York Fed Responds to Congressional Request for Information on Barclays - LIBOR Matter (July 13, 2012), http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html (hereinafter "N.Y. Fed Press Release").

[121] *Id*. at 16.

[122] Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299.html.

[123] *Id.*

[124] *Id.*

102. Over the next week, the BBA launched what its executives internally described as a "charm offensive,"[125] reaching out to investors and journalists to dispel concerns about bbaLIBOR™. For example, on April 17, 2008 the BBA publicly announced that it would expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions.[126] The BBA stated that it would fast-track an "intensive review" of its bbaLIBOR™ process, but that it did not believe that Contributor Banks had submitted false quotes.[127]

103. On information and belief, the purpose of this "charm offensive" was not to address the fraud and collusion causing USD bbaLIBOR™ depression but rather to create the false impression that the Bank Defendants provided accurate and honest USD bbaLIBOR™ submissions.

104. In May 2008, the New York Fed stated that "it is difficult to find convincing evidence of actual [LIBOR] misreporting."[128]

105. During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the bbaLIBOR™ process was being distorted.[129] Mr. Ewan reportedly told Thomson Reuters that he would investigate its concerns.[130] There is no public evidence that he did.

---

[125] Enrich & Colchester, *supra* note 13.

[126] UBS SOF, *supra* note 67, ¶ 114.

[127] Carrick Mollenkamp & Laurence Norman, *British Bankers Group Sets Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833.html.

[128] Samuel Cheun & Matt Raskin, MarketSource, Recent Concerns Regarding LIBOR's Credibility 3 (May 20, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/MarketSource_Report_May202008.pdf.

[129] Ian Pollock, *Libor: BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC (July 25, 2012), http://www.bbc.co.uk/news/business-18930191.

[130] *Id.*

106. On May 19, 2008, the FX & MM Committee met to discuss questions raised about bbaLIBOR™. The meeting was "confidential" and the BBA refused to admit that it took place.[131] Senior bank executives described this gathering as a "working level pre meeting" to determine what should happen at the BBA's formal meeting scheduled for May 30, 2008.[132] Contributor Bank executives reportedly decided that they would make no substantive changes to the way bbaLIBOR™ was calculated, but would instead embark on a false and misleading publicity campaign to cover up the truth.[133]

107. In May 2008, the broker ICAP plc announced it intended to create an alternative index of interbank lending rates called the New York Funding Rate ("NYFR"). According to ICAP, the NYFR would be determined by an anonymous survey of at least 24 banks (potentially including the Bank Defendants). ICAP would ask participants each morning to estimate the cost of funding for one- and three- month loans to a "representative" bank. NYFR would be calculated using the quotes of the middle half of that group.[134] The BBA's Chief Executive, Angela Knight, was quoted as saying in a May 12, 2008 interview: "We have had contact with ICAP and they have assured us that this is complementary, and in no way were they intending to

---

[131] Email from Angela Knight to Paul Tucker (May 21, 2008, 4:40 PM), attached as Exhibit 7 and incorporated into this Complaint by reference. Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

[132] Email from Paul Tucker (May 28, 2008, 4:36 PM), attached as Exhibit 8 and incorporated into this Complaint by reference.

[133] *Id.*

[134] Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable,'* Bloomberg (May 14, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio.

do something competitive to Libor."[135] The Bank Defendants, and other members of the BBA, were among ICAP's most important customers at the time.[136]

108. On May 29, 2008, the Wall Street Journal published another article questioning USD bbaLIBOR™ submissions made by Citigroup, WestLB, HBOS, J.P. Morgan, UBS, and other Bank Defendants.[137] Numerous Bank Defendants disputed the Wall Street Journal's analysis. The head of global fixed-income strategy at J.P. Morgan, for example, asserted that the Wall Street Journal's methodology was flawed because it was "based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank borrowing costs."[138] A Citigroup spokesman said, "We continue to submit our LIBOR rates at levels that accurately reflect our perception of the market."[139] WestLB insisted that it provided accurate data.[140]

109. An HBOS spokesman said in late May 2008, "We believe our Libor fixings are a genuine and realistic indication of our average cost of funding. Our postings are on the whole in line with the market."[141] Defendant HBOS has since admitted in connection with its settlement

---

[135] *Id.*

[136] ICAP, Annual Report 2008, at 3 (2008), *available at* http://www.icap.com/~/media/Files/I/Icap-Corp/Annual%20Reports/annual-report2008.pdf. ICAP obtained 42% of its revenue from brokering interest-rate derivative transactions. *Id.* at 20. It obtained another 37% of its revenue from brokering transactions in foreign exchange rate derivatives, commodities derivatives, and credit derivatives. *Id.* ICAP earned 43% of its revenues from its top 10 customers. ICAP, Morgan Stanley European Financials Conference (Apr. 2, 2009), *available at* http://www.icap.com/investor-relations/reports-and-presentations/~/media/Files/I/Icap-Corp/reports-and-presentations/year-2009-10/morgan-stanley-2009.pdf. Defendants possessed enormous market power in all of these markets.

[137] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135.html. The article also stated as follows: "The Journal's analysis doesn't prove that banks are lying or manipulating Libor. Analysts offer various reasons why some banks might report Libor rates lower than what other markets indicate." *Id.*

[138] *Id.*

[139] John Parry et al., *Banks May Be Understating Key Lending Rate: Report*, Reuters (May 29, 2008), http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[140] *Id.*

[141] *Id.*

with government regulators that, just weeks before the HBOS spokesman's announcement, an HBOS senior manager wrote an internal email admitting that the Bank Defendants were effectively required to coordinate because "no bank can be seen to be an outlier," including HBOS.[142] HBOS' public statement in late May 2008 appears to have been an intentional misrepresentation. Only the other Bank Defendants and the BBA could have known of this misrepresentation.

110. These pretextual explanations and/or denials were materially false and intended to conceal the fact that the Bank Defendants were fraudulently and collusively depressing USD bbaLIBOR™. Many published reports also attributed movements in bbaLIBOR™ rates to factors other than the fraud and collusion alleged in this Complaint.[143]

111. In another article published on May 29, 2008, the BBA insisted: "We have every confidence in the integrity of the LIBOR-setting process and the accuracy of the figures it produces."[144] The BBA knowingly issued a false statement because it knew that the Bank

[142] *In re Lloyds Banking Group plc*, No. 14-18, at 14 (C.F.T.C. July 28, 2014) (hereinafter "Lloyds CFTC Order"), attached as Exhibit 9 and incorporated into this Complaint by reference.

[143] *See, e.g.*, Int'l Monetary Fund, Global Financial Stability Report: Financial Stress and Deleveraging 72 (Oct. 2008), *available at* http://www.imf.org/External/Pubs/FT/GFSR/2008/02/pdf/chap2.pdf (concluding in October 2008 that the "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding"); Gillian Tett & Michael Mackenzie, *Debate Over Libor Breeds a Crisis of Confidence*, Fin. Times, Apr. 28, 2012, http://www.ft.com/cms/s/0/240c311a-1004-11dd-8871-0000779fd2ac.html#axzz3Dm3mmPpK ("It seems unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down."); *Update 2-European, U.S. Bankers Work on Libor Problems*, Reuters (May 16, 2008), http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516 ("There's more wind being made about [the Libor] issue than is being merited by the facts . . . Libor will retain its present function for the foreseeable future . . . . Due to capital pressures not seen for decades[,] . . . Libor rates . . . are historically high." (internal quotation marks omitted)).

[144] Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.

Defendants had been submitting false and dishonest rates, and that the BBA had helped to coordinate the Bank Defendants' unlawful agreements.[145]

112. After its formal meeting on May 30, 2008, the BBA announced that it would be strengthening the oversight of bbaLIBOR™ and that "the details will be published in due course."[146] The unidentified attendees at the May 30, 2008 BBA meeting signed confidentiality agreements limiting their ability to disclose what was discussed.[147] In fact, on information and belief, the Defendants intended only to make minor cosmetic changes to the bbaLIBOR™ process. The BBA shared its proposed changes with the Bank of England, which internally concluded that the BBA's proposal was "wholly inadequate."[148]

113. On June 10, 2008, the BBA issued a press statement asserting that Contributor Banks "are invariably those with the best credit ratings and in the current diminished credit capacity of the market it is therefore not surprising that some institutions will not be able to access funds at the LIBOR rate."[149] The BBA statement claimed that it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified. In fact, on information and belief, the BBA's statement was false and Defendants did not intend to employ a tight scrutiny mechanism but, rather, intended to allow the Bank Defendants to continue to fraudulently and collusively depress USD bbaLIBOR™.

[145] *Id.*; Mollenkamp & Whitehouse, *supra* note 137 (As with its April 2008 article, the Wall Street Journal cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor.").

[146] *International: Libor Process*, N.Y. Times, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html (last visited Oct. 1, 2014).

[147] Email from Angela Knight to Paul Tucker (May 31, 2008, 4:09 PM), attached as Exhibit 10 and incorporated into this Complaint by reference.

[148] Transcript of Governor's written comments, Email to Governors—GPS (May 30, 2008, 19:06), attached as Exhibit 11 and incorporated into this Complaint by reference.

[149] *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 70, at 1.

114. On August 5, 2008, the BBA represented that Contributor Banks which had responded to the BBA's request for consultation were "confident" that their submitted rates were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark, with contributors inputting rates that they believe reflect their future funding costs."[150] The FX & MM Committee stated that, based on its supposed independent review of responses and investigation, it "believes that current submissions are accurate." On information and belief, by this statement Defendants further sought to falsely portray the bbaLIBOR™ "dislocations" as the product of market forces and not fraud and collusion.

115. HBOS has since admitted that on August 8, 2008, one of its senior managers internally circulated a presentation that said, among other things, "As a bank we must be extremely careful about the rates we pay in different markets for different types of funds as paying too much risks not only causing a re-pricing of all short-term borrowings but, more importantly in this climate, may give the impression of HBOS being a desperate borrower and so lead to a general withdrawal of wholesale lines."[151] HBOS submitters knew at least by that time, that its bbaLIBOR™ submissions had to be coordinated with other Bank Defendants, notwithstanding the bbaLIBOR™ rules.

116. BBA officials later internally discussed the possibility of selling bbaLIBOR™ or spinning it off into a wholly independent entity, but when BBA staffers pitched the idea to the Bank Defendant executives, they reportedly understood that the Bank Defendants—which paid

---

[150] BBA, Libor Consultation Feedback Statement ¶¶ 3.14, 3.19 (Aug. 5, 2008), attached as Exhibit 12 and incorporated into this Complaint by reference.

[151] Lloyds CFTC Order, *supra* note 142, at 14.

many of the BBA's bills through their membership fees—wanted bbaLIBOR™ kept in-house so that they could continue to influence it.[152] As a result, the idea ultimately was abandoned.

117. Ms. Knight, then head of the BBA, was heard to argue with Mr. Ewan about bbaLIBOR™.[153] Ms. Knight reportedly wanted to scale back the BBA's role and took the position that bbaLIBOR™ had become too big for her organization to manage.[154] Mr. Ewan, on the other hand, reportedly advocated further expansion, touting the revenue that the BBA generated from bbaLIBOR™.[155]

118. In September 2008, an internal UBS discussion confirmed that the Bank Defendants were continuing to make artificially low bbaLIBOR™ submissions. In a documented discussion, a UBS employee admitted that, "LIBORs currently are even more fictitious than usual."[156] On September 18, 2008, Lloyds announced the terms of an offer to acquire HBOS. In late September, HBOS' USD bbaLIBOR™ submitter increased its submissions to more closely align with the published bbaLIBOR™ rules. On September 26, 2008, the submitter's supervisor told the submitter that HBOS USD bbaLIBOR™ submissions should be lower relative to other panel members.

119. In a recorded electronic chat that day, the HBOS submitter wrote to an employee of another financial institution (the identity of this institution has not been disclosed) that "youll like this ive been pressured by senior management to bring my rates down into line with

[152] Enrich & Colchester, *supra* note 13.

