# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: | **MDL No. 2262**<br>**Master File No. 1:11-md-02262-NRB**<br><br>**ECF CASE** |
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>          Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>          Defendants. | **Case No. 1:13-cv-03952-NRB** |

**MEMORANDUM IN SUPPORT OF MOTION OF PLAINTIFF
THE FEDERAL HOME LOAN MORTGAGE CORPORATION
FOR LEAVE TO FILE PROPOSED THIRD AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II.  SUMMARY OF ARGUMENT ................................................................................2

III.  THE SECOND CIRCUIT'S DECISION IN SCHWAB PROMPTED
     THE PROPOSED AMENDMENTS ........................................................................4

IV.  THE PTAC ALLEGES FACTS SUFFICIENT TO MAKE OUT A
     PRIMA FACIE CASE FOR PERSONAL JURISDICTION OVER
     DEFENDANTS THAT DIRECTLY OR INDIRECTLY SOLD
     LIBOR-BASED INSTRUMENTS TO FREDDIE MAC ..........................................5

     A.  Direct Sellers ...............................................................................................5

     B.  Sales to Freddie Mac in Virginia Through Subsidiaries and Affiliates .................7

V.  THE PROPOSED AMENDMENTS ALLEGE FACTS THAT MAKE OUT
    A PRIMA FACIE CASE OF PERSONAL JURISDICTION OVER ALL
    DEFENDANTS FOR "DATA FRAUD" AND ANTITRUST CLAIMS .......................11

     A.  Freddie Mac Has Plausibly Alleged a Conspiracy .................................................12

     B.  Freddie Mac Has Plausibly Alleged the Panel Bank Defendants
         and BBA Were Members of the Conspiracy .........................................................12

     C.  The Proposed Amendments Allege Overt Acts in Virginia
         (for the Fraud Claim) and the United States (for the Antitrust Claim) .................16

         1.  Defendants' Transmission of Their Individual LIBOR
             Submissions to Freddie Mac and Other U.S. Investors to
             Project Financial Soundness .................................................................16

         2.  Certain Panel Bank Defendants Committed Overt Acts by
             Promoting, and Profiting From, Their Financial Soundness
             to Freddie Mac in Virginia .......................................................................18

         3.  Affirmative Acts of Concealment in Virginia and
             the United States ...................................................................................19

         4.  Newly Discovered Overt Acts Further Confirming that
             Panel Bank Defendants Directed Artificial Suppression from
             the United States ...................................................................................20

         Citibank....................................................................................................21

         JPMorgan .................................................................................................22

              Barclays.................................................................................................23

    D.    Viewed in their Totality, The Overt Acts State a Prima Facie Case for
           Personal Jurisdiction Over All Defendants...............................................23

VI.    THE PROPOSED AMENDMENTS SUFFICIENTLY ALLEGE THAT THE
       PANEL BANKS CONTINUED TO ACTIVELY SUPPRESS THEIR USD
       LIBOR CONTRIBUTIONS FROM MAY 2010 THROUGH OCTOBER 2011 .............24

VII.   THE PTAC CLEAN-UP ITEMS...................................................................25

VIII.  CONCLUSION.........................................................................................25

## I.   INTRODUCTION

Pursuant to the Court's Orders of April 11 and May 7, 2018, and in light of the Second

Circuit's decision in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir.

2018), Plaintiff The Federal Home Loan Mortgage Corporation ("Freddie Mac") moves for leave

to amend its Second Amended Complaint.[1]  The Proposed Third Amended Complaint ("PTAC")

is attached as Exhibit A.  A redlined copy is attached as Exhibit B.

The proposed amendments fall into one or more of four different categories.  *First*, they

state with specificity the relationship between certain Panel Bank Defendants and their

subsidiaries and affiliates that transacted directly with Freddie Mac.  *Schwab* at 89-90 (granting

leave to amend to clarify agency relationships).  *Second*, they set forth additional facts showing

that Defendants committed in-forum acts in furtherance of the conspiracy by (1) transmitting

their individual LIBOR[2] submissions to Freddie Mac and others in Virginia and the United

States, (2) profiting at Freddie Mac's expense from their projection of financial soundness,

(3) falsely assuring Freddie Mac and others that LIBOR was not manipulated, and (4) directing

LIBOR suppression from the United States.  *Id.* at 90 (granting leave to add allegations in

support of conspiracy theory of jurisdiction).  *Third*, the proposed amendments provide

previously unknown facts showing Defendants actively suppressed LIBOR through October

2011.  *Finally*, the proposed amendments add allegations on which Freddie Mac relied in prior

---

[1] In accordance with the Court's May 14, 2018 Order, Freddie Mac has coordinated with the Federal Deposit Insurance Corporation as Receiver for 38 Closed Banks and the Federal Deposit Insurance Corporation as Receiver for Doral Bank (collectively, "FDIC-R"), which are also seeking leave to amend on largely overlapping grounds.  The FDIC-R is differently situated from Freddie Mac in that the FDIC-R brought two actions, the most recent in February 2018, in the Southern District of New York on behalf of a combined 39 Closed Banks.  The FDIC-R addresses issues unique to its proposed amended complaint in a separate Memorandum.  The FDIC-R otherwise expressly joins in the overlapping arguments in this Memorandum: Sections II (legal principles); III (*Schwab* prompted proposed amendments); IV (agency principles); V (the proposed amendments establish personal jurisdiction over all defendants); VI (the amendments plausibly allege active suppression through October 2011); and VII (clean-up items).

[2] All references to "LIBOR" are to US Dollar LIBOR.

briefing (with the Court's permission), so that those allegations appear in a single pleading, and add "clean-up" items, such as updating a corporate defendant's name.

## II.    SUMMARY OF ARGUMENT

Federal courts should "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). Motions for leave to amend should be denied only if the plaintiff has acted in bad faith (for example, by being unduly dilatory or repeatedly failing to cure deficiencies when able), the defendant is unduly prejudiced by an amendment, or amendment would be futile. *See, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."); *Richardson Greenshields Sec., Inc. v. Mui–Hin Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (motion to amend should be denied "only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most importantly, the resulting prejudice" to the moving party). None of those exceptions applies here.