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] UBS SOF, *supra* note 67, ¶ 101.

everyone else."[157] Consistent with the management directive, the HBOS USD bbaLIBOR™ submitter began submitting lower rates again.

120. Throughout this time, HBOS management also directed employees not to make bids for cash in the wholesale funding market above the rate of the daily bbaLIBOR™ rate. This instruction reinforced the supervisor's prior direction that HBOS should not be an outlier in the bbaLIBOR™ submissions, regardless of the published bbaLIBOR™ rules.

121. On October 10, 2008, a Barclays employee privately reported to the New York Fed that its USD bbaLIBOR™ submissions were "unrealistic."[158] On October 24, 2008, another Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish,"[159] citing submissions by WestLB and Deutsche Bank as being too low. The employee told the NY Fed that he was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[160] Publicly, however, Barclays and other Bank Defendants continued to falsely represent that bbaLIBOR™ was based on accurate and honest submissions.[161]

---

[157] Lloyds CFTC Order, *supra* note 142, at 15.

[158] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 10, 2008, at BARC-MAY6-000095, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_10_2008_transcript.pdf, *attachment to* N.Y. Fed Press Release, *supra* note 120.

[159] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 24, 2008, at 000098, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_24_2008_transcript.pdf, *attachment to* N.Y. Fed Press Release, *supra* note 120.

[160] *Id.* at 000100.

[161] Public disclosures reveal that certain derivatives traders employed by the Bank Defendants routinely asked their bbaLIBOR™ submitters to provide false and dishonest bbaLIBOR™ submissions to the BBA. *See* UBS SOF, *supra* note 67, ¶ 19; Barclays SOF, *supra* note 107, ¶ 11; *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A ¶ 14 (Feb. 5, 2013) (hereinafter "RBS SOF"), attached as Exhibit 13 and incorporated into this Complaint by reference. The bbaLIBOR™ submitters for these Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable bbaLIBOR™ submissions on hundreds, and perhaps thousands, of occasions. Barclays SOF, *supra* note 107, ¶ 11; UBS SOF, *supra* note 67, ¶ 20; RBS SOF, *supra* note 161, ¶¶ 14-15, 19. Over a period of years, a culture of collusion developed that ultimately led to Defendants' systematic bbaLIBOR™ depression discussed above. *See, e.g.*, Editors, *Libor Gives Prosecutors Chance to Change Banking Culture*, Bloomberg (Sept. 24, 2012), http://www.bloomberg.com/news/2012-09-

122. The conspiracy to depress bbaLIBOR™ superseded the prior and ongoing efforts of individual traders to manipulate bbaLIBOR™ to benefit their individual trading positions.[162] For example, UBS management on several occasions received requests from individual traders to deviate slightly from the systematic depression to manipulate a particular submission for Japanese Yen bbaLIBOR™ on a given day.[163] On information and belief, those requests were rejected and/or did not prevent USD bbaLIBOR™ depression.

**B. Harmful Effects of the Unlawful Conduct**

123. By submitting and publishing interbank lending rates that were determined by collusion rather than competition, the Bank Defendants interfered with the competitive process in the markets for short-term wholesale funding, USD interest-rate benchmarks, USD interest-rate derivatives, floating-rate loans to businesses and consumers ("retail loans"), floating-rate MBS, and other products that incorporated USD bbaLIBOR™.

124. When they do not collude, banks compete for cash based on the interest rates that they pay.[164] As noted above, the interest rate that a borrower is willing to pay, and a lender is willing to accept, is determined in large part by the borrower's credit standing and liquidity. In a competitive environment, less creditworthy banks are incentivized to become more efficient and

---

24/libor-gives-prosecutors-chance-to-change-banking-culture.html. Through coordination with Bank Defendants, on information and belief, these traders improved their efforts to fraudulently and collusively manipulate bbaLIBOR™. *See* Barclays SOF, *supra* note 107, ¶¶ 23-24. Defendants Barclays, UBS, RBS, Rabobank, Lloyds, and HBOS all admit that they submitted false and misleading bbaLIBOR™ submissions to the BBA, and that the bbaLIBOR™ fixings published by and through the BBA were materially false and misleading. Barclays SOF, *supra* note 107, ¶ 33; RBS SOF, *supra* note 161, ¶ 81; UBS SOF, *supra* note 67, ¶ 97. On information and belief, other Panel Defendant Banks engaged in the same type of conduct that Barclays, UBS, and RBS have admitted occurred.

[162] UBS SOF, *supra* note 67, ¶¶ 132-133.

[163] *Id.*

[164] *See e.g.*, Citigroup, Citi Annual Report 2009, at 262 (2009), *available at* http://www.citigroup.com/citi/fin/data/ar09c_en.pdf (Citigroup "actively competes for access to capital at competitive rates to fund its operations, including competition for deposits and funding in the short- and long-term debt markets.").

shed risk to compete more effectively.[165] For example, in 2007 and 2008, absent collusion, Barclays should have responded to concerns about its credit risk and liquidity by competing on the merits to improve its balance sheet, and not entering into a secret agreement with other Bank Defendants to hide their respective financials, abilities to obtain funds, and the interest rates they had to pay to obtain those funds. This fraud and collusion are precisely what the antitrust laws are designed to prevent.

125. In addition, Defendants' fraudulent and collusive conduct artificially biased the competitive process for USD interest-rate derivatives and floating-rate MBS in favor of the Bank Defendants. As shown above, prices for OTC USD interest-rate derivatives and floating-rate MBS were set based on the expectation that Defendants would determine USD bbaLIBOR™ according to the published rules and governance mechanisms. By secretly agreeing to depress USD bbaLIBOR™, the Bank Defendants obtained a competitive advantage over their counterparties that artificially inflated the margins that the Bank Defendants would earn in transactions for USD pay-fixed interest-rate swaps and floating-rate MBS.

126. Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™. From at least 1992, USD bbaLIBOR™ was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board from 2002-2006.[166] Eurodollars are time deposits

---

[165] Xavier Freixas et al., Fed. Reserve Bank of N.Y. Staff Reports, Bank Liquidity, Interbank Markets, and Monetary Policy (May 2009) (revised Sep. 2009), *available at* http://www.newyorkfed.org/research/staff_reports/sr371.pdf.

[166] *Ask Dr. Econ*, Fed. Res. Bank of S.F. (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

in USD held in commercial banks outside the United States, primarily London. Eurodollar futures contracts, based on a notional $1 million three-month deposit, are traded on the CME.[167]

127. In other words, prior to Defendants' fraud and collusion, a Eurodollar futures contract provided an estimate of USD bbaLIBOR™ in the future for the given maturity. The Eurodollar Bid Rate represents the interest rate at which a bank would offer to lend money to another bank, while bbaLIBOR™ can be seen as the rate at which a Panel Bank would ask to pay.[168] As a result, one would expect to see a small bid (Eurodollar)/ask (LIBOR) spread as reflected in the relationship that existed from 1992 through 2006.[169] From 1992 through 2007, the Eurodollar Bid Rate reportedly was a better predictor than bbaLIBOR™ rates of the following day's bbaLIBOR™ rates.[170]

128. The relationship between the Eurodollar Bid Rate and bbaLIBOR™ fundamentally changed in the summer of 2007, with bbaLIBOR™ rates falling below the Eurodollar Bid Rate, sometimes dramatically, through late 2011. These data confirm that the Bank Defendants' behavior changed in 2007 with regard to USD bbaLIBOR™ submissions at the same time that UBS, Barclays, RBS, and (on information and belief) other Bank Defendants secretly adopted policies to depress bbaLIBOR™ and maintain submitted rates within a narrow range. From at least 2007 through at least May 2010, every one of the Bank Defendants submitted USD bbaLIBOR™ submissions that were significantly lower than the Eurodollar Bid Rate.

---

[167] Barclays SOF, *supra* note 107, ¶ 9.

[168] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* 3, 7 (Apr. 10, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

[169] *Id.* at 7.

[170] *Id.* at 8.

**Figure 5: Difference Between 3M USD bbaLIBOR and 3M Eurodollar Bid Rate**




129. On a Defendant-by-Defendant basis, the average USD bbaLIBOR™/Eurodollar Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to 35 basis points (J.P. Morgan, WestLB).[171] Notably, there appears to be no distinction between the Bank Defendants that have admitted submitting artificially depressed USD bbaLIBOR™s and those that have not yet done so. Barclays submissions were at the high end of the range at an average 25 basis points spread, UBS and HBOS were in the middle with an average 29 basis points spread.

130. Similarly, focusing only on the last two weeks of September 2008, the average USD bbaLIBOR™/Eurodollar Bid Rate spread generally ranged from 110 basis points (HBOS) to 153 basis points (J.P. Morgan).[172] The outlier was Barclays (87 bp), which has admitted that it

[171] The remaining Bank Defendants are: RBC (26 bp), RBS (26 bp), Bank of America (30 bp), Credit Suisse (27 bp), HBOS (29 bp), UBS (29 bp), Lloyds (30 bp), Deutsche Bank (31 bp), Citigroup (32 bp), HSBC (32 bp), and Rabobank (32 bp).

[172] The remaining Bank Defendants are: BTMU (120 bp), Bank of America (144 bp), Citigroup (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

consistently submitted artificially low bbaLIBOR™ rates. Similarly, the next highest submissions were provided by HBOS, which has also admitted to depressing bbaLIBOR™. The fact that these two Bank Defendants were at the high end of bbaLIBOR™ submissions confirms that the other Bank Defendants were all submitting artificially depressed rates at the time.

131. The individual participants in the fraudulent and collusive conduct described in this Complaint would not have engaged in the conduct, which carries the potential for criminal penalties, absent a reasonable belief that the misconduct actually influenced the USD bbaLIBOR™ fixings.

132. By collusively depressing USD bbaLIBOR™, Defendants distorted prices in the markets for financial products that incorporated interest-rate benchmarks (e.g. pay-fixed swaps and floating-rate MBS), and diminished the quality of financial products that incorporated interest-rate benchmarks. The Unlawful Agreements also limited the choice of interest-rate benchmarks available to non-conspirators that negotiated for OTC interest-rate derivatives, floating-rate retail loans, and floating-rate MBS purchasers. As the EC recently wrote: "In order for users of benchmarks to make appropriate choices of, and understand the risks of, benchmarks, they need to know what the benchmark measures and their vulnerabilities."[173]

133. The Bank Defendants falsely purported to fully compete in all of these financial product markets. Further, to the extent that Defendants used false and dishonest USD bbaLIBOR™ submissions to inflate their apparent creditworthiness and their respective reputations, they artificially increased their ability to charge higher underwriting fees and obtain higher offering prices for financial products to the detriment of Freddie Mac and other consumers.

---

[173] EC Proposal, *supra* note 38, at 16.

134. Freddie Mac engaged in numerous financial transactions with Bank Defendants and others involving products that incorporated USD bbaLIBOR™. For example, Freddie Mac engaged in thousands of pay-fixed swaps and held billions of dollars in floating-rate MBS that paid monthly coupons tied directly to USD bbaLIBOR™. Freddie Mac reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding USD pay-fixed interest-rate swaps and floating-rate MBS. As a direct and proximate result of Defendants' unlawful conduct as described in this Complaint, and as will become clearer when information known only to Defendants is disclosed in discovery, Freddie Mac has been injured in its business and property and has suffered damages in an amount presently undetermined.

**C. Barclays Admissions**

135. On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ. As part of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the non-prosecution agreement. Barclays further received conditional leniency from the DOJ's Antitrust Division for potential Sherman Act violations involving financial instruments that reference Euribor. Barclays also entered into a settlement with the CFTC to resolve charges that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[174]

136. According to these filings, Barclays through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD bbaLIBOR™ and other currencies. More specifically, Barclays admitted that by falsely representing that its bbaLIBOR™ submissions were based on its perceived costs of borrowing unsecured funds in the relevant interbank markets, it engaged in a deceptive course of conduct in

[174] *See* Barclays SOF, *supra* note 107.

an effort to gain an advantage over its counterparties and that Barclays' bbaLIBOR™ submissions were false or misleading.[175] Barclays admitted that it lacked specific internal controls and procedures concerning its submission processes for bbaLIBOR™ and that its inadequate supervision allowed the fraudulent and collusive conduct to occur. Barclays further admitted that it knew that the fraudulent and collusive depression of affected interest-rate derivatives tied to bbaLIBOR™ benefited Barclays at the expense of its counterparties.[176]

**D. UBS Admissions**

137. On December 18, 2012, UBS entered into a non-prosecution agreement with the Criminal Fraud Division of DOJ. UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference Yen bbaLIBOR™ and Euroyen TIBOR.