Freddie Mac has acted in good faith. In the three-and-a-half years following its most recent October 2014 amendment, criminal trials, regulatory actions, and limited document productions[3] have disclosed many new facts. Rather than seeking leave to amend with each new disclosure, Freddie Mac waited to do so in a manner that would be efficient for the parties and the Court. The *Schwab* opinion presents that opportunity.

Defendants will not be prejudiced – let alone "unduly prejudiced" – by the proposed amendments. *See Foman*, 371 U.S. at 182 (prejudice to defendant must be "undue"). Such

---

[3] Due to prior rulings by the Court, Freddie Mac has access to only a limited subset of the documents produced by Defendants to the class plaintiffs in the certification discovery phase of this MDL. Freddie Mac expects that discovery will elicit substantial additional evidence of jurisdictionally relevant contacts under, at least, the agency and conspiracy theories of jurisdiction.

undue prejudice exists only if amendments would add a new claim that would require the defendant to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute. *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (reversing denial of motion for leave to amend because, without more, concerns about the "time, effort[,] and money . . . expended" in litigating the matter do not constitute prejudice sufficient to warrant denial of leave to amend). *Id.* Freddie Mac's proposed amendments raise no such concerns. Merits discovery has not yet begun, Freddie Mac does not seek to add new legal theories, and the PTAC will present the Court with its first opportunity to evaluate the viability of Freddie Mac's claims after the *Schwab* ruling.

Moreover, as explained more fully below, the proposed amendments will not be futile because they support claims that would survive a motion to dismiss. *Danaher Corp. v. Travelers Indem. Co.*, No. 10 Civ. 0121, 2013 WL 150027, at *1 (S.D.N.Y. Jan. 10, 2013) (courts will deem an amendment futile if the proposed amended complaint would not withstand a motion to dismiss). Courts routinely allow amendments to add jurisdictional allegations, including allegations regarding parent/subsidiary relationships. *See Yousef v. Al Jazeera Media Network*, No. 16-cv-6416 (CM), 2018 WL 1665239, at *15 (S.D.N.Y. March 22, 2018) (rejecting futility argument and allowing amendment where new allegations demonstrated a parent/subsidiary agency relationship sufficient for personal jurisdiction); *see also Weaver v. Derichebourg ICS Multiservices*, No. 09 Civ. 1611, 2010 WL 517595, at *3 (S.D.N.Y. Feb. 3, 2010) (allowing amendment to establish personal jurisdiction on theory that subsidiary was agent or "department" of parent and rejecting futility argument as premature).

3

The proposed amendments provide additional facts, unavailable at the time Freddie Mac last amended its Complaint and/or responsive to the *Schwab* opinion, that support Freddie Mac's claims on the merits and with respect to personal jurisdiction.

## III.   THE SECOND CIRCUIT'S DECISION IN *SCHWAB* PROMPTED THE PROPOSED AMENDMENTS

In its Order dated April 11, 2018, this Court wrote that the scope of any proposed amendments should be limited to those prompted by the *Schwab* decision.  ECF No. 2490 at 2. Freddie Mac's proposed amendments follow the Court's directive.

*Schwab* addressed the pleading standards for personal jurisdiction under an agency theory and granted the Schwab Plaintiffs leave to more specifically allege how Defendants purposefully availed themselves of California by "directing" their agents to transact with Schwab there. *Schwab* at 86, 89-90.  The PTAC alleges how Defendants purposefully availed themselves of Virginia by directing their agents to transact with Freddie Mac there.

*Schwab* also addressed the pleading standards for personal jurisdiction under a conspiracy theory and granted leave to add allegations in support of the conspiracy theory of jurisdiction.  *Id.* at 90.  The PTAC adds numerous allegations of Defendants' overt acts in Virginia and the United States.

In addition, *Schwab* held that it was plausible that a plaintiff could have reasonably relied on assurances from Defendant the British Bankers' Association ("BBA") that the BBA's "own investigation had confirmed the accuracy of LIBOR" and, therefore, that it was premature to grant Rule 12(b)(6) motions to dismiss under California's inquiry notice rules.  883 F.3d at 97-98 (citing *BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, 603 Fed. Appx. 57, 59 (2d Cir. 2015), finding trial court acted "too hastily" in dismissing fraud claims as time-barred under Pennsylvania law).  California has a "strong" inquiry notice rule, but does not deem a plaintiff on

inquiry notice from media coverage alone. *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *127 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*"). Pennsylvania is a "weak inquiry notice" jurisdiction, but "narrow" in comparison to some other jurisdictions. *Id.* at *132. Because Virginia is also a weak inquiry notice jurisdiction, *id.* at *133, the rationale of this aspect of *Schwab* should apply to revive Freddie Mac's fraud claims, which *LIBOR IV* dismissed as untimely. *Id.* at *170. The PTAC therefore alleges additional facts, which previously would have been futile to allege given the statute of limitations ruling, to support Freddie Mac's fraud claims.

In addition, by prompting the proposed amendments above, *Schwab* also created a timely opportunity for Freddie Mac to (1) allege facts that it did not know and could not have learned before its October 2014 Amended Complaint – such as government findings that Defendant Société Générale's ("SocGen") actively suppressed LIBOR from May 2010 through at least October 2011 and (2) make a number of clean-up amendments, e.g. updating a corporate defendant's name.