138. On December 19, 2012, the Swiss Financial Market Supervisory Authority ("FINMA") issued a Summary Report regarding its investigation of UBS.[177] The Final Notice summarizes UBS' misconduct and notes that UBS' "substantial failings in the system and control processes for LIBOR submissions" prevented those responsible at UBS from detecting and acting on the misconduct.[178]

139. In December 2012, UBS Securities Japan Co., Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343)[179] for secretly manipulating Yen

---

[175] *Id.* ¶ 33.

[176] *Id.* ¶¶ 30-32.

[177] FINMA, *FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG*, at 2 (Dec. 19, 2012), attached as Exhibit 14 and incorporated into this Complaint by reference.

[178] *Id.*

[179] UBS SOF, *supra* note 67, at Appendix B.

bbaLIBOR™ and TIBOR. UBSSJ admitted in its plea that false and misleading bbaLIBOR™ submissions were "material" from the perspective of counterparties to financial transactions.[180]

140. In December 2012, the DOJ charged two former UBS traders—Tom Hayes and Roger Darin (collectively, the "UBS traders")—with wire fraud and conspiracy to commit wire fraud for secretly manipulating bbaLIBOR™ and other benchmark rates.[181] In addition, the DOJ charged the UBS traders with a violation of Section 1 of the Sherman Act for conspiring with an unidentified employee at a major financial institution and others to fix Yen bbaLIBOR™, a key price component of Yen bbaLIBOR™-based derivative products.[182]

141. On December 19, 2012, UBS and UBSSJ entered into a settlement with the CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7 U.S.C. §§ 9, 13b, and 13(a)(2).[183] According to the CFTC's findings, from at least January 2005 through 2011, UBS by and through acts of dozens of employees, officers, and agents located around the world, engaged in systematic misconduct that undermined the integrity of certain global benchmarks, including USD bbaLIBOR™. UBS admitted that its false submissions contained market information that affected or tended to affect USD bbaLIBOR™, and USD bbaLIBOR™ was a commodity in interstate commerce.[184] Further, UBS continued its "rampant misconduct," including collusive conduct, long after it was on notice (in October 2008) of an investigation into its USD bbaLIBOR™ practices.[185]

---

[180] *Id.* at Appendix B, Ex. 3 ¶¶ 9-10, Ex. 4 ¶ 75.

[181] Compl. at 1-2, *United States of America v. Alexander, et al.*, No. 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012), attached as Exhibit 15 and incorporated into this Complaint by reference.

[182] *Id.* at 3.

[183] *In re UBS AG*, No. 13-09 (C.F.T.C. Dec. 19, 2012), attached as Exhibit 16 and incorporated into this Complaint by reference.

[184] *Id.* at 4, 41, 52-53.

[185] *Id.* at 5.

**E. RBS Admissions**

142. On February 5, 2013, RBS executed a Deferred Prosecution Agreement with the DOJ.[186] Under the terms of that agreement, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to bbaLIBOR™ submissions. The United States filed a two-count criminal information charging RBS with wire fraud and price fixing in connection with RBS' conduct and agreed to defer prosecution of that case pursuant to its agreement with RBS.[187] In addition, RBS Securities Japan Ltd. pleaded guilty to one count of wire fraud for its participation in fraudulent and collusive practices relating primarily to Yen bbaLIBOR™.[188]

**F. Rabobank Admissions**

143. On October 29, 2013, Rabobank settled bbaLIBOR™ investigations by the DOJ, CFTC, FSA and Dutch authorities. Rabobank admitted to the CFTC that its manipulation of USD bbaLIBOR™, Pound Sterling bbaLIBOR™, Yen bbaLIBOR™ and EURIBOR violated the CEA and it paid a $475 million fine.[189] Rabobank also entered into a deferred prosecution agreement with the Criminal Fraud Section of the DOJ to resolve charges of wire fraud based on the manipulation of bbaLIBOR™ and EURIBOR and paid a $235 million fine. As part of the settlements, Rabobank admitted that more than two dozen of its traders, including its Global

---

[186] The agreements reached between (a) the United States and Barclays, (b) the United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation into misconduct for additional benchmark rates. The United States has declined to reveal those benchmark rates. On information and belief, USD bbaLIBOR™ is among the interest rates under investigation by the United States.

[187] RBS SOF, *supra* note 161, ¶¶ 1-2.

[188] *Id.* ¶ 3.

[189] *In re Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.*, No. 14-02 (C.F.T.C. Oct. 29, 2013), attached as Exhibit 17 and incorporated into this Complaint by reference.

Head of Liquidity and Finance, participated in ongoing and pervasive manipulation of USD and Yen bbaLIBOR™ to favor its day-to-day trading positions.[190]

144. According to these filings, Rabobank, through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD bbaLIBOR™ and other currencies. More specifically, Rabobank admitted that by falsely representing its bbaLIBOR™ submissions, it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Rabobank's bbaLIBOR™ submissions were false or misleading.[191]

**G. Lloyds and HBOS Admissions**

145. On July 28, 2014, the FCA fined Lloyds and HBOS for colluding to manipulate USD, GBP, and JPY bbaLIBOR™, as well as the GBP repo rate. With regard to GBP and USD bbaLIBOR™, the FCA found that traders at Lloyds and HBOS had conversations and communications with other Contributor Banks to manipulate GBP and USD bbaLIBOR™ for profit on derivative transactions.

146. In addition, the FCA found that in September and October 2008, an HBOS manager instructed HBOS traders to depress GBP and USD bbaLIBOR™ submissions to stay in line with other Contributor Banks, rather than comply with the published methodology for bbaLIBOR™.[192] Lloyds and HBOS management claimed that they did not discover the

---

[190] *United States v. Coöperative Centrale Raiffeisen Boerenleenbank, B.A.,* Deferred Prosecution Agreement, Attachment A, Statement of Facts ¶ 40 (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf, attached as Exhibit 18 and incorporated into this Complaint by reference.

[191] *Id.* ¶ 97.

[192] Final Notice from the Fin. Conduct Auth. to Lloyds Bank plc & Bank of Scot. plc ¶¶ 4.48-59 (July 24, 2014), attached as Exhibit 19 and incorporated into this Complaint by reference.

unlawful conduct until after they had been asked to investigate potential issues in 2010.[193] In March 2011, Lloyds attested to the FCA that its systems and controls for its bbaLIBOR™ submissions were adequate.[194] This attestation was false.[195]

147. The FCA further found that Lloyds and HBOS colluded to manipulate the BBA Repo Rate. That rate, published by the BBA, served as a benchmark which purported to provide the rates offered by major banks in London for general collateral repo transactions of normal market size with other banks at 11 a.m. London time.[196] Both Lloyds and HBOS were Repo Rate Contributor banks. In 2008, the Bank of England gave UK banks cash under a Special Liquidity Scheme ("SLS"), in which the banks could swap illiquid securities with the UK for UK Treasury bills, which the banks could then use as collateral to borrow cash in secured transactions.[197] The fee for participating in the SLS was measured by the difference between three month GBP bbaLIBOR™ and the three-month GBP Repo Rate. Thus, banks had an incentive to depress GBP bbaLIBOR™ and increase the Repo Rate.

148. On July 28, 2014, Lloyds consented to entry of an Order Making Findings and Imposing Remedial Sanctions with the CFTC and agreed to pay a $105 million fine.[198] The CFTC found that Lloyds and HBOS violated the published bbaLIBOR™ methodology from at least 2006 through 2010. The CFTC findings quote an HBOS USD bbaLIBOR™ submitter as saying the following during an electronic chat with "an employee of another financial

[193] *Id.* ¶ 4.70.

[194] *Id.* ¶ 5.15.

[195] *Id.*

[196] *Id.* ¶¶ 2.2-2.9.

[197] *Id.* ¶ 4.9.

[198] Lloyds CFTC Order, *supra* note 142, at 23.

institution"—"youll like this ive been pressured by senior management to bring my rates down into line with everyone else."[199]

149. The CFTC also quoted an HBOS manager as complaining that GBP bbaLIBOR™ rates "could potentially create an issue with buyers of our paper." The CFTC found that HBOS was concerned that lenders might be unwilling to transact business or deal with HBOS or might have demanded higher interest rates had HBOS submitted rates that complied with the bbaLIBOR™ methodology. In addition, the CFTC found that an HBOS bbaLIBOR™ supervisor instructed employees that they normally should not make bids for cash in the market above the relevant bbaLIBOR™ rate. The CFTC found that at least through the end of 2008, HBOS made USD bbaLIBOR™ submissions that did not reflect the bbaLIBOR™ methodology and therefore conveyed false, misleading, or knowingly inaccurate reports concerning USD bbaLIBOR™.[200]

150. The CFTC found that Lloyds and HBOS violated Section 9(a)(2) of the CEA by false market information that affected, or tended to affect, the price of commodities sold in interstate commerce. The CFTC further found that this false information included information concerning the costs of borrowing funds in USD, the liquidity and stress conditions in the money markets, and Lloyds' and HBOS' ability to borrow funds in the particular markets.

151. In the Consent Order, Lloyds agreed to abide by a set of principles to ensure the integrity and reliability of submissions in the market for benchmark interest rates.[201]

152. The same day, Lloyds entered into an agreement with DOJ to pay an $86 million penalty for manipulating bbaLIBOR™ submissions.[202] "Lloyds's conduct undermined financial

---

[199] *Id*. at 15.

[200] *Id.*

[201] *Id*. at 25.

markets domestically and abroad," said Deputy Assistant Attorney General Brent Snyder of the DOJ's Antitrust Division.[203] As one example, DOJ quoted an exchange on May 19, 2009 between a money markets trader who was a former USD bbaLIBOR™ submitter at a subsidiary of Lloyds, who wrote: "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's," and a then-current USD bbaLIBOR™ submitter, who responded later that day: "obviously we got the Libors down for you."[204]

### H. Freddie Mac Could Not Have Discovered the Fraud and Collusion Before Barclays' Disclosures in 2012

153. On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the CFTC and the DOJ in connection with investigations into bbaLIBOR™. This note marked the first public acknowledgment by any Defendant of the confidential CFTC investigation, which had begun in late 2008.[205] The Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate bbaLIBOR™ rates. Over the next months, the Bank Defendants, regulators, and media reports gradually revealed the scope of the investigation until Barclays admitted its participation in bbaLIBOR™ manipulation in June 2012. The claims Freddie Mac alleges in this Complaint arise, among other things, from the

---

[202] Press Release, U.S. Dep't Justice, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

[203] *Id.*

[204] *Id.*

[205] Fin. Servs. Auth., Internal Audit Report: A Review Of The Extent Of Awareness Within The FSA Of Inappropriate Libor Submissions, Management Response ¶ 1.1 (Mar. 2013), *available at* http://www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf.

same wrongful acts and concern the same evidence, memories, and witnesses as the class actions filed in this MDL (11-MD-2262 (NRB)).

154. The BBA, which had known of the investigation since late 2008, publicly claimed to be "shocked" by Barclays' disclosures.[206] Just a few months earlier, the BBA deleted links on its website that detailed its involvement with setting bbaLIBOR™, including a statement that it "calculates and produces BBA LIBOR at the request of our members for the good of the market."[207]

155. Throughout the conspiracy period, Defendants offered facially plausible pretextual explanations for so-called "dislocations" in bbaLIBOR™ and repeatedly denied the existence of any fraudulent or collusive conduct relating to bbaLIBOR™ submissions. In particular, the BBA held itself and the FX & MM committee out as independent entities that exercised meaningful oversight of bbaLIBOR™, and on several occasions falsely represented that it had confirmed through investigation that bbaLIBOR™ submissions were honest and accurate. Freddie Mac therefore did not know, and could not have known of the Unlawful Agreements.