## IV. THE PTAC ALLEGES FACTS SUFFICIENT TO MAKE OUT A *PRIMA FACIE* CASE FOR PERSONAL JURISDICTION OVER DEFENDANTS THAT DIRECTLY OR INDIRECTLY SOLD LIBOR-BASED INSTRUMENTS TO FREDDIE MAC

### A. <u>Direct Sellers</u>

The Court has already ruled that it can assert personal jurisdiction under contract and fraud theories for claims against Panel Bank Defendants with which a plaintiff bought and traded certain LIBOR-based products. *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, No. 11 MDL 2262 NRB, 2016 WL 7378980, at *9 (S.D.N.Y. Dec. 20, 2016) *("LIBOR VI")*. This Court accordingly found that Freddie Mac stated a *prima facie* case of personal jurisdiction over Panel Bank Defendants Bank of America, N.A. ("BOA"), Barclays Bank, plc ("Barclays"), Citibank,

N.A. ("Citibank"), Credit Suisse AG ("Credit Suisse"), Deutsche Bank AG ("Deutsche Bank"), JPMorgan Chase Bank, N.A. ("JPMorgan"), Royal Bank of Scotland plc ("RBS"), and UBS AG ("UBS") for losses on swaps and purchases of mortgage loans. *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, 11 MD 2262 (NRB), 2016 WL 1301175, at *4 (S.D.N.Y. Mar. 31, 2016). The Court held, however, that it could not assert personal jurisdiction for claims arising from Freddie Mac's purchases of mortgage-backed securities ("MBS") tied to LIBOR because Freddie Mac did not sufficiently allege a description of those transactions and, in *LIBOR IV*, the Court held that there was no basis in any plaintiff's complaint to infer that "issuers of broadly-traded securities such as bonds and MBS purposely directed those securities into plaintiffs' home forums." *Id.* The PTAC adds such allegations for its billions of dollars of MBS purchases from Defendants during the "Conduct Period" (2007 through at least 2011). PTAC ¶¶ 10, 23 (targeting of Freddie Mac); 30-31, 39 (Bank of America, over $11 billion in over 50 transactions); 44-45, 58 (Barclays, almost $4 billion in nearly 85 transactions); 68, 73 (Citibank, nearly $6 billion in approximately 110 transactions); 87 (Credit Suisse, approximately $3 billion in more than 200 transactions); 99 (Deutsche Bank, approximately $1 billion in more than 40 transactions); 116 (HSBC Bank PLC ("HSBC"), $4 billion in nearly 50 transactions), 129 (JPMorgan, $1 billion in 20 transactions); 167 (RBS, nearly $6 billion in 130 transactions); 190 (UBS, $800 million in 9 transactions).

Each of these Defendants affirmatively solicited Freddie Mac's business in Virginia and directed sales of those securities to Virginia because Freddie Mac was one of the largest buyers of MBS in the world. *Id.* ¶ 10, 23, 30, 45, 64, 68, 87, 99, 116, 129, 167; *see also* Section V.B. (describing certain Defendants' efforts to meet Freddie Mac's pre-qualification standards to transact business with Freddie Mac). These transactions were part of a larger course of dealing

in which Defendants approached Freddie Mac in Virginia with potential investments and communicated with Freddie Mac in Virginia multiple times to negotiate and finalize those investments. *Id.* ¶ 14, 23, 30, 31, 33, 45, 68, 70, 77, 80, 89, 99, 101, 116, 118, 129, 146, 152, 158, 167, 169, 179, 182, 190, 192. These allegations provide the who, what, where, and how for those MBS claims sufficient to meet Federal Rules of Civil Procedure 8's notice requirement and firmly demonstrate that these Defendants purposely directed those MBS into Virginia.

A number of these sales were made directly by BOA and Citibank. *Id.* ¶¶ 30, 68. For those two defendants, the *Schwab* decision is dispositive. *Schwab* at 83 ("[T]here is jurisdiction" over direct sellers.). The remaining Panel Bank Defendants sold MBS to Freddie Mac through wholly owned subsidiaries and/or affiliates ("the Selling Defendants"). As shown below, the PTAC alleges facts making out a *prima facie* case of personal jurisdiction for those Selling Defendants under the agency principles articulated in *Schwab*.

**B.   Sales to Freddie Mac in Virginia Through Subsidiaries and Affiliates**

Personal jurisdiction may be asserted over a Panel Bank Defendant that "indirectly" sells securities through a subsidiary or affiliate because a corporation "can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Schwab* at 84 (citing *Daimler*, 134 S. Ct. at 759 n.13); *Walden v. Fiore*, 134 S.Ct. 1115, 1121, 1122 (2014) ("A defendant's physical entry into the forum – either 'in person or through an agent, goods, mail, or some other means' – constitutes contact with the forum sufficient to support specific jurisdiction.").

To state a *prima facie* case of specific personal jurisdictional under this theory, a plaintiff must show that the subsidiary/affiliate acted in the forum "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981). A formal agency relationship is not required.

*Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015).  Nor does the plaintiff need to pierce the corporate veil.  *Yousef*, 2018 WL 1665239 at *9 (Even "[w]here the parent is not involved in the day-to-day operations of its subsidiary, or, where the entities observe corporate formalities, the subsidiary and parent can nonetheless have an agency relationship because they are engaged in a 'common business enterprise.'").  Facts showing that the parent itself would perform equivalent services if the subsidiary did not exist are also sufficient to establish personal jurisdiction.  *Id.*  The PTAC alleges such facts.

Each Selling Defendant operated the investment arm of its operations as part of a single global business unit without regard to corporate formalities and with common branding.  PTAC ¶¶ 40, 53, 76, 83, 94, 108, 122, 148, 155, 157, 184, 196, 199.  Each Selling Defendant treated subsidiary/affiliate profits as the global business unit's profits.  *Id.* ¶¶ 40, 53, 76, 96, 97, 108, 125, 177, 195.  Each Selling Defendant determined and set the business unit's strategy targeting Freddie Mac as an important institutional client.  *Id.* ¶¶ 10, 23, 76, 108, 176, 195.  Each Selling Defendant's key executives were also executives of the subsidiary/affiliate.  *Id.* ¶¶ 40, 41, 57, 76-77, 94, 111, 125, 177, 196.  Employees of the subsidiary/affiliate reported directly to the Selling Defendant.  *Id.* ¶¶ 49, 58, 76, 90, 177, 112, 198,    Between 2007 and 2011, the Selling Defendants collectively sent hundreds of thousands of electronic messages to employees of Freddie Mac in Virginia (for example, Bank of America sent over 200,000 and Barclays sent almost 500,000 during that time period), solicited Freddie Mac's business in Virginia (in part by marketing the Selling Defendant's financial soundness), and engaged in many millions of dollars of transactions with Freddie Mac in Virginia.[4]  *Id.* at 62 n. 31, 396 n. 417.  Through their global

---

[4] The PTAC alleges, on a defendant-by-defendant basis MBS sales and swap transactions in detail, including the identity of the MBS seller and swap counterparty, the number of MBS and swap transactions, and the sales/transaction amounts. *Id.* ¶¶ 25, 37, 60, 76, 84, 98, 103, 118, 131, 149.

business units, the Selling Defendants directed their affiliates to sell MBS to, and execute swaps with, Freddie Mac. *Id.* ¶¶ 32, 40, 48, 57, 76, 94, 108, 125, 140, 178, 197. But for the existence of the subsidiary/affiliate, the Selling Defendants would have transacted directly with Freddie Mac.