156. The day after Barclays' June 2012 disclosure, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization,[208] which is further evidence that market participants, including Freddie Mac, were unaware that Barclays had been propping up its creditworthiness through bbaLIBOR™ manipulation.

---

[206] Rachel Cooper, *Barclays Libor Scandal: As It Happened—June 28, 2012*, The Telegraph, June 28, 2012, http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9361646/Barclays-Libor-scandal-as-it-happened-June-28-2012.html.

[207] Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs away from Rate*, Bloomberg Businessweek (Mar. 7, 2012), http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2.

[208] Cooper, *supra* note 206.

157. Until Barclays's disclosures in June 2012, Freddie Mac did not have access to any of the information that could have revealed the fraud and collusion, including, among other things, (a) the Bank Defendants' actual costs of borrowing, (b) internal communications at the Bank Defendants regarding fraud and collusion, (c) communications between and among the Bank Defendants regarding bbaLIBOR™, (d) communications between the Bank Defendants and government regulators, (e) documents produced in connection with the confidential investigations, (f) meetings of the FX & MM Committee, or (g) access to communications within the BBA or between Bank Defendants and the BBA.

158. The admissions by Barclays, UBS, RBS, Rabobank, Lloyds, and HBOS reveal the type of schemes that Defendants concocted to conceal their fraudulent and collusive conduct. For example, (a) a UBS trader scolded a manager for internally transmitting in writing a request to manipulate a bbaLIBOR™ submission,[209] (b) a Barclays trader consciously sought to move bbaLIBOR™ submissions in small increments over time to avoid detection,[210] (c) a UBS derivatives desk manager instructed a bbaLIBOR™ submitter to lie when interviewed by UBS attorneys investigating bbaLIBOR™ manipulation,[211] and (d) in 2010, long after learning of the investigation into bbaLIBOR™, RBS traders continued their conduct but sought to avoid communicating in writing because "at the moment the FED are all over us about libors."[212] On information and belief, the other Bank Defendants engaged in similar conduct to cover up their fraudulent and collusive activities involving USD bbaLIBOR™. The evidence of such conduct is solely within the custody and control of the Bank Defendants and/or government regulators.

[209] UBS SOF, *supra* note 67, ¶ 38.

[210] *Id.* ¶ 34.

[211] *Id.* ¶ 39.

[212] RBS Final Notice, *supra* note 79, ¶ 52.

159. Consistent with these statements, the former head of the FSA, Adair Turner, told Parliament on February 26, 2013, that there was "no information" of bbaLIBOR™ manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision."[213] Former CFTC Chairman Gary Gensler, who led the charge to uncover the Unlawful Agreements, has said that it took his agency, using the powers at its disposal, years to uncover the fraud and collusion. He was quoted as saying: "It took 20 months before we had actionable evidence. For two and a half years, I was constantly challenging the staff: 'How do we bring this case? How do we get it into the public arena?"[214]

**COUNT I: VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS)**

160. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

**Agreement**

161. From on or about August 2007 and lasting through at least May 2010, Defendants entered into a combination, conspiracy, and/or agreement that involved multiple horizontal and vertical levels, the effects of which continued through at least 2011. In this case, the Complaint alleges a set of agreements among Defendants that restricted competition in various markets. As shown above, the Unlawful Agreements consisted of the following:

- The Bank Defendants secretly agreed to (a) disregard the bbaLIBOR™ published rules to coordinate the interest rates that they submitted to the BBA for calculation, (b) keep those coordinated submissions below the actual rates at which they would be offered funds in the London interbank lending market for USD, and (c) keep those coordinated submissions within a narrow range.

[213] Huw Jones, *It Was Impossible To Spot Libor Rigging: UK Watchdog*, Reuters (Feb. 27, 2013), http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

[214] Joe Nocera, *The Little Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html?_r=0.

- Defendants agreed to falsely hold USD bbaLIBOR™ out as a reliable interest-rate benchmark calculated according to its published methodology and conceal the fact that the Defendant Banks had agreed to disregard the published methodology for USD bbaLIBOR™.

- Defendants agreed to conceal the extent to which conditions in the London interbank loan market had deteriorated.

- Defendants agreed to publicly, and falsely, maintain that USD bbaLIBOR™ would be protected by a strict governance protocol, that it would be overseen by an "independent" committee of active market participants, and that the BBA would ensure compliance with bbaLIBOR™'s published rules.

162. Defendants had a conscious commitment to common objectives, namely insulating bbaLIBOR™ from the forces of competition so that Defendants could collectively control the product standard in the market for USD interest-rate benchmarks. Through control of bbaLIBOR™, the Bank Defendants could manipulate it for their personal gain and systematically depress it to unfairly profit from interest-rate derivative and MBS transactions, among other transactions. Certain Bank Defendants also had a common interest in manipulating bbaLIBOR™ to protect their respective credit ratings.

163. As set forth above, Defendants had strong motives to conspire. Because of the way that USD bbaLIBOR™ was calculated based upon the Bank Defendants' bbaLIBOR™ submissions, a single Contributor Bank acting unilaterally had little ability to affect bbaLIBOR™. By cooperating, the Bank Defendants' collusion gave them the power to affect the USD bbaLIBOR™ fixing published by and through the BBA. In addition, the unlawful scheme required collective action to avoid detection. If any Bank Defendant deviated from the Unlawful Agreements on a sustained basis or disclosed that Defendants had agreed to disregard the bbaLIBOR™ rules, the scheme would have been exposed, bbaLIBOR™'s integrity and reliability would have been fundamentally undermined, and Defendants would have lost control of the dominant USD interest-rate benchmark. Disclosure of the Unlawful Agreements would

also have exposed bbaLIBOR™ to the forces of competition from other interest-rate indices, imperiling bbaLIBOR™'s position as the market standard for interest-rate benchmarks, and triggering government investigations and lawsuits. In fact, these are precisely the consequences that followed Barclays' disclosure of systematic depression in 2012.

164. There is abundant evidence that Defendants' conduct was the product of agreement and not independent action. To date, three Bank Defendants (UBS, Barclays, HBOS) have admitted systematically submitting artificially depressed USD bbaLIBOR™ rates to the BBA.[215] If any individual Contributor Bank unilaterally and systematically depressed its USD bbaLIBOR™ submissions, that Contributor Bank's submissions would have stood out as an outlier below the rates submitted by the other Contributor Banks. In fact, however, the individual USD bbaLIBOR™ rates submitted by Defendants Barclays, UBS and HBOS were not noticeably lower than the other Bank Defendants.

165. For example, Figure 6 below plots the submissions for 3 month USD bbaLIBOR™ during a two-month period in 2008 for the three Bank Defendants that have admitted to systematic depression (Barclays, UBS, and HBOS) and the submissions of Bank Defendants Bank of America, Citigroup, Credit Suisse, and JP Morgan. The chart shows that the latter four banks submitted USD bbaLIBOR™ rates that were within ***or below*** the range of the admittedly depressed rates. The submissions of other Bank Defendants shows the same trend. This pattern of coordinated submissions cannot be credibly explained in the absence of conspiracy.

[215] In addition, as shown above, several other Defendants (RBS and Rabobank) have admitted manipulating USD bbaLIBOR™.

**Figure 6: Comparison of bbaLIBOR™ Submissions**




166. While few of Defendants' documents have been disclosed to date, the sparse evidence that has been revealed confirms the existence of the Unlawful Agreements:

- In an electronic chat between an HBOS USD bbaLIBOR™ submitter and an employee of "another financial institution" (unidentified) states: "youll like this ive been pressured by senior management to bring my rates down into line with everyone else."[216]

- In one message dated August 19, 2007, former trader for RBS, Tan Chi Min, wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong: "It's just amazing how Libor fixing can make you that much money or lose if opposite. It's a cartel now in London."[217]

---

[216] Lloyds CFTC Order, *supra* note 142, at 15.

[217] Andrea Tan, Gavin Finch & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012), http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

- In October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[218]

- On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that all of the Bank Defendants were doing this.[219] The Barclays manager specifically identified certain other Bank Defendants that were submitting bbaLIBOR™ rates lower than rates at which those banks could actually get funds.[220]

- On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that the Bank Defendants, including Barclays, were submitting false and dishonest submissions.[221]

- On April 11, 2008, a Barclays employee privately told an employee of the New York Fed that he was aware of Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[222] The Barclays employee noted "if we can't borrow money at that rate, then no one else could really. . . . I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[223]

- On October 24, 2008, a Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish," citing submissions by WestLB and Deutsche Bank as being too low.[224] The employee told the NY Fed that he was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[225]

---

[218] Email to Jason Miu, *supra* note 109.

[219] Barclays SOF, *supra* at 107, ¶ 43.

[220] *Id.* ¶ 43.

[221] *Id.* ¶ 45.

[222] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the N.Y. Fed*, *supra* note 120.

[223] *Id*. at 16.

[224] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, *supra* note 159.

[225] *Id.* at 000100.

- In an internal email, a Barclays employee noted that Lloyds' USD bbaLIBOR™ submission was artificially low.[226]

167. In addition, Defendant RBS has admitted that its employees participated in agreements to submit bbaLIBOR™ submissions that were inconsistent with the published definitions. Although RBS did not admit systematic depression, the head of its money markets trading and the person responsible for USD bbaLIBOR™ submissions reportedly told a subordinate that Contributor Banks were setting bbaLIBOR™ "to where it suits their book" and that "LIBOR is what you say it is."[227] This communication occurred in August 2007, within days of the admitted directives issued by Barclays and UBS executives.

168. Because the BBA's instructions prohibited Contributor Banks from basing their USD bbaLIBOR™ submissions on submissions by other Contributor Banks, the Bank Defendants cannot claim that their conduct was merely the result of conscious parallelism without admitting that they secretly and fraudulently deviated from bbaLIBOR™'s published methodology. Defendants' pretextual explanations for their artificially low USD bbaLIBOR™ submissions further confirm the existence of the Unlawful Agreements.

169. Moreover, Defendants acted against their legitimate independent self-interest in several regards. First, absent agreement with other Defendants, any Bank Defendant that unilaterally chose to deviate from the published bbaLIBOR™ rules would have exposed itself to civil and criminal sanctions and removal from the USD bbaLIBOR™ panel, which would have undermined the Bank Defendant's reputation. Removal from the bbaLIBOR™ panel would have harmed the Bank Defendant's perceived integrity, exposed it to investigation by government regulators, and led counterparties to terminate their business relationships with the

[226] Email to Pat Leising, *supra* note 108.

[227] Vaughan & Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, *supra* note 105.

Bank Defendant and possibly initiate civil actions. Removal also could have proven catastrophic if the market interpreted the Bank Defendant's fraud as a desperate attempt to protect its reputation and hide its financial condition.

170. Second, Bank Defendants with better credit ratings than their supposed rivals on the USD bbaLIBOR™ panel acted against their independent economic self-interest by submitting USD bbaLIBOR™ rates that were not significantly lower than their less creditworthy "competitor" banks on the USD bbaLIBOR™ panel and tolerating false submissions that created the appearance that all of the Bank Defendants presented the same perceived credit risk. The Bank Defendants admittedly did not all share the same incentive to unlawfully depress their USD bbaLIBOR™ submissions. The Bank Defendants have claimed that some of them had AAA credit ratings and therefore no plausible reason to "help competitors mask their financial difficulties." Yet that is precisely what happened, even though they unquestionably knew of the systematic depression as key players in the interbank loan market. In the absence of collusion, the more creditworthy Bank Defendants would have used their stronger credit standing as a competitive advantage to obtain lower costs of funds than their rivals and to use those lower costs to compete on price in downstream markets for interest-rate derivatives, retail loans, and other financial products.