In turn, Freddie Mac devoted considerable resources to monitoring its swap, loan, and MBS counterparties' financial strength, taking into account the strength of the parent companies as well as the direct counterparties. *Id.* ¶¶ 11-15. Once a counterparty was approved for transactions with Freddie Mac, that counterparty would be reviewed on a regular basis by various Freddie Mac business areas. *Id.* ¶¶ 11. As one example, the Dealer Relations group within Freddie Mac created quarterly "Dealer Scorecards" that contained rankings and commentary on approximately 20 different areas of a counterparty's relationship with Freddie Mac. *Id.* ¶¶ 12-14. These counterparties included Defendants Bank of America Corp./Bank of America, N.A., Barclays Bank plc, Citigroup, Inc./Citibank, N.A., Credit Suisse AG/Credit Suisse International, Deutsche Bank AG, HSBC Bank plc/ HSBC Bank USA, N.A., J.P. Morgan Chase & Co./JPMorgan Chase Bank, N.A., The Royal Bank of Scotland plc/RBS Securities Inc., SG Americas Securities, LLC, and UBS AG. *Id.* ¶¶ 31, 46, 69, 88, 100, 117, 130, 151, 168, 191. Freddie Mac shared certain sections of the Dealer Scorecards with these counterparties and had ongoing conversations with its counterparties about them. *Id.* ¶¶ 13.

Just as Freddie Mac did, Freddie Mac's counterparties placed a great deal of importance on the Dealer Scorecards. *Id.* ¶¶ 10, 13. As part of the process, the counterparties would complete a "Divisional Value Added" spreadsheet which gave counterparties an opportunity to present their value to Freddie Mac prior to finalization of the Scorecard. *Id.* ¶¶ 13. These spreadsheets related to the LIBOR-linked swaps, MBS, and loan activity (among other things)

and had the potential to impact a counterparty's ranking. *Id.* ¶¶ 13-14. Freddie Mac attempted to meet with representatives of its counterparties on a regular basis to discuss the Scorecards (for example, on at least one occasion, Freddie Mac met with JPMorgan Chief Executive Officer Jamie Dimon). *Id.* ¶¶ 13.

As one specific example of a parent company operating through its subsidiary to transact business with Freddie Mac, Barclays conducted its investment banking operations through its Barclays Capital business unit ("BCBU"). *Id.* ¶¶ 53. Barclays Capital Inc. ("BCI") was the primary U.S. securities dealer for BCBU. *Id.* ¶¶ 56. Barclays CEO Robert Diamond oversaw BCBU. *Id.* ¶ 57. Barclays executive Jerry del Missier, President of BCBU and a member of BCI's Board of Directors, reported directly to Diamond. *Id.* In a 2009 speech, Diamond told investors that BCBU operated "as one firm" with "one brand and identity," "one risk and governance process," and "one set of goals and objectives." *Id.* ¶ 53.

Barclays, *inter alia*, engaged in hundreds of swap transactions with Freddie Mac, sold billions of dollars of MBS and thousands of residential mortgages to Freddie Mac, provided warehouse lines of credit to Freddie Mac's Sellers/Servicers, and provided financing to Freddie Mac's Seller/Servicers. *Id.* ¶¶ 45, 49-50. During the Conduct Period, among other performance and relationship-based activities with Freddie Mac, Barclays engaged in the Dealer Scorecard process discussed above to pursue swaps, MBS, and loan transactions. *Id.* ¶¶ 46. Taken together, these allegations make a *prima facie* case of personal jurisdiction under established agency principles.

The other Selling Defendants utilized similar global business unit structures through which the Selling Defendants knew of, benefited from, and exercised sufficient control over their domestic subsidiaries and affiliates in the sales of MBS to, and execution of swaps with, Freddie

Mac. *Id.* ¶¶ 30 n. 13, 40, 53, 60, 76, 83, 94, 108, 122, 125, 148, 153, 155, 157, 184, 196, 199. And, as with Barclays, the other Selling Defendants routinely solicited business from and engaged in thousands of financial transactions with Freddie Mac in Virginia. *Id.* ¶¶ 23, 30, 33, 45, 47, 68, 70, 80, 87, 89, 99, 101, 116, 118, 129, 131, 146, 152, 158, 167, 169, 182, 192. As described above, many of the Selling Defendants engaged in the Dealer Scorecard process, and many of them sent regular research notes directly to Freddie Mac traders and other personnel in Virginia that included analyses on LIBOR. *Id.* ¶¶ 61, 95, 119, 132, 160.