171. Defendants had ample opportunity to conspire through, among other things, BBA and FX & MM Committee meetings, numerous interbank communications, electronic messages and chats, and telephone calls. As shown above, even the minimal evidence publicly disclosed to date in connection with government regulatory actions reveals a sustained pattern of illicit communications among the Bank Defendants.

172. The economic evidence also supports the existence of the Unlawful Agreements in that the USD bbaLIBOR™'s relationship to the Eurodollar Bid Rate fundamentally changed during the alleged conspiracy period. During the conspiracy, Defendants offered a number of explanations for that change, but the disclosures following Barclays' June 2012 admission of unlawful conduct confirm that the agreements alleged above caused that fundamental change.

**Restraint of Trade**

173. The purpose and effect of the Unlawful Agreements was to maintain control over the market standard for USD interest-rate benchmarks during the conspiracy period and limit competition in the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, floating-rate MBS, and wholesale funding. Defendants achieved this objective by colluding to create the false impression that USD bbaLIBOR™ was suited for its intended purpose and that the London interbank loan market was a reliable source of data for the Bank Defendants' cost of unsecured funds. Only Defendants knew whether they were following the bbaLIBOR™ methodology, the extent to which the opaque London interbank loan market was active, and whether the Bank Defendants were submitting rates consistent with the actual interest rates available in the London interbank loan market. Defendants' conspiracy harmed competition in numerous markets.

174. Defendants foreclosed competition by alternative interest-rate benchmarks and shielded bbaLIBOR™'s dominant position as the market standard from the forces of competition. Taking advantage of their significant, if not dominant, market positions (and pursuant to the Unlawful Agreements), Bank Defendants continued to incorporate bbaLIBOR™ into USD interest-rate derivatives, floating-rate loans, and floating-rate MBS, even though Defendants knew that bbaLIBOR™ was not what they held it out to be. This conduct was

intended to, and did, insulate bbaLIBOR™ from the forces of competition, which allowed Defendants to maintain bbaLIBOR™ as the market standard without even attempting to innovate its rules or improve its governance mechanism. In short, Defendants maintained USD bbaLIBOR™ as the standard in the market for USD interest-rate benchmarks and the leading reference interest-rate benchmark in markets for USD interest-rate derivatives, floating-rate loans and floating-rate MBS not by competing on the merits, but by entering into secret agreements to exclude competition.

175. The Unlawful Agreements had especially pernicious effects because of the network effects on the market for USD interest-rate benchmarks. These network effects were driven by the widespread use of bbaLIBOR™ throughout the interconnected USD interest-rate derivative, floating-rate loan and floating-rate MBS markets, in which Bank Defendants were major players. Bank Defendants were among the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important users of USD interest-rate benchmarks. Thus, Defendants' agreements as dealers in the OTC interest-rate derivatives market necessarily diminished competition in the related floating-rate loan market, floating-rate MBS market, and in the upstream market for interest-rate benchmarks.

176. Defendants knew, or should have known, that the Unlawful Agreements would affect the prices and returns on financial products tied to USD bbaLIBOR™. By agreeing to systematically and secretly depress bbaLIBOR™ into the future, Defendants harmed the competitive process.

177. As explained in the Wheatley Report, an interest-rate benchmark serves two important purposes.[228] First, it functions as the reference interest rate incorporated into financial

[228] Wheatley Final Report, *supra* note 32, at 45.

contracts as a payment (and price) term. Thus, depression of the benchmark will cause economic loss to companies that hold interest-rate derivatives, floating-rate loans, floating-rate MBS, and certain other products incorporating bbaLIBOR™. Second, the benchmark functions as a discount rate used in negotiations to price products that incorporate the benchmark. As explained above, an interest-rate swap is determined by applying the rules of the interest-rate benchmark to the notional value over the duration of the proposed swap to determine the net present value of those payments which, in turn, determines the fixed rate that the counterparty will pay. Thus, the price of an interest-rate swap is set by the net present value of the interest-rate benchmark. The net present value calculation is expressly premised on the reliability, predictability, and integrity of the interest-rate benchmark.

178. By providing a benchmark supposedly tied to competitively determined interbank lending rates, bbaLIBOR™ purported to serve the price-discovery purpose in markets for, at least, interest-rate derivatives, floating-rate loans, and floating-rate MBS. By foreclosing competition in the market for USD interest-rate benchmarks, Defendants harmed the competitive process by which parties discovered the price of interest-rate derivatives, floating-rate loans, and floating-rate MBS, and other products that incorporated USD bbaLIBOR™.[229] As one District Court observed: "Fraud and deceit are not legitimate market forces. Fundamentally, markets are information processing systems. The market price is only as 'real' as the data that inform the

[229] For example, assume a monopolist offers a product for $30 when its internal cost to produce and sell the product is just $10. Absent competition, buyers will not know that $30 represents a three-fold increase over the seller's costs. Now, assume instead that there are multiple sellers of the same product, all with similar costs. Rather than lose a sale, the second seller will offer a price below $30, which should trigger a price reaction from the seller's rivals. Eventually, through the competitive process, buyers will "discover" that the market price for the product is just above $10. *See* Robert C. Marshall and Leslie M. Marx, The Economics of Collusion—Cartels and Bidding Rings 83-84 (2012).

process of price discovery. By the same token, the market price is 'artificial' when the market is misinformed."[230]

179. By artificially depressing USD bbaLIBOR™, Defendants caused purchasers of products that incorporated bbaLIBOR™ as an interest-rate benchmark to overpay for those products. Had purchasers known the true manner in which Defendants calculated, and intended to continue to calculate, USD bbaLIBOR™, purchasers would have chosen not to enter into the transaction at all or requested an alternative interest-rate benchmark. Similarly, purchasers, including Freddie Mac, suffered economic losses on financial products that incorporated USD bbaLIBOR™ as a price term. Market participants, including Freddie Mac, were not informed of the actual methodology that Defendants used to calculate USD bbaLIBOR™ and therefore the Unlawful Agreements prevented market participants from being able to make informed decisions whether to keep those financial products and, if so, whether to demand changes to the benchmark methodology. Through the Unlawful Agreements, the Bank Defendants artificially increased the profit margins that they earned in USD pay-fixed swaps, floating-rate MBS, and certain other products incorporating bbaLIBOR™, all to Freddie Mac's economic detriment.

180. Second, Defendants also interfered with the ability of non-conspirator banks to fairly compete against Bank Defendants in the markets for interest-rate derivatives, floating-rate loans, floating-rate MBS, and other products incorporating bbaLIBOR™. Non-conspirator banks were unaware of the alleged fraud and collusion and therefore priced interest-rate derivatives, floating-rate loans, and floating-rate MBS based on the reasonable expectation that USD bbaLIBOR™ would be determined according to the published rules.

[230] *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006).

181. Third, each artificially depressed bbaLIBOR™ submission by an individual Bank Defendant enhanced that Bank Defendant's reputation and false public perception of its credit risk and liquidity.[231] In the absence of collusion, banks with superior credit and liquidity profiles would have used their reputation as a competitive advantage and banks with lower reputations would have been forced to compete on the merits by providing better prices, improving efficiency, and shedding risk. Numerous Bank Defendants, in fact, have admitted that individual bbaLIBOR™ submissions contained market information that affected or tended to affect prices of financial contracts and products that incorporated the interest-rate benchmark.[232]

182. Fourth, Defendants stifled innovation and limited demand for alternative (competing) benchmarks. Through their agreement to submit rates that appeared to be fair and honest reflections of interbank lending, Defendants maintained the façade that market forces determined bbaLIBOR™ and that a more reliable benchmark was unnecessary. But for the collusion, Defendants would have been forced to compete on the merits by showing that bbaLIBOR™ served its intended purpose as a proxy for competition or by incorporating other floating interest-rate benchmarks into financial products they sold. One benchmark provider recently acknowledged that "the existing LIBOR framework [has] failed to keep pace with market needs as they have developed over the past two decades."[233]

183. Finally, Defendants interfered with the supply/demand balance for wholesale funding. The Bank Defendants treated their bbaLIBOR™ submissions as an upper limit on

---

[231] Business reputation is an "asset of significant value" in the banking sector. Rosa M. Abrantes-Metz et al., *LIBOR Manipulation?*, 36 J. Banking & Fin. 137, 138 (2008).

[232] *See, e.g.*, UBS SOF, *supra* note 67, ¶ 97.

[233] Rate Validation Servs., *Regulation of Benchmarks and Indices: RVS Response to the EU Consultation Document*, at 10 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/rate-valuations-services_en.pdf.

interest rates they would offer for other unsecured funding products. Defendants Lloyds and HBOS have admitted that they instructed employees not to bid for cash at rates that were out of line with their bbaLIBOR™ submissions. In a competitive environment, market forces determine interest rates and efficiently allocate money.

184. The antitrust charges filed against subsidiaries of UBS and RBS confirm that agreements to manipulate bbaLIBOR™ constitute *per se* restraints of trade that harmed competition in the markets for USD interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS in violation of Sherman Act Section 1. *Per se* treatment of the conspiracy is appropriate because the Unlawful Agreements were specifically related to price and quality. Where, as here, a plaintiff alleges a *per se* violation of the Sherman Act, no allegations with respect to relevant product market, geographic market, or market power are required. To the extent allegations may otherwise be necessary, the markets and harm to competition caused by the Unlawful Agreements are addressed below.

**Antitrust Injury and Damages**

185. During the conspiracy period, Freddie Mac purchased and owned interest-rate derivatives, including pay-fixed, receive-floating interest-rate swaps, that incorporated USD bbaLIBOR™ as a price term. In addition, Freddie Mac purchased and held floating-rate MBS and other financial products that incorporated USD bbaLIBOR™ as the interest-rate benchmark and that incorporated USD bbaLIBOR™ as a price term. In the absence of the Unlawful Agreements, competitive market forces would have created overwhelming incentives for Defendants to calculate and publish USD bbaLIBOR™ in compliance with its published rules and to ensure that the London interbank market used to calculate USD bbaLIBOR™ was sufficient to measure the Bank Defendants' cost of funds. In addition, the Unlawful Agreements

injected false information into financial markets that depended on interest-rate benchmarks for accurate information regarding the Bank Defendants' cost of funds.

186. As a result, Freddie Mac paid artificially high prices for USD pay-fixed, receive-floating swaps, floating-rate MBS, and floating-rate loans. Conversely, as a result of the collusion and anticompetitive effects, Freddie Mac received less from these derivatives, MBS, and floating-rate loans. These damages flow directly from the Unlawful Agreements' interference with competitive market forces.

187. In the absence of collusion, the Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased the profit margins that they were able to earn) in transactions for certain USD interest-rate derivatives and floating-rate MBS.

**Rule of Reason**

188. Alternatively, analyzed under either a "quick look" or full rule-of-reason framework, the Unlawful Agreements unreasonably restrained trade in the markets for USD interest-rate benchmarks, OTC USD interest-rate derivatives, USD floating-rate retail loans, and floating-rate MBS. The Unlawful Agreements arose from "competitor collaborations" as that term is used in the United States' Guidelines for Collaborations Among Competitors[234] because the Bank Defendants were purported competitors in each of the defined markets as well as in the market for unsecured short-term wholesale funding. As noted above, absent collusion, each Bank Defendant would have individually competed to submit the lowest rates to the BBA consistent with the published bbaLIBOR™ methodology and prevented any other Bank

[234] U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors (Apr. 2000), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

Defendant from submitting artificially low rates to the BBA by disclosing such false rates to the BBA (which, in the absence of collusion, would have acted on that information) or otherwise publicly identifying the cheater.

189. Even if the bbaLIBOR™ data gathering process, in fact, was intended to be a cooperative one, that does not mean that the actual submission process was intended to be collaborative and not competitive. Even for collaborative ventures, agreements are evaluated based on their effects on competition in relevant markets.[235] The Unlawful Agreements harmed the competitive processes in several markets and in several ways.

### A. Relevant Market: USD Short-Term Interest-Rate Benchmarks

#### Market Definition

190. During the relevant period, there were no reasonable substitutes for USD short-term interest-rate benchmarks. Interest-rate derivatives, floating-rate loans, and floating-rate MBS require an interest-rate benchmark. The market for USD short-term interest-rate benchmarks was global.