These allegations are more than sufficient to show benefit, knowledge, and control sufficient to make out a prima facie case of jurisdiction over the Defendants that used their subsidiaries and affiliates to sell MBS to Freddie Mac.[5]

## V.   THE PROPOSED AMENDMENTS ALLEGE FACTS THAT MAKE OUT A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION OVER ALL DEFENDANTS FOR "DATA FRAUD" AND ANTITRUST CLAIMS

*Schwab* held that a plaintiff states a *prima facie* case of jurisdiction under the "conspiracy theory" when the plaintiff plausibly alleges (1) a conspiracy existed, (2) the defendant participated in the conspiracy, and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with the forum to subject that co-conspirator to jurisdiction in the forum. 883 F.3d at 87. *Schwab* further held that the Schwab Plaintiffs should be granted

---

[5] *See Jensen v. Cablevision Systems Corp.*, 2:17-cv-00100, 2017 WL 4325829 (E.D.N.Y. Sept. 27, 2017) (finding personal jurisdiction over parent cable company that invested in subsidiary's business and would derive substantial revenue from in-forum conduct); *Ingenito*, 89 F. Supp. 3d at 476-77 (finding *prima facie* case of personal jurisdiction over parent that transacted business through subsidiary that acted as parent's sales and distribution representative); *Pfizer Inc. v. Perrigo Co.*, 903 F. Supp. 14, 16 (S.D.N.Y. 1995) ("[A] foreign corporation can sell goods and perform other activities in New York through its subsidiaries, subjecting the parent corporation to personal jurisdiction in New York."); CPLR § 302(a)(1) (Courts may exercise personal jurisdiction over any non-domiciliary that "in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state); *In re Hydroxycut Marketing and Sales Practices Litigation*, 810 F.Supp.2d 1100, 1118 (S.D. Cal. 2011) (exercising personal jurisdiction over parent based on subsidiary's in-forum contacts because it was "clear that one business enterprise has been divided into numerous parts that work together and depend on each other.")

leave to amend its complaint to add allegations about in-forum acts taken in furtherance of the conspiracy. *Id.* at 90. Freddie Mac's PTAC allegations meet all three criteria.

### A.    Freddie Mac Has Plausibly Alleged a Conspiracy

This element already has been satisfied. The Second Circuit held in *Gelboim* that plaintiffs plausibly alleged a conspiracy to suppress LIBOR. *Gelboim v. Bank of America, et al.*, 823 F.3d 759, 771 (2d Cir. 2016). *LIBOR VI* held that the motive for that conspiracy was to "project" financial soundness to investors, where "increased profits followed from a positive reputation." 2016 WL 7378980, at *5. As alleged, the conspiracy was expressly focused on the United States. PTAC ¶¶ 3, 20, 249, 303, 348.

### B.    Freddie Mac Has Plausibly Alleged the Panel Bank Defendants and BBA Were Members of the Conspiracy

As the second part of the "conspiracy theory" test discussed by *Schwab*, there must be plausible allegations of defendants' membership in the conspiracy. To show such membership, a plaintiff must plausibly allege that the defendant engaged in some "purposeful behavior aimed at furthering the goals of the conspiracy." *United States v. Diaz*, 176 F.3d 52, 97 (2d Cir. 1999). With regard to the Panel Bank Defendants, Freddie Mac has alleged that each of them agreed to, and did, submit artificially low LIBOR contributions. In *Gelboim*, the Second Circuit upheld conspiracy allegations against each Panel Bank Defendant. 823 F.3d at 781-82.

With regard to the BBA, the PTAC alleges that the BBA engaged in purposeful behavior to further the objectives of the conspiracy in several respects. PTAC ¶¶ 266, 270, 283, 287, 297-98, 303-306, 310-315, 320-33, 343. Most notably, the BBA repeatedly – and falsely – assured United States investors and regulators that LIBOR submissions were accurate. *Id.*; *see also Grunewald v. U.S.*, 353 U.S. 391, 974 (1957) (recognizing relevance of acts of concealment done

in furtherance of the main criminal objectives of a conspiracy, particularly where accomplishment of conspiracy necessitates concealment).[6]  For example:

> August 2007:  The BBA distributed a press release stating that LIBOR "closely reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."  PTAC ¶ 266.

> April 2008:  It told Wall Street Journal ("WSJ") reporters the BBA was "closely watching the rates banks contribute" and would take action (including expelling banks that submitted deliberately inaccurate submissions) if "deemed necessary."  *Id.* ¶ 297.

> May 2008:  It claimed it had "every confidence in the integrity of the LIBOR-setting process and the accuracy of the figures it produces."  *Id.* ¶ 320.

> June 2008:  It transmitted to the WSJ a press release and paper to "correct a number of misunderstandings and misperceptions" about LIBOR.  The paper stated that differences between LIBOR and a proxy known as the "Euro Dollar rate" were due to "existing market conditions, not necessarily a distortion" in LIBOR.  *Id.* ¶ 326.

> August 2008:  It published a report claiming it had conducted an internal review and found that each published LIBOR contribution was "truly reflective" of the contributing bank's perceived borrowing costs and LIBOR remained a "fundamentally robust and accurate benchmark, with contributors inputting rates that they believe reflect their future funding costs."  *Id.* ¶¶ 328, 554.

The BBA employed a full-time manager, John Ewan, to supervise on a day-to-day basis the calculation of LIBOR, negotiate licensing agreements, and supervise the dissemination of information and data to the marketplace.  *Id.* ¶¶ 242-243.  Ewan served as a secretary to the

---

[6] *See also, FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A., et al.,* 16 Civ. 5263, 2017 WL 3600425 at * 13 (S.D.N.Y. Aug. 18, 2017) (recognizing relevant acts of concealment in conspiracy to manipulate financial benchmark because "by its very nature, the conspiracy could not succeed unless kept a secret."); *United States v. Weisberg,* No. 17-331, 2018 WL 1311938 at *3 (2d. Cir. Mar. 14, 2018) (evidence that defendant engaged in conduct "designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of" unlawful drug sale proceeds was sufficient to support criminal conviction), *citing United States v. Henry,* 325 F.3d 93, 103 (2d Cir. 2003); *United States v. Gomez–Pabon,* 911 F.2d 847, 853–54 (1st Cir. 1990), cert. denied sub nom. *Benitez Guzman v. United States,* 498 U.S. 1074 (1991) (membership may be shown over those who performed ancillary functions – e.g., accountants, messengers, and enforcers in a drug conspiracy -- if they knowingly engage in actions to assist in the accomplishment of a conspiratorial goal).

Foreign Exchange and Money Markets Committee ("FX & MM Committee"). *Id.* ¶¶ 63-65, 149.