191. Defendants had substantial power in the market for short-term interest-rate benchmarks. bbaLIBOR™ was by far the dominant short-term interest-rate benchmark and the phenomenon of network effects protected Defendants' market power. Bank Defendants served on the supposedly independent FX & MM Committee responsible for overseeing and implementing bbaLIBOR™ during the conspiracy period. Bank Defendants were in the very small minority of financial institutions that could provide upstream information on the unsecured costs of funds for the largest commercial banks in the world. Bank Defendants were also among

---

[235] *Id.* at 3-4, 24-25.

the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important downstream issuers of USD short-term interest-rate benchmarks.

192. In addition, Bank Defendants were significant providers of floating-rate USD retail loans and floating-rate MBS, which increased their power in the market for USD short-term interest-rate benchmarks. The phenomenon of network effects further increased Defendants' market power because users will tend to choose the same short-term interest-rate benchmark incorporated into floating-rate loans and MBS.

**Harm to Competition**

193. The Unlawful Agreements harmed competition in the market for USD interest-rate benchmarks by creating the false impression that USD bbaLIBOR™ was suited for its intended purpose, could be reliably predicted based on the published rules, and was carefully governed by an "independent" overseer.

194. One of the reasons that Defendants entered into the Unlawful Agreements was to foreclose competition by alternative benchmarks and thereby insulate themselves from the forces of competition. The Bank Defendants benefited from maintaining control of the market standard interest-rate benchmarks, USD bbaLIBOR™, because it allowed them to profit on transactions involving interest-rate derivatives, USD floating-rate loans, and floating-rate MBS. In addition, the BBA generated revenues through the licensing of USD bbaLIBOR™ and the Bank Defendants indirectly benefited from those licensing fees as BBA members.

195. As shown above, had Defendants publicly disclosed their agreement to disregard the published USD bbaLIBOR™ methodology and governance mechanisms, market participants would have sought out, or developed, alternative benchmarks that would better serve the purpose of USD short-term interest-rate benchmarks, or at the very least negotiated lower prices that better reflected the additional uncertainty that would have been created by Defendants' self-

serving rules. In the absence of the agreement to secretly revise the USD bbaLIBOR™ methodology and governance, Defendants would have been forced to compete on the merits to protect the status of USD bbaLIBOR™ as the dominant USD short-term interest-rate benchmark.

196. Real-world insights into the way competition would have encouraged innovation, integrity, and reliability can be gained from market developments following the conspiracy's end. Soon after Barclays admitted its participation in the bbaLIBOR™ manipulation, the BBA voluntarily sought to reassure users that USD Contributor Banks would adhere to the published methodology in the future.[236] The BBA stated that its top priority was to ensure the provision of a reliable benchmark which had the confidence and support of users.[237]

197. In addition, the UK's Financial Conduct Authority ("FCA") sponsored a wide-ranging report overseen by Mr. Wheatley, that eventually recommended numerous improvements to "get back to what this reference rate is supposed to do."[238] The Wheatley Report reforms included stripping the BBA of its administrative role due to unresolvable conflicts of interest, imposing mechanisms to corroborate USD bbaLIBOR™ submissions with actual trade data, expanding the number of Contributor Banks, reducing the number of currencies, and delaying publication of individual Contributor Bank submissions by three months.

---

[236] Press Release, BBA, Libor Statement—Thursday 28 June (June 28, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-statement-thursday-28-june/.

[237] British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor, *supra* note 97.

[238] Martin Wheatley, Managing Director, FSA, and CEO Designate, FCA at the Wheatley Review of LIBOR, Pushing the Reset Button on LIBOR (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/speeches/2012/0928-mw.shtml.

198. In 2013, IOSCO drafted and published its Principles for Financial Benchmarks that outlined best practices for all indices, including bbaLIBOR™.[239] Market participants advocated for a broader set of interest-rate benchmarks that could be adapted to a range of applications. The news service Bloomberg, for example, demanded more alternatives to bbaLIBOR™.[240] CFTC Chairman Gary Gensler advocated for the abolishment of bbaLIBOR™.[241]

199. The BBA, in fact, implemented a number of the reforms recommended in the Wheatley Report. In February 2014, the BBA handed control of USD bbaLIBOR™ over to a private benchmark provider, the ICE. ICE has since implemented additional screens to prevent manipulation, imposed additional measures to boost LIBOR's reliability, and has vowed to continue to improve LIBOR.

200. As shown, the Unlawful Agreements harmed competition in the market for short-term interest-rate benchmarks by deterring innovation, eroding product quality, limiting product choice, and increasing price.

201. In addition, Defendants' agreement to conceal deterioration in the unsecured interbank loan market limited the ability of market participants to determine whether the interbank loan market was a trustworthy source of data. In the absence of collusion, Defendants

---

[239] IOSCO Principles, *supra* note 46.

[240] Darrell Duffie & Jeremy Stein, *Libor Needs More Competition*, Bloomberg View (July 22, 2014), http://www.bloombergview.com/articles/2014-07-22/libor-needs-more-competition.

[241] Gary Gensler, Chairman, U.S. C.F.T.C., Remarks of Chairman Gary Gensler on Libor Before the Global Financial Markets Association's Future of Global Benchmarks Conference (Feb. 28, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-133.

would have had an incentive to apprise users of this issue and clearly identify contingency measures to respond to it.[242]

202. The Unlawful Agreements did not provide any pro-competitive benefits.

**Antitrust Injury**

203. The reduction of competition in the market for USD interest-rate benchmarks was a direct and material cause of Freddie Mac's injuries. Freddie Mac negotiated pay-fixed, receive-floating USD interest-rate swaps with Bank Defendants and others that incorporated USD bbaLIBOR™ as a price term. In addition, Freddie Mac purchased floating-rate MBS that incorporated USD bbaLIBOR™ as the interest-rate benchmark. In a competitive market for interest-rate benchmarks, USD bbaLIBOR™ would have been calculated according to its published rules and not subject to manipulation and systematic depression. In the absence of the Unlawful Agreements, the competitive process would have created overwhelming incentives for Defendants to reliably apply the published USD bbaLIBOR™ methodology and Freddie Mac would have received the consideration for which it bargained.

204. In addition, but for the collusion, Defendants would have disclosed the extent of deterioration in the unsecured interbank loan market and identified methods to improve the reliability of the underlying data. Virtually all of the recent proposals for improvement of interest-rate benchmarks would broaden the range of data to include actual transactions in unsecured wholesale funding markets.

205. In its capacity as a purchaser of USD floating-rate loans, Freddie Mac was a consumer of USD short-term interest-rate benchmarks and therefore suffered a direct injury

---

[242] *See* IOSCO Consultation Report, *supra* note 42, at 20-21 (benchmark providers should clearly disclose changes to the methodology so that users can determine whether it remains a suitable reference); IOSCO Principles, *supra* note 46, at 22-23 (benchmark providers should publish methodology in sufficient detail to allow users to understand how it is derived and its appropriateness as a reference for financial instruments).

because it was forced to participate in a non-competitive and non-transparent market for interest-rate benchmarks, paid artificially inflated prices for interest-rate derivatives that incorporated USD bbaLIBOR™ as a payment term for Freddie Mac, and received lower payments from derivatives, floating-rate loans, and floating-rate MBS where payments were determined by USD bbaLIBOR™.

### B. Relevant Market: OTC USD Interest-Rate Derivatives

#### Market Definition

206. OTC USD interest-rate derivatives include instruments such as swaps, forwards, caps, floors, swaptions, and collars.[243] During the conspiracy period, USD bbaLIBOR™ was the dominant interest-rate benchmark used in OTC USD interest-rate derivatives.

207. The OTC interest-rate derivatives market differed from futures markets in a number of important respects. Whereas futures and futures options were standardized agreements that traded on organized exchanges, the OTC market was an informal bilateral market consisting of broker/dealers that traded price information and negotiated transactions over electronic communications networks. Although a great deal of contract standardization exists in the OTC market, dealers active in this market custom-tailor agreements to meet the specific needs of their customers. And unlike futures markets, where futures exchange clearinghouses guarantee contract performance through a system of margin requirements combined with the daily settlement of gains or losses, counterparties to OTC derivative agreements must bear some default or credit risk.[244] The OTC USD interest-rate derivatives

---

[243] Anatoli Kuprianov, *Chapter 16: Over-the-Counter Interest Rate Derivatives*, *in* Fed. Reserve Bank of Richmond, Instruments of the Money Market 238, 238-39 (1998), *available at* https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/pdf/chapter_16.pdf.

[244] *Id.*

market was opaque during the conspiracy period, even more so as a result of the Unlawful Agreements.

208. OTC USD interest-rate derivatives are traded in a global market. A small set of dealers—comprised primarily of Bank Defendants—dominated the market for OTC USD interest-rate derivatives during the conspiracy period. According to a July 2010 ISDA market survey, the largest 14 dealers held 82% of interest-rate derivatives by notional amount.[245] Of these 14 dealers, 10 were USD bbaLIBOR™ Contributor Banks: Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, UBS.[246] Similarly, the top five United States bank holding companies—Defendants Bank of America, Citigroup, JP Morgan, HSBC, and the investment bank Goldman Sachs, accounted for more than 95% of all OTC swaps and derivatives transactions in the United States.[247]

209. There were no reasonable alternatives to OTC USD interest-rate derivatives because those products were the most efficient way for lenders and borrowers to transfer risk through customized contracts.

**Harm to Competition**

210. Competition in the OTC USD interest-rate derivatives market depended on a reliable and predictable interest-rate benchmark. As noted above, OTC dealers quote prices for interest-rate swaps in two parts: (1) an interest-rate benchmark and (2) a fixed interest rate. The fixed rate is calculated to provide the net present value today of the expected cash flows from the quoted benchmark over the life of the swap. The potential purchaser of a pay-fixed, receive-floating derivative calculates the expected cash flows by applying the published rules of the

---

[245] Mengle, *supra* note 56, at 1.

[246] *Id*. at 2.

[247] *Id*. at 1.

quoted benchmark to the predicted market conditions over the length of the swap to determine the price it will pay for that swap.

211. The Unlawful Agreements harmed competition in the market for OTC USD interest-rate derivatives by undermining price transparency and excluding alternative benchmarks from being used to price OTC USD interest-rate derivatives. In a competitive market, bbaLIBOR™ would have been a reliable benchmark or it would have been replaced by one or more alternative benchmarks that better served its intended purposes.

212. The Unlawful Agreements did not provide any pro-competitive benefits in this market.

**Antitrust Injury**

213. Freddie Mac's injuries arose from the harm to competition alleged above. In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology and therefore would have been consistently higher throughout the conspiracy period. These injuries flow directly from the substitution of collusion for competition in the market for OTC USD interest-rate derivatives.

**C. Relevant Market: USD Floating-Rate Retail Loans**

**Market Definition**

214. USD floating-rate retail loans are loans made by banks, including the Bank Defendants, for mortgages and other consumer uses. Retail loans were typically of longer duration. There are markets for USD floating-rate retail loans worldwide.[248] During the conspiracy period, the Bank Defendants made billions of dollars' worth of USD retail loans,

[248] Wholesale loans are also referred to as "trades," with "buy" corresponding to borrow and "sell" corresponding to lend.

which Bank Defendants packaged for sale to investors such as Freddie Mac. For example, in 2010, more than half of all mortgages in the United States were originated by three banks: Wells Fargo, Bank of America, and JP Morgan.[249] During the conspiracy period, these three banks and Citigroup were consistently among the top five mortgage originators.[250] They were also, by far, the four largest commercial banks in the United States.[251] In 2010, these four banks held $3.6 trillion in deposits at the end of the fourth quarter, whereas the next 46 institutions in the top 50 collectively held $2.68 trillion in deposits.