The FX & MM Committee was comprised of 13 panel banks, whose identities were not

disclosed. Freddie Mac has identified 11 of those banks: BOA, Barclays, Citibank, Credit

Suisse, Deutsche Bank, HSBC, HBOS, Lloyds, Rabobank, RBS, and BTMU.

Actions of these Panel Bank Defendants under cover of the FX & MM Committee

provide additional evidence of their membership in the conspiracy. The Court in *LIBOR IV*

wrote there was nothing "suspicious about banks forming a committee within the BBA to

administer LIBOR." 2015 WL 6243526 at *48. But subsequent testimony has shown the FX &

MM Committee was "independent" of the BBA.[7] PTAC ¶¶ 241, 328, 399. The FX & MM

Committee had overarching responsibility for the operation and development of LIBOR, *i.e.*

determining LIBOR's rules, who could be members, and making disciplinary decisions. *Id.* In

the scope of his employment with the BBA, Ewan served at the direction of the FX & MM

Committee. *Id.* ¶ 53.





To further the conspiracy's objectives and to quash concerns about LIBOR's reliability after publication of the WSJ articles, Defendants (via the FX & MM Committee and the BBA) "dispatched" Ewan to the United States to "placate" investors and regulators there. *Id.* ¶ 303, n.306.



Defendants' efforts to "placate" United States investors, press, and regulators succeeded. Relying on the same arguments made by the BBA regarding the reasons for LIBOR's "dislocations," the NY Fed concluded it could not find "convincing evidence of actual misreporting" and took no action to prevent Defendants' unlawful actions. *Id.* ¶ 307, 405. United States investors and lenders, including Freddie Mac, continued to use LIBOR.

While engaging in this conduct, the BBA *knew* that its assurances were false. *Id.* ¶¶ 283, 287, 299-305.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████

Viewed in their totality, these allegations are more than sufficient to plausibly allege the

Panel Bank Defendants and BBA were members of the conspiracy to suppress LIBOR.

**C.      The Proposed Amendments Allege Overt Acts in Virginia (for the Fraud
         Claim) and the United States (for the Antitrust Claim)**

In keeping with the Second Circuit's grant of leave to Schwab to "add allegations about

in-forum acts taken in furtherance of the conspiracy," (*Schwab* at 89-90), Freddie Mac includes

additional "overt act" allegations in the PTAC as well.  An overt act is any act knowingly said or

done, including "innocent" acts, performed in furtherance of the purpose of the conspiracy's

objectives.  *U.S. v. Lange*, 834 F.3d 58, 70 (2d. Cir. 2016).  Overt acts committed in Virginia will

support personal jurisdiction for Freddie Mac's claim for fraud under Virginia law.  Acts

committed elsewhere in the United States (in addition to those in Virginia) will support personal

jurisdiction for Freddie Mac's antitrust claim.  *LIBOR VI*, 2016 WL 7378980 at * 8 (relevant

forum for assessment of contacts for antitrust claims is the United States as a whole).

*1.      Defendants' Transmission of Their Individual LIBOR Submissions to
         Freddie Mac and Other U.S. Investors to Project Financial Soundness*

The PTAC alleges the Panel Bank Defendants projected financial soundness by

confidentially submitting false quotes to the BBA, ***and by knowingly and intentionally***

communicating those otherwise secret quotes to United States investors, including Freddie Mac,

in Virginia, and elsewhere in the United States.  *Id.* ¶¶ 64, 237, 239.  As alleged in the PTAC,

publication of individual submissions was not a rule thrust upon the Panel Bank Defendants by

the BBA. To the contrary, the FX & MM Committee made that rule and, in 2008, unanimously rejected proposals to "anonymize" Panel Bank Defendants' submissions. *Id.* ¶ 327.

Panel Bank Defendants transmitted their individual (fraudulent) submissions to Virginia in no fewer than four ways. First, they sent them via their agent (and conduit), Thomson Reuters, directly to Freddie Mac and others, e.g. International Data Corporation ("IDC"), in Virginia. *Id.* ¶¶ 64, 237, 239. Second, they transmitted them to Freddie Mac's Bloomberg Terminal, located in Virginia. *Id.* ¶¶ 64, n.40, 64, n.41. Defendants knew that Freddie Mac subscribed to Bloomberg because Defendants routinely used it to communicate with Freddie Mac. *Id.* ¶ 406, n.463. Third, BOA routinely sent individual submissions directly to Freddie Mac via BOA's agent, Banc of America Securities, LLC. *Id.* ¶¶ 64, n.40, 406, n.463. Fourth, elsewhere in the United States, Panel Bank Defendants transmitted LIBOR data via Thomson Reuters to investors and licensed vendors in New York, including the WSJ. *Id.* ¶¶ 64, 91, 239.

Each such transmission was an overt act in furtherance of the reputational aspects of the conspiracy. *See, e.g., Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975); *U.S. v. Sindzingre*, Case No. CR 17-464 (attached as Exhibit C) (Grand Jury Indictment of SocGen executives alleging as overt acts the transmission of artificially suppressed individual submissions to New York to project financial soundness). And each overt act, individually and collectively, is sufficient to show "purposeful" direction toward Virginia. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (wire communications sent across state lines sufficient to establish specific personal jurisdiction as "in forum" acts); *Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164, 850 N.E.2d 1140 (2006) (New York Court of Appeals recognized long-arm jurisdiction over "commercial actors and

investors using electronic and telephonic means to project themselves into New York to conduct business transactions").[8]

### 2. Certain Panel Bank Defendants Committed Overt Acts by Promoting, and Profiting From, Their Financial Soundness to Freddie Mac in Virginia

The proposed amendments further allege that numerous Panel Bank Defendants profited from their positive reputation with Freddie Mac. Thus, these acts furthered the conspiracy's profit objectives. *LIBOR VI*, 2016 WL 7378980 at *5 (profits followed from the projection of financial soundness); *Schwab* (allegations that defendants undertook sales to Schwab as part of the alleged conspiracy could establish personal jurisdiction).