215. There were no reasonable substitutes for USD floating-rate retail loans. Participants in the floating-rate loans market seek to transfer risk from the lender to the borrower for a price. In fixed-rate loans, the lender typically cannot transfer interest-rate risk, which makes the loan more expensive to the borrower and an insufficient substitute.

**Harm to Competition**

216. The Unlawful Agreements harmed competition in the market for USD floating-rate retail loans by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process. The Bank Defendants were among the largest lenders and, as a result of their conspiracy, were uninterested in promoting competition for interest-rate benchmarks. Also as a result of the conspiracy, lenders other than the Bank Defendants were unaware that bbaLIBOR™ no longer served its intended purpose and therefore non-defendant lenders had no incentive to demand alternative interest-rate benchmarks.

---

[249] Press Release, Mortgage Daily, 3 Biggest Lenders Close Over Half of U.S. Mortgages (Feb. 15, 2011), http://www.mortgagedaily.com/PressRelease021511.asp.

[250] *Id*.

[251] *See, e.g.*, Aarti Kanjani, *Top 50 U.S. Banks and Thrifts by Assets*, SNL Fin., Mar. 21, 2011, http://www.snl.com/InteractiveX/article.aspx?CDID=A-12500123-14138&KPLT=2.

217. The Unlawful Agreements did not provide any pro-competitive benefits in this market.

**Antitrust Injury**

218. Freddie Mac's injuries arose from this harm to competition. In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology. Freddie Mac purchased USD floating-rate loans during the conspiracy period that incorporated USD bbaLIBOR™ as the interest-rate benchmark. As a result of the reduction of competition in the market for interest-rate benchmarks, Freddie Mac lacked adequate alternatives to USD bbaLIBOR™ and was deceived into believing that USD bbaLIBOR™ sufficiently served its intended purpose. As a direct result of the competitive harms caused by Defendants' conduct, payments to Freddie Mac on floating-rate loans that incorporated USD bbaLIBOR™ were lower than they would have been in the absence of the conspiracy.

**D. Relevant Market: USD Floating-Rate MBS**

**Market Definition**

219. The market for USD floating-rate MBS was a global one. During the conspiracy period, the Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS. For example, in 2009 Bank of America was the leading underwriter of U.S. mortgaged-backed securities with 17.5 percent of the total market. Other Bank Defendants in the top 10 included Barclays, Credit Suisse, JP Morgan, Citigroup, RBS, and Deutsche Bank.[252]

220. There were no reasonable substitutes for USD floating-rate MBS. Participants in the market for USD floating-rate MBS sought exposure to interest-rate risk and the prices for

---

[252] Adam Quinones, *Bank of America Top MBS Underwriter in 2009. What is an MBS Underwriter?*, Mortgage News Daily, Jan. 4, 2010, http://www.mortgagenewsdaily.com/01042010_bank_of_america_mbs_uw.asp.

floating-rate MBS reflected a discount from fixed-rate MBS because the buyer of the floating-rate MBS agreed to take on the interest-rate risk inherent in floating-rate products.

**Harm to Competition**

221. The Unlawful Agreements harmed competition in the market for USD floating-rate MBS by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process. The Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS and, as a result of their conspiracy, were uninterested in promoting competition for interest-rate benchmarks. As a result of the conspiracy, purchasers of USD floating-rate MBS paid artificially high prices for products and received lower quality.

222. The Unlawful Agreements did not provide any pro-competitive benefits in this market.

**Antitrust Injury**

223. The harms to competition in the market for USD floating-rate MBS were a material contributing factor to Freddie Mac's injuries because Freddie Mac purchased billions of dollars of USD floating-rate MBS from Bank Defendants and others. In a competitive environment, USD bbaLIBOR™ would have been calculated according to its published methodology and Freddie Mac would not have suffered its alleged injuries because the payments that Freddie Mac received from floating-rate MBS were less than they would have been in the absence of the conspiracy.

**COUNT II: BREACH OF CONTRACT (DEFENDANT BANK OF AMERICA)**

224. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

225. On March 8, 1999, Freddie Mac entered into an ISDA Master Agreement with NationsBank, N.A., predecessor-in-interest to Bank of America, under which Freddie Mac entered into pay-fixed swaps with Bank of America ("BOA Master Agreement").[253] In the BOA Master Agreement, the parties represented that the execution, delivery, and performance of the BOA Master Agreement did not violate or conflict with any law applicable to it.[254] The BOA Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[255] The BOA Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the BOA Master Agreement or any Credit Support Document to which it is a party.[256]

226. The BOA Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[257] The BOA Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the BOA Master Agreement.[258]

---

[253] The BOA Master Agreement is attached as Exhibit 20 and incorporated into this Complaint by reference (hereinafter "BOA Master Agreement").

[254] *Id.* ¶ 3(a)(iii).

[255] *Id.* ¶ 3(d).

[256] *Id.* ¶ 4(c).

[257] *Id.* ¶ 5(a)(iv).

[258] *Id.* ¶ 11.

227. The BOA Master Agreement states that all transactions between Freddie Mac and Bank of America are entered into in reliance on the fact that the BOA Master Agreement and all confirmations form a single agreement between the parties.[259] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

228. During the relevant period, Freddie Mac entered into more than 150 pay-fixed swaps governed by the BOA Master Agreement.

229. Bank of America knowingly breached and defaulted on the BOA Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

230. As a result of Bank of America's breach of the BOA Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the BOA Master Agreement.

## COUNT III: BREACH OF CONTRACT (DEFENDANT BARCLAYS)

231. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

232. On January 2, 1996, Freddie Mac entered into an ISDA Master Agreement with Barclays ("Barclays Master Agreement").[260] In the Barclays Master Agreement, the parties represented that the execution, delivery, and performance of the Barclays Master Agreement did

[259] *Id.* ¶ 1(c).

[260] The Barclays Master Agreement is attached as Exhibit 21 and incorporated into this Complaint by reference.

not violate or conflict with any law applicable to it.[261] The Barclays Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[262] The Barclays Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Barclays Master Agreement or any Credit Support Document to which it is a party.[263]

233. The Barclays Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[264] The Barclays Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Barclays Master Agreement.[265]

234. The Barclays Master Agreement states that all transactions between Freddie Mac and Barclays are entered into in reliance on the fact that the Barclays Master Agreement and all confirmations form a single agreement between the parties.[266] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

---

[261] *Id.* ¶ 3(a)(iii).

[262] *Id.* ¶ 3(d).

[263] *Id.* ¶ 4(c).

[264] *Id.* ¶ 5(a)(iv).

[265] *Id.* ¶ 11.

[266] *Id.* ¶ 1(c).

235. During the relevant period, Freddie Mac entered into more than 100 pay-fixed swaps governed by the Barclays Master Agreement.

236. Barclays breached and defaulted on the Barclays Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

237. As a result of Barclays' breach of the Barclays Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Barclays Master Agreement.

## COUNT IV: BREACH OF CONTRACT (DEFENDANT CITIBANK, N.A.)

238. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

239. On January 21, 1993, Freddie Mac entered into an ISDA Master Agreement with Defendant Citibank, N.A. The parties renewed the ISDA Master Agreement on April 1, 1994 ("Citibank Master Agreement").[267] In the Citibank Master Agreement, the parties each represented that the execution, delivery, and performance of the Citibank Master Agreement did not violate or conflict with any law applicable to it.[268] The Citibank Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[269] The Citibank Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair

[267] The Citibank Master Agreement is attached as Exhibit 22 and incorporated into this Complaint by reference.

[268] *Id.* ¶ 3(a)(iii).

[269] *Id.* ¶ 3(d).

its ability to perform its obligations under the Agreement or any Credit Support Document to which it is a party.[270]

240. The Citibank Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[271] The Citibank Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Citibank Master Agreement.[272]

241. The Citibank Master Agreement states that all transactions between Freddie Mac and Citibank are entered into in reliance on the fact that the Citibank Master Agreement and all confirmations form a single agreement between the parties.[273] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

242. During the relevant period, Freddie Mac entered into more than 90 pay-fixed swaps governed by the Citibank Master Agreement.

243. Citibank breached and defaulted on the Citibank Master Agreement through Citigroup's fraudulent and collusive conduct, Citigroup's failure to disclose the fraudulent and collusive conduct, Citigroup's intentional misrepresentation and manipulation of USD bbaLIBOR™, and Citibank's underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

[270] *Id.* ¶ 4(c).

[271] *Id.* ¶ 5(a)(iv).

[272] *Id.* ¶ 11.

[273] *Id.* ¶ 1(c).

244. As a result of Citigroup's breach of the Citibank Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Citibank Master Agreement.

**COUNT V: BREACH OF CONTRACT (DEFENDANT CREDIT SUISSE)**

245. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

246. On August 23, 2002, Freddie Mac entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Credit Suisse, under which Freddie Mac entered into pay-fixed swaps with Credit Suisse ("Credit Suisse Master Agreement").[274] In the Credit Suisse Master Agreement, the parties represented that the execution, delivery, and performance of the Credit Suisse Master Agreement did not violate or conflict with any law applicable to it.[275] The Credit Suisse Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[276] The Credit Suisse Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Credit Suisse Master Agreement or any Credit Support Document to which it is a party.[277]

247. The Credit Suisse Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material

[274] The Credit Suisse Master Agreement is attached as Exhibit 23 and incorporated into this Complaint by reference.

[275] *Id.* ¶ 3(a)(iii).

[276] *Id.* ¶ 3(d).

[277] *Id.* ¶ 4(c).

respect when made or repeated.[278] The Credit Suisse Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Credit Suisse Master Agreement. [279]

248. The Credit Suisse Master Agreement states that all transactions between Freddie Mac and Credit Suisse are entered into in reliance on the fact that the Credit Suisse Master Agreement and all confirmations form a single agreement between the parties.[280] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

249. During the relevant period, Freddie Mac entered into more than 200 pay-fixed swaps governed by the Credit Suisse Master Agreement.

250. Defendant Credit Suisse breached and defaulted on the Credit Suisse Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

251. As a result of Credit Suisse's breach of the Credit Suisse Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Credit Suisse Master Agreement.

---

[278] *Id.* ¶ 5(a)(iv).

[279] *Id.* ¶ 11.

[280] *Id.* ¶ 1(c).

## COUNT VI: BREACH OF CONTRACT (DEFENDANT DEUTSCHE BANK)

252. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

253. On April 10, 1997, Freddie Mac entered into an ISDA Master Agreement with Deutsche Bank ("Deutsche Bank Master Agreement").[281] In the Deutsche Bank Master Agreement, the parties represented that the execution, delivery, and performance of the Deutsche Bank Master Agreement did not violate or conflict with any law applicable to it.[282] The Deutsche Bank Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[283] The Deutsche Bank Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Deutsche Bank Master Agreement or any Credit Support Document to which it is a party.[284]

254. The Deutsche Bank Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[285] The Deutsche Bank Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all

[281] The Deutsche Bank Master Agreement is attached as Exhibit 24 and incorporated into this Complaint by reference.

[282] *Id.* ¶ 3(a)(iii).

[283] *Id.* ¶ 3(d).

[284] *Id.* ¶ 4(c).

[285] *Id.* ¶ 5(a)(iv).

reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Deutsche Bank Master Agreement.[286]

255. The Deutsche Bank Master Agreement states that all transactions between Freddie Mac and Defendant Deutsche Bank are entered into in reliance on the fact that the Deutsche Bank Master Agreement and all confirmations form a single agreement between the parties.[287] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

256. During the relevant period, Freddie Mac entered into more than 300 pay-fixed swaps governed by the Deutsche Bank Master Agreement.

257. Deutsche Bank breached and defaulted on the Deutsche Bank Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

258. As a result of Defendant Deutsche Bank's breach of the Deutsche Bank Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Deutsche Bank Master Agreement.

**COUNT VII: BREACH OF CONTRACT (DEFENDANT HSBC)**

259. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

---

[286] *Id.* ¶ 11.

[287] *Id.* ¶ 1(c).