As alleged, Freddie Mac authorized its traders to transact business only with counterparties that were pre-approved by Freddie Mac's Counterparty Credit Risk Management group ("CCRM"). *Id.* ¶¶ 11-14, 23. The CCRM assigned credit ratings to counterparties, and ranked them, based on, *inter alia*, the counterparty's perceived credit risk, *i.e.*, the likelihood that a counterparty would become unable to fulfill its financial obligations. *Id.* Counterparties that fell below a certain rating would not be approved. *Id.*

As discussed above, Freddie Mac shared these ratings (in the Scorecards) on a quarterly basis with its counterparties, including the Selling Defendants. *Id.* To solicit Freddie Mac's business, Selling Defendants provided written responses to the ratings and sent them to Freddie Mac in Virginia. *Id.* On an annual basis, the Selling Defendants met with Freddie Mac to discuss the ratings and Selling Defendants' responses to the ratings. *Id.* Each Selling Defendant

---

[8] *See also, Transamerican Equipment Company, LLC v. Industrial Assets Corp.*, 7:17-CV-00481-LSC, 2018 WL 831014 at * 5 (N.D. Al. Feb. 12, 2018) (correspondence sent to forum state in furtherance of conspiracy); *Bowman v. Hodge Mgmt. Group, LLC*, 7:15-cv-01318-JHE, 2016 WL 3483170 at *6 (M.D. Ala., June 27, 2016) (finding a single phone call to the plaintiff in furtherance of the conspiracy an overt act); *U.S. v. Geibel*, 369 F.3d 682, 696 (2d. Cir. 2004) (criminal act committed in forum state through letter and telephone call with forum resident); *United States v. Kim*, 246 F.3d 186, 192-93 (2d Cir.2001) (wire transmissions were overt acts in the forum).

earned millions of dollars in USD LIBOR-based and other transactions with Freddie Mac based, at least in part, on the Selling Defendants' reputation for financial soundness the Selling Defendant carefully cultivated with Freddie Mac. *See, id.* ¶¶ 30-31, 39, 44-45, 58, 68, 73, 87, 99, 116, 129, 167, 190.

### 3.   *Affirmative Acts of Concealment in Virginia and the United States*

*Schwab* confirmed that victims of LIBOR suppression could reasonably have relied on assurances by the BBA that its internal investigation confirmed the reliability of LIBOR. *Schwab* at 98. False assurances, and other acts of concealment are deemed overt acts when they are in furtherance of the objectives of the conspiracy. *See, e.g., Grunewald*, 353 U.S. at 974. Here, Freddie Mac alleges that Defendants provided false assurances to deceive Freddie Mac and other investors into continuing to use LIBOR in financial transactions, dupe regulators into believing LIBOR was not being unlawfully manipulated, and rebut news media questions about LIBOR's reliability. PTAC ¶¶ 61, 65, 95, 119, 132, 140, 160, 193, 266, 303, 312, 324, 328, 339, 390, 396, 478, 540-561. These were all acts committed in furtherance of the main objectives of the conspiracy and therefore relevant overt acts.

The PTAC synthesizes the contents of a number of contemporaneous publications and communications (many of which were previously referenced in jurisdictional briefing) showing that Defendants intentionally reached out to Freddie Mac and other U.S. investors to falsely assure them that "dislocations" in LIBOR were the product of extraordinary events in the financial crisis and not the result of the fraudulent and collusive suppression of individual LIBOR contributions. *Id.* ¶ 131, 328, 399, 413

The BBA and certain Defendants reached out to Freddie Mac to deliver those assurances in Virginia. For instance, JPMorgan, through its agent JPMorgan Securities, sent a Research Note to Freddie Mac in Virginia explaining at length why LIBOR was "not broken," and how

differences between LIBOR and other indices "can largely be explained by the composition of the Libor panel" as well as lack of liquidity in the interbank loan market rather than any bias in the fixing process." *Id.* ¶¶ 132, 317, 404. JPMorgan invited Freddie Mac to a presentation to discuss the Research Note. *Id.* JPMorgan sent the Research Note after Defendants internally discussed the importance of having JPMorgan and Citibank promote the reliability of LIBOR. *Id.* ¶ 312. Barclays, BOA, Citi, Credit Suisse, Deutsche Bank, RBS, and UBS all sent materials to Freddie Mac in Virginia defending LIBOR. *Id.* ¶¶ 33, 61, 70, 77, 89, 95, 101, 119, 132, 160, 169, 193, 312, 314, 317, 406.

In addition, the BBA engaged in efforts in the United States on behalf of the Panel Bank Defendants to falsely assure U.S. investors of LIBOR's accuracy. *Id.* ¶¶ 303, 320, 348. For example, the June 2008 note the BBA sent to the WSJ discussed above states that the note "represents the view of" the FX & MM Committee. *Id.* ¶¶ 326. Similarly, the FX & MM Committee "approved" the BBA "Feedback Statement" that was sent to Freddie Mac in Virginia and other U.S. investors, claiming that an investigation uncovered no evidence of manipulation. *Id.* ¶¶ 409.

These overt acts in furtherance of the conspiracy provide additional support for the exercise of personal jurisdiction over all Defendants.

### 4. *Newly Discovered Overt Acts Further Confirming that Panel Bank Defendants Directed Artificial Suppression from the United States*

The PTAC also recites facts that were not previously known to Freddie Mac or addressed in *LIBOR VI.* These facts include several instances in which Citigroup, JPMorgan, and Barclays engaged in overt acts in furtherance of the conspiracy by directing suppression from the United States. These are jurisdictionally relevant acts for Freddie Mac's antitrust claim. *See, e.g.,*

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984) (specific jurisdiction exists "when the cause of action arises out of the very activity being conducted, in part," inside the forum.).

*Citibank*



The direction to suppress LIBOR contributions came from the United States. Citibank's LIBOR submitters simply followed that direction.