260. On October 25, 2001, Freddie Mac entered into an ISDA Master Agreement with HSBC Bank USA under which Freddie Mac entered into pay-fixed swaps with HSBC ("HSBC Master Agreement").[288] In the HSBC Master Agreement, the parties represented that the execution, delivery, and performance of the HSBC Master Agreement did not violate or conflict with any law applicable to it.[289] The HSBC Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[290] The HSBC Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair a party's ability to perform its obligations under the HSBC Master Agreement or any Credit Support Document to which it is a party.[291]

261. The HSBC Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[292] The HSBC Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the HSBC Master Agreement.[293]

262. The HSBC Master Agreement states that all transactions between Freddie Mac and HSBC are entered into in reliance on the fact that the HSBC Master Agreement and all

---

[288] The HSBC Master Agreement is attached as Exhibit 25 and incorporated into this Complaint by reference.

[289] *Id.* ¶ 3(a)(iii).

[290] *Id.* ¶ 3(d).

[291] *Id.* ¶ 4(c).

[292] *Id.* ¶ 5(a)(iv).

[293] *Id.* ¶ 11.

confirmations form a single agreement between the parties.[294] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

263. During the relevant period, Freddie Mac entered into more than 20 pay-fixed swaps governed by the HSBC Master Agreement.

264. HSBC breached and defaulted on the HSBC Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

265. As a result of HSBC's breach of the HSBC Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the HSBC Master Agreement.

**COUNT VIII: BREACH OF CONTRACT (DEFENDANT RBS)**

266. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

267. On April 7, 2006, Freddie Mac entered into an ISDA Master Agreement with RBS ("RBS Master Agreement").[295] In the RBS Master Agreement, the parties represented that the execution, delivery, and performance of the RBS Master Agreement did not violate or conflict with any law applicable to it.[296] The RBS Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party

[294] *Id.* ¶ 1(c).

[295] The RBS Master Agreement is attached as Exhibit 26 and incorporated into this Complaint by reference.

[296] *Id.* ¶ 3(a)(iii).

[is] true, accurate and complete in every material respect."[297] The RBS Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the RBS Master Agreement or any Credit Support Document to which it is a party.[298]

268. The RBS Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[299] The RBS Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the RBS Master Agreement.[300]

269. The RBS Master Agreement states that all transactions between Freddie Mac and RBS are entered into in reliance on the fact that the RBS Master Agreement and all confirmations form a single agreement between the parties.[301] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

270. During the relevant period, Freddie Mac entered into some 200 pay-fixed swaps governed by the RBS Master Agreement.

---

[297] *Id.* ¶ 3(d).

[298] *Id.* ¶ 4(c).

[299] *Id.* ¶ 5(a)(iv).

[300] *Id.* ¶ 11.

[301] *Id.* ¶ 1(c).

271. RBS breached and defaulted on the RBS Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

272. As a result of RBS' breach of the RBS Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the RBS Master Agreement.

**COUNT IX: BREACH OF CONTRACT (DEFENDANT UBS)**

273. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

274. On May 1, 1996, Freddie Mac entered into an ISDA Master Agreement with Swiss Bank Corporation, predecessor-in-interest to UBS, under which Freddie Mac entered into pay-fixed swaps with UBS ("UBS Master Agreement").[302] In the UBS Master Agreement, the parties represented that the execution, delivery, and performance of the UBS Master Agreement did not violate or conflict with any law applicable to it.[303] The UBS Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[304] The UBS Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability

[302] The UBS Master Agreement is attached as Exhibit 27 and incorporated into this Complaint by reference.

[303] *Id.* ¶ 3(a)(iii).

[304] *Id.* ¶ 3(d).

to perform its obligations under the UBS Master Agreement or any Credit Support Document to which it is a party.[305]

275. The UBS Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[306] The UBS Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the UBS Master Agreement.[307]

276. The UBS Master Agreement states that all transactions between Freddie Mac and UBS are entered into in reliance on the fact that the UBS Master Agreement and all confirmations form a single agreement between the parties.[308] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

277. During the relevant period, Freddie Mac entered into more than 200 pay-fixed swaps governed by the UBS Master Agreement.

278. UBS breached and defaulted on the UBS Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

---

[305] *Id.* ¶ 4(c).

[306] *Id.* ¶ 5(a)(iv).

[307] *Id.* ¶ 11.

[308] *Id.* ¶ 1(c).

279. As a result of UBS' breach of the UBS Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the UBS Master Agreement.

**COUNT X: FRAUD (ALL DEFENDANTS)**

280. Freddie Mac incorporates by reference the preceding paragraphs in this Complaint.

281. Each Defendant owed a duty to Freddie Mac to honestly and accurately report USD bbaLIBOR™ and not to intentionally mislead Freddie Mac and others by secretly and collectively manipulating USD bbaLIBOR™ for their gain and to the detriment of others in the financial markets. Defendants' duty arises from representations that they made, individually and/or through the BBA, that bbaLIBOR™ was "a reliable indicator of the state of the money markets," that it was a "reliable barometer of risk," that it reflected competitive rates in the London interbank lending market, and other such public representations. Freddie Mac reasonably relied on Defendants' fraudulent misrepresentations and conduct because, among other things, Defendants falsely held USD bbaLIBOR™ out as a trustworthy, reliable benchmark and Defendants' fraud could only have been known to Defendants. Freddie Mac could not have discovered Defendants' fraud.

**Fraudulent USD bbaLIBOR Submissions (all Bank Defendants)**

282. As described above, beginning in August 2007 and continuing through at least May 2010, each Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition of bbaLIBOR™.
- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Bank Defendants.

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

283. The Bank Defendants made these representations knowing that they were false, or with reckless disregard for their truth.

284. Each of these representations was material because it formed the basis for USD bbaLIBOR™ published by and through the BBA and affected the price of USD OTC interest-rate derivatives, floating-rate retail loans, floating-rate MBS, and other products incorporating USD bbaLIBOR™. In addition, an individual bank's published submission provided information regarding its creditworthiness and liquidity. When a Bank Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially low in relation to other Bank Defendants, that Bank Defendant's submission was material because it led market participants to believe that the Bank Defendant presented the same credit standing as the other Bank Defendants. Had market participants and purchasers of USD interest-rate derivatives known the true credit risk and liquidity issues facing those Bank Defendants, they would have declined to do business with them.

285. The Bank Defendants recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark. In doing so, the Bank Defendants intended for Freddie Mac and others to rely on their false representations of material fact. Freddie Mac reasonably relied on these false representations of material fact in deciding whether to do business with a particular Bank Defendant.

286. As a result of Freddie Mac's reasonable reliance on these false representations of material fact, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and receiving a lower quality product

that did not generate the cash flows that would have been generated if Defendants had applied bbaLIBOR™'s published rules and governance mechanism.

**Fraudulent USD bbaLIBOR (all Defendants)**

287. As described above, beginning in August 2007 and continuing through at least May 2010, Defendants falsely represented on a daily basis that USD bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest submissions by the Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of bbaLIBOR™.

288. Defendants made these misrepresentations knowing that they were false, or with reckless disregard for their truth. These misrepresentations were material because they (a) formed the basis for pricing pay-fixed USD interest-rate swaps, floating-rate USD retail loans, and floating-rate USD MBS and (b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending rates. Defendants recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark. In doing so, Defendants intended for Freddie Mac and others to rely on their false representations of material fact.

289. Freddie Mac reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to continue holding USD pay-fixed interest-rate swaps and floating-rate MBS. Freddie Mac specifically relied on Defendants' false representations in calculating the expected future cash flows from USD bbaLIBOR™ and, consequently, the price it was willing to pay for pay-fixed swaps and floating-rate MBS.

290. As a result of Freddie Mac's reasonable reliance on these false representations of material fact, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and lower interest-rate payments from Defendants and others from pay-fixed interest-rate swaps, floating-rate MBS, and floating-rate retail loans.

**The BBA's Fraud**

291. Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to Freddie Mac and others that it actively and independently monitored the Bank Defendants' USD bbaLIBOR™ submissions to ensure that they were consistent with the published definition of bbaLIBOR™. From 2007 through at least 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

292. In April 2008, the BBA falsely represented that (a) it was closely watching USD bbaLIBOR™ submissions, (b) it would expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) it would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) it did not believe that Contributor Banks had submitted false rates.

293. In June 2008, the BBA falsely represented that (a) the Contributor Banks' USD bbaLIBOR™ submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

294. On August 5, 2008, the BBA falsely represented that rates submitted by Contributor Banks were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."

295. The BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth. These misrepresentations were material because the BBA held

itself out as an independent entity that would exercise strong oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™. Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

296. The BBA intended for Freddie Mac and others to rely on these false representations of material fact. Freddie Mac reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding pay-fixed USD interest-rate swaps and floating-rate MBS.

297. As a result of Freddie Mac's reasonable reliance on these false representations of material fact, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and lower interest-rate payments from Bank Defendants and others from pay-fixed USD interest-rate swaps and floating-rate MBS.

**Contracting Bank Defendants' Fraud**

298. As discussed above, Freddie Mac entered into contracts with certain Defendants for pay-fixed USD interest-rate swaps, floating-rate MBS and retail loans ("the Contract Defendants"). By virtue of these contractual relationships, the Contract Defendants owed a duty of good faith and fair dealing to Freddie Mac.

299. Contrary to their duty, the Contract Defendants affirmatively misrepresented their credit risk and liquidity through fraudulent and collusive USD bbaLIBOR™ submissions. In addition, the Contract Defendants affirmatively misrepresented that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates. Further, the Contract Defendants failed to disclose the fraud and collusion relating to USD

bbaLIBOR™. The Contract Defendants made these and other false representations and material omissions knowing that they were false, or with reckless disregard for their truth. The Contract Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with Freddie Mac under the pay-fixed swaps in order to induce Freddie Mac to enter into these transactions. Freddie Mac would not have entered into the pay-fixed swaps at the same prices if Freddie Mac had known the Contract Defendants intended to substitute collusion for competition in the setting of USD bbaLIBOR™.

300. Freddie Mac reasonably relied on the Contract Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding pay-fixed USD interest-rate swaps and floating-rate MBS.

301. As a result of Freddie Mac's reasonable reliance on the Contract Defendants' fraudulent misrepresentations and omissions, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and lower interest-rate payments from Defendants and others from pay-fixed USD interest-rate swaps and floating-rate MBS.

## COUNT XI: TORTIOUS INTERFERENCE WITH CONTRACT (ALL DEFENDANTS)

302. Freddie Mac incorporates by reference the preceding paragraphs in this Complaint.

303. Freddie Mac purchased MBS, entered into pay-fixed swaps, and entered into other financial contracts tied to USD bbaLIBOR™ with counterparties other than Defendants.

304. Each Defendant knew that USD bbaLIBOR™ was incorporated into ISDA Master Agreements and other financial instruments.

305. Defendants intentionally and fraudulently held USD bbaLIBOR™ out to the world, including Freddie Mac, as a trustworthy and reliable benchmark.

306. Defendants knew, or should have known, that Freddie Mac had purchased MBS and entered into financial instruments that incorporated USD bbaLIBOR™.

307. Defendants intentionally and improperly interfered with these contracts and agreements, as described above, and caused Freddie Mac to receive reduced payments from those contracts and/or a decrease in value.

308. As a result of Defendants' intentional interference with Freddie Mac's contracts and agreements, Freddie Mac suffered damages in the form of, among other things, receiving lower interest-rate payments from Defendants and others.

## PRAYER FOR RELIEF

WHEREFORE, Freddie Mac requests the Court to:

a. Enter judgment for Freddie Mac awarding Freddie Mac its full damages for all economic, monetary, actual, consequential, and compensatory damages that Freddie Mac suffered as a result of Defendants' unlawful and/or inequitable conduct.

b. Award punitive damages to the extent allowable by law.

c. Treble damages for violations of the Sherman Act.

d. Award attorneys' fees and costs of suit.

e. Grant such other further relief as allowed by law.

## JURY DEMAND

Freddie Mac requests a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: October 6, 2014

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By: /s/ Richard J. Leveridge

Richard J. Leveridge
James R. Martin
Jennifer D. Hackett
1825 I Street, NW
Washington, DC 20006
202-420-2200

*Attorneys for Plaintiff Federal Home Loan Mortgage Corporation*