Thursfield, a former member of the FX & MM Committee, previously submitted a declaration to this Court stating that he oversaw the employees responsible for Citibank's LIBOR submissions and those submitters "determined and transmitted" LIBOR contributions in London.  Declaration of James Andrew Thursfield Regarding Citibank, N.A.'s U.S. Dollar Submissions (May 23, 2016), ECF No. 1484-1.  The Court should ignore that affidavit because Thursfield has since claimed he has no idea who directed Citibank submitters to *artificially suppress* LIBOR.[9]

### *JPMorgan*



These communications, which Freddie Mac believes are just the tip of the factual iceberg, are enough to demonstrate that JPMorgan's LIBOR submitters lacked authority to unilaterally submit fraudulent LIBOR contributions.  Instead, it was JPMorgan's United States executives – not their underlings in London – who approved, and directed, artificial suppression.

### *Barclays*

In *LIBOR VI*, this Court found that del Missier's October 2008 direction to subordinates to artificially suppress Barclays's LIBOR submissions was insufficient to qualify as an overt act in the United States because del Missier was acting as an intermediary for his boss, Diamond. *LIBOR VI*, 2016 WL 7378980 at n. 17. The PTAC alleges an additional critical fact -- Diamond was also in the United States at the time he issued the directive to del Missier. PTAC ¶ 340. Diamond moved to New York in August 2008 and worked there at the time he issued that directive. *Id.* Diamond's directive accordingly qualifies as an overt act in the United States.

### D. Viewed in their Totality, The Overt Acts State a *Prima Facie* Case for Personal Jurisdiction Over All Defendants

Courts must look to the totality of a defendant's contacts to determine if the defendant's contacts with the forum were "random" or exclusively "plaintiff-driven." *LIBOR IV*, 2015 WL 6243526 at *27, 33. The PTAC alleges far more: Defendants' contacts were systematic, frequent, and in the service of their reputation and profits. Defendants injected themselves into Virginia to do business with Freddie Mac. Selling Defendants in particular solicited hundreds of millions of dollars worth of financial transactions virtually every day during the Conduct Period. Defendants marketed themselves to Freddie Mac in Virginia and elsewhere as creditworthy banks with strong financial reputations. But for their forum-related conduct, they would not have reaped the profits that flowed from the projection of financial soundness to Freddie Mac in Virginia and elsewhere in the United States. Similarly, but for their intentional acts of concealment, the conspiracy would have collapsed. The proposed amendments are thus more than sufficient to make out a *prima facie* case of personal jurisdiction for Freddie Mac's fraud and antitrust claims.

**VI.    THE PROPOSED AMENDMENTS SUFFICIENTLY ALLEGE THAT THE PANEL BANKS CONTINUED TO ACTIVELY SUPPRESS THEIR USD LIBOR CONTRIBUTIONS FROM MAY 2010 THROUGH OCTOBER 2011**

Freddie Mac's complaints have consistently alleged that Defendants submitted artificially low USD LIBORs through "at least" May 2010 and the effects of Defendants' conduct lasted through 2011. *See* Ex. C ¶¶ 14, 28, 29, 30, 33. Freddie Mac originally based the 2011 end date on data showing that LIBOR was consistently below a proxy for what LIBOR would have been but for the unlawful conduct from August 2007 through late 2011. *See, e.g.,* ECF No. 1585 (LIBOR did not return to non-suppressed levels until late in 2011); PTAC at Figure 5 (chart of 3-month LIBOR compared to proxy rate). In 2016, the Court granted Defendants' motion to dismiss Freddie Mac claims for losses after May 2010 based on a lack of allegations that Defendants actively suppressed LIBOR during that time. *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, 11 MD 2262, 2016 WL 7621354 (S.D.N.Y. Dec. 19, 2016).

In August 2017, however, a United States Grand Jury indicted two SocGen executives for artificially suppressing its LIBOR submissions from May 2010 through October 2011. Ex. C ¶¶ 14-31; PTAC ¶ 346-53. SocGen suppressed its contributions "to avoid anticipated reputational harm" that would have followed from the submission of "honest estimates of its borrowing rates, which rates were publicized through the LIBOR rate setting process." *Id.* That Indictment, when viewed in the context of other facts, helps explain why the data showed LIBOR was suppressed through October 2011 – because it was.

During the same time period, Citibank, Deutsche Bank, HSBC, JPMorgan, UBS, BOA, and Lloyds consistently submitted rates that were *lower* rates than SocGen's suppressed rates. *Id.* ¶ 349. The other Panel Bank Defendants were slightly higher, but still consistently within a few basis points of SocGen's false LIBOR contributions. *Id.*. Contemporaneously with the SocGen directive, the spread between LIBOR and the Eurodollar rate (a proxy for what USD

bbaLIBOR™ would have been but for the unlawful conduct) increased sharply in late May 2010. These data confirm that all the Panel Bank Defendants submitted artificially low LIBOR contributions along with SocGen through at least October 2011. Viewing the allegations as a whole, the PTAC sets forth sufficient facts to plausibly allege that LIBOR suppression continued through at least October 2011.

## VII.    THE PTAC CLEAN-UP ITEMS

Over the course of the litigation, Freddie Mac has referred to facts outside its complaints in briefing and reached stipulations with certain defendants to correctly identify corporate entities. Certain Defendants have also changed names. The PTAC updates the prior complaint to address these issues and synthesize the known facts into a single pleading.

## VIII.   CONCLUSION

The Court should allow Freddie Mac to include the proposed additions set forth in the attached PTAC because the amendments are sufficient to withstand a motion to dismiss and therefore are not futile. At set forth above, the proposed amendments fall within the categories contemplated by the *Schwab* decision or this Court's previous Orders. For these reasons, and others set forth above, the Motion should be granted.

Dated: June 15, 2018

Respectfully submitted,

Zelle LLP

By:   /s/ James R. Martin
      James R. Martin
      Jennifer D. Hackett
      1775 Pennsylvania Avenue, NW
      Suite 375
      Washington, DC  20006
      202-899-4100

      Richard J. Leveridge
      Adams Holcomb LLP
      1001 Pennsylvania Avenue, NW

Washington, DC  20004
202-580-8817

*Attorneys for Plaintiff Federal Home Loan Mortgage Corporation*