# Exhibit A
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE FEDERAL HOME LOAN MORTGAGE
CORPORATION,

               Plaintiff,

      v.

BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A.; BARCLAYS
BANK PLC; BARCLAYS CAPITAL, INC.;
BRITISH BANKERS' ASSOCIATION; BBA
ENTERPRISES, LTD; BBA TRENT LTD.
(F.K.A. BBA LIBOR, LTD); CITIGROUP,
INC.; CITIBANK, N.A.; COÖPERATIEVE
RABOBANK UA (F.K.A. COÖPERATIEVE
CENTRALE RAIFFEISEN-
BOERENLEENBANK, B.A.); CREDIT
SUISSE AG; CREDIT SUISSE
INTERNATIONAL; DEUTSCHE BANK AG;
HSBC BANK PLC; HSBC BANK USA, N.A.;
JPMORGAN CHASE & CO.; JPMORGAN
CHASE BANK, N.A.; LLOYDS BANKING
GROUP, PLC; LLOYDS BANK PLC (F.K.A
LLOYDS TSB BANK PLC); BANK OF
SCOTLAND PLC; SOCIÉTÉ GÉNÉRALE;
THE NORINCHUKIN BANK; ROYAL BANK
OF CANADA; THE ROYAL BANK OF
SCOTLAND GROUP PLC; NATWEST
MARKETS PLC (F.K.A. THE ROYAL BANK
OF SCOTLAND PLC); THE BANK OF
TOKYO-MITSUBISHI UFJ, LTD; UBS AG;
WESTLB AG (F.K.A PORTIGON AG),

               Defendants.

**PROPOSED THIRD AMENDED
COMPLAINT**

**Case No. 1:13-cv-03952-NRB**

**MDL No: 2262**

**ECF CASE**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**Page**

TABLE OF FIGURES ................................................................................................ vi

NATURE OF THE CASE ............................................................................................ 1

JURISDICTION AND VENUE ................................................................................... 9

PARTIES ................................................................................................................... 12

    A.    Bank of America ................................................................................. 12

          Contacts with Freddie Mac ..................................................... 13

          Bank of America Operational Structure .................................. 16

    B.    Barclays ............................................................................................. 18

          Contacts with Freddie Mac ..................................................... 19

          Barclays Operational Structure ............................................... 21

    C.    BBA .................................................................................................... 24

    D.    Citi ..................................................................................................... 27

          Contacts with Freddie Mac ..................................................... 28

          Citi Operational Structure ....................................................... 31

    E.    Rabobank ........................................................................................... 32

          Contacts with Freddie Mac ..................................................... 33

          Rabobank Operational Structure .............................................. 33

    F.    Credit Suisse ...................................................................................... 35

          Contacts with Freddie Mac ..................................................... 36

          Credit Suisse Operational Structure ........................................ 38

    G.    Deutsche Bank ................................................................................... 40

          Contacts with Freddie Mac ..................................................... 40

          Deutsche Bank Operational Structure ..................................... 43

H.    HSBC .................................................................................................... 46

      Contacts with Freddie Mac ............................................................... 47

      HSBC Operational Structure .............................................................. 49

I.    JPMorgan ............................................................................................. 51

      Contacts with Freddie Mac ............................................................... 52

      JPMorgan Operational Structure ........................................................ 55

J.    Lloyds & Bank of Scotland ................................................................ 55

K.    Société Générale ................................................................................. 57

      Contacts with Freddie Mac ............................................................... 57

      Société Générale Operational Structure.............................................. 58

L.    Norinchukin ........................................................................................ 58

M.    RBC .................................................................................................... 59

      Contacts with Freddie Mac ............................................................... 60

      RBC Operational Structure ................................................................ 60

N.    RBS..................................................................................................... 61

      Contacts with Freddie Mac ............................................................... 62

      RBS Operational Structure ................................................................ 64

O.    BTMU.................................................................................................. 67

      Contacts with Freddie Mac ............................................................... 68

      BTMU Operational Structure .............................................................. 68

P.    UBS..................................................................................................... 69

      Contacts with Freddie Mac ............................................................... 70

      UBS Operational Structure ................................................................ 72

Q.    WestLB/Portigon ................................................................................ 73

BACKGROUND ....................................................................................................... 75

A.  Interest Rate Fundamentals.................................................................75

B.  The Role of Indices and Benchmarks in Financial Markets.................77

C.  The Role of Interest-Rate Benchmarks in Lending .............................81

D.  The Role of Interest-Rate Benchmarks in Derivatives ........................82

E.  Development of bbaLIBOR™...............................................................86

F.  Calculation of bbaLIBOR™................................................................87

G.  bbaLIBOR™ Governance ....................................................................91

H.  Defendants' Knowledge of bbaLIBOR™'s Importance .......................95

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™ ...................99

A.  Systematic bbaLibor™ Depression:  The Conduct Begins ..................99

B.  Barclays Moves to a "Within-the-Pack" Directive Which Enabled
    Further Suppression ...........................................................................106

C.  The Bank Defendants Suppress USD bbaLIBOR™ By At Least
    20-30 Basis Points .............................................................................109

D.  Defendants Collectively Seek to Continue Suppression and Maintain
    bbaLIBOR™'s Credibility and Dominance ........................................115

E.  Renewed Efforts to Suppress USD bbaLIBOR™ in May 2010 Lasted
    Through October 2011.........................................................................135

F.  Harmful Effects of the Unlawful Conduct..........................................137

G.  Barclays Admissions ..........................................................................142

H.  UBS Admissions.................................................................................143

I.  RBS Admissions.................................................................................145

J.  Rabobank Admissions ........................................................................145

K.  Lloyds and HBOS Admissions ...........................................................146

L.  Deutsche Bank Admissions ................................................................150

M.  Citi Admissions ..................................................................................152

N.  Société Générale Findings ..................................................................153

THE FRAUD AND COLLUSION ALLEGED IN THIS COMPLAINT COULD
NOT REASONABLY HAVE BEEN DISCOVERED BEFORE BARCLAYS'S
ADMISSIONS OF INTENTIONAL MISREPRESENTATIONS OF MATERIAL
FACT ........................................................................................................154

COUNT I:  VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS)...........165

    Agreement........................................................................................165

    Restraint of Trade ...........................................................................172

    Antitrust Injury and Damages.........................................................177

    Rule of Reason ................................................................................178

    A.     Relevant Market:  USD Short-Term Interest-Rate Benchmarks .........................179

    Market Definition ...........................................................................179

    Harm to Competition ......................................................................180

    Antitrust Injury ...............................................................................183

    B.     Relevant Market:  OTC USD Interest-Rate Derivatives ....................................184

    Market Definition ...........................................................................184

    Harm to Competition ......................................................................185

    Antitrust Injury ...............................................................................186

    C.     Relevant Market:  USD Floating-Rate Retail Loans ...........................................186

    Market Definition ...........................................................................186

    Harm to Competition ......................................................................187

    Antitrust Injury ...............................................................................188

    D.     Relevant Market:  USD Floating-Rate MBS ......................................................188

    Market Definition ...........................................................................188

    Harm to Competition ......................................................................189

    Antitrust Injury ...............................................................................189

COUNT II:  BREACH OF CONTRACT (DEFENDANT BANK OF AMERICA) .................189

COUNT III:  BREACH OF CONTRACT (DEFENDANT BARCLAYS)................................191

COUNT IV:  BREACH OF CONTRACT (DEFENDANT CITIBANK, N.A.)..........................193

COUNT V:  BREACH OF CONTRACT (DEFENDANT CREDIT SUISSE) ..........................195

COUNT VI:  BREACH OF CONTRACT (DEFENDANT DEUTSCHE BANK) ...................197

COUNT VII:  BREACH OF CONTRACT (DEFENDANT HSBC)..........................................199

COUNT VIII:  BREACH OF CONTRACT (DEFENDANT RBS) ..........................................200

COUNT IX:  BREACH OF CONTRACT (DEFENDANT UBS).............................................202

COUNT X:  FRAUD (ALL DEFENDANTS) .....................................................................204

    Fraudulent USD bbaLIBOR™ Submissions (all Bank Defendants)..............................205

    Fraudulent USD bbaLIBOR™ (all Defendants) ............................................................206

    The BBA's Fraud..........................................................................................................207

    Contracting Bank Defendants' Fraud ...........................................................................208

COUNT XI:  TORTIOUS INTERFERENCE WITH CONTRACT
(ALL DEFENDANTS)...........................................................................................................210

PRAYER FOR RELIEF ..........................................................................................................211

JURY DEMAND......................................................................................................................211

## TABLE OF FIGURES

Figure 1:  Vanilla Interest-Rate Swap ........................................................................83
Figure 2:  Relationship Between Product Markets ..................................................86
Figure 3:  bbaLIBOR™ Processes ............................................................................91
Figure 4:  Overnight USD bbaLIBOR Submissions................................................102
Figure 5:  Difference Between 3M USD bbaLIBOR and 3M Eurodollar Bid Rate....................139
Figure 6:  Comparison of bbaLIBOR™ Submissions...............................................168

## NATURE OF THE CASE

1.      This Complaint arises from what has been characterized as the most costly commercial banking scandal in history.[1]  Over a period of years, Defendants collectively manipulated and depressed bbaLIBOR™, an interest-rate benchmark, incorporated into trillions of dollars in interest-rate derivatives, floating-rate loans, floating-rate mortgage-backed securities ("MBS"), and other financial products, that played a fundamentally important role in financial systems throughout the world.  According to the Defendant British Bankers' Association ("BBA"), bbaLIBOR™ represented the average interest rate paid in the London interbank-loan market by a panel of the largest and most reputable commercial banks in the world.  The Defendant banks comprised the panel for bbaLIBOR™ for U.S. Dollar ("USD") interbank loans (the "Bank Defendants"), and every working day the Bank Defendants submitted to the BBA the interest rates that purportedly represented the rates at which they would be offered USD interbank loans in a competitive market.  As shown below, the Bank Defendants were not only contributors to USD bbaLIBOR™, they were among the most important members of the Defendant BBA, active participants in the committees that oversaw bbaLIBOR™, and the most important users of the benchmark in downstream financial markets—such as the markets for USD interest-rate derivatives, floating-rate loans, and floating-rate MBS.

2.      The BBA represented that bbaLIBOR™ was a "simple, transparent benchmark [that is] a reliable indicator of the state of the money markets, and one of the most reliable barometers of risk in the global economy,"[2] promoted bbaLIBOR™ as "the world's most

---

1 *The Worst Banking Scandal Yet?*, Bloomberg (July 12, 2012), http://www.bloomberg.com/news/2012-07-12/the-worst-banking-scandal-yet-.html.

2 BBA, 2010 Annual Report, at 25 (2010).

important number,"[3] and claimed that bbaLIBOR™ represented competitive interest rates in the market for unsecured interbank loans.

      3.     In truth, however, Defendants[4] acted collectively to secretly deviate from the rules published by the BBA and to coordinate the Bank Defendants' USD bbaLIBOR™ submissions at interest rates below the rates at which they would be offered loans in the interbank market. Defendants subverted the competitive process by agreeing to (1) misrepresent the manner in which USD bbaLIBOR™ was calculated, (2) hold USD bbaLIBOR™ out as a reliable benchmark calculated and governed according to its published rules, and (3) conceal their agreements (collectively the "Unlawful Agreements") to create the façade that USD bbaLIBOR™ reliably served its intended purpose. This misconduct caused USD bbaLIBOR™ to be systematically depressed below the rates that would have been submitted and published but for the Unlawful Agreements. The Bank Defendants engaged in this conduct both to hide their institutions' financial problems by projecting financial soundness and to artificially boost their profits. Defendants participated in this scheme to foreclose competition in the market for USD interest-rate benchmarks. But for the conspiracy, market participants in a competitive market would have known that USD bbaLIBOR™ was not functioning as a reliable and predictable interest-rate benchmark and would have sought alternatives to incorporate into financial instruments. Had the market participants done so, that demand would have created overwhelming incentives for Defendants to strictly adhere to the published rules for USD bbaLIBOR™, and to continue to improve that interest-rate benchmark to meet user needs and the

---

3 *Id.*; Press Release, BBA, BBA LIBOR: The World's Most Important Number Now Tweets Daily (May 21, 2009), *available at* https://www.easier.com/25225-bba-libor-the-world-s-most-important-number-now-tweets-daily.html.

4 The term "Defendants" includes both the Defendant BBA and the Bank Defendants.

forces of competition.  Otherwise, market participants would have switched to an alternative interest-rate benchmark, thus relegating USD bbaLIBOR™ to irrelevancy.

4.     Defendants' fraud and collusion must be viewed in the context of the basic business model for banks, which is to borrow low and lend high.[5]  A bank's profitability rests on its ability to attract money through customer deposits and short-term wholesale funds[6] (short-term loans, sometimes secured by collateral and sometimes not, issued by financial institutions to other financial institutions).[7]  In the absence of collusion, banks compete for short-term wholesale funds by attempting to negotiate for the lowest interest rate.  By agreeing to create the false impression that they all had similar levels of credit risk, the Bank Defendants effectively agreed to limit competition in the market for unsecured wholesale funds.  In the absence of collusion, banks with lower credit risk compete for unsecured wholesale funds based, in part, on their respective credit ratings.  But for the conspiracy, banks with higher credit risk and lower ratings would have been forced to pay higher interest rates for short-term wholesale funding, and therefore would have acted to shed risky assets that affected their credit ratings.[8]

5.     The collusion also gave the Bank Defendants an unfair competitive advantage in the markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS.  Interest-rate derivatives are financial contracts in which one party trades payments over time on a principal

---

[5] *See, e.g.*, Richard Posner, *Is Banking Unusually Corrupt and, If So, Why? Posner*, The Becker-Posner Blog (July 22, 2012), http://www.becker-posner-blog.com/2012/07/is-banking-unusually-corrupt-and-if-so-why-posner.html.

[6] *See, e.g.*, William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Fixing Wholesale Funding to Build a More Stable Financial System, Remarks at the New York Bankers Association's 2013 Annual Meeting & Economic Forum, The Waldorf Astoria, New York City (Feb. 1, 2013), *available at* http://www.newyorkfed.org/newsevents/speeches/2013/dud130201.html.

[7] *See, e.g.*, *Your Mortgage and the Markets*, BBA (March 7, 2012), http://www.angelnews.co.uk/article.jsf?articleId=13024 (On file with Plaintiff) ("Banks are competing for savers' funds, pushing the cost of this funding even higher as they offer more attractive rates.").

[8] *See* Dudley, *supra* note 6.

amount, referred to as a "notional value," in exchange for interest payments determined by an interest-rate benchmark.  Floating-rate loans allow borrowers to make interest-rate payments based on an interest-rate benchmark rather than a fixed rate.  An MBS is a security backed by a pool of mortgages that pays cash flows determined by a fixed or floating interest rate.  A floating-rate MBS pays cash flows determined by an interest-rate benchmark.  In the case of interest-rate derivatives, floating-rate loans, and floating-rate MBS, prices in a competitive market are expressly based on the published rules of the designated interest-rate benchmark. Those rules, and the benchmark provider's promise that they will be reliably applied, form the core of any transaction in which the interest-rate benchmark is incorporated as a price term.  The Bank Defendants included the largest and most important issuers of interest-rate derivatives, floating-rate loans, and floating-rate MBS.  The Bank Defendants had significant market power in each of these markets and a strong influence over the interest-rate benchmark(s) that would be incorporated into those derivatives, loans, and MBS.

6.     Unlike all other market participants, Defendants knew that the published USD bbaLIBOR™ rules were a façade because the Bank Defendants had collectively determined to deviate from those rules to systematically depress USD bbaLIBOR™.  Alternative benchmark providers and other participants in markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS were unaware of the Unlawful Agreements.  The Bank Defendants injected false information into the markets and used that false information to benefit themselves by foreclosing competition and charging artificially high prices for USD interest-rate derivatives, floating-rate loans, and floating-rate MBS.

7.     Defendants engaged in this fraudulent and collusive conduct on a daily basis from August 2007 through at least October 2011 (the "Conduct Period").  Defendants have no

legitimate justification for their anticompetitive conduct.  While some Defendants have admitted unlawful conduct, most of the facts remain known only to Defendants and the regulatory agencies investigating bbaLIBOR™.  Investigators are still piecing together what one publication called a "breathtaking portrait of avarice and deceit."[9]  The former Chairman of the United States Federal Reserve, Alan Greenspan, stated:  "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities.  You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[10]

8.      Plaintiff, The Federal Home Loan Mortgage Corporation ("Freddie Mac"), is a government-sponsored enterprise ("GSE") chartered by Congress with a public mission to provide liquidity, stability, and affordability to the United States housing market.  Freddie Mac serves the secondary mortgage market by providing a stable supply of money for lenders (including some of the Bank Defendants), which lowers mortgage interest rates for millions of consumers.  Freddie Mac plays a vital role in the United States economy by moderating cyclical swings in the housing sector, equalizing the flow of mortgage funds regionally throughout the United States, and ensuring the availability of mortgage funds in a variety of economic conditions.  Freddie Mac increases opportunities for affordable home ownership and rental housing for low- and moderate-income families across the nation.

---

9 *The Worst Banking Scandal Yet?*, *supra* note 1.  As William Dudley, the President and CEO of the New York Federal Reserve Bank, recently stated with respect to the bbaLIBOR™ investigation:  "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner."  William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* http://www.ny.frb.org/newsevents/speeches/2014/dud141002.html.

10 Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

9.     Throughout the 2000s, Freddie Mac generated income through investment activities.  Freddie Mac purchased financial products that incorporated USD bbaLIBOR™ as an interest-rate benchmark and sought to generate attractive returns through a disciplined approach to interest-rate risk and capital management.  Freddie Mac used derivative financial instruments to balance its funding mix and to economically hedge forecasted issuance of debt and foreign-currency exposure.

10.     As Defendants were aware, Freddie Mac, during the relevant time period, was among the largest purchasers of mortgages and holders of MBS in the United States and engaged in interest-rate swap transactions with billions of dollars in notional value every year.  Due to Freddie Mac's size and Congressional mandate, the Bank Defendants considered Freddie Mac to be a highly desirable customer during the Conduct Period.  Because Freddie Mac was a large institutional player in the mortgage loan, MBS, interest-rate swaps, and other financial products markets, dealers (including Defendants identified below) actively sought Freddie Mac's business.

11.     During the Conduct Period, Freddie Mac devoted significant resources to monitoring its counterparties' financial strength and viewed credit risk as an important determinant in choosing counterparties.  Freddie Mac traders and employees in other business segments were only authorized to transact with counterparties that were pre-approved by its Counterparty Credit Risk Management group, which assigned credit ratings to counterparties based on the likelihood that the counterparty would become unable to fulfill its financial obligations.  For at least capital markets counterparties, which includes counterparties engaging in swaps and MBS with Freddie Mac, another factor that went into the analysis was the strength of the parent company.  Counterparties that fell below a certain credit rating would not be

approved.  Once approved, the counterparty would be reviewed on a regular basis, and its rating

could change depending on its financial condition.  Accordingly, even if a counterparty had

initially been approved, future transactions with it could be curtailed, conditioned, or suspended

if Freddie Mac's risk exposure warranted those actions.  Counterparties that scored poorly in

relation to other counterparties could lose Freddie Mac's business.  If warranted, Freddie Mac

would assign a counterparty to its Counterparty Watchlist for further monitoring.

12.     A number of other groups within Freddie Mac also reviewed and ranked

counterparties.  For example, the Dealer Relations group analyzed counterparties based on a

holistic review of their relationship with Freddie Mac and created quarterly "Dealer Scorecards."

The Dealer Scorecards contained rankings and commentary on the dealers' activity in over

twenty different areas of Freddie Mac's business.  At least during the 2007-2009 period, Freddie

Mac shared, on a quarterly basis, the Dealer Scorecards with its counterparties, including, for

example, Bank of America, N.A., Barclays Bank plc, Citibank, N.A., Credit Suisse International,

Deutsche Bank AG, HSBC Bank USA, N.A., JPMorgan Chase Bank, N.A., RBS Securities Inc.,

SG Americas Securities, LLC, and UBS AG.

13.     Freddie Mac had ongoing conversations with its dealers about the Dealer

Scorecards.  As a part of the Dealer Scorecard preparation process, Freddie Mac asked its

counterparties to complete what is known as a "Divisional Value Added" spreadsheet ("DVA"),

which gave counterparties an opportunity to present their value to Freddie Mac.  The dealers

took advantage of that opportunity and sent the completed DVAs to Freddie Mac in Virginia.

Among other things, the DVAs related to the swaps, MBS, and mortgage loan activity, and had

the potential to impact a counterparty's ranking.  Every quarter, after the Dealer Scorecards were

prepared, Freddie Mac circulated the Dealer Scorecards to its counterparties.  Freddie Mac

endeavored to meet with representatives of its counterparties on an annual or semiannual basis to review the Dealer Scorecards. For example, on one occasion Freddie Mac met with JPMorgan Chief Executive Officer ("CEO") Jamie Dimon.

14.    Freddie Mac's servicing group also created monthly scorecards that contained both ratings and rankings of the servicer in many different categories. The servicing group also created account plans to address metrics, performance issues, and strategic initiatives. During part of the Conduct Period and continuing today, these scorecards and account plans were shared with Bank of America, N.A., CitiMortgage, Inc., and JPMorgan Chase Bank, N.A. on a monthly basis and reviewed with those entities during on-site meetings. The servicing group also made scorecards and various reports available to its other servicers, including MUFG Union Bank, N.A. (f.k.a. Union Bank, N.A.), DB Structured Products, Inc., HSBC Bank USA, N.A., Rabobank, N.A., RBC Bank USA, and RBS Citizens Bank, N.A. (n.k.a. Citizens Bank, N.A.). Freddie Mac's sales group also regularly communicated with its sellers in the same manner, often with weekly work plans. In addition, over the years, Bank of America, Citibank, and JPMorgan representatives have participated on various of Freddie Mac's advisory boards.

15.    In entering into transactions with Defendants, Freddie Mac relied upon the reputations, integrity, and the history of Defendants' relationships and course of dealing with Freddie Mac. Freddie Mac reasonably relied on Defendants' fraudulent and collusive misrepresentations in entering into financial transactions tied to USD bbaLIBOR™.

16.    Defendants' unlawful conduct, as described in this Complaint, caused substantial losses to Freddie Mac. For example, in 2008 alone, Freddie Mac entered into, among other things, hundreds of interest-rate swap transactions in which Freddie Mac agreed to pay counterparties (both Bank Defendants and others) interest payments based on a negotiated fixed

rate, in exchange for interest payments based on USD bbaLIBOR™ ("pay-fixed swaps") with billions of dollars in notional value.  Similarly, Freddie Mac purchased or held billions of dollars of MBS in which coupon payments, or the interest paid on the underlying collateral, were determined by USD bbaLIBOR™.  Freddie Mac reasonably expected that competitive market forces—and not a secret agreement among Bank Defendants—would determine USD bbaLIBOR™ and, consequently, the value of interest-rate swaps and MBS tied to USD bbaLIBOR™.  Freddie Mac's losses flowed directly from the harms to competition caused by the fraud and collusion alleged in this Complaint.  Freddie Mac brings this action in the United States District Court for the Eastern District of Virginia to recover the losses it suffered as a result of this unlawful conduct.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over the claims under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337.  This Court also has subject matter jurisdiction under 12 U.S.C. § 1452(f), which grants district courts of the United States original jurisdiction over all civil cases in which Freddie Mac is a party.

18.     This Court has subject matter jurisdiction over the state-law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

19.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Sections 1 and 4 of the Virginia Long-Arm Statute (Va. Code. Ann. § 8.01-328.1).  Defendants have deliberately and purposefully availed themselves of the privilege of conducting business in the United States and in the Eastern District of Virginia.  Defendants are either incorporated in and maintain their principal places of

business in the United States, or maintain significant ongoing operations in the United States.

Certain Defendants also maintain a substantial corporate presence in the Eastern District of

Virginia, including, but not limited to, sales offices and agents that promote, manage, and

operate Defendants' businesses and provide significant sales and promotional support.

20.     Further, as discussed more fully below, all Defendants conspired to artificially

depress USD bbaLIBOR™ for interbank loans, and thereby intentionally directed their unlawful

conduct at the United States, including the Eastern District of Virginia.  Defendants performed

acts in furtherance of their unlawful conspiracy within the Eastern District of Virginia and

elsewhere in the United States.  Moreover, Defendants' unlawful conduct foreclosed competition

and caused other harm within the United States, and specifically within the Eastern District of

Virginia, Freddie Mac's principal place of business.  Defendants are sophisticated market

participants that knew, or reasonably should have known, their fraudulent and collusive

depression of USD bbaLIBOR™ would produce substantial and foreseeable effects in the United

States and in the Eastern District of Virginia.

21.     As described below, in furtherance of the Unlawful Agreements, certain

Defendants entered into contracts with Freddie Mac in the Eastern District of Virginia and made

payments to Freddie Mac in the Eastern District of Virginia that were determined by the

fraudulent USD bbaLIBOR™ rates, and therefore hundreds of millions or billions of dollars less

than the payments that would have been made in the absence of the fraud and conspiracy.

22.     Freddie Mac has had long-standing business relationships with many of the Bank

Defendants and/or their affiliates or subsidiaries.  For example, Defendants Bank of America,

N.A., Bank of Tokyo-Mitsubishi UFJ, LTD, Barclays Bank plc, Citibank, N.A., Credit Suisse

AG, Deutsche Bank AG, HSBC plc, JPMorgan Chase Bank, N.A., The Royal Bank of Scotland

plc, and UBS AG either directly or through a corporate subsidiary or affiliate entered into contracts with Freddie Mac in Virginia, pursuant to which they collectively sold over two million loans from 2007-2011 to Freddie Mac with an aggregate unpaid principal balance exceeding $400 billion.  Freddie Mac also entered into more than 4500 interest-rate swaps with Bank Defendants and/or their subsidiaries and affiliates with a total notional value of over $3 trillion during the Conduct Period.

 23. Because Freddie Mac was a large institutional investor in the MBS market, dealers were familiar with the type of assets that Freddie Mac might buy and actively solicited Freddie Mac's business in Virginia.  During the Conduct Period, Defendants approached Freddie Mac in Virginia with potential investments and communicated with Freddie Mac in Virginia before any sales were consummated.  As described in paragraph 11, Freddie Mac could only purchase MBS from counterparties that had been previously approved by Freddie Mac's Counterparty Credit Risk Management group and reviewed by the Alternative Market Operations group (which evaluated counterparties' operational integrity).  Defendants' traders regularly approached Freddie Mac's traders in Virginia with proposed MBS investments.  If interested in the deal, Freddie Mac's traders, credit risk analysts and/or business operations personnel spent much time communicating with Defendants about the potential investments.  For example, Freddie Mac requested and obtained from potential Defendant counterparties aggregate information on loan pool characteristics that contained stratifications of the data.  At times, Freddie Mac's operations group identified loans it wanted excluded from the collateral pool for a proposed MBS investment and provided that information to the dealer.

 24. All Defendants knew that USD bbaLIBOR™ was a key component of standardized derivatives and loan contracts or other documentation used in the Eastern District of

Virginia and elsewhere.  Because of Freddie Mac's size, importance, and presence in these

markets, Defendants knew, or should have known, of these contracts and payments to Freddie

Mac.  Defendants that engaged in swap, MBS, and loan transactions with Freddie Mac therefore

intentionally and purposefully availed themselves of the privilege of conducting activities in the

United States, and the Eastern District of Virginia, in connection with the unlawful activities

described in this Complaint.

25.     Venue is proper in the Eastern District of Virginia pursuant to Sections 4 and 12

of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391.  Defendants maintain offices or

agents, transact business, or can be found within the Eastern District of Virginia.  The interstate

commerce giving rise to the claims described in this Complaint was carried out, in part, within

the Eastern District of Virginia.  Defendants performed acts in furtherance of their conspiracy

within the Eastern District of Virginia and elsewhere that were intended to affect, and did affect,

Freddie Mac and others located within the Eastern District of Virginia.

## PARTIES

26.     Freddie Mac is a GSE located at 8200 Jones Branch Drive in McLean, Virginia.

### A.     Bank of America

27.     Defendant Bank of America Corporation ("Bank of America") is a Delaware

corporation and holding company headquartered in Charlotte, North Carolina, with numerous

corporate offices and branches in the Eastern District of Virginia.[11]  Its wholly owned subsidiary,

Defendant Bank of America, N.A. was at all relevant times a member of the USD bbaLIBOR™

panel of banks.  Bank of America, N.A. (successor-in-interest to NationsBank, N.A.) is

---

11 In August 2007, Bank of America borrowed $500 million from the U.S. Federal Reserve System's Discount
Window to provide liquidity and bolster its reputation with investors and regulators in the United States.  Gretchen
Morgansen, *The Bank Run We Knew So Little About*, N.Y. Times (Apr. 2, 2011),
https://www.nytimes.com/2011/04/03/business/03gret.html (last visited May 31, 2018).

headquartered in Charlotte, North Carolina. Bank of America, N.A. is Bank of America's primary banking subsidiary.

28.     Banc of America Securities, LLC ("BAS") was a wholly owned indirect subsidiary of Bank of America with its principal place of business in New York, New York. BAS was a registered broker-dealer with the SEC. On November 1, 2010, Bank of America, N.A. merged BAS into Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") after Bank of America acquired Merrill Lynch & Co., Inc. BAS no longer exists. As the surviving entity, MLPFS is the primary broker-dealer for Bank of America in the United States. MLPFS is a wholly owned indirect subsidiary of Bank of America, N.A. BAS/MLPFS at all relevant times served as the primary investment banking arm of Bank of America, N.A. in the United States.

29.     As alleged more fully below, Bank of America, N.A. operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including BAS/MLFPS, in the United States and Virginia.[12] On information and belief, Bank of America, N.A. participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

*Contacts with Freddie Mac*

30.     Bank of America, N.A. has had a longstanding and deep relationship with Freddie Mac in Virginia. For example, during the Conduct Period, Bank of America, N.A. solicited Freddie Mac in Virginia and sold it $800 million of MBS tied to USD bbaLIBOR™ in 31 transactions. Through BAS/MLPFS, Bank of America sold Freddie Mac in Virginia another $11

---

12 *See Bank of America Bank and ATM Locations*, https://locators.bankofamerica.com/ (last visited June 13, 2018).

billion of MBS tied to USD bbaLIBOR™ in over 250 separate transactions.[13]  During the

Conduct Period, Bank of America, N.A. executed over 400 interest-rate swaps with Freddie Mac

in Virginia with a notional value of over $610 billion.  In addition, over the course of the

Conduct Period, Bank of America, N.A.[14] sold almost 1 million single family loans or interests

in loans to Freddie Mac with an aggregate unpaid principal balance of approximately $180

billion in Virginia.  These loan sales were governed by complex master agreements negotiated

by Freddie Mac and Bank of America, N.A., with payments for the loans made to Freddie Mac

in Virginia.  Each of the loan and swaps transactions involved communications with Freddie

Mac and Virginia, and payments to or from Freddie Mac in Virginia.

      31.     From at least 2007-2009, Bank of America and/or Bank of America, N.A.

engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order

to demonstrate its value to Freddie Mac with regard to, *inter alia*, MBS, swaps, and loan

transactions.

      32.     In addition to these contacts, other relevant contacts demonstrate that, throughout

the Conduct Period and beyond, the Bank of America entities have viewed Freddie Mac as a

very important component of their overall portfolio.  Indeed, over the years, Bank of America

has participated on various of Freddie Mac's advisory boards.

      33.     During the Conduct Period, Bank of America entities sent hundreds of thousands

of electronic communications, routinely made telephone calls to Freddie Mac, and regularly met

with Freddie Mac personnel in the Eastern District of Virginia for the purpose of soliciting and

---

13 Were it not for the existence of BAS/MLFPS, Bank of America, N.A. would have directly sold MBS to Freddie
Mac.  Bank of America knew of, and benefited from, BAS/MLFPS's sales of MBS and treated BAS's profits as
Bank of America profits.

14 During the conduct period, Bank of America, N.A. was the counterparty seller for the bulk of these sales, but it is
possible that other Bank of America entities were also sellers.

engaging in financial transactions, and as part of a regular course of dealing with Freddie Mac. Maintaining counterparty approval was essential for counterparties, like Bank of America, to engage in transactions with Freddie Mac for USD bbaLIBOR™-linked and other financial products.

34.     For instance, Bank of America, N.A.[15] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac, and in the course of these servicing responsibilities, Bank of America N.A. regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered servicing data and documentation to Freddie Mac in Virginia. Freddie Mac regularly provided Bank of America, N.A. with performance metrics and account plans, and met with Bank of America, N.A. to review this information.  As of December 2011, Bank of America, N.A. had serviced over a million single family loans on behalf of Freddie Mac with an aggregate unpaid principal balance exceeding $190 billion.  Since then, Bank of America has continued to be a strong partner with Freddie Mac, servicing over 580,000 loans with an aggregate unpaid principal balance exceeding $80 billion.

35.     During the Conduct Period, Bank of America, N.A. also entered into agreements with Freddie Mac in Virginia to provide custodial services for original mortgage notes and related documents for loans sold to, and serviced for, Freddie Mac.  As a custodian, Bank of America, N.A. was responsible for, among other things, reviewing, examining, and verifying the notes in accordance with the terms of the agreements.

36.     In addition, Bank of America, N.A. has provided warehouse lines of credit to Freddie Mac's Sellers/Servicers to, among other things, fund mortgage loans.  When a Servicer

---

15 During the conduct period, Bank of America, N.A. was the counterparty servicer for the bulk of these loans, but it is possible that other Bank of America entities were also servicers.

draws on a line of credit to fund a mortgage loan, a warehouse lender receives an interest in the mortgage note as collateral.  Before Freddie Mac would purchase a mortgage loan from a Seller/Servicer, it required the warehouse lenders to enter into agreements with Freddie Mac, which the warehouse lenders delivered to Freddie Mac in Virginia on an ongoing basis as new mortgage loans were sold to Freddie Mac.

37.     Further, Bank of America, N.A. has provided hundreds of millions of dollars in financing to Freddie Mac's Seller/Servicers, secured by Mortgage Servicing Rights ("MSRs") or related income streams.  Freddie Mac required its Seller/Servicers and their lenders to enter into agreements with Freddie Mac in Virginia prior to entering into any such financing arrangement.

38.     BAS/MLPFS has entered into agreements with Freddie Mac under which BAS/MLPFS, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of Freddie Mac's Structured Agency Credit Risk ("STACR") securities and/or Whole Loan Securities ("WLS"), as well as Freddie Mac seasoned loans, via sales or structured sales. BAS/MLPFS charged Freddie Mac significant fees for these services.

39.     Additionally, during the Conduct Period and beyond, BAS/MLPFS entered into master dealer agreements with Freddie Mac under which BAS/MLPFS entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to BCI in connection with the development, structuring, issuance, and/or sale of tens of billions of dollars in Real Estate Mortgage Investment Conduit ("REMIC") securities.  BAS/MLPFS paid Freddie Mac tens of millions of dollars in fees for these services.

*Bank of America Operational Structure*

40.     During the Conduct Period, Bank of America operated its global banking unit, which included global corporate and commercial banking and investment banking operations,

-16-

primarily through Bank of America, N.A and BAS/MLPFS.  For example, operating under the

Global Corporate and Investment Banking ("GCIB") segment, Bank of America, N.A. sold MBS

to and executed swaps with Freddie Mac and BAS/MLPFS sold MBS to Freddie Mac.  GCIB

operated as a single business unit across entities.  For instance, investment banking executives at

BAS/MLFPS worked closely with, and took direction from, executives at Bank of America and

Bank of America, N.A., without regard to corporate formalities.  Bank of America and Bank of

America, N.A. determined the strategic direction of BAS/MLPFS, specifically with regard to its

dealings with Freddie Mac, and benefited from BAS/MLPFS's sales of MBS to Freddie Mac.

Bank of America reported GCIB profits on a segment-wide basis, including BAS/MLPFS

profits.[16] ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████.  Bank of America and

BAS/MLPFS used common branding.

     41.    During the Conduct Period, many of the principal officers of Bank of America

held identical positions with Bank of America, N.A.  For example, in 2007 and 2008, Kenneth

Lewis acted as Chairman, CEO, and President of both companies.  In addition, the entities'

respective roles of Chief Risk Officer ("CRO") and Chief Financial Officer ("CFO"), as well as

the roles of President of the individual business units, were filled by the same individuals:  CRO

Amy Woods Brinkley, CFO Joe Price, and business unit Presidents Barbara Desoer, Liam

McGee, and Brian Moynihan.  These executives also played key roles in GCIB.  For example,

Mr. Moynihan simultaneously acted as CEO of GCIB and President of BAS/MLPFS.  On

---

16 Bank of Am., 2008 Annual Report, at 1, 24-25 (2008), *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

information and belief, these executives all served as directors of Bank of America, N.A., and

helped determine the strategy of GCIB worldwide. Bank of America and Bank of America, N.A.

did not contemporaneously specify which of them served on the USD bbaLIBOR™ panel, listing

themselves only as "Bank of America."[17]

### B.   Barclays

42.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited

company headquartered in London, England. Barclays was at all relevant times a member of the

USD bbaLIBOR™ panel of banks.[18]

43.     Defendant Barclays Capital Inc. ("BCI") is a wholly owned subsidiary of

Barclays. BCI is a broker-dealer, member of the Financial Regulatory Authority, and registered

with the United States Securities and Exchange Commission ("SEC").

44.     As alleged more fully below, Barclays operated directly, or through its wholly

owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including BCI, in the

United States.[19] On information and belief, Barclays participated in the unlawful conduct

alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern

District of Virginia and elsewhere in the United States.

---

17 BBA LIBOR Panels 2005, http://www.bba.org.uk/media/article/bba-libor-panels-2005; BBA LIBOR Panels
2006, http://www.bba.org.uk/media/article/bba-libor-panels-2006; BBA LIBOR Panels 2007,
http://www.bba.org.uk/media/article/bba-libor-panels-2007 (on file with Plaintiff).

18 Barclays is registered as a financial holding company with the NY Federal Reserve Bank ("NY Fed"). It
maintained branch offices in the United States to solicit business from United States financial institutions and
manage its USD funding position. Barclays has employed more than 9,700 people in the United States. Barclays
had access to the NY Fed's discount window. In 2016, Barclays's branches in the United States generated $1.67
billion in revenue. As of 2011, Barclays's United States office held more than $4.67 billion in notional value in
interest-rate derivatives, nearly all of which were tied to USD bbaLIBOR™. In 2007, Barclays paid $400 million
for the naming rights of Barclays Center—a sports arena located in Brooklyn with its own subway station of the
same name.

19 *See Barclays in the USA*, Barclays, http://www.barclays.com/about-barclays/around-the-world/usa.html (last
visited May 31, 2018).

*Contacts with Freddie Mac*

45.    Barclays has had a long-standing and deep relationship with Freddie Mac in Virginia.  For example, during the Conduct Period, Barclays executed almost 500 interest-rate swaps with Freddie Mac in Virginia with a total notional value of over $450 billion.  In addition, over the course of the Conduct Period, Barclays[20] sold over 700 single family loans or interests in loans with an aggregate unpaid principal balance of over $100 million to Freddie Mac in Virginia.  These loan sales were governed by complex master agreements between Freddie Mac and Barclays, with payments for the loans made to Freddie Mac in Virginia.  Through BCI, Barclays also solicited Freddie Mac in Virginia and sold it nearly $4 billion of MBS tied to USD bbaLIBOR™ in nearly 150 transactions during the Conduct Period.[21]  Each of these transactions involved communications with Freddie Mac in Virginia, and either payments to or from Freddie Mac in Virginia.

46.    From at least 2007-2009, Barclays engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, swaps, loan, and MBS and transactions.

47.    During the Conduct Period, Barclays also routinely sent thousands of electronic messages to Freddie Mac employees in Virginia to solicit Freddie Mac business, which included USD bbaLIBOR™-linked products.  In addition, Barclays's executives regularly met, and spoke, with Freddie Mac employees.  For example, in the Fourth Quarter of 2008, Barclays had the following contacts (among others) with Freddie Mac:

- ██████████████████████████████████████████████████

---

20 During the conduct period, Barclays was the counterparty seller for the bulk of these loans, but it is possible that other Barclays entities were also sellers.

21 Were it not for BCI, Barclays would have directly sold MBS to Freddie Mac. Barclays knew of, and benefited from, BCI's sales of MBS and treated BCI's profits as Barclays profits.

██████████████████ █████████████████████████

- Barclays swaps trader Ryan Reich met with Freddie Mac to discuss potential trade ideas. On information and belief, Mr. Reich was aware of USD bbaLIBOR™ suppression and used it to Barclays's advantage in swaps trades with Freddie Mac. Mr. Reich has acknowledged manipulating USD bbaLIBOR™ for financial benefit, but asserts that Barclays senior management condoned the practice.[22]

- ████████████████████████████████████████████████████████████

- ████████████████████████████ met with Freddie Mac to solicit Freddie Mac's business.

- Other Barclays executives spoke and/or met with Freddie Mac in Virginia on at least five other occasions to discuss market conditions, participate in regular monthly meetings, work on economic models, and discuss mortgage pass-through business.

48.   ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

49.   In addition to these contacts, other relevant contacts demonstrate that, throughout the Conduct Period and beyond, Barclays has viewed Freddie Mac as an important component of Barclays's overall portfolio. For example, during the Conduct Period, Barclays provided warehouse lines of credit to Freddie Mac's Sellers/Servicers to, among other things, fund mortgage loans.

---

22 Kristin Ridley, *Former Barclays traders acquitted in UK's fourth Libor trial*, Reuters (Apr. 6, 2017, 4:57 AM), https://www.reuters.com/article/us-court-libor-barclays-idUSKBN178126.

23 *Infra* ¶¶ 57, 281, 284, 294, 340.

24 ████████████████████████████████████████████████████████

50.    In addition, Barclays has provided hundreds of millions in financing to Freddie Mac's Seller/Servicers, secured by MSRs or related income streams.

51.    BCI has entered into agreements with Freddie Mac under which BCI, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of STACR securities and/or WLS. BCI charged Freddie Mac significant fees for these services.

52.    BCI also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to BCI in connection with the development, structuring, issuance, and/or sale of billions of dollars in REMIC securities. BCI paid Freddie Mac millions of dollars in fees for these services.

### *Barclays Operational Structure*

53.    During the Conduct Period, Barclays operated its investment banking operations through its Barclays Capital business unit ("BCBU"). BCBU operated internationally without regard to corporate formalities. Barclays consolidated BCBU profits in Barclays's financial statements. In a 2009 speech to investors, Barclays former CEO Robert Diamond said BCBU was "operating as one firm" with "[o]ne brand and identity," "[o]ne risk and governance process," and "[o]ne set of goals and objectives."[25]

54.    In 2007, BCBU accounted for 31% of revenues for Barclays's Investment Banking and Investment Management unit. Barclays managed capital and liquidity for BCBU through a centralized management team that had responsibility for those tasks Barclays-wide. Barclays managed BCBU's risk and exposure on an aggregate basis.

---

25 Robert Diamond, Speaking Notes at Morgan Stanley Financial Services Conference, Barclays (Mar. 31, 2009), https://www.home.barclays/content/dam/barclayspublic/docs/InvestorRelations/IRNewsPresentations/2009Presentations/Speech%20by%20Robert%20E%20Diamond%20Jr%20President,%20Barclays%20PLC.pdf.

55.     In 2008, Barclays acquired Lehman Brothers Holdings Inc. ("Lehman") as part of its strategy to expand the global Barclays Capital franchise, and integrated Lehman into BCBU.

56.     BCI served as the "market access point" for Barclays's secured USD fundraising and transacted in asset-backed securities, agency mortgage-backed securities, securities borrowing and lending, and served as a primary dealer in United States government securities.[26] BCI used the same branding as Barclays.

57.     During the Conduct Period, Barclays's Board of Directors was in charge of all Barclays entities and determined the overall strategic objectives and policies of the group as a whole.[27]  For example, then CEO Mr. Diamond was responsible for BCBU.  Mr. del Missier was President of BCBU and a member of BCI's Board of Directors.  Reporting to Mr. del Missier were BCBU's Global Head of Strategic Portfolio and Liquidity Management, John Porter, and BCBU's Global Head of Fixed Income (with responsibility for trading mortgage-backed securities and interest rate swaps), Eric Bommensath.  These executives helped set the global strategy for BCBU and implement that strategy in the United States.  On information and belief, Barclays undertook the business dealings with Freddie Mac described above in furtherance of that strategy.  Barclays also implemented its legal compliance strategy on a global basis.

58.     During the Conduct Period, Barclays engaged in derivatives transactions in Virginia and the United States and obtained funding via business units known within Barclays as, respectively, the Treasury unit (overseen globally by Mr. Stone) and the Money Market unit. Barclays's employees from these business units, including employees located in the United

---

26 Barclays Resolution Plan (Oct. 2013) at 14, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/barclays-plc-1g-20131001.pdf.

27 Barclays, 2010 Annual Report, at 153 (2010).

States, reported to the same supervisors within their respective business units.[28]  BCBU earned

billions of dollars in revenues for the benefit of Barclays from United States investors and

Freddie Mac.[29]  BCBU also ran a proprietary trading fund that profited from artificially

depressed USD bbaLIBOR™ rates.

59.    Barclays "failed to have adequate systems and controls in place" relating to its

bbaLIBOR™ submissions.[30]  During the relevant period, BCBU employees in the United States

communicated regularly with Barclays employees in London regarding USD bbaLIBOR™

submissions and helped determine, from the United States, Barclays's USD bbaLIBOR™

submissions.  BCBU failed to wall off the trading teams from the teams contributing USD

bbaLIBOR™ submissions.[31]  ███████████████████

████████████████████████████████████

████████████

60.    BCBU was responsible for, *inter alia*, submitting Barclays's bbaLIBOR™

contributions and transacting business with Freddie Mac.  On information and belief, Barclays,

through BCBU, determined the strategic direction of BCI, specifically with regard to its dealings

with Freddie Mac, and benefited from BCI's sale of MBS to Freddie Mac.

---

28 For example, on information and belief, Mr. Bommensath oversaw the global unit for which Mr. Reich worked and Mr. Porter oversaw the global unit for which Mr. Mathew worked.

29 Barclays, 2010 Annual Report, at 56, 57 (2010), available at https://www.home.barclays/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2010/2010-barclays-plc-annual-report.pdf (last visited June 14, 2018).

30 Anthony Salz & Russell Collins, Salz Review: An Independent Review of Barclays' Business Practices ¶ 6.58 (Apr. 2013), *available at* https://online.wsj.com/public/resources/documents/SalzReview04032013.pdf.

31 For example, in 2005, Mr. Bommensath, told a subordinate Barclays derivatives trader "to introduce the New York swaps desk" to USD bbaLIBOR™ manipulation and "teach [the New York swaps desk] how to communicate with the cash desk in London and make the New York desk more profitable."  Jeremy Hodges & Stephen Morris, *Ex-Barclays Trader Told SFO His Bosses Knew About Libor Fix*, Bloomberg (Apr. 7, 2016), http://www.bloomberg.com/news/articles/2016-04-07/ex-barclays-traders-quit-rate-rigging-as-crisis-hit-sfo-says.

32 ████████████████████████████████████

61.     Barclays published multiple reports on global and U.S. Fixed Income Research, which included analyses on bbaLIBOR™. These reports typically included a disclaimer stating that the "publication [had] been prepared by Barclays Capital, the investment banking division of Barclays Bank PLC, and/or one or more of its affiliates . . ." and distributed in the United States through BCI. Over the course of the Conduct Period, Barclays entities (including Barclays and BCI) sent hundreds of thousands of these research notes directly to Freddie Mac traders and other personnel.

**C.    BBA**

62.     The BBA is a trade association based in the United Kingdom. Throughout the 2000s, the BBA owned bbaLIBOR™. The BBA was governed by a Board, which officially met four times per year, comprised of the BBA Chief Executive and the Chief Executives of a number of Bank Defendants. During the Conduct Period, the BBA acted on behalf of its member banks. Defendant BBA Enterprises, Ltd. was a wholly owned subsidiary of the BBA located in London. In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR, Ltd., to house bbaLIBOR™. One published report has stated that the BBA created BBA LIBOR, Ltd. to help shield the BBA from potential liability arising from the misconduct alleged in this Complaint.[33] On September 23, 2014, BBA LIBOR Ltd. changed its name to BBA Trent Ltd.

63.     ██████████████████████████████████████████████
████████████████████████████████████████████████████

---

33 *See* David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J. (Sept. 11, 2012), http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

██████████████████████████████  During the Conduct Period, the FX & MM Committee was comprised of thirteen Bank Defendants.  The FX & MM Committee was responsible for determining bbaLIBOR™'s rules, choosing panel banks, and deciding whether and how to discipline panel banks that failed to adhere to bbaLIBOR™'s rules.  The FX & MM Committee was not a traditional trade association committee.  It met in secret, did not include an antitrust lawyer to monitor committee meetings and communications, did not publish minutes of its meetings, and did not publicly identify its members.  With respect to, at least, bbaLIBOR™, the BBA operated at the direction of the FX & MM Committee.  ██████████████

██████████████████

64.     As set forth more fully below, the BBA advertised bbaLIBOR™ in the United States and in the Eastern District of Virginia, and solicited business in the United States.  In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the United States Patent and Trademark Office, located in the Eastern District of Virginia at 600 Dulany Street, Alexandria, Virginia (Registration No. 3212218).  The BBA electronically communicated news and information through Internet websites (e.g., www.bba.org, www.bbalibor.org), the Thomson Reuters website (www.reuters.com), the Wall Street Journal, and through other data vendor websites including International Data Corp. ("IDC"), which maintains an office in Alexandria, Virginia.[36]  During the Conduct Period, the BBA distributed USD bbaLIBOR™ data via a

---

██████████████████████████████████████████

35 ████████████████████████████

36 *See, e.g., Frequently Asked Questions (FAQs)*, BBA Libor, https://web.archive.org/web/20110303121338/http://www.bbalibor.com/bbalibor-explained/faqs (last visited May 31, 2018); *Worldwide Offices*, IDC, http://www.idc.com/about/wwoffices.jsp#.UTkzDo6BBMY (last visited May 31, 2018).

number of data vendors, including Professional Service ("Bloomberg")[37] and IDC, to more than a million computer screens around the world, including in the United States and the Eastern District of Virginia.[38] In 2009, the BBA launched a Twitter social media news feed to bypass the print media[39] because interest in bbaLIBOR™ had soared "since so many loans are linked to it."[40]  The BBA also maintained a Facebook page accessible from the Eastern District of Virginia (https://www.facebook.com/BritishBankers).  On information and belief, the BBA participated in the unlawful conduct alleged in this Complaint in the Eastern District of Virginia and elsewhere in the United States.

---

37 The "Bloomberg Terminal" was a specialized computer application provided to subscribers to receive real-time market data from Bloomberg.  The Bloomberg Terminal "is a modern icon of financial markets" and sits on the desk of more than 300,000 of the "world's most influential decision makers."  The Terminal, Bloomberg Professional Services, https://www.bloomberg.com/professional/solution/bloomberg-terminal/?utm_source=bloomberg-facts (last visited May 23, 2018).  The Bloomberg Terminal had a specialized keyboard to provide access to real-time market data.  Bloomberg provided bbaLIBOR™ data for subscribers.  The Bloomberg Terminal also provided subscribers with a method of communication.  Subscribers received a unique message address, *e.g.*, Name@bloomberg.net. Bloomberg subscribers could also "chat" with each other via instant messages sent through Bloomberg.  It was common for Bloomberg subscribers, including subscriber Defendants, to send electronic messages to Freddie Mac in Virginia.  Between 2007 and 2009, at least the following Defendants and/or their affiliates, subsidiaries, or internal groups collectively sent hundreds of thousands of electronic messages to employees of Freddie Mac in Virginia: Bank of America (Banc of America Securities; Merrill Lynch; CMBS Strategy; Interest Rate Strategy); Bank of Tokyo - Mitsubishi UFJ (Mitsubishi UFJ Securities); Barclays (Barclays Capital); Citibank (Citigroup Global Markets); Credit Suisse (Credit Suisse Securities); Deutsche Bank (Deutsche Bank Securities); HBOS/Bank of Scotland (HBOS TS); Lloyds (Lloyds TSB Bank PLC); JPMorgan (JPMorgan Securities; JPMorgan Credit Research; Global Sector Research; JPMorgan Technical Analysis Research); Rabobank (Central Banks Rabobank); RBC (RBC Capital Markets); RBS (Royal Bank of Scotland; RBS Securities Inc.; RBS GBM; RBS Greenwich Capital); and Societe Generate (SG Americas Securities). Declaration of L. MacVittie, ECF No. 899 (Dec. 8, 2014).

38 *See Frequently Asked Questions (FAQs)*, *supra* note 36.  The BBA explained to U.K. House of Commons that LIBOR data "can be seen on a range of financial vendor screens around the world." House of Commons, Treasury Committee, *Fixing LIBOR: some preliminary findings, Written Evidence* at 79, *available at* https://www.parliament.uk/documents/commons-committees/treasury/Fixing-LIBOR-evidence2.pdf.  Those vendors included Bloomberg and IDC, and the screens to which the BBA referred included Freddie Mac's Bloomberg Terminals.

39 *See BBA LIBOR*, Capital Markets Bull., June 2009, at 5, *available at* http://hb.betterregulation.com/external/ Capital%20Markets%20Bulletin%20-%20June%2009.pdf (On file with Plaintiff).

40 The World's Most Important Number Now Tweets Daily, *supra* note 3.

65.     The BBA and its employees sought to maintain USD bbaLIBOR™'s reputation as an accurate and reliable benchmark and its prestige and role as a dominant benchmark.  On behalf of the Bank Defendants, the BBA and its employees engaged in extensive communication with regulatory authorities in the United States for that purpose. For example, BBA documents reveal that the bbaLIBOR™ Secretariat "met with regulatory authorities in the US" on numerous occasions between 2005 and 2009 to discuss issues related to USD bbaLIBOR™.[41]

**D.     Citi**

66.     Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation headquartered in New York, New York, with numerous corporate offices and branches in the Eastern District of Virginia.  Citigroup's indirectly wholly owned subsidiary Defendant Citibank, N.A. ("Citibank"), which is headquartered in New York, New York, was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Citibank is the primary banking entity of Citigroup, providing consumer finance, investment banking, commercial banking, and other services.  It is provisionally registered with the U.S. Commodity Futures Trading Commission ("CFTC") as an interest-rate swaps dealer.  CitiMortgage Inc.("CitiMortgage") is an indirect subsidiary of Citibank, which provides mortgage loans for home purchase and refinance transactions in the United States.  Citigroup Global Markets Inc. ("CGMI") is Citigroup's principal broker-dealer subsidiary in the United States.  CGMI is registered as a securities broker dealer and investment advisor with the SEC.

67.     As set forth more fully below, Citigroup and Citibank operated directly, or through their subsidiaries, affiliates, agents, and/or predecessors, including CGMI, in the United States.  On information and belief, Citigroup and Citibank participated in the unlawful conduct

---

41 *See Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 70.

alleged in this Complaint both directly and through their subsidiaries and/or affiliates in the Eastern District of Virginia and elsewhere in the United States. Moreover, as set forth more fully below, Citigroup and Citibank employees and managers located in the United States participated in the alleged fraud and conspiracy by holding out USD bbaLIBOR™ out as an honest and reliable benchmark and concealing the fraud and directing Citibank's USD bbaLIBOR™ submitters to artificially suppress Citibank's published USD bbaLIBOR™ contributions.

### *Contacts with Freddie Mac*

68.     Citigroup, through Citibank and certain of its other subsidiaries, has had a long-standing and extensive relationship with Freddie Mac in Virginia. For example, during the Conduct Period, Citibank entered into over 400 interest-rate swaps with Freddie Mac in Virginia, with a total notional value of over $225 billion. In addition, during the Conduct Period, Citibank, through CGMI, solicited Freddie Mac in Virginia and sold it approximately $6 billion of MBS tied to USD bbaLIBOR™ in approximately 110 transactions. During the Conduct Period, Citibank also sold Freddie Mac in Virginia multi-family loans with an aggregate unpaid principal balance of more than $2 billion, and, through CitiMortgage[42], single family loans with an aggregate unpaid principal balance of approximately $70 billion.[43] CitiMortgage's loan sales were governed by complex master agreements negotiated by Freddie Mac and CitiMortgage, with payments for the loans made to Freddie Mac in Virginia. Each of these transactions involved communications with Freddie Mac in Virginia, and either payments to or from Freddie Mac in Virginia.

---

42 During the conduct period, CitiMortgage was the counterparty seller for the bulk of these loans, but it is possible that other Citigroup entities were also sellers.

43 Were it not for the existence of CGMI and CitiMortgage, Citibank would have directly sold MBS and single family loans to Freddie Mac. Citibank benefited from CGMI's sales of MBS and CitiMortgage's sales of single family loan and treated CGMI's and CitiMortgage's profits as Citibank profits.

69.     From at least 2007-2009, Citigroup engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, swaps MBS, and loan transactions.

70.     During the conduct period, Citigroup entities also sent hundreds of thousands of electronic communications, routinely made telephone calls to Freddie Mac, and met with Freddie Mac personnel in the Eastern District of Virginia for the purpose of soliciting and engaging in financial transactions, including transactions involving USD bbaLIBOR™-linked products, and as part of a regular course of dealing with Freddie Mac.  Citibank also met with Freddie Mac executives in Virginia and elsewhere.  As just one of many examples, in the fourth quarter of 2008, Citibank's Head of Asset and Liability Management met with Freddie Mac to discuss market conditions and the health of banks.  Citibank worked hard to maintain a good relationship with Freddie Mac.  As discussed above, maintaining counterparty approval was essential for counterparties, like Citibank, to engage in transactions with Freddie Mac for USD bbaLIBOR™-linked and other financial products.[44]

71.     In addition to these contacts, other relevant contacts demonstrate that, throughout the Conduct Period and beyond, Citigroup and Citibank have viewed Freddie Mac as a very important component of their overall portfolio.  Indeed, over the years, Citibank has participated in various of Freddie Mac's advisory boards.

72.     Throughout the Conduct Period, Citibank also entered into agreements with Freddie Mac to provide custodial services for original mortgage notes and related documents for loans sold to, and serviced for, Freddie Mac.  Additionally, Citibank has provided warehouse lines of credit to Freddie Mac's Sellers/Servicers to, among other things, fund mortgage loans

---

44 *Supra* ¶ 33.

and tens of millions in financing to Freddie Mac's Seller/Servicers, secured by MSRs or related income streams.

73.    Citigroup and Citibank had further contacts with Freddie Mac through CitiMortgage and CGMI.  CitiMortgage[45] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac, and in the course of these servicing responsibilities, CitiMortgage regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered servicing data and documentation to Freddie Mac in Virginia.  As of December 2011, CitiMortgage had serviced approximately 1 million single family loans on behalf of Freddie Mac with an aggregate unpaid principal balance of approximately $130 billion.  Since then, CitiMortgage has continued to be a strong partner with Freddie Mac, servicing over 63,000 loans with an aggregate unpaid principal balance exceeding $12 billion.  Additionally, as of year-end 2011, Citibank also serviced hundreds of millions of dollars of loans in Freddie Mac's portfolio or in Freddie Mac sponsored securitizations.

74.    Additionally, CGMI has entered into agreements with Freddie Mac under which CGMI, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of STACR securities and/or WLS, as well as Freddie Mac seasoned loans, via sales or structured sales. CGMI charged Freddie Mac significant fees for these services.

75.    CGMI also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to CGMI in connection with the

---

45 During the conduct period, CitiMortgage was the counterparty servicer for the bulk of these loans, but it is possible that other CitiMortgage entities were also servicers.

development, structuring, issuance, and/or sale of tens of billions of dollars in REMIC securities. CGMI paid Freddie Mac tens of millions of dollars in fees for these services.

### Citi Operational Structure

76. Citigroup, Citibank, and CMGI all use common branding and the "Citi" logo. Citigroup has promoted itself as a "global bank for businesses."[46] During the Conduct Period, Citigroup managed its businesses along segment and product lines, without regard for corporate formalities. One of those segments was the Institutional Clients Group ("ICG").[47] Citigroup formed ICG in 2007 to focus on important institutional clients like Freddie Mac. On information and belief, ICG controlled and directed the strategic direction of Citibank and CGMI with regard to their dealings with Freddie Mac, including sales of MBS and swap transactions, and benefited from profits generated in transactions with Freddie Mac. ICG reported profits and losses on a segment-wide basis,[48] including Citibank and CMGI profits from transactions with Freddie Mac. During the Conduct Period, ICG's CEOs included key executives of Citigroup, including Vikam Pandrit (Citigroup CEO), Michael Klein, and John Havens. Citibank and CMGI employees responsible for dealing with Freddie Mac reported to ICG management. On information and belief, those executives knew of, directed, and/or condoned USD bbaLIBOR™ suppression.

77. Citibank's USD bbaLIBOR™ submitters were also within the ICG segment. Specifically, the London desk of G10 Risk Treasury Europe within ICG was responsible for submitting USD bbaLIBOR™. Among others, the New York desk of G10 Risk Treasury

---

46 Citi Reshuffles Its Management as Split Looms, DealBook N.Y. Times (Jan. 27, 2009),
https://dealbook.nytimes.com/2009/01/27/citi-reshuffles-its-management-as-split-looms/ (last visited June 14, 2018).

47 Citi Rearranges Its Wealth Management Unit, DealBook N.Y. Times (Mar. 3, 2008),
https://dealbook.nytimes.com/2008/03/03/citi-rearranges-its-wealth-management-unit/ (last visited June 14, 2018).

48 Citi, Annual Report 2009 at 26-29, (2009), *available at*
https://www.citigroup.com/citi/investor/quarterly/2010/ar09c_en.pdf?ieNocache=992.

interacted regularly with the London desk of G10 Risk Treasury Europe.  Further, as detailed more fully below, U.S.-based executives for Citibank (all under ICG) communicated regularly with USD bbaLIBOR™ submitters regarding USD bbaLIBOR™, at times directing the submission of USD bbaLIBOR™ contributions that did not reflect Citibank's true cost of interbank borrowing.  Following the publication of the Wall Street Journal article, which questioned the accuracy of USD bbaLIBOR™, U.S.-based employees generated bank-wide talking points to share with counterparties, such as Freddie Mac, which defended the benchmark's accuracy.

### E.  Rabobank

78.     Defendant Coöperatieve Rabobank UA ("Rabobank") (f.k.a. Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.) is a financial services provider with its headquarters in Utrecht, the Netherlands.  Rabobank was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Rabobank, N.A. is a U.S. subsidiary of Rabobank.

79.     Rabobank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States, including through Rabobank's "Member Banks," which Rabobank supports and supervises.[49]  On information and belief, Rabobank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

---

49 *See, e.g.*, *Rabobank Group United States of America*, Rabobank Grp., https://www.rabobank.com/en/locate-us/americas/usa.html (last visited May 31, 2018).

### Contacts with Freddie Mac

80.     During the Conduct Period, Rabobank sent hundreds of electronic communications to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting and engaging in financial transactions.

81.     Rabobank had further contacts with Freddie Mac through Rabobank, N.A. During the Conduct Period, Rabobank, N.A.[50] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac, and in the course of these servicing responsibilities, Rabobank N.A. regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered servicing data and documentation to Freddie Mac in Virginia. As of December 2011, Rabobank N.A. had serviced nearly 100 single family loans on behalf of Freddie Mac with an aggregate unpaid principal balance exceeding $5 million. Since then, Rabobank, N.A. has continued to be a strong partner with Freddie Mac, servicing over 20 loans with an aggregate unpaid principal balance exceeding $1 million.

### Rabobank Operational Structure

82.     Rabobank does business in the United States. It is licensed by the New York State Department of Financial Services ("NYSDFS") and is regulated by the New York Federal Reserve ("NY Fed"). Rabobank has employed more than 500 employees in the United States and generated substantial revenue from its U.S. branches. For example, Rabobank conducts its wholesale activities through its U.S. branch and certain wholly owned subsidiaries of Utrecht-America Holdings, Inc., including Rabo Securities USA, Inc., a broker-dealer registered with the SEC, and Rabo Capital Services, Inc. In 2000, the BBA selected Rabobank to be a member of

---

50 During the conduct period, Rabobank was the counterparty servicer for the bulk of these loans, but it is possible that other Rabobank entities were also servicers.

the USD bbaLIBOR™ panel even though Rabobank rarely participated in the interbank loan market.

83.     On information and belief, during the Conduct Period, Rabobank operated its derivatives business globally without regard for corporate formalities,[51] and produced consolidated financial statements.  On information and belief, Rabobank employees in the United States were aware of USD bbaLIBOR™ manipulation, and bought and sold derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark from and to counterparties located in the United States. ███████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

███████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████

84.     Rabobank's "book" of USD derivatives transactions was the primary consideration for Rabobank's USD bbaLIBOR™ submissions.[55]  On information and belief, a majority of Rabobank's USD bbaLIBOR™ derivatives transactions were with counterparties



55 Defense Ex. 608C at 7, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

located in the United States.  According to its Report of Assets and Liabilities of U.S. Branches

and Agencies of Foreign Banks, in 2011, Rabobank's U.S. office held more than $7.8 billion in

notional value in interest-rate derivatives for trading, nearly all of which were tied to USD

bbaLIBOR™.

      **F.**    **Credit Suisse**

    85.    Defendant Credit Suisse AG ("Credit Suisse") is a Swiss company headquartered

in Zurich, Switzerland.  Credit Suisse was at all relevant times a member of the USD

bbaLIBOR™ panel of banks.[56]  Defendant Credit Suisse International ("CSI") (f.k.a. Credit

Suisse First Boston International), Credit Suisse Securities (USA) LLC ("CSSUSA"), and DLJ

Mortgage Capital, Inc. ("DLJ") are indirect wholly owned subsidiaries of Credit Suisse.  CSI is

the global derivatives trading entity of Credit Suisse.[57]  CSSUSA is a U.S. limited liability

company and a registered broker-with the SEC.  Among other things, CSSUSA acts as a primary

dealer in U.S. government securities and an underwriter, placement agent, and dealer for money

market instruments, commercial paper, mortgage and other asset-backed securities, as well as a

range of debt, equity, and other convertible securities.[58]  DLJ is a U.S. corporation, which

engages in, among other things, the purchase and sale of residential mortgage loans.  CSSUSA

and DLJ are both headquartered at Credit Suisse's New York office.

---

56 Credit Suisse listed its stock on the New York Stock Exchange.  It had more than 140 employees in the United States and transacted in billions of dollars in interest-rate derivatives in the United States.

57 Credit Suisse International, Annual Report 2009, *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csg-ar-2009-en.pdf.

58 Credit Suisse (Bank) Consolidated Financial Report 2017, Credit Suisse, https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csg-ar17-consolidated-financial-statements-bank-en.pdf.

86.     As alleged more fully below, Credit Suisse operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including CSI and CSSUSA, in the United States, including Virginia.[59]  On information and belief, Credit Suisse participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

### Contacts with Freddie Mac

87.     Credit Suisse has had a long-standing and deep relationship with Freddie Mac in Virginia.  For example, during the Conduct Period, Credit Suisse was among Freddie Mac's top counterparties for financial products.  Through CSI, Credit Suisse entered into more than 600 interest-rate swap transactions with Freddie Mac in Virginia with a total notional value of over $300 billion.  Through CSSUSA, Credit Suisse solicited Freddie Mac in Virginia and sold it nearly $3 billion of MBS tied to USD bbaLIBOR™ in more than 20 transactions.  Through DLJ[60], Credit Suisse sold Freddie Mac in Virginia over 2000 single family loans with a principal unpaid balance of almost $400 million.[61]  These loan sales were governed by complex master agreements between Freddie Mac and DLJ, with payments for the loans made to Freddie Mac in Virginia.

---

59 *See, e.g.*, *Office Locator*, Credit Suisse, https://www.credit-suisse.com/who_we_are/en/office_locator.jsp (last visited May 31, 2018).

60 During the conduct period, DLJ was the counterparty seller for the bulk of these loans, but it is possible that other Credit Suisse entities were also sellers.

61 Were it not for the existence of CSSUA, CSI, and DLJ, Credit Suisse would have directly engaged in MBS swap, and loan transactions with Freddie Mac.  Credit Suisse knew of, directed, and benefited from CSSUA's, CSI's, and DLJ's sales of swaps, MBS, and loans and treated CSSUA's, CSI's, and DLJ's profits as Credit Suisse profits.

88.     From at least 2007-2009, Credit Suisse engaged with Freddie Mac in Freddie

Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie

Mac with regard to, *inter alia*, swaps, MBS, and loan transactions.

89.     During the Conduct Period, Credit Suisse entities also sent hundreds of thousands

of electronic communications, and routinely made telephone calls, to Freddie Mac in the Eastern

District of Virginia for the purpose of soliciting and engaging in financial transactions, including

transactions involving USD bbaLIBOR™-linked products, and as part of a regular course of

dealing with Freddie Mac.

90.     In addition to these contacts, other relevant contacts demonstrate that, throughout

the Conduct Period and beyond, Credit Suisse has viewed Freddie Mac as an important

component of its overall portfolio.  For example, Credit Suisse has provided hundreds of millions

in financing to Freddie Mac's Seller/Servicers, secured by MSRs or related income streams.

91.     DLJ[62], as a Servicer, entered into contracts with Freddie Mac to service loans on

behalf of Freddie Mac, and in the course of these servicing responsibilities, DLJ regularly

contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered

servicing data and documentation to Freddie Mac in Virginia.  As of December 2011, DLJ had

serviced over 2,000 single family loans on behalf of Freddie Mac with an aggregate unpaid

principal balance exceeding $400 million.  Since then, DLJ has continued to be a strong partner

with Freddie Mac, servicing over 500 loans with an aggregate unpaid principal balance

exceeding $100 million.

---

[62] During the conduct period, DLJ was the counterparty servicer for the bulk of these loans, but it is possible that other Credit Suisse entities were also servicers.

92.     CSSUSA has entered into agreements with Freddie Mac under which Credit Suisse, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of STACR securities and/or WLS, as well as Freddie Mac seasoned loans, via sales or structured sales. CSSUSA charged Freddie Mac significant fees for these services.

93.     CSSUSA also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to CSSUSA in connection with the development, structuring, issuance, and/or sale of tens of billions of dollars in REMIC securities. CSSUSA paid Freddie Mac tens of millions of dollars in fees for these services.

### Credit Suisse Operational Structure

94.     During the Conduct Period, Credit Suisse maintained banking divisions and subsidiaries around the world, including in the United States, which it operated under a divisional model.  CSI and CSSUSA operated within Credit Suisse's Global Markets and Investment Banking and Capital Markets divisions.  On information and belief, during the Conduct Period, Credit Suisse pursued the investment banking side of its business—which was responsible for trading derivatives that incorporated USD bbaLIBOR™—through the Investment Banking Division ("CS IBD").  CS IBD was responsible for, *inter alia*, trading interest-rate derivatives and underwriting/selling asset-backed securities.  CS IBD operated globally without regard to corporate formalities.[63]  In its 2009 Annual Report, Credit Suisse wrote that CS IBD provided a range of financial products and services, including "global securities sales" "via regional and local teams."  CS IBD implemented global strategies and directives in the United

---

[63] Credit Suisse also implemented its Code of Conduct globally.

States through CSSUSA and CSI.[64]  CS IBD (through CSSUSA) entered into derivative

contracts for Credit Suisse's risk management needs.[65]  On information and belief, CS IBD was

responsible for, *inter alia*, submitting Credit Suisse's bbaLIBOR™ contributions and transacting

business with Freddie Mac.  On information and belief, CS IBD directed the overall management

of the relationship with Freddie Mac in Virginia with respect to, at least, the sale of MBS

through CSSUSA and execution of interest-rate swaps through CSI.  During the Conduct Period,

the CEOs of CS IBD were also members of the Credit Suisse Executive Board.[66]

     95.     Credit Suisse published multiple reports on global and U.S. Fixed Income and

Economic Research, which included analyses on bbaLIBOR™.  These reports typically included

a disclaimer stating that references to "Credit Suisse" in the report included "all subsidiaries of

Credit Suisse operating under its investment banking division" and that U.S. distribution of the

report was achieved by CSSUSA.  The disclaimer also advised that U.S. customers who wished

to transact with Credit Suisse should effect such a transaction through CSSUSA.  Over the

course of the Conduct Period, Credit Suisse entities sent thousands of these research notes

directly to Freddie Mac traders and other personnel in Virginia.

     96.     Credit Suisse promoted its global brand, international reach, and increased profits

from the perception that it was a "strong counterparty."[67]  Credit Suisse also highlighted its

---

64 According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Credit Suisse's United States branch held more than $27 billion in notional value in interest-rate derivatives for trading, including derivatives that incorporated USD bbaLIBOR™ as the interest-rate benchmark.

65 Credit Suisse International, Annual Report 2009, *supra* note 57, at 3.

66 Credit Suisse, 2009 Annual Report at 34, *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csg-ar-2009-en.pdf (last visited June 13, 2018).

67 Renato Fassbind, Bank am Bellevue "The perfect business model?!", Credit Suisse (Jan. 16, 2009), *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/web-events/shareholder-events/bank-am-bellevue-16012009.pdf.

secondary trading of U.S. MBS as "key client business[]" and treated CS IBD profits earned in the United States from trading MBS and interest-rate derivatives as Credit Suisse profits.[68]

### G.    Deutsche Bank

97.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany, with subsidiaries and affiliates located in the Eastern District of Virginia.  Deutsche Bank was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Deutsche Bank Securities, Inc. ("DBSI") and DB Structured Products, Inc. ("DB Structured Products") are indirect, wholly owned subsidiary of Deutsche Bank.  DBSI shares offices with Deutsche Bank.  DB Structured Products is headquartered at Deutsche Bank's New York office.  On information and belief, Deutsche Bank treated DBSI and DB Structured Products profits as its own, including profits on transactions with Freddie Mac.

98.    As alleged more fully below, Deutsche Bank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States and Virginia.[69]  On information and belief, Deutsche Bank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

### *Contacts with Freddie Mac*

99.    Deutsche Bank has had a long-standing and deep relationship with Freddie Mac in Virginia.  During the Conduct Period, Deutsche Bank executed almost 700 interest-rate swaps with a total notional value of over $500 billion with Freddie Mac in Virginia and through DBSI,

---

68 Paul Calello, Presentation at UBS Global Financial Services Conference, Credit Suisse (May 12, 2009), *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/web-events/shareholder-events/calello-ubs-12052009.pdf.

69 *See, e.g., Location Finder*, Deutsche Bank, https://www.db.com/company/en/location-finder.htm (last visited May 31, 2018).

Deutsche Bank solicited Freddie Mac in Virginia and sold it over $1 billion in MBS tied to USD bbaLIBOR™ in more than 40 transactions. Deutsche Bank also sold Freddie Mac in Virginia multi-family loans with an aggregate unpaid principal balance of approximately $8 billion, and, through DB Structured Products[70], over 6000 single family loans with a principal unpaid balance of over $1.5 billion.[71] DB Structured Products' loan sales were governed by complex master agreements between Freddie Mac and DB Structured Products, with payments for the loans made to Freddie Mac in Virginia. Each of the swap, MBS, and loan transactions involved communications with Freddie Mac in Virginia, and payments to or from Freddie Mac in Virginia.

100.     From at least 2007-2009, Deutsche Bank engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above in ¶¶ 12-13) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, swaps, MBS, and loan transactions.

101.     During the Conduct Period, Deutsche Bank entities also sent hundreds of thousands of electronic communications, routinely made telephone calls to Freddie Mac, and met with Freddie Mac in the Eastern District of Virginia for the purpose of soliciting and engaging in financial transactions, including transactions involving USD bbaLIBOR™-linked products, and as part of a regular course of dealing with Freddie Mac. As discussed above, maintaining counterparty approval was essential for counterparties, such as Deutsche Bank, to engage in transactions with Freddie Mac for USD bbaLIBOR™-linked and other financial products.

---

70 During the conduct period, DB Structured Products was the counterparty seller for the bulk of these loans, but it is possible that other Deutsche Bank entities were also sellers.

71 Were it not for the existence of DBSI and DB Structured Products, Deutsche Bank would have sold MBS and multi-family loans to Freddie Mac. Deutsche Bank knew of, directed, and benefited from DBSI's sales of MBS and DB Structured Products' sales of multi-family loans to Freddie Mac and treated DBSI's and DB Structured Products' profits as Deutsche Bank profits.

102.     In addition to these contacts, other relevant contacts demonstrate that, throughout the Conduct Period and beyond, Deutsche Bank has viewed Freddie Mac as an important component of its overall portfolio, achieved directly and through, its operating entities in the United States.  For example, during the Conduct Period, Deutsche Bank and DB Structured Products[72] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac, and in the course of these servicing responsibilities, Deutsche Bank and DB Structured Products regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered servicing data and documentation to Freddie Mac in Virginia.  As of December 2011, Deutsche Bank serviced multi-family loans with an aggregate unpaid principal balance exceeding $100 million, and DB Structured Products serviced over a thousand single family loans on behalf of Freddie Mac with an aggregate unpaid principal balance of approximately $290 million.

103.     Additionally, DBSI has entered into agreements with Freddie Mac under which DBSI, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of STACR securities and/or WLS.  DBSI charged Freddie Mac significant fees for these services.

104.     DBSI also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to DBSI in connection with the development, structuring, issuance, and/or sale of tens of billions of dollars in REMIC securities. DBSI paid Freddie Mac tens of millions of dollars in fees for these services.

---

72 During the conduct period, Deutsche Bank and DB Structured Products were the counterparty servicers for the bulk of these loans, but it is possible that other Deutsche Bank entities were also servicers.

*Deutsche Bank Operational Structure*

105.     Deutsche Bank maintains a branch office in the United States, which is registered to do business with the NYSDFS and regulated by the United States Federal Reserve System, and has subsidiaries (*e.g.*, Deutsche Bank Securities, Inc.) with substantial operations in the United States.  Deutsche Bank has employed more than 10,000 people in the United States.

106.     In November 2007, Deutsche Bank borrowed $2.4 billion from the U.S. Federal Reserve System's Discount Window to provide liquidity and bolster its reputation with investors and regulators in the United States.[73]  In 2012, Deutsche Bank registered with the CFTC as a swap dealer for the purpose of engaging in financial transactions incorporating USD bbaLIBOR™ in the United States, including Virginia.

107.     The U.S. branch of Deutsche Bank primarily engaged in traditional lending and deposit activities, as well as trading activities dealing with derivatives (primarily interest-rate derivatives) and cash financial products.[74]

108.     During the Conduct Period, Deutsche Bank engaged in securities sales in the United States, including Virginia, through its Corporate and Investment Bank ("CIB") division, which operated globally without regard to corporate formalities.  CIB reported profits and losses on a division-wide basis.[75]  CIB focused on institutional clients like Freddie Mac.[76]  CIB directed DBSI's sales of MBS to Freddie Mac in Virginia.

---

73 Morgansen, *supra* note 11.

74 According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Deutsche Bank's United States branch held nearly $20 trillion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

75 Deutsche Bank, Annual Review 2009 at 31, *available at* https://www.db.com/ir/en/download/Annual_Report_2009_entire.pdf (last visited June 13, 2018).

76 *Id.* at 34.

109.    Deutsche Bank published multiple Global Markets Research reports, which included analyses on bbaLIBOR™. These reports, which were regularly distributed to Freddie Mac and others, expressly included a "Global Disclaimer," stating that "[t]he information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank") . . . . In the U.S. this report was approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and SIPC."

110.    On information and belief, Deutsche Bank operated its interest-rate derivatives and securities businesses through its Global Finance and Foreign Exchange business unit ("GFFX").[77]  GFFX existed under the CIB (and Global Markets) umbrella.  From 2006 to 2011, GFFX consisted of Global Finance and FX Forwards ("GFF") and Foreign Exchange ("FX") and employed traders in both its Pool Trading groups and its Money Market Derivatives ("MMD") groups.[78]  The Pool Trading and MMD desks were organized by currency, with senior traders overseeing the desks and regional managers overseeing the business lines by location.[79]  DBSI served as GFFX's investment banking and securities arm in the United States.  GFFX was responsible for, *inter alia*, submitting Deutsche Bank's bbaLIBOR™ contributions and transacting business with Freddie Mac.

111.    Through CIB (and Global Markets and GFFX), Deutsche Bank carried out its MBS activities.  Global head of Global Markets Anshu Jain was aware of, and condoned, USD

---

77 *In re Deutsche Bank AG*, Consent Order Under New York Banking Law §§ 44-44a ¶ 11(NYSDFS Apr. 23, 2015) (hereinafter "DB NYSDFS CO"), attached as Exhibit 1 and incorporated into this Complaint by reference.

78 *United States v. Deutsche Bank AG*, Deferred Prosecution Agreement, Attachment A, Statement of Facts ¶14 (Apr. 23, 2015) (hereinafter "DB SOF"), attached as Exhibit 2 and incorporated into this Complaint by reference.

79 *In re Deutsche Bank AG*, No. 15-20, at 8 (C.F.T.C. Apr. 25, 2015) (hereinafter "DB CFTC Order"), attached as Exhibit 3 and incorporated into this Complaint by reference.

bbaLIBOR™ suppression.[80] Ms. Jain was also a member of Deutsche Bank's Group Executive Committee.

112.    GFFX employees reported up the same chain of management, with a global senior manager responsible for both desks "instruct[ing] all traders to have open communication across offices and instill[ing] an expectation that the derivatives traders and submitters would communicate routinely about relevant market conditions and individual trading positions."[81] At least thirty members of the GFFX, including derivatives traders based in the United States, knew of, and/or participated in, USD bbaLIBOR™ manipulation.[82] Members of the GFFX unit were responsible for formulating and making Deutsche Bank's USD bbaLIBOR™ submissions and trading a variety of derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark. Many of these trades were initiated by GFFX members from New York and involved counterparties located in the United States, including Virginia.[83] GFFX was overseen by an Executive Committee that included executives who participated in USD bbaLIBOR™ suppression.

113.    GFFX employees, including those based in the United States, participated in weekly meetings during which USD bbaLIBOR™ manipulation was openly discussed.[84] GFFX employees in the United States also made requests of Deutsche Bank's USD bbaLIBOR™ submitters to manipulate USD bbaLIBOR™ for Deutsche Bank's profit.[85]

---

80 Letter from Frauke Menke, Dep't President Fed. Fin. Supervisory Auth. (BaFin), to Deutsche Bank AG Management Board (Mar. 31, 2015) (convenience translation), attached as Exhibit 4 and incorporated into this Complaint by reference.

81 DB CFTC Order at 8; *see also* DB SOF, *supra* note 78, at ¶ 15.

82 *United States v. Deutsche Bank AG*, Deferred Prosecution Agreement, *supra* note 78, at ¶ 4.d.

83 DB SOF, *supra* note 78, at ¶¶ 17-20, 22, 25, 32-35; DB CFTC Order, *supra* note 79, at 10-11.

84 DB CFTC Order, *supra* note 79, at 9.

85 *Id.* at 9-10.

**H.    HSBC**

114.    Defendant HSBC Bank plc ("HSBC") is a United Kingdom public limited company headquartered in London, England, with numerous corporate offices and branches in the Eastern District of Virginia.  HSBC was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Defendant HSBC Bank USA, N.A. ("HBUS") is a national banking association with its main office in McLean, Virginia, which is where Freddie Mac is headquartered.[86]  HSBC Mortgage Corporation (USA) ("HSBC Mortgage") is a subsidiary of HBUS, which operates as a residential mortgage lender and originator in the United States. HSBC Securities (USA) Inc. ("HSBC Securities") is a registered broker-dealer with the SEC incorporated in Delaware.  HSBC, HBUS, HSBC Mortgage, and HSBC Securities are all wholly owned subsidiaries of HSBC Holdings plc ("HSBC Holdings").  HSBC Holdings represents that it is a holding company only and publicly defines the term "HSBC" and "HSBC Group" to mean HSBC Holdings and its subsidiaries.[87]  HSBC entities used common branding.

115.    As alleged more fully below, HSBC operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including Defendant HBUS and HSBC Securities, in the United States.[88]  On information and belief, HSBC participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

---

86 See, e.g., *Fact Sheet*, HSBC Bank USA, Nat'l Ass'n, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5 S00000000/content/new_usshared/shared_fragments/pdf/hbus_factsheet_0912.pdf (On file with Plaintiff).

87 See, e.g. HSBC, HSBC Holdings plc Annual Report and Accounts 2008, *available at* https://www.hsbc.com/-/media/hsbc-com/.../financialresults/2008/hbeu2008ar-en.pdf.

*Contacts with Freddie Mac*

116.    Defendant HSBC has had a long-standing relationship with Freddie Mac in Virginia.  For example, during the Conduct Period, HSBC, through HBUS, executed almost 90 interest-rate swap transactions with Freddie Mac in Virginia with a total notional value of almost $28 billion.  HSBC also sold Freddie Mac multi-family loans with an aggregate unpaid balance of over a billion dollars, and, through HSBC Mortgage[89], nearly 50,000 single family loans with an aggregate unpaid principal balance of over $10.5 billion.  HSBC Mortgage's sales were governed by complex master agreements between Freddie Mac and HSBC Mortgage, with payments for the loans made to Freddie Mac in Virginia.  HSBC also solicited and sold Freddie Mac in Virginia approximately $4 billion in MBS tied to USD bbaLIBOR™ in nearly 50 transactions, through HBUS.[90]  Each of these transactions involved communications with Freddie Mac in Virginia, and payments to or from Freddie Mac in Virginia.

117.    From at least 2007-2009, HSBC engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate their value to Freddie Mac with regard to, *inter alia*, swaps, loan, and MBS transactions.

118.    During the Conduct Period, HSBC entities also sent thousands of electronic communications, and routinely made telephone calls, to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting and engaging in financial transactions, including transactions involving USD bbaLIBOR™-linked products, and as part of a regular course of dealing with Freddie Mac.  Maintaining counterparty approval was essential for counterparties,

---

89 During the conduct period, HSBC Mortgage was the counterparty seller for the bulk of these loans, but it is possible that other HSBC entities were also sellers.

90 Were it not for HBUS, HSBC Mortgage, and HSBC Securities, HSBC would have entered into swap, loan, and MBS transactions directly with Freddie Mac.  HSBC benefited from HBUS's, HSBC Mortgage's, and HSBC Securities' swap, loan, and MBS transactions with Freddie Mac and treated HBUS's, HSBC Mortgage's, and HSBC Securities' profits as HSBC profits.

like HSBC, to engage in transactions with Freddie Mac for USD bbaLIBOR™-linked and other financial products.

119.    HSBC, directly and through HSBC Securities, published multiple reports on global or U.S. Fixed Income Strategy, which included analyses on bbaLIBOR™. These reports typically included a disclaimer that advised that U.S. customers who wished to transact with HSBC should effect such a transaction through HSBC Securities. Over the course of the Conduct Period, HSBC entities sent hundreds of these research notes to directly Freddie Mac traders and other personnel in Virginia.

120.    In addition to these contacts, other relevant contacts demonstrate that, throughout the Conduct Period and beyond, HSBC has viewed Freddie Mac as an important component of its overall portfolio. For example, during the Conduct Period, HBUS[91] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac in Virginia. HBUS regularly contacted Freddie Mac by telephone, mail, and electronic messages in the course of its servicing responsibilities, and delivered servicing data and documentation to Freddie Mac in Virginia. As of December 2011, HBUS serviced over 85,000 loans on behalf of Freddie Mac with an aggregate unpaid principal balance exceeding $10 billion. Since then, HBUS has continued to be a strong partner with Freddie Mac, servicing 5 loans with an aggregate unpaid principal balance exceeding $300 thousand.

121.    HBUS also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to HBUS in connection with the

---

91 During the conduct period, HBUS was the counterparty servicer for the bulk of these loans, but it is possible that other HSBC entities were also servicers.

development, structuring, issuance, and/or sale of billions of dollars in REMIC securities.

HBUS paid Freddie Mac millions of dollars in fees for these services.

### HSBC Operational Structure

122.   As discussed above, throughout the Conduct Period, HSBC operated on a "group"

basis under the control and direction of various business segments.  "HSBC Group" included

HSBC branches and entities located worldwide, including HSBC, HBUS, and HSBC Securities.

HSBC Group was responsible for determining the compensation principles of, *inter alia*, HSBC,

HBUS, and HSBC Securities.[92]  On information and belief, HSBC Group's derivatives and asset-

backed securities businesses, including the sale of MBS to and execution of swap transactions

with Freddie Mac, fell within the Global Banking & Markets segment ("HSBC Global

Banking").  HSBC Global Banking operated on a global basis without regard to corporate

formalities, in part, through HSBC, HBUS and HSBC Securities.

123.   Under HSBC Global Banking, HSBC, HBUS and HSBC Securities, shared global

management and policy directives, which HBUS and HSBC Securities implemented in the

United States and Virginia.[93]  In a 2009 investor presentation, HSBC wrote that HBUS continued

to execute "our strategy" by leveraging "group strengths and competencies."[94]  HSBC set the

"tactical priorities" for HBUS and HSBC Securities in the context of their operations under

---

92 *See* HSBC Holdings PLC Group Remuneration Committee Terms of Reference (May 25, 2018) (delegating responsibility for matters relating to remuneration).

93 Prior to January 2008, HSBC Global Banking was known as the Corporate, Investment Banking and Markets division.  HSBC changed the name to reflect the culmination of the division's shift to a global strategy.  The new name "aligns with how the business is managed."  HSBC, *HSBC Renames Its Wholesale Banking Division* (Jan. 22, 2008) (hereinafter "*HSBC Rename*"), *available at* https://www.hsbcnet.com/gbm/about-us/news/2008/hsbc-renames-its-wholesale-banking-division.html.

94 HSBC USA Inc., HSBC Investor Presentation (Mar. 16, 2009), *available at* www.hsbc.com/-/media/hsbc-com/investorrelationsassets/presentationsandwebcasts/2009/090316-citigroup-husi.pdf.

HSBC Global Banking.  HSBC promoted itself as the "world's local bank."[95]  In a 2008 statement, HSBC wrote that HSBC Global Banking "has offices in more than 60 countries," was "[m]anaged as a global business" and sought to provide "tailored financial solutions to major government, corporate and institutional clients worldwide."[96]  HSBC Global Banking viewed the United States as a "core market."[97]  On information and belief, HSBC Global Banking was responsible for, *inter alia*, submitting HSBC's bbaLIBOR™ contributions and transacting business with Freddie Mac.

124.    Stuart Gulliver, Chief Executive of HSBC Global Banking during the Conduct Period (who, as detailed more fully below, had direct involvement with USD bbaLIBOR™ suppression), was a member of the Board of Directors for HSBC Holdings, HSBC (where he was a Managing Director), and HBUS.  During the Conduct Period, HBUS President and CEO Paul Lawrence had dual reporting lines to Mr. Gulliver and HSBC Holdings CEO Michael Geoghegan.[98]  On information and belief, Mr. Gulliver's compensation included incentives for the performance of HSBC Global Banking, including profits obtained from HSBC Global Banking transactions, which would have included those with Freddie Mac.

125.    As head of HSBC Global Banking during the Conduct Period, Mr. Gulliver determined the strategic direction of HSBC, HBUS, and HSBC Securities, including with regard to its dealings with Freddie Mac during the Conduct Period.  On information and belief, HSBC Global Banking directed, and benefited from, the sale of MBS to Freddie Mac by HBUS and

---

95 HSBC, HSBC Holdings plc Annual Report and Accounts 2008, *available* www.hsbc.com/-/media/hsbc-com/investorrelationsassets/financialresults/2009/hsbc2009ara0.pdf

96 HSBC, *HSBC Rename*, *supra* note 93.

97 HSBC Holdings plc 2008 Final Results – Highlights at 6 (Mar. 2, 2009), *available at* https://www.hsbc.com/-/media/hsbc-com/.../financialresults/2008/hsbc2008arn.pdf.

98 Mr. Geoghegan was Chairman of HBUS, and a member of the Board of Directors of HSBC and HBUS.

HSBC Securities.  HSBC Global Banking reported profits and losses on a consolidated groupwide basis, including HSBC, HBUS, and HSBC Securities.[99]  It reported profits and losses in USD.[100]  On information and belief, Mr. Gulliver held approval authority over all executives within HSBC Global Banking.

126.     Under Mr. Gulliver's oversight, HBUS and HSBC Securities provided each other with sources of liquidity to fund operations, pooled human resources and shared other business functions.  HSBC Global Banking possessed the power to transfer businesses and activities from one corporate entity to another to realize economic efficiencies from a groupwide perspective. HSBC Global Banking managed its balance sheet on a groupwide basis (and in 2008 positioned its balance sheet to benefit from lower interest rates through at least 2010).  During the Conduct Period, HSBC provided HBUS and HSBC Securities with a line of credit in excess of $2 billion. HSBC Global Banking routinely entered into derivative transactions with HSBC affiliates as part of a global HSBC strategy to offset interest rate risks.

## I.     JPMorgan

127.     Defendant J.P. Morgan Chase & Co. ("JPMorgan") is a Delaware corporation headquartered in New York, New York,[101] with numerous corporate offices and branches in the Eastern District of Virginia.  Its wholly owned subsidiary, Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A."), a National Association headquartered in Columbus, Ohio with numerous locations in New York and Virginia.  JPMorgan N.A. was at all relevant times a

---

99 HSBC, HSBC Holdings plc Annual Report and Accounts 2010 at 73-75, *available at* https://www.hsbc.com/-/media/hsbc-com/investorrelationsassets/financialresults/2009/hsbc2009ara0.pdf.

100 *Id.*

101 In August 2007, JPMorgan borrowed $500 million from the United States Federal Reserve System's Discount Window to provide liquidity and bolster its reputation with investors and regulators in the United States. Morgansen, *supra* note 11.

member of the USD bbaLIBOR™ panel of banks (the BBA listed "JP Morgan Chase" as the panel bank).[102] JPMorgan Securities LLC (f.k.a. J.P. Morgan Securities Inc.), a wholly owned subsidiary of JPMorgan, is JPMorgan's primary broker-dealer in the United States.

128.    JPMorgan is the marketing name for JPMorgan Chase & Co. and its subsidiaries and affiliates.[103] On information and belief, and as set forth more fully below, JPMorgan participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia.

### *Contacts with Freddie Mac*

129.    JPMorgan and JPMorgan N.A. have had a longstanding and extensive relationship with Freddie Mac in Virginia.  For example, during the Conduct Period, JPMorgan N.A. (and related entities) sold Freddie Mac in Virginia nearly 800,000 single family loans in Virginia with an aggregate unpaid principal balance exceeding $170 billion.  These sales were governed by complex master agreements negotiated by Freddie Mac and JPMorgan N.A., with payments for the loans made to Freddie Mac in Virginia.  It also solicited Freddie Mac in Virginia and sold it, through J.P. Morgan Securities LLC, approximately $1 billion in MBS tied to USD bbaLIBOR™ in over 20 transactions.[104] Each of these transactions involved communications with Freddie Mac in Virginia, and payments to or from Freddie Mac in Virginia.

---

102 BA LIBOR Panels 2005, http://www.bba.org.uk/media/article/bba-libor-panels-2005; BBA LIBOR Panels 2006, http://www.bba.org.uk/media/article/bba-libor-panels-2006; BBA LIBOR Panels 2007, http://www.bba.org.uk/media/article/bba-libor-panels-2007 (on file with Plaintiff).

103 *See, e.g.*, T. Belton, F. Bassi, A. Roever, & S. Ramaswamy, *The Outlook for Libor*, JPMorgan, US Fixed Income Weekly (May 16, 2008), at 10, *available at* http://www.levow.com/wp-content/uploads/SG/LIBOR%20Outlook.pdf.

104 Were it not for the existence of JPMorgan Securities, JPMorgan N.A. would have sold MBS to Freddie Mac. JPMorgan N.A. knew of, directed, and benefited from JPMorgan Securities sales of MBS to Freddie Mac and treated JPMorgan Securities profits as JPMorgan profits.

130.     From at least 2007-2009, JPMorgan and/or JPMorgan Chase Bank, N.A. engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, loan and MBS transactions.

131.     During the Conduct Period, JPMorgan entities also sent hundreds of thousands of electronic messages, routinely made telephone calls to Freddie Mac in Virginia, and met with Freddie Mac in Virginia for the purpose of developing its relationship and soliciting business. JPMorgan held regular calls with Freddie Mac, including calls led by JPMorgan's Terry Belton, a financial analyst who provided Freddie Mac with analysis and research purporting to show that USD bbaLIBOR™ "dislocations" were the product of extraordinary market forces during the financial crisis and not intentional manipulation or collusion.

132.     JPMorgan published multiple reports on global and U.S. Fixed Income, which included analyses on bbaLIBOR™. Over the course of the Conduct Period, JPMorgan entities sent thousands of these research notes directly to Freddie Mac traders and other personnel.

133.     In addition to these contacts, other relevant contacts demonstrate that, throughout the Conduct Period and beyond, the JPMorgan entities viewed Freddie Mac as an important component of their overall portfolio. Indeed, over the years, JPMorgan has participated on various of Freddie Mac's advisory boards.

134.     During the Conduct Period, JPMorgan (and related entities) entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac. JPMorgan regularly contacted Freddie Mac by telephone, mail, and electronic messages in the course of its servicing responsibilities, and delivered servicing data and documentation to Freddie Mac in Virginia. Freddie Mac regularly provided JPMorgan with performance metrics and account plans, and met with JPMorgan to review this information on a regular basis. As of December 2011, JPMorgan

serviced over 1.3 million loans on behalf of Freddie Mac with an aggregate unpaid principal balance exceeding $210 billion.  Since then, JPMorgan has continued to be a strong partner with Freddie Mac, servicing over 920,000 loans with an aggregate unpaid principal balance exceeding $148 billion.

135.    In addition, JPMorgan entered into agreements with Freddie Mac to provide custodial services for original mortgage notes and related documents for loans sold to, and serviced by, Freddie Mac.

136.    JPMorgan also provided warehouse lines of credit to Freddie Mac's Sellers/Servicers to, among other things, fund mortgage loans.

137.    JPMorgan also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to JPMorgan in connection with the development, structuring, issuance, and/or sale of tens of billions of dollars in REMIC securities. JPMorgan paid Freddie Mac tens of millions of dollars in fees for these services.

138.    JPMorgan also has provided tens of millions in financing to Freddie Mac's Seller/Servicers, secured by MSRs or related income streams.

139.    Additionally, JPMorgan Securities LLC has entered into agreements with Freddie Mac under which JPMorgan Securities LLC, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of STACR securities and/or WLS.  JPMorgan Securities charged Freddie Mac significant fees for these services.

### *JPMorgan Operational Structure*

140.    JPMorgan held itself out as a "global leader" in financial services.[105]  It operated

on a "line of business basis."[106]  JPMorgan N.A. and JPMorgan Securities were a part of

JPMorgan's global Investment Bank division.  JPMorgan proclaimed in its 2008 Annual Report

that "we are a large player in the asset-backed securities market."  JPMorgan Securities told

customers they would receive "the global resources" of JPMorgan.  In published materials,

JPMorgan referred to itself and JPMorgan N.A., collectively, as a single entity.  JPMorgan stated

that JPMorgan N.A. and JPMorgan Securities were under its "common control."[107]  On

information and belief, JPMorgan, through its Investment Bank division, directed JPMorgan

Securities to transact business with Freddie Mac in Virginia and to provide false assurances to

Freddie Mac regarding bbaLIBOR™'s accuracy.  JPMorgan, through its Investment Banking

division, directed JPMorgan Securities to transact business with Freddie Mac in Virginia and to

provide false assurances to Freddie Mac regarding bbaLIBOR™'s accuracy.

### J.    Lloyds & Bank of Scotland

141.    Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public

limited company headquartered in London, England.  Lloyds Banking Group plc was formed in

2009 through the acquisition of HBOS plc ("HBOS").

---

105 JPMorgan Chase & Co. Resolution Plan (Oct. 2013) at 7, 9, 30, *available at*
https://www.federalreserve.gov/bankinforeg/resolution-plans/jpmorgan-chase-1g-20131001.pdf (last visited June 13, 2018).

106 JPMorgan Chase & Co. Resolution Plan (Oct. 2013) at 6-8, 14, 16, 28, *available at*
https://www.federalreserve.gov/bankinforeg/resolution-plans/jpmorgan-chase-1g-20131001.pdf (last visited June 13, 2018).

107 J.P. Morgan Securities, Safety of Customer Assets Disclaimer, *available at*
https://www.jpmorgansecurities.com/pages/am/securities/legal/safety (last visited June 13, 2018).

142.    Defendant Lloyds Bank plc, formerly known as Lloyds TSB Bank plc ("LTSB") is a wholly owned subsidiary of Lloyds.

143.    Defendant Bank of Scotland plc ("Bank of Scotland") is a direct subsidiary of HBOS and a wholly owned indirect subsidiary of Lloyds .[108]

144.    Defendants Bank of Scotland and Lloyds Bank plc (as LTSB) were members of the USD bbaLIBOR™ panel until February 6, 2009, at which time Lloyds Banking Group plc, following the acquisition, joined the USD bbaLIBOR™ panel.[109]  Bank of Scotland had taken over submissions from the HBOS subsidiary HBOS Treasury Services plc ("HBOS Treasury") in September 2007.

145.    Lloyds operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States. [110]  On information and belief, Lloyds participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

146.    During the Conduct Period Lloyds and HBOS entities sent thousands of electronic communications to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting and engaging in financial transactions.

147.    Lloyds conducts its activities in the United States primarily through United States branches of Lloyds Bank plc and Bank of Scotland plc. Lloyds also conducts capital markets

---

108 *In re Lloyds Banking Group plc*, No. 14-18, at 1 (C.F.T.C. July 28, 2014) (hereinafter "Lloyds CFTC Order"), attached as Exhibit 5 and incorporated into this Complaint by reference.

109 *Id.* at 2 & n.2.

110 *See, e.g.*, *Local to You*, Lloyds Banking Grp., http://www.lloydsbankinggroup.com/tablet-story-map/ (last visited May 31, 2018).

activities in the United States through its subsidiary, Lloyds Securities Inc., which has been registered to do business as a broker-dealer in the United States since February 10, 2011.[111]

148.    Lloyds operates globally, without regard to corporate formalities, and produces consolidated financial statements.  On information and belief, Lloyds participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

### K.    Société Générale

149.    Defendant Société Générale is a French banking corporation, headquartered in Paris, France.  Société Générale replaced HBOS on the USD bbaLIBOR™ panel on February 9, 2009.  SG Americas Securities, LLC ("SG Americas") was an indirect wholly owned subsidiary of Société Générale and a registered broker/dealer in the United States.

150.    As alleged more fully below, Société Générale operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[112]  On information and belief, Société Générale participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

### *Contacts with Freddie Mac*

151.    Freddie Mac had longstanding relationships with Société Générale in Virginia. From at least 2007-2009, SG Americas engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, MBS transactions.

---

111 *Contact Us*, Lloyds Bank, http://www.lbusa.com/contact-us (last visited May 31, 2018).

112 *See, e.g.*, *Our Locations*, Société Générale Grp., http://www.societegenerale.com/en/about-us/our-businesses/our-locations (last visited May 31, 2018).

152.     During the Conduct Period, Société Générale entities also sent thousands of electronic communications, and routinely made telephone calls, to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting, including transactions involving USD bbaLIBOR™-linked products, and engaging in financial transactions and as part of a regular course of dealing with Freddie Mac.  Société Générale was an approved mortgage services dealer during the Conduct Period and beyond.

### Société Générale Operational Structure

153.     Société Générale operated its investment banking division globally through its Corporate Banking and Investment Group.  In the United States, Société Générale operated through SG Americas.  Société Générale's CEO of Corporate & Investment Banking directed the operation of SG Americas for the benefit of Société Générale.  On information and belief, the Corporate Banking and Investment Group was responsible for, *inter alia*, submitting Société Générale's bbaLIBOR™ contributions and transacting business with Freddie Mac.  Société Générale determined the strategic direction of SG Americas, specifically with regard to its dealings with Freddie Mac, and benefited from the sale of MBS to Freddie Mac by SG Americas.

### L.     Norinchukin

154.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.  Norinchukin was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Norinchukin maintains a branch office in the United States, which is supervised by the New York Department of Financial Services and the NY Fed.[113] Norinchukin is one of Japan's largest institutional investors and is one of Japan's largest hedge funds.  Norinchukin operated directly, or through its wholly owned and/or controlled

---

113 *See, e.g., Global Network*, The Norinchukin Bank, http://www.nochubank.or.jp/en/about/globalnetwork.html (last visited May 31, 2018).

subsidiaries, affiliates, agents, and predecessors, in the United States.  On information and belief, Norinchukin participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

155.    Norinchukin operates globally, without regard to corporate formalities, and produces consolidated financial statements. Its United States branch operates primarily to obtain better access to USD funding markets in the United States and engage in derivatives transactions in the U.S. market, including interest rate swaps.

**M.    RBC**

156.    Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Canada, with numerous corporate offices and branches in the Eastern District of Virginia and elsewhere in the United States.  RBC was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  RBC Bank (USA) is a U.S. corporation and an indirect wholly owned subsidiary of RBC.

157.    As alleged more fully below, RBC operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[114]  On information and belief, RBC participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.  RBC operated globally, without regard for corporate formalities, and produced consolidated financial statements. RBC also managed its capital needs centrally, deploying capital to its subsidiaries.

---

114 *See, e.g.*, *RBC Business Segments*, RBC Bank, http://www.rbc.com/aboutus/about2.html (last visited May 31, 2018).

*Contacts with Freddie Mac*

158.     During the Conduct Period, RBC entities sent tens of thousands of electronic communications to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting, including transactions involving USD bbaLIBOR™-linked products.

159.     RBC had further contacts with Freddie Mac through RBC Bank (USA).  During the Conduct Period, RBC Bank (USA)[115] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac, and in the course of these servicing responsibilities, RBC Bank (USA) regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered servicing data and documentation to Freddie Mac in Virginia.  As of December 2011, RBC Bank (USA) had serviced over 1000 loans on behalf of Freddie Mac with an aggregate unpaid principal balance exceeding $210 million.

160.     Additionally, during the conduct period, RBC published multiple reports from its RBC Capital Markets unit on global and U.S. Fixed Income and FX Research, which included analyses on bbaLIBOR™.  Over the course of the Conduct Period, RBC entities sent hundreds of these research notes directly to Freddie Mac traders and other personnel in Virginia.

*RBC Operational Structure*

161.     RBC "has had a presence in the United States since 1899, when RBC opened a New York State chartered agency."[116]  RBC maintained approximately ten corporate offices and branches in the United States, including three federally licensed branches in New York, and has had additional offices in the United States.  RBC and its subsidiaries presently employ more than

---

115 During the conduct period, RBC Bank (USA) was the counterparty servicer for the bulk of these loans, but it is possible that other RBC entities were also servicers.

116 Royal Bank of Canada, U.S. Resolution Plan Section 1 Public Section, (Dec. 2013), at 5, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbc-165-1312.pdf.

8,000 people in their branches and offices located in the United States. According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, RBC's New York office held more than $37 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to bbaLIBOR™ and specifically, USD bbaLIBOR™.

162.    RBC Capital Markets, LLC is a U.S. wholly owned indirect subsidiary of RBC, a registered broker-dealer with the SEC, and a member of the New York Stock Exchange. RBC Capital Markets operates numerous branch offices across the United States, including one in Richmond, Virginia. RBC Capital Markets offers a full investment banking product range, including securities and interest rate swap transactions, and competed with large investment banks in the United States and around the world. RBC Capital Markets has stated that it seeks to be a "leading provider" of capital markets in the United States.[117]

163.    In the United States, RBC and its subsidiaries, including RBC Bank (USA) operate under the master brand name of RBC. RBC markets RBC Bank (USA) as providing RBC banking in the United States.

**N.    RBS**

164.    Defendant The Royal Bank of Scotland Group plc is a United Kingdom public limited company headquartered in Edinburgh, Scotland. Defendant The Royal Bank of Scotland plc (n.k.a. NatWest Markets plc) ("RBS") is a wholly owned subsidiary of The Royal Bank of Scotland Group plc and is headquartered in Edinburgh, Scotland, with numerous corporate offices and branches in the Eastern District of Virginia and elsewhere in the United States. RBS was at all relevant times a member of the USD bbaLIBOR™ panel of banks.

---

117 RBC 2009 Annual Report at 1,7, *available at* http://www.rbc.com/investorrelations/pdf/ar_2009_e.pdf.

165.    RBS Securities Inc. ("RBSI") (f.k.a. RBS Greenwich Capital ("RBS Greenwich")) is an indirect wholly owned subsidiary of RBS and a registered broker dealer in the United States and Virginia.  According to RBS, "With respect to the execution of interest rate derivatives . . . [RBSI] generally acts as agent for RBS which will be the principal in such transactions."[118]  Citizens Bank, N.A. ("Citizens Bank") (f.k.a. RBS Citizens Bank, N.A.) is a U.S. indirect wholly owned subsidiary of RBS; the entity principally through which the "RBS group"[119] operates its retail & commercial business in the United States.

166.    As alleged more fully below, RBS operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including RBSI and Citizens Bank, in the United States.[120]  On information and belief, RBS participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

*Contacts with Freddie Mac*

167.    RBS has had a long-standing and extensive relationship with Freddie Mac in Virginia.  For example, during the Conduct Period, RBS entered into over 400 interest-rate swaps with Freddie Mac in Virginia with a notional value of over $280 billion.  RBS, through RBSI, also solicited Freddie Mac in Virginia and sold it $6 billion in MBS tied to USD bbaLIBOR™ in more than 130 transactions with Freddie Mac.  Through Citizens Bank[121], RBS

---

118 2012 The Simple Supervisory Formula Approach (SSFA) and Its Impact on the Securitization Market (DRAFT), RBS, *available at* https://www.fdic.gov/regulations/laws/federal/2012-ad-95-96-97/2012-ad-97_c_05-supp-2.pdf.

119 Together, RBS and its subsidiaries operate as "RBS group."

120 *See, e.g.*, *Where We Do Business*, RBS, http://www.rbs.com/about/worldwide-locations.html (last visited May 31, 2018).

121 During the conduct period, CitizensBank was the counterparty seller for the bulk of these loans, but it is possible that other RBS entities were also sellers.

sold Freddie Mac in Virginia almost 12,000 single family loans with a principal unpaid balance of over $2.5 billion during the Conduct Period.[122]  These loan sales were governed by complex master agreements between Freddie Mac and Citizens Bank, with payments for the loans made to Freddie Mac in Virginia.  Each of the swap, MBS, and loan transactions involved communications with Freddie Mac in Virginia, and payments to or from Freddie Mac in Virginia.

168.    From at least 2007-2009, RBSI engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, swaps and MBS transactions.

169.    During the Conduct Period, RBS entities also sent hundreds of thousands of electronic communications, and routinely made telephone calls, to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting, including transactions involving USD bbaLIBOR™-linked products, and engaging in financial transactions and as part of a regular course of dealing with Freddie Mac.

170.    In addition to these contacts, other relevant contacts demonstrate that, throughout the Conduct Period and beyond, RBS viewed Freddie Mac as an important component of its overall portfolio, achieved directly and through, its operating entities in the United States. Citizens Bank[123] entered into contracts with Freddie Mac to service loans on behalf of Freddie Mac, and in the course of these servicing responsibilities, Citizens Bank regularly contacted Freddie Mac in Virginia by telephone, mail, and electronic messages, and delivered servicing

---

122 Were it not for the existence of RBSI and Citizens Bank, RBS would have sold MBS and single family loans to Freddie Mac.  RBS knew of, directed, and benefited from RBSI's and Citizens Bank's sales of MBS and single family loans to Freddie Mac and treated RBSI's and Citizens Bank's profits as RBS profits.

123 During the conduct period, Citizens Bank was the counterparty servicer for the bulk of these loans, but it is possible that other RBS entities were also servicers.

data and documentation to Freddie Mac in Virginia.  As of December 2011, Citizens Bank had serviced over 24,000 loans on behalf of Freddie Mac with an aggregate unpaid principal balance of almost $3 billion.  Since then, Citizens Bank has continued to be a strong partner with Freddie Mac, servicing over 23,000 loans with an aggregate unpaid principal balance exceeding $4 billion.

171.    RBS also provided warehouse lines of credit to Freddie Mac's Sellers/Servicers to, among other things, fund mortgage loans.  RBS Greenwich directly invited Freddie Mac to join its Weekly Investor Conference Calls.

172.    In addition, RBSI has entered into agreements with Freddie Mac under which RBSI, as dealer, provided services to Freddie Mac in Virginia in connection with, among other thing, the development, structuring, marketing and/or execution of billions of dollars of STACR securities and/or WLS, RBSI charged Freddie Mac significant fees for these services.

173.    RBSI also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to RBSI in connection with the development, structuring, issuance, and/or sale of tens of billions of dollars in REMIC securities. RBSI paid Freddie Mac tens of millions of dollars in fees for these services.

### RBS Operational Structure

174.    RBS maintains banking divisions and subsidiaries around the world, including in the United States.  Its headquarters in the United States is in Stamford, Connecticut.  RBS's United States branch is supervised by the New York Department of Financial Services and is subject to supervision by the NY Fed.  During the Conduct Period, RBS generated 20% of its

global revenues, including revenues from the transaction of financial instruments that incorporated USD bbaLIBOR™ as the interest-rate benchmark, from the United States.[124]

175.    During the Conduct Period, RBS operated its banking divisions and subsidiaries through a group structure.  From 2006-2010, one of RBS's most important divisions was its investment banking arm, Global Banking & Markets ("RBS GBM"), which had employees in multiple legal entities associated with RBS, including RBSI.

176.    In 2006, RBS GBM brought its money market and derivatives traders under one umbrella known as the Short-Term Markets ("STM") unit.  The purpose of this reorganization was to encourage the sharing of information among traders, including traders in the United States.[125]  Such information included, as set forth more fully below, systematic suppression of USD bbaLIBOR™.

177.    RBS GBM employed money market traders and derivatives traders in the United States (including, on information and belief, RBSI).[126]  RBS GBM's derivatives traders were responsible for trading financial instruments that incorporated USD bbaLIBOR™ as an interest-rate benchmark.  RBS GBM's money market traders were responsible for, among other things, trading cash and ensuring that RBS had sufficient funding with regard to specific currencies.  In a December 2007 securities filing, RBS stated that its GBM division had a "leading position" in structuring, distributing and trading asset-backed securities, including securities backed by U.S.

---

124 According to its Reports of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, RBS's United States office held more than $72 million, and RBS's Chicago office held more than $1.9 billion, in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

125 Fin. Servs. Auth., Final Notice to the Royal Bank of Scotland plc ¶ 39 (Feb. 6, 2013) (hereinafter "RBS Final Notice"), attached as Exhibit 6 and incorporated into this Complaint by reference.

126 *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A  ¶ 11 (Feb. 5, 2013) (hereinafter "RBS SOF"), attached as Exhibit 7 and incorporated into this Complaint by reference.

sub-prime mortgages. On information and belief, RBS GBM was responsible for, *inter alia*, submitting RBS's bbaLIBOR™ contributions and transacting business with Freddie Mac. RBS GBM reported profits and losses on a group-wide basis.[127] RBS treated RBS GBM profits as its own, including profits on sales of MBS to Freddie Mac. RBS consolidated RBS GBM profits into its financial statements. From at least August 2007 through October 2008, Johnny Cameron, a member of RBS's Board of Directors, was head of RBS GBM. After 2008, RBS appointed John Hourican, a member of RBS's Executive Committee and its Management Committee, to head GBM. Senior executives of RBSI (including, for example, the heads of GBM Americas) reported directly to Hourican. In a 2009 investor presentation, RBSI's Bob McKillip, interim Co-Head of RBS GBM Americas, stated that "GBM is a global business –The Americas is a key geography in that context."[128] During the Conduct Period, RBS GBM implemented a strategy of selling in the United States financial products backed by mortgages. In a December 2007 securities filing, RBS stated that its GBM division had a "leading position" in structuring, distributing and trading asset-backed securities, including securities backed by U.S. sub-prime mortgages. RBS gave its GBM unit (including RBSI) access to its entire balance sheet to assemble and sell MBS in the United States. RBS GBM used common branding. By 2007, RBS was ranked in the top three underwriters and sellers of MBS backed by mortgages from the United States.[129] RBS GBM focused on core corporate and institutional customers, including Freddie Mac.

---

127 RBS, 2010 Annual Report, at 34 (2010), *available at* https://investors.rbs.com/~/media/Files/R/RBS-IR/annual-reports/rbs-group-annual-report-and-accounts-10.pdf.

128 Ellen Alemany et al., *RBS Americas* (Mar. 16, 2009), *available at* https://investors.rbs.com/~/media/Files/R/RBS-IR/archived-presentations/2009/citigroupinvestors.pdf

129 Complaint at ¶56, FHFA v. The Royal Bank of Scotland Group plc et al., Case No. 3:11-cv-1383 (D. Conn.), ECF No. 1.

178.     RBSI's sales of MBS to Freddie Mac was a part of this strategy directed by RBS GBM.  In 2007, Mr. Cameron and other RBS executives directed RBSI to overvalue asset-backed securities to protect RBS's reputation.  RBSI executives raised questions about the directive, but were overruled by RBS.[130]

179.     RBS GBM's money market traders were responsible for, among other things, trading cash and ensuring that RBS had sufficient funding with regard to specific currencies.  Through its GBM division, RBS traders were responsible for contributing USD bbaLIBOR™ submissions.  During the relevant period, RBS encouraged its derivatives traders, including those located in New York, employed by RBSI, to communicate with USD bbaLIBOR™ submitters, and *vice versa*, for RBS's profit.  At least twenty-one members of the RBS GBM division (whose identities are exclusively known by RBS) were involved in bbaLIBOR™ manipulation.

### O.     BTMU

180.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") is a Japanese subsidiary of Mitsubishi UFJ Financial Group, Inc. ("MUFG").  BTMU was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  BTMU is MUFG's principal broker-dealer in the United States.  It employed more than 200 individuals as of 2013.  MUFG Union Bank, N.A. ("MUFG Union") (f.k.a. Union Bank, N.A. ("UBNA")) is a wholly owned subsidiary of BTMU.  MUS(USA) is an indirect wholly owned subsidiary of MUFG.

---

130 *Court documents allege clashes inside RBS over 2008 toxic assets*, Reuters (Nov. 16, 2016), *available at* https://www.moneycontrol.com/news/world/court-documents-allege-clashes-inside-rbs-over-2008-toxic-assets-930009.html.  According to another news report, RBS has instructed a former RBSI employee to destroy documents confirming Mr. Cameron's directions.  Sinead Cruise, *Exclusive: RBS lawyers ask ex-staffer to destroy documents, DOJ informed*, Reuters (May 17, 2018), *available at* https://www.reuters.com/article/us-rbs-whistleblower-exclusive/exclusive-rbs-lawyers-ask-ex-staffer-to-destroy-documents-doj-informed-idUSKCN1I10PZ.

### *Contacts with Freddie Mac*

181.    During the Conduct Period, BTMU, through MUFG Union/UBNA[131] sold Freddie Mac in Virginia approximately 300 single family loans with an aggregate unpaid principal balance of almost $70 million.  These sales were governed by complex master agreements between Freddie Mac and MUFG Union/UBNA, with payments for the loans made to Freddie Mac in Virginia.  As of December 2011, MUFG Union/UBNA, had serviced over100 single family loans on behalf of Freddie Mac with an aggregate unpaid principal balance exceeding $30 million.

182.    During the Conduct Period, BTMU and MUS (USA) employees sent hundreds of electronic communications to, and otherwise communicated regularly with, employees of Freddie Mac in Virginia for the purpose of soliciting business and in furtherance of a course of dealing in connection with the purchase and sale of certain financial instruments.

### *BTMU Operational Structure*

183.    BTMU operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[132]

184.    On information and belief, MUFG operated internationally without regard to corporate formalities, and produced consolidated financial statements.  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, BTMU's

---

131 During the conduct period, MUFG Union/UBNA was the counterparty seller for the bulk of these loans, but it is possible that other BTMU entities were also sellers.

132 Written Opening Submissions of the Claimant ¶¶ 424(4), Property Alliance Group Ltd. v. The Royal Bank of Scotland PLC, No. FL-2016-000004 (United Kingdom High Court of Justice, Chancery Division, May 16, 2016).

132 NatWest Markets, Terms and Conditions, https://www.rbsm.com/psp/public/pagebuilder.aspx?page=co0138 (last visited May 31, 2018).

132 *See, e.g., Global Network—The Americas*, MUFG, http://www.bk.mufg.jp/ global/globalnetwork/americas/index.html (last visited May 3G1, 2018).

United States office held more than $361 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™. On information and belief, BTMU participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

185.    During the Conduct Period, MUFG operated in the United States through three subsidiaries:  the United States Branch of BTMU; UBNA; and Mitsubishi UFJ Securities (USA) ("MUS(USA)"), Inc.  As of 2013, UNBA operated 443 branches in California, Washington, Oregon, Texas, Illinois, and New York, and employs over 11,000 individuals. [133]  On July 1, 2014 BTMU announced that it would integrate its U.S. branch banking operations with Union Bank, N.A., and would operate the U.S. banking operations under the new name MUFG UBNA and that all of BTMU's Americas banking activities, including the new unified U.S. organization, would be overseen by a newly renamed holding company, MUFG Americas Holdings Corporation.

186.    MUS(USA) was part of MUFG's global network of securities firms, and worked in concert with BTMU and other MUFG subsidiaries to provide clients with a range of securities and investment services. [134]

### P.    UBS

187.    Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.  UBS was at all relevant times a member of the USD bbaLIBOR™ panel of banks. UBS was formed in 1998 through the merger of Swiss Bank Corporation and the Union Bank of Switzerland.  UBS shares are listed on the New York Stock Exchange.  UBS maintains banking

---

133 *Public: Mitsubishi UFJ Financial Group, Inc. Resolution Plan* 2013 at 12, https://www.fdic.gov/regulations/reform/resplans/plans/mufj-165-1312.pdf (last visited June 1, 2018).

134 *Id.* at 13-14.

divisions and subsidiaries around the world, including in the United States. Its headquarters in the United States are located in New York, New York and Stamford, Connecticut.

188.   UBS Americas Inc. ("UBSA"), UBS Securities LLC ("UBSS") (f.k.a. UBS Warburg), and UBS Real Estate Securities Inc. ("UBS Real Estate") are U.S. wholly owned indirect subsidiaries of UBS. UBSA, UBSS, and UBS Real Estate share the same New York headquarters with UBS.

189.   As alleged more fully below, UBS operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including UBSA and UBSS, in the United States and Virginia.[135] On information and belief, and as set forth more fully below, UBS participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

### *Contacts with Freddie Mac*

190.   UBS has had a long-standing and extensive relationship with Freddie Mac in Virginia. For example, during the Conduct Period, Freddie Mac executed almost 400 interest-rate swaps with UBS in Virginia with a notional value of more than $375 billion. Through UBSA, UBS sold Freddie Mac in Virginia $800 million in MBS in 9 transactions. Through UBS Real Estate, UBS[136] sold Freddie Mac in Virginia almost 200 single family loans with a principal unpaid balance of over $45 million.[137] These loan sales were governed by complex master

---

135 *See, e.g.*, *UBS Locations*, UBS, https://www.ubs.com/global/en/about_ubs/about_us/locations.html (last visited June 1, 2018).

136 During the conduct period, UBS Real Estate was the counterparty seller for the bulk of these loans, but it is possible that other UBS entities were also sellers.

137 Were it not for the existence of UBSS, UBSA, and UBS Real Estate, UBS would have sold MBS and single family loans to Freddie Mac. UBS knew of, directed, and benefited from UBSS's, UBSA's, UBS Real Estate's sales of MBS and single family loans to Freddie Mac and treated UBSS's, UBSA's, and UBS Real Estate's profits as UBS profits.

agreements between Freddie Mac and UBS Real Estate, with payments for the loans made to Freddie Mac in Virginia.  Each of the swap, MBS, and loan transactions involved communications with Freddie Mac in Virginia, and payments to or from Freddie Mac in Virginia.

191.    From at least 2007-2009, UBS engaged with Freddie Mac in Freddie Mac's Dealer Scorecard process (discussed above) in order to demonstrate its value to Freddie Mac with regard to, *inter alia*, swaps, MBS, and loan transactions.

192.    During the Conduct Period, UBS entities sent thousands of electronic communications, and routinely made telephone calls, to Freddie Mac in the Eastern District of Virginia for the purpose of soliciting and engaging in financial transactions, including transactions involving USD bbaLIBOR™-linked products, and as part of a regular course of dealing with Freddie Mac.

193.    UBS, directly and through its subsidiaries and/or affiliates (including UBSS), published multiple reports on global and U.S. Fixed Income and FX Research, which included analyses on bbaLIBOR™.  These reports typically included a "Global Disclaimer," stating that that U.S. distribution of the report was achieved by UBSS or UBS Financial Services Inc.  Over the course of the Conduct Period, UBS entities sent thousands of these research notes directly to Freddie Mac traders and other personnel in Virginia.

194.    UBSS also entered into a master purchase agreement with Freddie Mac in Virginia, under which Freddie Mac provided services to UBSS in connection with the development, structuring, issuance, and/or sale of tens of billions of dollars in REMIC securities. UBSS paid Freddie Mac tens of millions of dollars in fees for these services.

### *UBS Operational Structure*

195.     During the Conduct Period, UBS operated its banking divisions and subsidiaries

through a group structure designed to efficiently support its businesses globally by use of a

single legal platform.[138] U ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ UBS IB reported profits and losses on a group-wide

basis.[141]  On information and belief, UBS treated UBS IB profits as its own, including profits on

sales of MBS to Freddie Mac.

196.     UBS IB operated globally without regard to corporate formalities through UBS's

New York and Stamford branches and its indirectly wholly owned subsidiaries, including UBSA

and UBSS.  The branches and entities operating under UBS IB shared common management,

global policy directives, and branding.  UBSS's former CEO, Teresa Ressel, was quoted as

saying that UBS operated "in a truly global manner" and that "our operations function

---

138 UBS, 2009 Annual Report at 187 (2009), *available at*
https://www.ubs.com/global/en/about_ubs/investor_relations/annualreporting/archive/_jcr_content/par/accordionbox
_c1db/teaserbox_97a6/teaser_c2fa/linklist/link_f814.1913599476.file/bGluay9wYXRoPS9jb250ZW50L2RhbS91Y
nMvZ2xvYmFsL2ludmVzdG9ycy9hbm51YWxfcmVwb3J0J0aW5nMjAwOS8xNzU3MTlfQVIwOV9lbmdsaXNoLLn
BkZg==/175719_AR09_english.pdf (last visited June 14, 2018).

139 *See e.g., id;* ███████████████████████████████████████████.

140 ███████████████████████████████████████████

141 UBS, 2010 Annual Report at 104 (2010); *available at*
https://www.ubs.com/global/en/about_ubs/investor_relations/annualreporting/archive/_jcr_content/par/accordionbox
_c1db/teaserbox_e506/teaser_87c2/linklist/link_7b5c.1396496368.file/bGluay9wYXRoPS9jb250ZW50L2RhbS91Y
nMvZ2xvYmFsL2Fib3V0X3Vicy9pbnZlc3Rvcl9yZWxhdGlvbnMvMTg5MTcyX0FSMjAxMxMF9lLnBkZg==/18917
2_AR2010_e.pdf.

seamlessly across national boundaries."[142] UBSS, a registered broker/dealer, served as UBS IB's banking and securities arm in the United States.[143] Ms. Ressel reported directly to the Global COO of UBS IB. The president and COO of IB during the Conduct Period, was Robert Wolf, who was also chairman and CEO of UBS Group Americas and a member of the UBS Group Executive Board.

197.     During the Conduct Period, UBS IB controlled and directed, among other things, the fixed income, currency, and commodity (FICC) business, which was broken into several business segments, including Real Estate and Securitization ("RE&S"), Rates, and FX and Money Markets. ██████████████████████████████████████

██████████████████████████████████████   ████████████████

████████████████████████████████████████████████████.[146]

## Q.     WestLB/Portigon

198.     WestLB AG was a German joint stock company headquartered in Dusseldorf, Germany. Defendant Portigon AG is a German company headquartered in Dusseldorf, Germany, with an office in New York. Portigon AG acquired WestLB AG in 2009. Prior to

---

142 Teresa Ressel, *Seamless Services Globally*, Leaders Online, 2009, http://www.leadersmag.com/issues/2009.1_jan/women/ressel.html (last visited May 23, 2018).

143 FINRA Letter of Acceptance, Waiver and Consent, No. 20130382589-01, *Re: UBS Securities LLC*.

144 ███████████████████████████████████████████████████   █████████

145 Specifically, prior to 2009, the Rates trading desks were responsible for submitting USD bbaLIBOR™, after which time the submissions were then taken over by UBS's Asset and Liability Management ("UBS ALM") group. Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Div., U.S. Dep't Justice, Appendix A, Statement of Facts ¶ 99 (Dec. 18, 2012) (hereinafter "UBS SOF"), attached as Exhibit 8 and incorporated into this Complaint by reference.

146 █████████████████; *see also*, e.g., UBS SOF, *supra* note 145, ¶ 6.

2009, WestLB AG was a member of the USD bbaLIBOR™ panel of banks.  Portigon joined the USD bbaLIBOR™ panel of banks after acquiring WestLB AG.

199.     Portigon operated in the United States through two entities:  Portigon AG New York Branch and Portigon Securities Inc.[147]  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Portigon's New York office held more than $179 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to bbaLIBOR™ and specifically, USD bbaLIBOR™.  Portigon operated internationally, without regard to corporate formalities, and produced consolidated financial statements.  Through these entities, Portigon engaged in interest rate swap and securities transactions in the United States.

200.     WestLB operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[148]  On information and belief, WestLB participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Eastern District of Virginia and elsewhere in the United States.

201.     The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by their officers, directors, agents, employees, or representatives while actively engaged in the management of Defendants' businesses or affairs.

202.     Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to Freddie Mac and which cannot at

---

147 NRW.Bank (Portigon) Resolution Plan 2013 at 2-4, (Dec. 31, 2013), https://www.fdic.gov/regulations/reform/resplans/plans/nrw-165-1312.pdf (last visited June 1, 2018).

148 *See, e.g., Our Locations*, Portigon Fin. Servs., http://www.1fins.com/1cm/cm/content/efs/i/en/ueber-EFS/standorte.html (last visited June 1, 2018).

present be named as Defendants in this action, may have participated as co-conspirators with Defendants in the unlawful conduct alleged in this Complaint, and/or performed substantial acts and made statements in the Eastern District of Virginia in furtherance of the alleged violations.

203.     At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of each other, and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

## **BACKGROUND**

### A.    **Interest Rate Fundamentals**

204.     Absent collusion, interest rates are set in arms-length negotiations between a lender with cash and a borrower in need of cash.  The interest rate charged by the lender is the price the lender charges to let the borrower use the cash for a period of time.  An interest rate has two basic components:  the "risk-free rate," which represents the return that a lender will expect for losing access to its funds for a period of time (i.e. the time value of money), and a "risk premium," which compensates the lender for the risk that the borrower will not fully repay the loan on time.  Absent collusion, and all else being equal, lenders will charge a higher risk premium to borrowers with lower relative creditworthiness.

205.     In a competitive market, the interest rate that banks pay for short-term wholesale funds is negotiated at arm's length and accounts for the factors described above.  For example, all else being equal, a bank that receives a credit downgrade will have to pay higher interest rates

for short-term wholesale funds than it would have to pay absent the downgrade.[149]  Short-term

wholesale loans can be secured or unsecured.  Unsecured wholesale loans are backed only by the

borrowing bank's creditworthiness.  During the relevant period, Defendants held out

bbaLIBOR™ as a reliable index that measured competitive interest rates for unsecured interbank

loans, which market participants referred to as the bank's "cost of funds."[150]

206.   By the mid-2000s, the London interbank market had been a major source of cash

for banks seeking to fund USD loans for more than 30 years.  The London interbank market

enabled banks in need of cash to obtain USD deposits ("Eurodollar deposits"), either on an

overnight basis or for fixed terms (typically, one, two, three, or six months), from banks with

excess cash.

207.   A bank's "liquidity" is determined by the amount of cash that it has, or can raise

quickly, to pay off its debts.[151]  Banks also compete in the capital markets for longer-term assets.

Longer-term assets, such as residential mortgages, tend to pay higher rates of return[152] but are

less "liquid" than cash.  A bank's profitability rests on its ability to attract money through

customer deposits and short-term assets and to invest (lend) that money in longer-term assets that

pay higher interest rates.

---

149 *See, e.g.*, Barclays PLC, Annual Report 2009, at 130-32 (2009), *available at* http://www.barclays.com/
content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2009/barclays-plc-annual-report-2009.pdf.

150 *See, e.g.*, Martin Wheatley, *The Wheatley Review of LIBOR: Final Report* 82 (2012), *available at* https://
www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_
280912.pdf (hereinafter "Wheatley Final Report").

151 An asset is liquid if the market in which it is traded has many buyers and sellers and the asset is bought and sold
frequently with low transaction costs.  All else equal, the more liquid an asset is relative to alternative assets, the
greater the demand will be for that asset and, consequently, it will be priced higher.  Frederic S. Mishkin, The
Economics of Money, Banking, and Financial Markets 90 (3d. ed. 2013).

152 For example, mortgage lenders sometimes charge a premium over bbaLIBOR™, usually in the form of a set
rate on top of bbaLIBOR™.

### B.    The Role of Indices and Benchmarks in Financial Markets

208.    An index is a statistical measure, typically of price or quantity, calculated from a representative set of underlying data.[153]  Index providers invest significant amounts of time and money to develop and market financial indices.  The market for financial indices is competitive, with providers differentiating their indices through incremental improvements and innovation.[154]  As stated by an association representing the benchmark industry:  "A well-functioning benchmark industry is one in which index administrators have an incentive to invest continuously in innovation . . . .  Without this incentive, innovation and competition in the industry is likely to decrease."[155]

209.    By providing reliable information to market participants, financial indices promote what economists refer to as "price discovery"—the process by which parties to a transaction come to an agreement on a price for a given product.  In economics, "perfect competition" involves a market in which, among other things, buyers and sellers equally have all of the same information about the market.  All else being equal, when consumers are deprived of information or given false information about a product, they will receive lower quality and higher prices than when they are provided full and accurate information.

---

153 *Commission Staff Working Document, Impact Assessment Accompanying the Document Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 1, SWD (2013) 336 final (Sep. 18, 2013).

154 *See, e.g.*, BlackRock, *Response to Consultation Document on the Regulation of Indices* 17 (Nov. 29, 2012), *available at* https://www.blackrock.com/corporate/en-ch/literature/whitepaper/regulation-of-benchmarks-and-market-indices-european-commission.pdf (hereinafter "BlackRock Resp.").

155 Deutsche Börse Group, *White Paper on the Benchmark Industry* 16-17 (Dec. 2013), *available at* https://deutsche-boerse.com/dbg/dispatch/en/binary/gdb_content_pool/imported_files/public_files/10_downloads/ 11_about_us/Public_Affairs/The_benchmark_industry_1213.pdf (hereinafter "*The Benchmark Industry*"); *see also* BlackRock Resp., *supra* note 154, at 17 ("We note that significant investment and research is involved in creating and calculating indices and it is a competitive market place with providers differentiating through incremental improvements and innovation.").

210.     If an index is used as a reference price for a financial instrument or a financial

contract, it becomes a benchmark.[156]  There are four main types of players in benchmark

markets:  (1) those that contribute the data ("contributors"); (2) administrators who provide the

benchmark ("providers"); (3) institutions that issue products that incorporate the benchmark

("issuers"); and (4) end users.

211.     Absent collusion, the forces of competition choose financial benchmarks.[157]

Thus, providers in a competitive market will only succeed in creating commercially viable

benchmarks if they provide accurate and reliable data, establish appropriate governance

structures, and provide sufficient transparency around their methodology and data inputs.[158]  If a

---

[156] *Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 2, COM (2013) 641 final (Sept. 18, 2013) (hereinafter "EC Proposal"); Wheatley Final Report, *supra* note 150, at 54.

[157] *See, e.g.*, Argus Media, *Response to Consultation Document on the Regulation of Indices* 15, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/argus_en.pdf (last visited Oct. 1, 2014) (hereinafter "Argus Resp.") ("[T]he choice of benchmarks for financial contracts must be largely market driven."); BDEW, *Position Paper on European Commission's Consultation Document on the Regulation of Indices* 2 (Nov. 15, 2012), *available at* http://ec.europa.eu/finance/consultations/2012/benchmarks/docs/contributions/registered-organisations/bdew-en.pdf ("[M]arket participants know best, which index is efficient and fits best for their needs."); Blackrock Resp., *supra* note 154, at 15 (competition gives end-users options "and the recourse to change providers if governance and transparency are deemed to be insufficient"); Euribor-EBF, *Response to the European Commission Consultation Document on the Regulation of Indices* 21 (Nov. 28, 2012), *available at* http://www.emmi-benchmarks.eu/assets/files/D2161C-2012-Euribor-EBF%20response%20to%20the%20EC%20Consultation%20on%20the%20Regulation%20of%20Indices_clean.pdf; Fed'n Bancaire Francaise, *Response to the European Commission Consultation Document for the Regulation of the Production and Use of Indices* 3, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/fbf_en.pdf (last visited Oct. 1, 2014) ("[T]he choice of alternative benchmarks should be market-led, with users choosing the best alternatives for their needs."); Fin. Watch, *Response to Consultation Document on the Regulation of Indices* 16 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/finance-watch_en.pdf ("A self-regulation principle will state that competition will let the 'best' benchmarks impose themselves.").  Even the BBA has advocated for choice in the market for interest-rate benchmarks.  *See* BBA, LIBOR—Update (Mar. 5, 2012) , *available at* http://www.betterregulation.com/doc/2/128582 (On file with Plaintiff) (quoting Ian Mair, then Chairman of the London Money Market Ass'n, as saying that "[i]t is important that all market participants have a choice of benchmarks").

[158] *See* Markit, *Response to Consultation Document on the Regulation of Indices* 11 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/markit_en.pdf (hereinafter "Markit Resp."); *The Benchmark Industry*, *supra* note 155, at 15 ("Indices are only beneficial if users can trust them fully.").

benchmark does not command the confidence of all participants in the market, parties will cease to use it. As one index provider recently wrote: "Absent fraud and collusion . . . financial markets, investors, consumers and government agencies will efficiently rout poorly constructed benchmarks and condemn . . . illogical/ill-conceived uses of benchmarks."[159]

212.     Because the actual market or economic reality is likely to change over time, benchmark providers in a competitive market regularly reassess key terms of, and inputs to, a financial benchmark to ensure that the benchmark still provides a reliable representation of the actual market or economic reality that the benchmark is intended to measure.[160]  Recent proposals to improve bbaLIBOR™ include provisions to (a) compare unsecured interbank loan interest rates to actual transaction data and (b) reference other forms of wholesale funding.

213.     In a competitive market, issuers and end users choose financial benchmarks based on how they weigh various quality factors.[161]  First, will the benchmark serve its intended purpose?[162]  If not, issuers and end users will not use it.

214.     Second, is the benchmark anchored in observable transactions or high quality data?  Absent collusion, issuers and users demand input data that is sufficient to represent the

---

159 Russell Indexes, *Response to Consultation Document on the Regulation of Indices* 9 (July 2012), *available at* https://www.russell.com/documents/indexes/eu-commission-consultation-response.pdf; *see also* BlackRock Resp., *supra* note 154, at 3 ("[B]ecause of competition and innovation in the marketplace, index providers will be incentivised through market forces to ensure their products are of a certain quality and viable indices for the end investor.").

160 Bd. Int'l Org. Sec. Comm'ns [IOSCO], *Financial Benchmarks Consultation Report* 25, IOSCO Doc. CR01/13 (Jan. 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD399.pdf (hereinafter "IOSCO Consultation Report"); EC Proposal, *supra* note 156, at 8.

161 *See* ICAP, *Response to the European Commission Consultation on the Regulation of Indices* 4 (Nov. 27, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/ icap_en.pdf (hereinafter "ICAP Resp.").

162 EC Proposal, *supra* note 156, at 2.

actual market or economic reality that the benchmark is intended to measure.[163]  For interest-rate benchmarks in particular, users want input data that is formed by competitive supply and demand conditions.[164]

215.    Third, does the benchmark provide a clearly defined calculation methodology that users can replicate and predict?  Transparency as to what benchmarks measure and their most relevant characteristics are critical because they allow issuers and end users to make correct assessments about whether to choose a particular benchmark.[165]  Market transparency is a "core principle" because "the market demands it."[166]

216.    Fourth, will the benchmark be published by a provider with high professional standards and proven experience and does the benchmark have controls in place to deter manipulation and ensure that rates are properly calculated in accordance with the published

---

163 *Id.* at 15-16; Wheatley Final Report, *supra* note 150, at 55-56.

164 IOSCO, *Principles for Financial Benchmarks: Final Report*, at 10, 20, 33, IOSCO Doc. FR07/13 (July 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf  (hereinafter "IOSCO Principles"); Market Participants Grp. on Reforming Interest Rate Benchmarks, Final Report 28 (Mar. 2014) ("Rates should be based on prices formed by competitive supply and demand and anchored in observable transactions.").

165 *See, e.g., The Benchmark Industry*, *supra* note 155, at 5-6 (index should be fully replicable and completely transparent); AFG, *Response to the European Commission's Consultation on the Regulation of Indices* 3 (Nov. 29, 2012); Amundi, *Answer to E.C.'s Consultation Document on the Regulation of Indices* 2 (Nov. 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/amundi_en.pdf; Wheatley Final Report, *supra* note 150, at 55-56.

166 S&P Dow Jones Indices, *Response to Consultation Document on the Regulation of Indices* ¶ 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/s-p-dow-jones-indices_en.pdf ; Markit Resp., *supra* note 158, at 11 ("[C]ommercial benchmark providers will only succeed in creating commercially viable products if they manage to provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs."); *The Benchmark Industry*, *supra* note 155, at 15 ("End customers . . . need transparency about the index methodology to understand what the index is measuring."); Barclays, *Response to the Wheatley Review of Libor: Initial Discussion Paper* 2 (Sept. 6, 2012) ("It is essential that the market has access to benchmarks that are well-constructed, transparent, and that inspire the confidence of both market participants and regulators.")  Transparency enhances investor protection. EC Proposal, *supra* note 156, at 9.

methodology?  If not, issuers and end users will avoid the benchmark as insufficiently trustworthy.[167]

217.    Absent collusion, "if benchmarks are found wanting, the market will migrate towards an alternative through choice."[168]  As a result, absent a conspiracy, providers seek to provide the most reliable and accurate indices "in order to retain a competitive advantage in the marketplace."[169]

### C.    The Role of Interest-Rate Benchmarks in Lending

218.    Lenders can offer loans at fixed or floating rates.  In a fixed-rate loan, the interest rate stays the same through the term of the loan.  As the term increases, however, so does the risk that market-wide interest rates will go up, leaving the lender with an asset paying below market rates.  In a competitive market, the price of a fixed-rate loan reflects these risks.

219.    In a floating-rate loan, the interest rate can change over time as determined by an agreed-upon benchmark.  This allows the lender to initially accept a (typically) lower floating rate that would adjust upwards in case the credit environment deteriorated or for a variety of other reasons.

220.    Lenders in a competitive market should gravitate toward interest-rate benchmarks that reliably represent a bank's actual cost of funds because that enables them to pass those costs

---

167 *See, e.g.*, Wheatley Final Report, *supra* note 150, at 55-56; Argus Resp., *supra* note 157, at 2 ("Continued commercial success in this competitive marketplace is directly related to the integrity of an organisation's services.").

168 ICAP Resp., *supra* note 161, at 9.

169 Index Indus. Ass'n, *Response to Consultation Document—Regulation of Indices* 6 (Nov. 29, 2012), *available at* http://www.indexindustry.org/?page_id=1405.

on to borrowers and lock in a profit.  For example, a lender may offer a 20-year loan at its cost-of-funds plus a margin.[170]

### D.    The Role of Interest-Rate Benchmarks in Derivatives

221.    As compared to a fixed-rate loan, a floating-rate loan reduces a lender's risk that interest rates will increase (and increases the risk that rates will decrease), but it transfers that same risk to borrowers.  The market for interest-rate derivatives provides a way for borrowers to transfer interest-rate risk to third parties for a price.  An interest-rate derivative is a derivative where the underlying asset is the right to pay or receive a principal amount of money at a given interest rate.  For example, a borrower may accept a floating-rate loan tied to an interest-rate benchmark and contemporaneously enter into a contract with a third party where the borrower agrees to make fixed-rate payments in exchange for floating interest rates tied to the same benchmark—an interest-rate swap.  Through this "hedging" strategy, the borrower has effectively converted its floating-rate loan into a fixed-rate one.  The ability to hedge is increased if the same interest-rate benchmark is incorporated into the swap and the floating-rate loan because it synchronizes changes in the interest rates.

222.    This synchronization creates a "network effect" in which a product tends towards dominance because its utility increases with the number of people that use it.[171]  For example, a consumer's demand for a telephone network increases with the number of other users on the network whom she can call or from whom she can receive calls.  In industries characterized by

---

170 *See, e.g.*, Wheatley Final Report, *supra* note 150, at 44 ("The use of a benchmark such as LIBOR allows lenders to use it as a barometer of the inter-bank funding market to base the margin to be applied to its customers.").

171 *See, e.g., id.* at 46, 76; European Comm'n, *Consultation Document on the Regulation of Indices: A Possible Framework for the Regulation of the Production and Use of Indices Serving as Benchmarks in Financial and Other Contracts* 19 (Sept. 5, 2012), *available at* http://ec.europa.eu/internal_market/consultations/docs/2012/benchmarks/consultation-document_en.pdf.

network effects, competing networks can "tip" so that if one network overtakes the other, the other becomes insignificant.[172]

223.    During the conspiracy period, the vast majority of interest-rate swaps were traded over-the-counter ("OTC").  Since June 2013, Dodd-Frank legislation has mandated that interest-rate swaps are traded on exchanges, such as the Chicago Mercantile Exchange ("CME") and Intercontinental Exchange ("ICE").  Exchange-traded swaps are standardized financial instruments, with pre-defined notional values, repayment dates, benchmarks, and length.

**Figure 1:  Vanilla Interest-Rate Swap**



224.    The advantage of OTC swaps was that they could be adjusted to meet a user's needs, for example by synchronizing the payment dates and duration within a loan.  OTC swaps were typically negotiated pursuant to a standardized Master Agreement that was developed by ISDA.  Many of the Bank Defendants served on ISDA's Board of Directors and had other prominent roles in that trade association.[173]  A swap contract is negotiated for an agreed-upon term—10 years, for example—with pre-defined dates on which the interest rates are calculated and payments made (known as "payment dates").  Assuming simultaneous payment dates, the interest payments are "netted" out and the "loser" pays its counterparty the difference between the fixed- and floating-rate payments.  For example, if on the first payment date, application of the fixed interest rate to the notional results in a payment due of $10,000 and application of the

---

172 *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 393 (4th ed. 2005).

173 *See, e.g.,* 2011 Board of Directors, International Swaps & Derivatives Ass'n, Inc., http://www. isda.org/wwa/bod.html (last visited on Oct. 1, 2014).

predefined benchmark interest rate to the notional results in a payment due of $9,000, then the fixed-rate payer must pay the difference ($1,000) to its counterparty.

225.     In the OTC interest-rate swap market, broker/dealers function as market makers. A small set of dealers dominated the market for OTC USD interest-rate derivatives during the conspiracy period.  According to a July 2010 ISDA market survey, the largest 14 broker/dealers held 82% of all interest-rate derivatives by notional amount.[174]  Of these 14 largest dealers, 10 were Bank Defendants:  Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS.[175]  Similarly, the top five bank holding companies in the United States—Bank Defendants Bank of America, JPMorgan, Citigroup, and HSBC, and non-Defendant Goldman-Sachs—accounted for more than 95% of all OTC swaps and derivatives transactions in the United States during the conspiracy period.[176]

226.     As Defendant UBS has acknowledged, in interest-rate swap transactions, "the benchmark is a price, not an index."[177]  OTC dealers quote prices for interest-rate swaps in two parts:  (1) an interest-rate benchmark and (2) a fixed interest rate.  In the absence of collusion, the fixed rate is calculated to provide the same value today (net present value or "NPV") of the expected cash flows from the quoted benchmark over the life of the swap.  The fixed-rate payer calculates the expected cash flows by applying the published rules of the quoted benchmark to

---

174 David Mengle, *Concentration of OTC Derivatives Among Major Dealers*, ISDA Research Notes, July 2010, *available at* https://www.isda.org/a/8PDDE/concentrationrn-4-10.pdf (last visited on June 12, 2018).

175 *See id.*

176 *See* Office of the Comptroller of the Currency, OCC's Quarterly Report on Bank Trading and Derivatives Activities:  First Quarter 2009, *available at* http://www.occ.gov/news-issuances/news-releases/2009/nr-occ-2009-72a.pdf (last visited Oct. 1, 2014).  In the first quarter of 2009, Bank Defendants JPMorgan, Bank of America, and Citigroup collectively earned more than $6 billion in trading revenue from interest-rate derivative positions.  *See id.*

177 UBS, *Re: Consultation Document on the Regulation of Indices* 3 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/ubs_en.pdf.

the predicted market conditions over the length of the swap.  For example, for a three-year swap, the counterparty would use bbaLIBOR™'s published rules to predict competitive interbank interest rates over the three-year period and use those predictions to determine the NPV of those interest-rate payments.[178]

227.    For example, assume that on January 1, 2014, an OTC dealer offers a three-year swap where the floating rate is indexed to 3-month USD bbaLIBOR™ on a notional $10 million with payment dates at the end of each year.  Applying the USD bbaLIBOR™ methodology, a potential counterparty will predict the floating-rate payments on each payment date and then calculate the NPV of those payments.  If the NPV of the quoted fixed rate exceeds the NPV of the quoted benchmark, then the swap would be over-priced.  In other words, the price of the swap is expressly predicated on the USD bbaLIBOR™ published rules and application of those rules to expected market conditions.

228.    Thus, the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS are inextricably intertwined in that:  (a) interest-rate benchmarks serve as a component of the prices of interest-rate derivatives and floating-rate loans; (b) interest-rate derivatives and floating-rate loans require a reliable interest-rate benchmark; (c) network effects support adoption of a single standard interest-rate benchmark for interest-rate derivatives, floating-rate loans, and floating-rate MBS; and (d) the value of an interest-rate benchmark is fundamentally determined by its suitability as a pricing component in interest-rate derivatives and floating-rate loans.  Holders of floating-rate MBS (whose prices incorporate interest-rate benchmarks) also seek to hedge their risks through interest-rate derivatives (whose prices likewise incorporate interest-rate benchmarks, which further reinforce

---

178 *See* Wheatley Final Report, *supra* note 150, at 45.

the network-effect nature of the market for interest-rate benchmarks.  The relationship among

these product markets is graphically depicted in Figure 2 below.

**Figure 2:  Relationship Between Product Markets**

### E.      Development of bbaLIBOR™

229.    The origin of bbaLIBOR™ can be traced to 1969, when a Greek banker arranged

an $80 million syndicated loan to the Shah of Iran.[179]  At the time, lenders in global markets did

not have access to a uniform benchmark that would reflect their cost of funds.  Instead, lending

syndicates offered loans with interest rates that were renegotiated every three or six months to

reflect changing market conditions.

230.    The banker, who worked for the London branch of Manufacturer's Hanover (now

part of JPMorgan), devised a formula whereby a group of major reference banks within each

---

179 Kirstin Ridley & Huw Jones, *Insight:  A Greek Banker, the Shah and the Birth of Libor*, Reuters (Aug. 7, 2012), http://www.reuters.com/article/2012/08/08/us-banking-libor-change-idUSBRE87702320120808.

syndicate agreed to report their funding costs shortly before a loan rollover date.  The weighted average of these rates, rounded to the nearest 1/8th percent plus a spread for profit, became the price of the loan for the next period.  The banker named this rate the London interbank offer rate.  Within a few years, this version of "Libor" evolved from a measure used to price individual loans to a much broader benchmark for deals worth hundreds of billions of dollars a year.  As demand for loans surged, demand for interest-rate derivatives followed.

231.    In the mid-1980s, the banks using the informal "Libor" asked the BBA to devise a benchmark to act as a reference point for pricing derivatives and interest-rate swaps, and to make benchmarking more transparent and objective.[180]  The BBA agreed and, working with other parties such as the Bank of England, renamed the benchmark bbaLIBOR™.

### F.    Calculation of bbaLIBOR™

232.    During the 2000s, the BBA licensed bbaLIBOR™ for 15 maturities (from overnight to 12 months) and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Pound Sterling, Japanese Yen, New Zealand Dollar, Swedish Krona, and USD).  The BBA's licensees included vendors located in the United States.[181]

233.    The BBA represented that it chose the banks, including the Bank Defendants, that would contribute submissions ("Contributor Banks") based on their scale of market activity, credit rating, and perceived expertise in the currency concerned.[182]  The BBA stated that it

---

180 Michael R. Koblenz, et al., *LIBOR: Everything You Ever Wanted to Know But Were Afraid to Ask*, 6 J. Bus., Entrepreneurship & L. 281, 283 (2013), *available at* http://digitalcommons.pepperdine.edu/cgi/viewcontent. cgi?article=1094&context=jbel.

181 *Licensing*, BBA Libor, http://web.archive.org/web/20111210044943/http://www.bbalibor.com/licencing (last visited Oct. 1, 2014).  The BBA's licensing records do not appear to be publicly available.  The BBA has access to this license information.  Plaintiff Freddie Mac does not.

182 *The Basics*, BBA Libor, https://web.archive.org/web/20130130191334/http://www.bbalibor.com/bbalibor-explained/the-basics (last visited Oct. 1, 2014).  Many, if not all of the Bank Defendants were, during the relevant time period, contributors to other bbaLIBOR™ panels as well as the USD bbaLIBOR™ panel.

intended the selection criteria to show that Contributor Banks would have the best and most accurate knowledge of interbank borrowing costs for each currency. Only the Contributor Banks knew what the rates really were in the opaque interbank loan market.[183]

234.    The BBA's published rules (its methodology) governed the way that Contributor Banks were required to determine their submissions, and Contributor Banks purported to agree to abide by those rules in order to remain on the bbaLIBOR™ panel of banks. In 1998, the FX & MM Committee decided that a universal definition of a prime bank could no longer be given and, in response to user demand, changed the definition to the one that was used through the 2000s and continues to exist today: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[184]

235.    The published rules required each Contributor Bank to submit rates: (a) without reference to rates contributed by other Contributor Banks; (b) determined by the Contributor Bank's staff primarily responsible for management of a bank's cash, rather than its derivative trading book; (c) without reference to the pricing of any derivative financial instrument; and (d) that represented the rates it "would be offered funds."[185] The BBA intended for these rules to

---

183 The term "opaque" is often used in financial markets as an antonym for "transparent." Transparent financial markets are those in which much is publicly known about prices and volumes of financial transactions. *See Transparency and Over-the-counter Derivatives*, ISDA, Research Notes, 2009, *available at* http://www.isda.org/ researchnotes/pdf/isda-research-notes1.pdf. Transparent financial markets promote price discovery and are therefore considered to be more efficient than opaque markets. Commercial banks have superior access to information in the financial markets and use that information for profit through their activity in OTC derivative markets. *See, e.g.*, U.S. C.F.T.C. Chairman Gary Gensler, Remarks at the OTC Derivatives Reform, Consumer Federation of America Financial Services Conference (Dec. 3, 2009), *available at* http://www.cftc.gov/PressRoom/ SpeechesTestimony/opagensler-22.

184 Until 1998, banks submitted quotes to the BBA answering the question: "At what rate do you think interbank term deposits will be offered by one prime bank to another prime bank for a reasonable market size today at 11 am?"

185 UBS SOF, *supra* note 145, ¶ 7; *The Basics*, *supra* note 182; *Setting bbalibor*, BBA Libor, https://web.archive.org/web/20120902014345/http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Oct. 1, 2014); *Definitions*, BBA Libor,

show that the inputs to bbaLIBOR™ reflected competitive interest rates in the market for unsecured interbank loans.[186]  In its 2010 Annual Report, the BBA identified bbaLIBOR™'s three main strengths as:  (1) its simplicity; (2) its transparency (because it purportedly published all of the information needed to understand bbaLIBOR™ including the instructions given to contributing banks); and (3) it was "market led."[187]

236.   In addition, the BBA claimed that it was independent of the Contributor Banks and that it would aggressively monitor compliance with the published rules.  For example, in 2008, the BBA stated that the bbaLIBOR™ process is overseen by an "independent committee of market participants."[188]

237.   Contributor Banks electronically communicated their bbaLIBOR™ submissions every London business day to the BBA's calculation agent, Thomson Reuters, by 11:10 a.m. London time.  As calculation agent, Thomson Reuters was under the supervision of the FX & MM Committee.  The BBA's published rules stated that Contributor Banks were not to know the bbaLIBOR™ rates submitted by other Contributor Banks during this submission window.[189]

238.   USD bbaLIBOR™ was calculated by throwing out the four highest and four lowest submissions, and then averaging the remaining eight submissions.  This average constituted the bbaLIBOR™ "fixing."[190]

---

https://web.archive.org/web/20130205220303/http://www.bbalibor.com/bbalibor-explained/definitions (last visited Oct. 1, 2014).

186 Wheatley Final Report, *supra* note 150, at 55.  One of the key characteristics for a credible benchmark rate is that the benchmark should "clearly convey the economic realities of the underlying interest it seeks to measure to its users."  IOSCO Consultation Report, *supra* note 160, at 10.

187 BBA, 2010 Annual Report, *supra* note 2, at 25.

188 BBA, *Understanding the Construction and Operation of BBA LIBOR* 1 (June 10, 2008) (On file with Plaintff).

189 *Id.*

190 In the parlance of commercial banks, a rate submission for LIBOR was referred to as a "submission" and the LIBOR rate that the BBA published was known as the "fixing."

239.     Thomson Reuters, as an agent for the BBA (and the FX & MM Committee), then electronically communicated the bbaLIBOR™ fixings to licensees, including the Wall Street Journal, Telerate, IDC, and Bloomberg by midday, London time.[191]  Every business day during the Conduct Period, Defendants agreed to, and did, transmit and publish bbaLIBOR™ data, including the Bank Defendants' individual contributions, via these vendors.  Freddie Mac accessed bbaLIBOR™ via subscriptions to both Reuters and Bloomberg.  Additionally, a number of Defendant Banks emailed the bbaLIBOR™ fix directly to Freddie Mac and at least Bank of America (via BAS) directly sent individual USD bbaLIBOR™ submissions to Freddie Mac for at least a portion of the Conduct Period.

240.     Figure 3 below presents the BBA's graphic depiction of the bbaLIBOR™ process.[192]

---

191 *See Frequently Asked Questions (FAQs)*, *supra* note 36.

192 *The Basics*, *supra* note 182.

**Figure 3: bbaLIBOR™ Processes**



### G.   bbaLIBOR™ Governance

241.    Through 2010, the FX & MM Committee had sole responsibility for all aspects of

the functioning and development of bbaLIBOR™.[193]  Thirteen "active market practitioners"

comprised the FX & MM Committee.[194]  The BBA claimed that the FX & MM Committee was

an "independent body."[195]  The BBA did not disclose the names of the members of the FX &

---

193 *See, e.g.*, Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; U.K. House of Commons Treasury Comm., *Fixing LIBOR: Some Preliminary Findings*, Second Report of Session 2012-13, Vol. I, at 5 (Aug. 18, 2012), *available at* http://www.publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/481.pdf.

194 *Understanding BBA LIBOR*, BBA Libor, https://web.archive.org/web/20130511195637/http://www.bba.org.uk/media/article/understanding-bba-libor (last visited Oct. 1, 2014).

195 *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny:  Proposals Agreed by the FX & MM Committee § 1.6 (Nov. 17, 2008) (On file with Plaintiff) (hereinafter "LIBOR Governance and Scrutiny").

MM Committee,[196] but UBS and RBS have both admitted in connection with their settlements with government regulators that they had representatives on the FX & MM Committee.[197]  On information and belief, other Bank Defendants also served on the FX & MM Committee.  The chair and two deputy chairs of the FX & MM Committee were representatives from Contributor Banks ███████████████████████).[198] ████████████████████████

████████████████████████████████████████████

████████████████████████[199]  FX & MM Committee members met at least every two months at undisclosed locations to discuss bbaLIBOR™.[200]  The FX & MM Committee did not publish official minutes.[201]

---

196 Enrich & Colchester, *supra* note 33. Executives from the following banks have been revealed as members of the FX & MM Committee: ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

UBS SOF, *supra* note 145, at ¶ 85; Fin. Servs. Auth., Final Notice to UBS AG ¶ 122 (Dec. 19, 2012) (hereinafter "UBS Final Notice"), attached as Exhibit 9 and incorporated into this Complaint by reference; RBS Final Notice, *supra* note 125, ¶ 89.  The specific entities for which the executives purportedly worked and their relationship to their bank's respective U.S. operations are not publicly known.  The identities of other individuals involved in the FX & MM Committee and/or the BBA are not publicly known.

197 UBS SOF, *supra* note 145, ¶ 85; UBS Final Notice, *supra* note 196, ¶ 122; RBS Final Notice, *supra* note 125, ¶ 89.

198 BBA Libor, LIBOR Governance and Scrutiny, *supra* note 195, § 1.11; ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

200 Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg (Aug. 21, 2012), http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonimity-after-rigging-scandal.html.

201 *Id.*

242.     The BBA employed a full-time manager to supervise on a day-to-day basis all aspects of bbaLIBOR™'s calculation and dissemination to the marketplace. The manager was purportedly responsible for ensuring that all bbaLIBOR™ processes met the highest standards. The bbaLIBOR™ manager acted as an executive on the FX & MM Committee and was responsible for informing the FX & MM Committee about issues pertaining to bbaLIBOR™. The BBA and its agents monitored the Contributor Banks' individual submissions in real-time. When one Contributor Bank submitted rates that seemed out of line with other submissions, the BBA or its agents would contact the outlier Contributor Bank to "confirm" the submission—for example, "Everyone else is coming in a good bit under that."[202]

243.     In April 2005, the BBA hired John Ewan, a 29-year-old financial researcher with a biology degree and no apparent prior experience managing a financial benchmark, to serve as the bbaLIBOR™ manager.[203]  Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has claimed that he was hired to put bbaLIBOR™ on a secure commercial footing and that in his first two years he increased revenue more than tenfold, introduced new products, obtained European Union, United States and Japanese trademarks for bbaLIBOR™, and successfully negotiated contracts with the derivatives exchanges, all of the major data vendors, and hundreds of other users.[204]

244.     Mr. Ewan claims that he was responsible for developing and maintaining relationships with all stakeholders in bbaLIBOR™, including keeping them apprised of changes

---

202 Donald MacKenzie, *What's in a Number?*, London Rev. Books, Sep. 25, 2008, at 11-12, *available at* http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number.

203 *John Ewan Public Profile*, LinkedIn, https://www.linkedin.com/pub/john-ewan/5/490/627 (last visited Oct. 1, 2014).  Mr. Ewan left the BBA in the summer of 2012.

204 Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012, http://www.thesun.co.uk/sol/homepage/news/money/4441913/Mr-Libor-quits.html.

to the benchmark and the markets it tracks.[205]  Mr. Ewan also claims to have cultivated "excellent relationships at a senior level" with most major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[206]

245.    On January 1, 2010, more than a year after learning that regulators were investigating bbaLIBOR™ (but long before the information was publicly available), the BBA modified its structure.  It created a new entity, BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark.  As noted above, one report suggested that the BBA created BBA LIBOR, Ltd. to limit the BBA's liability for expected claims relating to bbaLIBOR™.  The FX & MM Committee continued to oversee bbaLIBOR™.  Despite this change in structure, the processes and procedures followed by Contributor Banks and the BBA in calculating and publishing bbaLIBOR™ remained the same.

246.    On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in bbaLIBOR™ rate setting.  As Martin Wheatley, head of the United Kingdom's Financial Services Authority ("FSA"), explained at the time, "the BBA acts as the lobby organisation for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[207]  In February 2013, the BBA agreed to cede control of bbaLIBOR™ to a new operator.  On January 31, 2014, the BBA handed over responsibility for the administration of bbaLIBOR™ to Intercontinental Exchange Benchmark Administration, Ltd.[208]

---

205 *John Ewan Public Profile*, *supra* note 203.

206 *Id.*

207 Wheatley Final Report, *supra* note 150, at 21.

208 *Disclaimer*, BBA Libor, http://www.bbalibor.com/disclaimer (On file with Plaintiff).

### H.     Defendants' Knowledge of bbaLIBOR™'s Importance

247.     As evidenced by the following quote from the BBA, Defendants understood the importance of bbaLIBOR™ to the global economy and actively promoted bbaLIBOR™ as a key benchmark rate.

> BBA LIBOR is by far the most widely referenced interest rate index in the world.  Its importance goes beyond that of inter bank lending and touches everyone from large international conglomerates to small borrowers.  It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR.  Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR.  It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges.  It is written into standard derivative and loan documentation such as the ISDA terms[209] and is also used for an increasing range of retail products.[210]

248.     Financial instruments that incorporated USD bbaLIBOR™ were priced based on the express understanding that Defendants would adhere to the BBA's published methodology for the benchmark.  Market participants, including Freddie Mac, reasonably relied on Defendants' representations that bbaLIBOR™ was, and would be, honestly and reliably calculated according to the published rules.  Indeed, the BBA acknowledged in 2008 that bbaLIBOR™ "has always been relied on by the market as a reliable benchmark" of borrowing costs.[211]

An internal BBA document from 2008 stated that USD bbaLIBOR™ "is overwhelmingly the most widely used rate, as it is the reference rate for a vast derivatives

---

209 Through their membership in ISDA (which is located in New York), the Bank Defendants agreed to, and did, chose to incorporate USD bbaLIBOR™ as the default interest-rate benchmark in the standardized ISDA contracts.

210 *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 188, at 3.

211 Press Release, BBA, Libor Gets Enhanced Governance and Scrutiny Procedures (Dec. 17, 2008), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-gets-enhanced-governance-and-scrutiny-procedur.

industry, whose establishment was only possible due to the existence of BBA LIBOR as an objective market rate."[212]



250.    The United States was by far the biggest market for products that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  It therefore was the focus of Defendants' efforts to suppress USD bbaLIBOR™, and maintain USD bbaLIBOR™'s credibility and status as the dominant short-term USD interest rate benchmark.



253.    All Defendants were aware, and intended, that each bbaLIBOR™ submission conveyed information to market participants about the Contributor Bank's costs of borrowing unsecured funds, the liquidity conditions and stress in the money markets, and each Contributor

---

212 *See Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 138.

213 ▮▮▮▮▮▮▮▮▮▮▮

214 ▮▮▮▮▮▮▮▮▮▮▮

215 ▮▮▮▮▮▮▮▮

216 ▮▮▮▮▮▮▮▮

Bank's ability to borrow funds in particular markets.[217]  Defendants were likewise aware, and intended, that each individual USD bbaLIBOR™ submission contained market information concerning, *inter alia*, the contributing bank's ability to borrow unsecured funds, which "affected or tended to affect" the daily rates at which USD bbaLIBOR™ was fixed and the prices of financial products that incorporated bbaLIBOR™ as the interest-rate benchmark.[218]

254.   Because a Contributor Bank's bbaLIBOR™ submissions should correspond to the cost of money for that Contributor Bank, market participants could perceive a Contributor Bank's bbaLIBOR™ submission as an indicator of that Contributor Bank's financial health and liquidity.  For example, if a Contributor Bank's bbaLIBOR™ submission was relatively high as compared to other Contributor Banks, that submission would have suggested that the Contributor Bank presented a credit risk and had potential liquidity problems.  Commercial banks with liquidity problems have trouble attracting business and could find themselves prohibited from working with institutions such as Freddie Mac.

255.   Because the Contributor Banks were purportedly among the world's largest and most financially sound commercial banks, market participants valued bbaLIBOR™ as a floor for the borrowing rate of other less creditworthy institutions and individuals.[219]  Though bbaLIBOR™ developed into the industry standard, other reference rates existed throughout the relevant period.  For example, brokers such as Tullet Prebon and Tradition Financial Services provided data on various interest-rate benchmarks, as did the data providers Bloomberg and Depository Trust & Clearing Corp. ("DTCC").

---

217 *See In re Barclays plc*, No. 12-25, 2012 WL 2500330, at *22 (C.F.T.C. June 27, 2012) (hereinafter "Barclays CFTC Order") (CFTC finding the same), attached as Exhibit 10 and incorporated into this Complaint by reference.

218 *Id.*

219 David Hou & David Skeie, Fed. Res. Bank of N.Y., LIBOR: Origins, Economic Crisis, Scandal, and Reform 3 (March 2014), *available at* http://www.ny.frb.org/research/staff_reports/sr667.pdf.

256.    In March 2012, the BBA responded to published reports about an investigation into bbaLIBOR™ by insisting that it and the Contributing Banks were "committed to the continuing evolution of Libor so that it adapts to meet the changing market and user requirements and general expectations."[220]  The BBA quoted Ian Mair, then Chairman of the London Money Market Association, as saying "It is important that all market participants *have a choice* of benchmarks."[221]  Following Barclays' admission of bbaLIBOR™ manipulation, the BBA again stated that it was committed to providing a benchmark that had the support of all users.[222]

257.    In 2014, the BBA transferred control of bbaLIBOR™ to a commercial benchmark provider, the Intercontinental Exchange ("ICE") Benchmark Administration Limited ("IBA").  IBA announced that it would implement additional controls to deter misconduct and ensure that bbaLIBOR™ serves its intended purpose.[223]  Among the changes, the IBA made was to cease contemporaneously publishing individual USD bbaLIBOR™ contributions.

258.    Following Barclays' disclosure, multiple providers have sought to enter the market for interest-rate benchmarks, such as the DTCC, which offers the General Collateral Finance ("GCF") Repo Index (which has gained the support of numerous market participants).  This restored competition in the market for interest-rate benchmarks has also led to the introduction of new financial products, such as futures and options contracts linked to repo rate indices and overnight indexed swap ("OIS") rates.

---

220 LIBOR––Update, *supra* note 157.

221 *Id.* (emphasis added).

222 Press Release, BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor (Aug. 18, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-statement-regarding-the-treasury-committees-prelim.

223 Iris Dorbian, *Will Banks Pay Up for a New, Improved Libor?*, CFO (Aug. 19, 2014), http://ww2.cfo.com/credit/2014/08/will-banks-pay-new-improved-libor.

## FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™

### A.    Systematic bbaLibor™ Depression:  The Conduct Begins

259.    In 2007, the United States economy endured a housing correction.  As a result, the market found itself unable to value certain illiquid assets, while creditors demanded additional collateral for secured short-term wholesale funds and became increasingly reluctant to offer unsecured short-term funding.  One major financial institution, UK-based Northern Rock, collapsed in late 2007 when it was unable to roll over the short-term funding on which it relied to finance its operations.  These events increased the demand for, and reduced the supply of, cash.

260.    Many of the Bank Defendants faced some of the same problems that Northern Rock faced in that they held illiquid assets and relied on short-term wholesale funding to meet their regular obligations.  During this time, many of the Bank Defendants were net borrowers, meaning that they financially benefited from reductions in short-term interest rates.  For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to bbaLIBOR™ because bbaLIBOR™ was lower than predicted by competitive market forces (and, lower than bbaLIBOR™ would have been had it been calculated according to its published methodology).[224]  Similarly, Bank of America reported that it was "liability sensitive to LIBOR" and net interest income would increase substantially if short-term interest rates fell by 100 basis points while long-term rates remained the same.[225]  Bank of America further stated that it held a notional amount of more than $50 billion in receive fixed/pay floating interest-rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive

---

224 Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

225 Bank of Am., 2008 Annual Report, at 88-90 (2008), *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

floating interest-rate swaps.[226]  At the same time, many Bank Defendants were exposed to the dangers of their reliance on wholesale funding.[227]

261.    On Thursday, August 9, 2007, the Bank Defendants submitted overnight USD bbaLIBOR™ rates that were significantly higher than the prior day.  Overnight USD bbaLIBOR™ rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD bbaLIBOR™ at its highest level since 2001.  Because these increases were not coincidental with changes in the rates charged by central banks, the media speculated that the increase in USD bbaLIBOR™ indicated that the Bank Defendants were afraid to lend to each other and that major losses for Bank Defendants and others were on the horizon.

262.    On August 9, 2007, after the bbaLIBOR™ submissions were electronically published for that day, ▮▮▮▮▮▮, a senior manager ▮▮▮▮▮▮, sent an internal email ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

226 *Id.* at 91 tbl.42.

227 It was common for banks, including the Bank Defendants, to rely on short-term wholesale funding to finance longer-term assets.  This meant that banks had to constantly renew, or obtain, short-term loans or risk running out of cash.  For example, during the Conduct Period, wholesale funders and interbank lenders grew wary of RBS (which had just acquired ABN AMRO) due to its lack of cash from customer deposits, excessive reliance on wholesale funding, and portfolio of "toxic" U.S. subprime mortgages.  Accordingly, wholesale funders became increasingly concerned about RBS's potential for insolvency.  As a result, the Bank Defendants had a strong incentive to keep bbaLIBOR™ down (much as a commodities producer has an incentive to reduce the cost of raw materials) and to portray a reputation for financial soundness.



263.    The following day, UBS dropped its overnight USD bbaLIBOR™ submission 50 basis points.  UBS employees understood this secret directive to apply to all bbaLIBOR™ currencies.[230]

264.    From this point forward, in accordance with instructions contained in the August 9 Email,[231] UBS derivatives traders with experience trading in the short-term money markets (including, on information and belief, derivatives traders located in New York and Connecticut) coordinated with UBS's USD bbaLIBOR™ submitters to profit on trades on bbaLIBOR™-based instruments with counterparties in the United States, including Freddie Mac in Virginia.[232]  The "err on the low side" instruction was well known to various derivatives traders and managers on the trading desks (including, on information and belief, traders and managers located in New York and Connecticut).[233]

265.    By August 16, 2007, all of the Bank Defendants dropped their submissions significantly.  The initial differences were consistent with the fact that the Bank Defendants had

---

228 ███████████████; UBS SOF, *supra* note 145, ¶ 105.

229 ██████████████████████; UBS SOF, *supra* note 145, ¶ 105-107.

230 UBS SOF, *supra* note 145, ¶ 108.

231 *Id.* ¶ 106.

232 *Id.*

233 UBS SOF, *supra* note 145, ¶ 108.

different credit ratings and presented different risks for unsecured short-term wholesale lenders.[234]  UBS, for example, lowered its overnight USD bbaLIBOR™ submission by 90 basis points.  Figure 4 below plots the overnight USD bbaLIBOR™ submissions for the Bank Defendants from August 7, 2007 through August 28, 2007.  As can be seen in Figure 4, bbaLIBOR™ submissions showed significant differences in early August but then showed significant uniformity by the end of the month.  This pattern is consistent with allegations that the Bank Defendants began colluding on USD bbaLIBOR™ in August 2007.

**Figure 4:  Overnight USD bbaLIBOR Submissions**

---

234 *See, e.g.*, Wheatley Final Report, *supra* note 150, at 79 ("[I]t could be argued that, in the current environment inter-bank lending rates are dominated by credit risk and there is a large dispersion in the perceived creditworthiness of banks.").

266.    During this same time period, the BBA issued a press release titled "Key Facts about LIBOR" in which the BBA falsely stated that bbaLIBOR™ "closely reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."[235]

267.     According to King's unclassified interview with the FBI, after being shown this document, Mr. King stated that Connolly's "reference to 'tons of pays coming up' meant the bank's USD desk in New York had a lot of trading positions rolling off (i.e., fixings),"[238] i.e., that Deutsche Bank would have to pay counterparties interest payments tied to USD bbaLIBOR™.

268.    On August 20, 2007, RBS's London-based head of money markets trading and the person responsible for USD bbaLIBOR™ submissions, Paul Walker, reportedly telephoned RBS' head of short-term markets for Asia, Scott Nygaard, in Tokyo, to discuss how banks were

---

235 Press Release, BBA, Key Facts About BBA LIBOR (Aug. 10, 2007), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-falls-on-central-bank-intervention/.

237 *Id.*

238 Unclassified FBI FD-302 memorandum of the Government's July 31, 2014 interview of James R. King, excerpt attached as Ex. C to the Supp. Decl. of Seth L. Levine in Further Support of Defendants' Joint Motion for a *Kastigar* Hearing, *United States v. Connolly et al.*, No. 1:16-cr-00370 (S.D.N.Y. Sept. 25, 2017) [hereinafter "King FD-302"], at 31.

using bbaLIBOR™ to profit on its movements rather than submitting rates that honestly reflected their perceived costs of borrowing. Mr. Walker is quoted as telling Mr. Nygaard: "People are setting to where it suits their book. . . . LIBOR is what you say it is."[239] Senior RBS managers reportedly knew that, at least as of August 2007, the Bank Defendants were systematically rigging bbaLIBOR™.[240]

269. ███████████████████████



The submitter stated that inter-dealer brokers believed that the projected USD bbaLIBOR™ fix was too low and "not based on where people really would be offering," to which Patterson responded that he "understood."[242]

270. The FX & MM Committee agreed that USD bbaLIBOR™ submissions should be aligned (within five basis points of the median of all USD bbaLIBOR™ submissions).

239 Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg (Dec. 13, 2012), http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

240 *Id.*

241 Joint Decl. of David E. Kovel & Michael B. Hausfeld in Support of Pls.' Coordinated Opp. To Defs.' Mtn. to Dismiss for Leave of Personal Jurisdiction, *Mayor & City Council of Balto., et al. v. Credit Suisse Group AG, et al.*, No. 11-cv-5450, and *Metzler Investment GmbH, et al., v. Credit Suisse Group AG, et al.*, No. 11-cv-2613 (S.D.N.Y. Aug. 5, 2016) [hereinafter "Kovel Decl."] ¶ 32.

242 *Id.*

██████████████████████ Robson told investigators that "Rabobank management's sole goal was to ensure Rabobank's submissions were within the range of other panel bank submissions and submitters were 'towing [sic] the line.'"[244]  In a transcript of an October 2008 phone call between Rabobank's Anthony Allen and the BBA's Mr. Ewan, the Rabobank representative said that as a AAA-rated bank, Rabobank's USD bbaLIBOR™ submissions should, contrary to its aligned submissions, be "miles away from someone like UBS is at the moment."[245]  Robson described the USD bbaLIBOR™ process as a "charade" and a "crock of rubbish."[246]

271.    Similarly, internal documents from Lloyds made public reveal that an unidentified HBOS senior manager directed USD bbaLIBOR™ submitters to contribute USD bbaLIBOR™s at the rate of the expected USD bbaLIBOR™ fixing so that HBOS did not stand out as an outlier relative to other panel banks.[247]

272.    Not only did the Bank Defendants align submissions through the agreed-upon "flagging system" for submission outliers, they also contacted each other directly to discuss their respective USD bbaLIBOR™ submissions.  For example, one eyewitness told the FBI that an unknown Bank of America employee used to call Rabobank executive Tony Allen to discuss USD bbaLIBOR™ submissions.[248]

---

████████████████████████████████████ Defense Ex. 608B at 11, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-5.

244 Defense Ex. 608C at 4, *United States. v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.).

245 Government Ex. 110B at 3, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 185-3.

246 Defense Ex. 608C at 4, 18, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

247 Lloyds CFTC Order, *supra* note 108, at 14 (HBOS could not "afford to be significantly away from the pack").

248 Defense Ex. 608K at 3, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-9.

273.    In the event that a Contributor Bank submitted a USD bbaLIBOR™ submission outside of that range, the FX & MM Committee privately and directly contacted that Contributor Bank to tell the Contributor Bank what other Contributor Banks had submitted—even though the bbaLIBOR™ rules stated that Contributor Banks should not have any advance knowledge of other USD bbaLIBOR™ submissions.  As agreed upon by the FX & MM Committee members and USD bbaLIBOR™ Contributor Banks, the Contributor Bank would then re-submit its USD bbaLIBOR™ submission so that the submission was within the range of all other Contributor Banks.  When publishing each Contributor Bank's individual USD bbaLIBOR™ submissions, the BBA published only the re-submitted rate.

### B.    Barclays Moves to a "Within-the-Pack" Directive Which Enabled Further Suppression

274.    On August 31, 2007, Scott Bere, Citibank's Head of Risk Treasury in the United States, who was responsible for managing Citibank's balance sheet "risks" in the United States, messaged Barclays Capital's Global Head of Portfolio and Liquidity Management, John Porter (a former colleague of Mr. Bere's with whom he had not communicated in a long time).  Mr. Porter was a good friend of Barclays CEO Robert Diamond.[249] ███████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████   By this time, Citibank was already suppressing for publication its USD bbaLIBOR™ submissions so that it was "not seen" to be paying higher interest rates

---

[249] *See Larger loot: Fatcat Barclays bankers toast bonuses with booze-filled breakfast in posh pub*, Mirror (Feb. 11, 2012, 2:12 PM), https://www.mirror.co.uk/news/uk-news/barclays-bankers-toast-their-bonuses-with-booze-filled-681354.

[250] ████████████████

[251] ████████████████

because "that would be damaging" to its reputation.[252]  Citibank wanted to push USD bbaLIBOR™ down further, but needed Barclays (which was submitting suppressed rates that were at the high end of the scale) to reduce its submissions further so that Citibank (which was submitting suppressed rates that were at the low end of the scale) could further reduce its submissions without drawing unwanted scrutiny.

275.     On September 3, 2007, Bloomberg published a story titled "Barclays Takes a Money-Market Beating," that observed that Barclays' published 3-month USD bbaLIBOR™ contribution was (as noted above and can be seen in Figure 4) relatively high compared to other Bank Defendants.  The article speculated that Barclays and "its Barclays Capital securities unit" were struggling for cash due to their exposure to United States subprime mortgages.  In response to this article, senior managers at Barclays instructed their USD bbaLIBOR™ submitters to further depress their USD bbaLIBOR™ submissions so that they would stay "within the pack" and be nearer to the depressed rates of other Bank Defendants rather than rates that were consistent with the BBA's definition of bbaLIBOR™.[253]  In one internal Barclays email, a Barclays employee noted that Lloyds's USD bbaLIBOR™ submission was artificially low.[254]  Similarly, in October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[255]

---

252 In re Citibank, N.A., No. 16-17, at 15 (C.F.T.C. May 25, 2016) (hereinafter "Citi CFTC Order"), attached as Exhibit 11 and incorporated into this Complaint by reference.

253 Nonprosecution Agreement Between U.S. Dep't of Justice, Criminal Div. Fraud Section and Barclays Bank plc, Appendix A, ¶ 37 (June 26, 2012) (hereinafter "Barclays SOF"), attached as Exhibit 12 and incorporated into this Complaint by reference.

254 Email to Pat Leising (Aug. 28, 2007, 11:27), attached as Exhibit 13 and incorporated into this Complaint by reference.

255 Email to Jason Miu (Oct. 3, 2007, 07:34), attached as Exhibit 14 and incorporated into this Complaint by reference.

276.     Barclays' directive to stay "within the pack" with other Bank Defendants remained in place, and was repeated, through October 2011.  Barclays has admitted that its USD bbaLIBOR™ submissions were false because they were lower than what Barclays would otherwise have submitted and contrary to the definition of bbaLIBOR™.[256]

277.     On September 4, 2007, Mr. Bere (Citibank) wrote an internal email to USD bbaLIBOR™ submitter and Citibank representative on the FX & MM Committee, Andrew Thursfield, on which he copied the Global Head of Risk Treasury (who oversaw both Messrs. Bere and Thursfield):  "assuming we aren't adversely impacting our reset risk, I think it may be prudent to show leadership and try to hold line" on Citibank's USD bbaLIBOR™ submissions.  In response, Mr. Thursfield submitted for publication USD bbaLIBOR™ contributions that were the lowest on the panel.

278.     At that same time, Citibank continued its efforts to encourage Barclays to further lower its already suppressed USD bbaLIBOR™ submissions.  Mr. Thursfield asked Mr. Bere if Bere could "somehow get Barclays to lower their rates."  On information and belief, Mr. Bere continued to try to do so.

279.     ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████    Mr. Thursfield submitted for publication a 3-month USD bbaLIBOR™ of 5.60%.

---

256 Barclays SOF, *supra* note 253, at ¶ 36.
███████████████████████████████
████████████████

**C.   The Bank Defendants Suppress USD bbaLIBOR™ By At Least 20-30 Basis Points**

280.    In October 2007, Deutsche Bank's Global Head of GFFX directed Deutsche Bank's USD bbaLIBOR™ submitter (Michael Curtler) to "[m]ake sure our libors are on the low side for all [currencies]."[259]  Members of Deutsche bank's GFFX unit, including members based in New York, knew of this directive and used it to their advantage in trading financial products tied to USD bbaLIBOR™ with counterparties in the United States, including New York and with Freddie Mac in Virginia.

281.    In a 2007 Barclays internal email sent to Mr. Diamond, Mr. del Missier wrote that USD bbaLIBOR™ submissions for all of the Contributor Banks were "fantasy rates."[260]



283.    On November 29, 2007, Miles Storey, Head of Group Balance Sheet at Barclays and a member of the FX & MM Committee, contacted Mr. Ewan at the BBA to advise that USD

---

259 DB NYSDFS CO, *supra* note 77, at ¶ 57.

260 Kit Chellel, *Del Missier Called Libor Rates 'Fantasy' in Diamond E-Mail*, Bloomberg (Mar. 21, 2014), http://www.bloomberg.com/news/articles/2014-03-21/del-missier-called-libor-rates-a-fantasy-in-e-mail-to-diamond.

261 ▮▮▮▮▮▮▮▮▮

"LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the Bank Defendants.[262]  Mr. Storey explained that the Bank Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."[263]  Mr. Storey specifically identified certain other Bank Defendants that were submitting bbaLIBOR™ rates lower than where those banks could actually get funds.

284.    Also on November 29, 2007, the supervisor of Barclays' USD bbaLIBOR™ submitters convened a telephone discussion with the senior Barclays Treasury managers and the USD bbaLIBOR™ submitters (whose identities are known only to Barclays).  The supervisor said if the submitters contributed the rate for a particular tenor at 5.50, which was the rate they believed to be the appropriate submission, Barclays would be twenty basis points above "the pack" and "it's going to cause a shit storm."[264]  The supervisor asked that the issue be taken "upstairs," meaning that it should be discussed among more senior levels of Barclays' management.  Mr. Storey agreed to do so.  The group then decided to set its USD bbaLIBOR™ submissions for the next day at the same level as another bank, a rate of 5.3, which was, again, not at the rate the submitters believed to be appropriate for Barclays.  In an email written by Mr. Storey to an undisclosed list of Barclays executives, Mr. Storey wrote that "senior management" authorized Barclays' USD bbaLIBOR™ submitters to "stick within the bounds" in their submissions, regardless of the bbaLIBOR™ definition.[265]  On information and belief, Mr. del Missier (in New York) was among the senior managers who authorized that directive.

---

262 Barclays SOF, *supra* note 253, at ¶ 43.

263 *Id.*

264 Barclays CFTC Order at 21.  The documents have not been publicly disclosed, nor has Barclays identified the executives who authorized this decision.

265 Barclays CFTC Order at 21.

285.   The next day, both Barclays and Bank of Scotland submitted for publication a 1-month USD bbaLIBOR™ of 5.3.

286.   On November 30, 2007, a representative of Barclays and the FSA had a private discussion.  The Barclays representative internally wrote that he did not disclose to the FSA that "'we're not posting where we think we should.'"[266]  On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that s/he was submitting USD bbaLIBOR™ "lower than s/he would have set if given a 'free hand,'" and that the Bank Defendants, including Barclays, were submitting false and dishonest submissions.[267]



288.

During this time period, New York-based JPMorgan employees also sought to suppress USD bbaLIBOR™.

---

266 Barclays SOF, *supra* note 253, at ¶ 45.

267 *Id.*



289.

290.

---

271 Kovel Decl., *supra* note 241, at ¶ 41.

272 Kovel Decl., *supra* note 241, at ¶ 41 & Table 11 at 22.

274 *See id.*; Kovel Decl., *supra* note 241, at ¶ 44 & Table 14 at 24.

275 Kovel Decl., *supra* note 241, at ¶ 45.

276 Kovel Decl., *supra* note 241, at ¶ 45 & Table 15 at 25.

291.    On March 5, 2008, the FSA asked Barclays what it was paying for funding in certain currencies.[277]  A Barclays manager stated internally that s/he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to bbaLIBOR™.[278]  A Barclays bbaLIBOR™ submitter agreed that if s/he responded with "the honest truth" it might open a "can of worms."[279]  Barclays responded to the FSA that it was paying for one-year USD at bbaLIBOR™ "flat," which was untrue.[280]

292.    

                Following Smith's direction, Citibank's next USD bbaLIBOR™ submissions were in the middle of the pack for 1, 3, and 6 month USD bbaLIBOR™.[283]  The following day, Citibank's USD bbaLIBOR™ submissions were among the lowest for those tenors.[284]

293.    

---

277 Barclays SOF, *supra* note 253, at ¶ 46.

278 *Id.*

279 *Id.*

280 *Id.*

282 *Id.*

283 Submissions by tenor Spreadsheet.

284 Submissions by tenor Spreadsheet.



285 Kovel Decl., *supra* note 241, at ¶ 47.

286 Kovel Decl., *supra* note 241, at ¶ 47.

287 Kovel Decl., *supra* note 241, at ¶ 47 & Table 17 at 27.

289 In re UBS AG, No. 13-09, at 47 (C.F.T.C. Dec. 19, 2012) (emphasis added) (hereinafter "UBS CFTC Order"), attached as Exhibit 15 and incorporated into this Complaint by reference.

███████████████████████████████████████████

███████████████████████████████████████████

296.     On April 11, 2008, a Barclays employee told an employee of the NY Fed that he was aware of Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[291]  The Barclays employee said that Barclays could not borrow money at the rates submitted by other Bank Defendants and that "if we can't borrow money at that rate, then no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage bbaLIBOR™ s will correct themselves."[292]

**D.     Defendants Collectively Seek to Continue Suppression and Maintain bbaLIBOR™'s Credibility and Dominance**

297.     On Wednesday, April 16, 2008, the Wall Street Journal published an article questioning the accuracy of bbaLIBOR™.[293]  The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we

---

290 *See supra* ¶ 262.

291 *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the N.Y. Fed*, Apr. 11, 2008, at 7, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/April_11_2008_ transcript.pdf (hereinafter "*Apr. 11 Barclays and N.Y. Fed Tr.*"), *attachment to* Press Release, Fed. Reserve Bank of N.Y., New York Fed Responds to Congressional Request for Information on Barclays - LIBOR Matter (July 13, 2012), http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html (hereinafter "N.Y. Fed Press Release").

292 *Id.* at 16.

293 Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299.html.

will take action to preserve the reputation and standing in the market of our rates."[294]   The article

states that bbaLIBOR™ was to be on the agenda of an upcoming BBA board meeting.[295]

298.     The article prompted two parallel efforts by the Bank Defendants and the BBA in

order to obscure the fact of suppression and allay concerns about the reliability of USD

bbaLIBOR™.



301.     On April 17, 2008, UBS revised its "err on the low side" directive with a "middle

of the pack" directive.[299]

_____

294 *Id.*

295 *Id.*



299 UBS SOF, *supra* note 145, ¶ 115.

302. Accordingly, USD bbaLIBOR™ rates increased on April 18, 2008 not because of any legitimate fear among the Bank Defendants that the BBA would actually discipline any Contributor Bank for submitting false quotes—the members of the FX & MM Committee had already agreed that they would not impose any such discipline. Instead, the temporary rise in USD bbaLIBOR™ was the result of coordinated action among the Bank Defendants to avoid detection of their unlawful conduct.

303. Second, over the next week, at the direction of the FX & MM Committee the BBA launched what its executives internally described as a "charm offensive,"[300] reaching out to investors and journalists in the United States, and the NY Fed,[301] to dispel concerns about bbaLIBOR™. For example, on April 17, 2008 the BBA told the Wall Street Journal that it would "strictly enforce," the LIBOR rules and expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions.[302] The BBA falsely stated that it did not believe banks had submitted false quotes. The BBA stated that it would fast-track an "intensive review" of its bbaLIBOR™ process, but that it did not believe that Contributor Banks had submitted false quotes.[303]

---

300 Enrich & Colchester, *supra* note 33. Internal notes from the BBA indicate that Mr. Ewan was "dispatched" to New York to "placate investors" and the NY Fed.

301 According to the BBA, from 2005-08, Mr. Ewan met with regulatory authorities in the U.S. to discuss a number of issues relating to LIBOR, including proposed improvements to LIBOR. Following the decision to review LIBOR, Mr. Ewan consulted at length with the NY Fed to provide reassurances about the reliability of bbaLIBOR™. Mr. Ewan held conference calls with the NY Fed on April 15, April 28, and June 2, 2008. On November 4, 2008, Mr. Ewan met with the NY Fed to discuss the LIBOR "governance and scrutiny" review. He met again with the NY Fed in October 2009 to provide updates on LIBOR. Mr. Ewan also met with the Office of the Comptroller of the Currency in March 2008, June 2008, and November 2008. *See Fixing LIBOR; some preliminary findings, Written Evidence, supra* note 38 at 70.

302 UBS SOF, *supra* note 145, at ¶ 114. On information and belief, the BBA electronically communicated that statement to reporters and regulators in New York.

303 Carrick Mollenkamp & Laurence Norman, *British Bankers Group Sets Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833.html.

304. 

305.



306.    On information and belief, the purpose of the "charm offensive" was not to address the fraud and collusion causing USD bbaLIBOR™ depression but rather to create the false impression that the Bank Defendants provided accurate and honest USD bbaLIBOR™ submissions.

307.    In May 2008, the New York Fed stated that "it is difficult to find convincing evidence of actual [LIBOR] misreporting."[312]

308.    During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the bbaLIBOR™ process was being distorted.[313]  Mr. Ewan reportedly told Thomson Reuters that he would investigate its concerns.[314]  There is no public evidence that he did.

309.    In May 2008, the broker ICAP plc announced it intended to create an alternative index of interbank lending rates called the New York Funding Rate ("NYFR").  According to ICAP, the NYFR would be determined by an anonymous survey of at least 24 banks (potentially

---

312 Samuel Cheun & Matt Raskin, MarketSource, Recent Concerns Regarding LIBOR's Credibility 3 (May 20, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/MarketSource_Report_May202008.pdf.

313 Ian Pollock, *Libor: BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC (July 25, 2012), http://www.bbc.co.uk/news/business-18930191.

314 *Id.*

including the Bank Defendants). ICAP would ask participants each morning to estimate the cost of funding for one- and three- month loans to a "representative" bank. NYFR would be calculated using the quotes of the middle half of that group.[315]

310.                 Ms. Knight was later quoted as saying

"[w]e have had contact with ICAP and they have assured us that this is complementary, and in no way were they intending to do something competitive to Libor."[318] The Bank Defendants, and other members of the BBA, were among ICAP's most important customers at the time and thus were well positioned to collusively force ICAP's agreement not to compete with USD LIBOR.[319]

311. At an FX & MM Committee meeting held on May 19, 2008, one Contributor Bank executive stated that any USD LIBOR rival would be problematic because "Only one can

315 Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable,'* Bloomberg (May 14, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio (On file with Plaintiff).

316 ▓▓▓▓▓▓▓▓▓▓

317 ▓▓▓.

318 Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable,'* Bloomberg (May 14, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio (On file with Plaintiff).

319 ICAP, Annual Report 2008, at 3 (2008), *available at* http://www.icap.com/~/media/Files/I/Icap-Corp/Annual%20Reports/annual-report2008.pdf. ICAP obtained 42% of its revenue from brokering interest-rate derivative transactions. *Id.* at 20. It obtained another 37% of its revenue from brokering transactions in foreign exchange rate derivatives, commodities derivatives, and credit derivatives. *Id.* ICAP earned 43% of its revenues from its top 10 customers. ICAP, Morgan Stanley European Financials Conference (Apr. 2, 2009), *available at* http://www.icap.com/investor-relations/reports-and-presentations/~/media/Files/I/Icap-Corp/reports-and-presentations/year-2009-10/morgan-stanley-2009.pdf. Defendants possessed enormous market power in all of these markets.

survive. Therefore, if another rate did surface for fixing in the US then either that would become prominent or die."[320] The Bank Defendants, and other members of the BBA, were among ICAP's most important customers at the time.[321]

312.  On May 19, 2008, the FX & MM Committee met to discuss an internal paper titled 'Evolution of LIBOR' circulated by the BBA to the FX & MM Committee and a research note distributed to Freddie Mac and others by J.P. Morgan Securities Inc., which argued that any criticisms of LIBOR were a reflection of extreme market conditions and not indicative of fatal flaws in LIBOR's construction. The meeting was "confidential" and the BBA refused to admit that it took place.[322] The names of the attendees have not been publicly disclosed, but they included employees of seven Contributor Banks, one of whom attended from an undisclosed location via phone. Senior bank executives described this gathering as a "working level pre meeting" to determine what should happen at the BBA's formal meeting scheduled for May 30, 2008.[323] Contributor Bank executives reportedly decided that they would make no substantive changes to the way bbaLIBOR™ was calculated, but would instead embark on a false and misleading publicity campaign to cover up the truth.[324]

313.  The BBA's notes of the meeting were published by the U.K. Treasury. Those notes disclose that the participants intended to address not only the substance but also the

---

320 *Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 156.

321 ICAP, Annual Report 2008, *supra* note 319.

322 Email from Angela Knight to Paul Tucker (May 21, 2008, 4:40 PM), attached as Exhibit 16 and incorporated into this Complaint by reference. Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

323 Email from Paul Tucker to Michael Cross, Rachel Lomax, Paul Fisher, and John Gleve (May 28, 2008, 4:36 PM) (hereinafter "May 28 Email from Tucker to Cross *et al.*"), attached as Exhibit 17 and incorporated into this Complaint by reference.

324 *Id.*

perception of LIBOR.  The attendees sought to address questions raised by the NY Fed and entities "in America" regarding USD LIBOR.  The attendees on multiple occasions made decisions based on their effect on the "US market" and the need to "manage the Fed's perception on Libor."[325]

314.     The attendees also rejected proposals to add banks located in the United States to the Panel and/or changing the timing of USD LIBOR publication to coincide with the US market opening.  Internally, the attendees said Defendants RBS and HSBC were "in the top ten banks in America" and a number of "Euro domiciled" USD LIBOR Contributor Banks "have US banking licenses and quote on NYSE."[326]  One BBA representative told the attendees that they needed to get "Citi and JP Morgan to back" public statements defending LIBOR's reliability "as they produced the reports" (which were, in fact, published by the United States arms of Defendants Citi and JPMorgan.[327]

315.     

316.     In an internal

---

325 *See, e.g. Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 158.

326 *Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 159.

327 *Id.*
; *Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 158.

communication, the Citibank submitter for Citibank wrote that he got calls from Smith, "in New York," who stated, "'[y]eah, why are you posting high LIBORs?'"[330]  Smith was functionally the USD LIBOR submitter's superior.  The submitter's note, along with the documents discussed above, show that Citibank executives in New York concerned about Citibank's reputation in New York directed the unlawful suppression of its USD LIBOR submissions.  Throughout this time period, Citibank expressly recognized a link between its individual LIBOR submissions and the price it would have to pay for cash in the United States.

317.  On May 29, 2008, the Wall Street Journal published another article questioning USD bbaLIBOR™ submissions made by Citigroup, WestLB, HBOS, JPMorgan, UBS, and other Bank Defendants.[331]  Numerous Bank Defendants disputed the Wall Street Journal's analysis.[332]  Consistent with the Bank Defendants' desire to get Citi and JPMorgan to promote the reliability of USD LIBOR, the head of global fixed-income strategy at JPMorgan published a Research Note which asserted that the Wall Street Journal's methodology was flawed because it was "based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank borrowing costs."[333]  On May 16, 2008, multiple individuals from JPMorgan Securities sent this Research Note directly to Freddie Mac in Virginia.  A Citigroup spokesman said, "We

---

330 Citi CFTC Order, *supra* note 252, at 16.

331 Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135.html.  The article also stated as follows: "The Journal's analysis doesn't prove that banks are lying or manipulating Libor.  Analysts offer various reasons why some banks might report Libor rates lower than what other markets indicate."  *Id.*

332 WestLB told the Wall Street Journal it "provides accurate data."  *Id.*  Citigroup said "We continue to submit our Libor rates at levels that accurately reflect our perception of the market."  *Id.*  HBOS said its submissions were a "genuine and realistic" indication of its borrowing costs.  *Id.*

333 *Id.*

continue to submit our LIBOR rates at levels that accurately reflect our perception of the market."[334]  WestLB insisted that it provided accurate data.[335]

318.     An HBOS spokesman said in late May 2008, "We believe our Libor fixings are a genuine and realistic indication of our average cost of funding.  Our postings are on the whole in line with the market."[336]  Defendant HBOS has since admitted in connection with its settlement with government regulators that, just weeks before the HBOS spokesman's announcement, an HBOS senior manager wrote an internal email admitting that the Bank Defendants were effectively required to coordinate because "no bank can be seen to be an outlier," including HBOS.[337]  HBOS' public statement in late May 2008 appears to have been an intentional misrepresentation.

319.     These pretextual explanations and/or denials were materially false and intended to conceal the fact that the Bank Defendants were fraudulently and collusively depressing USD bbaLIBOR™.  As set forth more fully below, many published reports also attributed movements in bbaLIBOR™ rates to factors other than the fraud and collusion alleged in this Complaint.[338]

---

334 John Parry et al., *Banks May Be Understating Key Lending Rate: Report*, Reuters (May 29, 2008), http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

335 *Id.*

336 *Id.*

337 Lloyds CFTC Order, *supra* note 108, at 14.

338 *See, e.g.*, Int'l Monetary Fund, Global Financial Stability Report:  Financial Stress and Deleveraging 72 (Oct. 2008), *available at* http://www.imf.org/External/Pubs/FT/GFSR/2008/02/pdf/chap2.pdf  (concluding in October 2008 that the "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding"); Gillian Tett & Michael Mackenzie, *Debate Over Libor Breeds a Crisis of Confidence*, Fin. Times, Apr. 28, 2012, http://www.ft.com/cms/s/0/240c311a-1004-11dd-8871-0000779fd2ac.html#axzz3Dm3mmPpK (On file with Plaintiff)("It seems unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down."); *Update 2-European, U.S. Bankers Work on Libor Problems*, Reuters (May 16, 2008), http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516 ("There's more wind being made about [the Libor] issue than is being merited by the facts . . . Libor will retain its present function for the foreseeable future . . . . Due to capital pressures not seen for decades[,] . . . Libor rates . . . are historically high." (internal quotation marks omitted)).

320.     In another article published on May 29, 2008, the BBA insisted: "We have every confidence in the integrity of the LIBOR-setting process and the accuracy of the figures it produces."[339]  The BBA knowingly issued a false statement because it knew that the Bank Defendants had been submitting false and dishonest rates, and that the BBA had helped to coordinate the Bank Defendants' unlawful agreements.[340]

321.     After its formal meeting on May 30, 2008, the BBA publicly announced that it would be strengthening the oversight of bbaLIBOR™ and that "the details will be published in due course."[341]  CGMI reported news of the committee's forthcoming plan for heightened oversight to Freddie Mac.

322.     In an email dated May 28, 2008, to Barclays CEO Robert Diamond, the Bank of England's Paul Tucker wrote: "I have spoken to hsbc and rbs, stuart and johnny.  Sense similar across all three of you.  I encouraged contact amongst Mark Dearlove peer group."[342]  In a separate email, Mr. Tucker wrote that Robert Diamond was joined by Barclays' group treasurer in the conversation[343] and RBS's Johnny Cameron was joined by RBS' group treasurer in their conversation.  Mr. Tucker wrote that he encouraged Messrs. Diamond, Cameron, and Gulliver to ensure that their respective group treasurers "talk to each other" about USD bbaLIBOR™

---

339 Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.

340 *Id.*; Mollenkamp & Whitehouse, *supra* note 331 (As with its April 2008 article, the Wall Street Journal cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor.").

341 *International:  Libor Process*, N.Y. Times, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html (last visited Oct. 1, 2014).

342 Email from Paul Tucker (May 28, 2008, 11:24 AM), attached as Exhibit 18 and incorporated into this Complaint by reference.  The references to "stuart" and "johnny" were to HSBC Global Banking head Stuart Gulliver and RBS chairman Johnny Cameron.  Mr. Dearlove was Barclays' head of money markets at the time.

343 As alleged above, Jonathon Stone (who met with Freddie Mac to solicit business) was Barclays' Head of Group Treasury during the Conduct Period.

suppression.[344]  On information and belief, through at least these individuals, Barclays, HSBC,

and RBS engaged in communications to systematically suppress USD bbaLIBOR™.  During this

same time period, Mr. Tucker spoke on several occasions with Ms. Knight of the BBA about

USD LIBOR suppression and, on information and belief, his communications with Messrs.

Diamond, Cameron, and Gulliver.[345]  Ms. Knight wrote that she had spoken with the CEOs of

several (undisclosed) Bank Defendants about USD LIBOR suppression and made them all sign

confidentiality agreements.

   323. The unidentified attendees at the May 30, 2008 BBA meeting signed

confidentiality agreements limiting their ability to disclose what was discussed.[346]  In fact, on

information and belief, the Defendants intended only to make minor cosmetic changes to the

bbaLIBOR™ process.  The BBA shared its proposed changes with the Bank of England, which

internally concluded that the BBA's proposal was "wholly inadequate."[347]

   324. On June 2, 2008, Ms. Knight reached out to the NY Fed to falsely assure the NY

Fed that the BBA was undertaking serious efforts to prevent USD LIBOR suppression.

   <span style="background:black">    </span>On June 10, 2008, the BBA issued a press statement[348] asserting that Contributor

Banks "are invariably those with the best credit ratings and in the current diminished credit

capacity of the market it is therefore not surprising that some institutions will not be able to

---

344 May 28 Email from Tucker to Cross *et al.*, *supra* note 323.

345 *See, e.g.*, Email from Angela Knight to Paul Tucker (May 31, 2008, 4:09 PM), attached as Exhibit 19 and incorporated into this Complaint by reference.

346 *Id.*

347 Transcript of Governor's written comments, Email to Governors—GPS (May 30, 2008, 19:06), attached as Exhibit 20 and incorporated into this Complaint by reference.

348 The BBA's Brian Mairs emailed the press release and accompanying materials directly to the Wall Street Journal.  The BBA appeared to routinely email news releases and information to the Wall Street Journal.

access funds at the LIBOR rate."[349]  The BBA statement claimed that it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.  In fact, on information and belief, the BBA's statement was false and Defendants did not intend to employ a tight scrutiny mechanism but, rather, intended to allow the Bank Defendants to continue to fraudulently and collusively depress USD bbaLIBOR™.  In an internal UBS chat on June 1, 2008, UBS ALM manager Mr. Lasala told USD STIR trader Julie Doherty that UBS "will start lowering [USD bbaLIBOR™] over the next few days to get to more or less middle of the pack until further notice." ███████████████████

███████████████████████████████

326.    The BBA sent the June 10, 2008 statement directly to the Wall Street Journal along with a "consultative paper" titled "Understanding the construction and operation of BBA LIBOR – strengthening for the future."[351]  The consultative paper stated that it "represents the views" of the FX&MM Committee.  It purported to "correct a number of misunderstandings and misperceptions" about LIBOR, including assertions that "[d]ifferences between London Euro Dollar rate and domestic US Dollar rates are a reflection of existing market conditions, not necessarily a distortion in benchmarks," "[r]elevant authorities" expressed support for LIBOR, and "[t]he BBA has contacted all contributors to ensure that their submissions to the rate setting process are fully compliant with the procedures as laid out by the FX & MM Committee."[352]

327.    In August 2008, the FX & MM Committee considered a number of proposals from the public to improve bbaLIBOR™'s reliability and accuracy.  One proposal, documented

---

349 *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 188, at 1.

████████████████████

351 *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 188.

352 *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 188.

in an internal memo, called for the "anonymization" of individual bbaLIBOR™ submissions to respond to suggestions in certain research reports that Contributor Banks may be understating their true funding costs or exhibiting "pack behaviour" as in the current strained market, indicating funding costs out of line with the market invites scrutiny and speculation in the media. The FX & MM Committee conceded that anonymization "solves this problem" by encouraging Contributor Banks to submit "their 'true' rates" and "removes immediately the problem of accusations" that banks were submitting for publication artificially low bbaLIBOR™s.[353] Nevertheless, the FX & MM Committee unanimously agreed to reject the proposal and continue publishing their individual contributions.

328.    On August 5, 2008, the BBA represented that Contributor Banks which had responded to the BBA's request for consultation were "confident" that their submitted rates were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark, with contributors inputting rates that they believe reflect their future funding costs."[354] The FX & MM Committee stated that, based on its supposed independent review of responses and investigation, it "believes that current submissions are accurate." On information and belief, by this statement Defendants further sought to falsely portray the bbaLIBOR™ "dislocations" as the product of market forces and not fraud and collusion.

329.    According to the CFTC, however, internal documents from Lloyds have revealed that on August 8, 2008, one of HBOS's senior managers internally circulated a presentation that said, among other things, "As a bank we must be extremely careful about the rates we pay in

---

353 *Fixing LIBOR: some preliminary findings, Written Evidence, supra* note 38 at 140.

354 BBA, Libor Consultation Feedback Statement ¶¶ 3.14, 3.19 (Aug. 5, 2008), attached as Exhibit 21 and incorporated into this Complaint by reference.

different markets for different types of funds as paying too much risks not only causing a re-pricing of all short-term borrowings but, more importantly in this climate, may give the impression of HBOS being a desperate borrower and so lead to a general withdrawal of wholesale lines."[355]   HBOS submitters knew at least by that time, that its bbaLIBOR™ submissions had to be coordinated with other Bank Defendants, notwithstanding the bbaLIBOR™ rules.

330.    According to a Wall Street Journal article, Ms. Knight told regulators in April 2008 that bbaLIBOR™ had become too big to manage, but BBA's member banks "clung to control of Libor."[356]   After November 2008, BBA staffers pitched the idea of selling bbaLIBOR™ or spinning it off into a wholly independent entity.[357]   According to the Wall Street Journal article, the BBA in late 2008 drew up plans to license bbaLIBOR™ to an independent third party that would pay a fee to administer the rate instead of the BBA.   But when BBA staffers pitched the idea to the Bank Defendant executives, they reportedly understood that the Bank Defendants—which paid many of the BBA's bills through their membership fees—wanted bbaLIBOR™ kept in-house so that they could continue to influence it.[358]   As a result, the idea ultimately was abandoned.

331.    Ms. Knight, then head of the BBA, was heard to argue with Mr. Ewan about bbaLIBOR™.[359]   Ms. Knight reportedly wanted to scale back the BBA's role and took the

---

355 Lloyds CFTC Order, *supra* note 108, at 14.

356 Enrich & Colchester, *supra* note 33.

357 *Id.*

358 Enrich & Colchester, *supra* note 33.

359 *Id.*

position that bbaLIBOR™ had become too big for her organization to manage.[360]  Mr. Ewan, on the other hand, reportedly advocated further expansion, touting the revenue that the BBA generated from bbaLIBOR™.[361]  According to the BBA, bbaLIBOR™ earned more than £1.8 million and £1.7 million in 2011 and 2012, respectively, in licensing fees.[362]



360 *Id.*

361 *Id.*

362 BBA, Audited Consolidated Financial Statements Year Ended 31 December 2012, at 13 (2012), *available at* https://www.bba.org.uk/wp-content/uploads/2014/01/BBA_2012_Financials.pdf.

363
364

334.   Yet in September 2008, an internal UBS discussion confirmed that the Bank Defendants were continuing to make artificially low bbaLIBOR™ submissions. In a documented discussion, a UBS employee admitted that, "LIBORs currently are even more fictitious than usual."[365] On September 18, 2008, Lloyds announced the terms of an offer to acquire HBOS. In late September, HBOS' USD bbaLIBOR™ submitter increased its submissions to more closely align with the published bbaLIBOR™ rules. On September 26, 2008, the submitter's supervisor told the submitter that HBOS USD bbaLIBOR™ submissions should be lower relative to other panel members.

335.   Throughout this time, HBOS management also directed employees not to make bids for cash in the wholesale funding market above the rate of the daily bbaLIBOR™ rate. This instruction reinforced the supervisor's prior direction that HBOS should not be an outlier in the bbaLIBOR™ submissions, regardless of the published bbaLIBOR™ rules.

336.   Likewise, it has been reported that RBS was having trouble persuading wholesale funders, including the Bank Defendants, to lend it cash for more than 24 hours due to RBS' precarious financial position.[366] The head of treasury of one major U.K. bank was quoted as saying that it had concerns that there was "something going horribly wrong" with RBS.[367] These events led to a "silent run" on RBS and HBOS as large investors sought to withdraw cash which, in turn, increased the need for RBS and HBOS to access cash through interbank loans and sale of assets (such as their portfolio of U.S.-backed MBS).[368]

---

[365] UBS SOF, *supra* note 148, at ¶ 98.

[366] Ian Fraser, *Shredded: Inside RBS, the Bank that Broke Britain* 323-324, 355-356, 361-362, 367 (2014).

[367] Fraser, *supra* note 366, at 356.

[368] *Id.* at 356, 371-372.

337.    On October 10, 2008, a Barclays employee privately reported to the New York

Fed that its USD bbaLIBOR™ submissions were "unrealistic."[369]  An October 17, 2008 email

from a Rabobank bbaLIBOR™ submitter stated, "we are now setting all libors [sic] significantly

under the market levels."[370]

338.    On October 15, 2008, an unidentified Citibank USD bbaLIBOR™ submitter

wrote that "off the record, we are not allowed to be the highest" USD bbaLIBOR™

contributor.[371]  Citibank's Mr. Thursfield, who oversaw Citibank's USD bbaLIBOR™

submitters in London, has submitted an affidavit saying that he was unaware of any Citibank

directive to manipulate USD bbaLIBOR™.  ███████████████████████

████████████████████████████████████

████████████████████████████████████

███████████[372]

339.    On October 24, 2008, a Barclays employee privately reported to the NY Fed that

USD bbaLIBOR™ rates were "absolute rubbish,"[373] citing submissions by WestLB and

Deutsche Bank as being too low.  The employee told the NY Fed that he was aware of banks that

---

369 *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*,
Oct. 10, 2008, at BARC-MAY6-000095, *available at*
https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/October_10_2008_transcript.
pdf, *attachment to* N.Y. Fed Press Release, *supra* note 291.

370 *United States v. Cooperative Centrale Raiffeisen Boerenleenbank, B.A.*, Deferred Prosecution Agreement,
Attachment A, Statement of Facts (Oct. 29, 2013) ¶ 40, *available at* http://www.justice.gov/iso/opa/resources/
645201310298755805528.pdf (hereinafter "Rabobank SOF"), attached as Exhibit 22 and incorporated into this
Complaint by reference.

371 Citi CFTC Order at 18.

372 *See supra* ¶¶ 277, 278, 292, 316.

373 *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*,
Oct. 24, 2008, at 000098, *available at*  http://www.newyorkfed.org/newsevents/news/markets/2012/libor/
October_24_2008_transcript.pdf, *attachment to* N.Y. Fed Press Release, *supra* note 291.

were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[374] Publicly, however, Barclays and other Bank Defendants continued to falsely represent that bbaLIBOR™ was based on accurate and honest submissions.[375]

340.    On October 29, 2008, a member of the Bank of England telephoned Mr. Diamond to discuss Barclays's USD bbaLIBOR™ submissions.[376] At the time, Mr. Diamond was located in New York.[377] After his call with the Bank of England, Mr. Diamond telephoned his next in command, Mr. del Missier.[378] Mr. del Missier interpreted Mr. Diamond's call as an instruction to artificially suppress Barclays' USD bbaLIBOR™ submissions.[379] Mr. Del Missier relayed that instruction to Barclays' USD bbaLIBOR™ submitters who obeyed the instruction.[380]

---

374 *Id.* at 000100.

375 Public disclosures reveal that certain derivatives traders employed by the Bank Defendants routinely asked their bbaLIBOR™ submitters to provide false and dishonest bbaLIBOR™ submissions to the BBA. *See* UBS SOF, *supra* note 145, at ¶ 19; Barclays SOF, *supra* note 253, at ¶ 11; RBS SOF, *supra* note 126, ¶ 14. The bbaLIBOR™ submitters for these Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable bbaLIBOR™ submissions on hundreds, and perhaps thousands, of occasions. Barclays SOF, *supra* note 253, at ¶ 11; UBS SOF, *supra* note 145, at ¶ 20; RBS SOF, *supra* note 126, at ¶¶ 14-15. Over a period of years, a culture of collusion developed that ultimately led to Defendants' systematic bbaLIBOR™ depression discussed above. *See, e.g.,* Editors, *Libor Gives Prosecutors Chance to Change Banking Culture,* Bloomberg (Sept. 24, 2012), http://www.bloomberg.com/news/2012-09-24/libor-gives-prosecutors-chance-to-change-banking-culture.html. Through coordination with Bank Defendants, on information and belief, these traders improved their efforts to fraudulently and collusively manipulate bbaLIBOR™. *See* Barclays SOF, *supra* note 253, at ¶¶ 23-24. Defendants Barclays, UBS, RBS, Rabobank, Lloyds, and HBOS all admit that they submitted false and misleading bbaLIBOR™ submissions to the BBA, and that the bbaLIBOR™ fixings published by and through the BBA were materially false and misleading. Barclays SOF, *supra* note 253, at ¶ 33; RBS SOF, *supra* note 126, at ¶ 81; UBS SOF, *supra* note 145, at ¶ 97. On information and belief, other Panel Defendant Banks engaged in the same type of conduct that Barclays, UBS, and RBS have admitted occurred.

376 U.K. House of Commons Treasury Comm., *Fixing LIBOR, supra* note 193, at 9 (Supplementary information regarding Barclays settlement with the Authorities in respect of their investigations into the submission of various interbank offered rates)

377 In September 2008, Mr. Diamond moved to New York and worked out of Barclays's New York offices through the end of the Conduct Period.

378 *Id.*

379 *Id.*

380 *Id.*

341. 

342.   The conspiracy to depress bbaLIBOR™ superseded the prior and ongoing efforts of individual traders to manipulate bbaLIBOR™ to benefit their individual trading positions.[383] For example, UBS management on several occasions received requests from individual traders to deviate slightly from the systematic depression to manipulate a particular submission for Japanese Yen bbaLIBOR™ on a given day.[384]   On information and belief, those requests were rejected and/or did not prevent USD bbaLIBOR™ depression.

343.

---

382 Kovel Decl., *supra* note 241, at ¶ 72 & Table 29 at 43.

383 UBS SOF, *supra* note 145, at ¶¶ 132-133.

384 *Id.*

███████████████████████████████████

████████

344.     From June 2009 through May 2010, the spread between USD bbaLIBOR™ and the Eurodollar Rate gradually shrank (as shown in Figure 5) from more than 50 basis points to only a few basis points.

345.     In November 2009, RBS's Mr. Smith sent a Bloomberg message to individuals at RBS, Bank of America, RBC, Deutsche Bank, Rabobank BTMU, JPMorgan, UBS, and Portigon stating: "███████████████████████." At the time, 3-month USD bbaLIBOR™ was some 40 basis points lower than the Eurodollar Rate. The recipients of this message included USD bbaLIBOR™ submitters at RBS, Citibank.

### E.     Renewed Efforts to Suppress USD bbaLIBOR™ in May 2010 Lasted Through October 2011

346.     In an April 22, 2010 internal communication, one of Société Générale's USD LIBOR submitters stated that "LIBOR is extremely manipulated."

347.     In or about May 20, 2010, Société Générale's Global Head of Treasury, Danielle Sindzingre met with members of Société Générale's General Directorate [Board of Directors]—whose names are not yet publicly known—to discuss news reports about Société Générale 's financial condition and how Société Générale 's USD bbaLIBOR™ submissions harmed Société Générale 's reputation for financial soundness because those submissions were near the top of the pack of USD bbaLIBOR™ submissions. Ms. Sindzingre and the General Directorate agreed in that meeting that Société Générale should artificially suppress its USD bbaLIBOR™ submissions.

---

385 █████████████████████████

386 ████████████████████

348.     On May 21, 2010, Ms. Sindzingre sent an email to her subordinate, Muriel

Bescond, and several other Société Générale employees, whose names are not yet publicly

known, directing Société Générale USD bbaLIBOR™ submitters to suppress USD

bbaLIBOR™.  The purpose of the directive was, among other things, to make it appear to

investors in the United States, through the publication of its artificially suppressed rates, that

Société Générale was able to borrow money at lower interest rates than it actually could.  The Head

of Treasury for Société Générale stated that USD LIBOR was "a total charade."

349.     From May 2010 through October 2011, Bank Defendants Citibank, Deutsche

Bank, HSBC, JPMorgan, UBS, Bank of America, and Lloyds consistently submitted lower USD

bbaLIBOR™ rates than Société Générale's artificially low submissions.  Other Bank Defendants

were consistently within the same range as Société Générale's artificially low submissions.  All

Bank Defendants submitted individual contributions that were lower than the Eurodollar rate (a

proxy for what USD bbaLIBOR™ would have been but for the unlawful conduct).

350.     Société Générale's default insurance rates (as measured by credit default swap

("CDS") prices) were almost identical to the average CDS rates for all Contributor Banks in

May, which indicates that they were all perceived to present the same credit risk as Société

Générale.  Contemporaneous with the Société Générale directive described above , the spread

between USD bbaLIBOR™ and the Eurodollar rate (a proxy for what USD bbaLIBOR™ would

have been but for the unlawful conduct) increased sharply in late May 2010.  These data confirm

that all the Bank Defendants submitted artificially low USD bbaLIBOR™ contributions in late

May 2010.

351.     On March 15, 2011, UBS disclosed in a note to its Annual Report that it had

received subpoenas from the CFTC and the DOJ in connection with investigations into

bbaLIBOR™.  That same month, Lloyds attested to the FCA that its systems and controls for its bbaLIBOR™ submissions were adequate.  That attestation was false.

352.     In September 2011, an internal Société Générale communication stated that "all our competitors" were suppressing USD bbaLIBOR™.

353.     Société Générale 's directive to suppress USD bbaLIBOR™ continued through October 2011.  The other Bank Defendants systematically suppressed their USD bbaLIBOR™ contributions during that same time.  The spread between USD bbaLIBOR™ and the Eurodollar Rate reached zero in October 2011.

### F.     Harmful Effects of the Unlawful Conduct

354.     By submitting and publishing interbank lending rates that were determined by collusion rather than competition, the Bank Defendants interfered with the competitive process in the markets for short-term wholesale funding, USD interest-rate benchmarks, USD interest-rate derivatives, floating-rate loans to businesses and consumers ("retail loans"), floating-rate MBS, and other products that incorporated USD bbaLIBOR™.

355.     When they do not collude, banks compete for cash based on the interest rates that they pay.[387]  As noted above, the interest rate that a borrower is willing to pay, and a lender is willing to accept, is determined in large part by the borrower's credit standing and liquidity.  In a competitive environment, less creditworthy banks are incentivized to become more efficient and shed risk to compete more effectively.[388]  For example, in 2007 and 2008, absent collusion, Barclays should have responded to concerns about its credit risk and liquidity by competing on

---

387 See e.g., Citigroup, Citi Annual Report 2009, at 262 (2009), *available at* http://www.citigroup.com/citi/fin/data/ ar09c_en.pdf (Citigroup "actively competes for access to capital at competitive rates to fund its operations, including competition for deposits and funding in the short- and long-term debt markets.").

388 Xavier Freixas et al., Fed. Reserve Bank of N.Y. Staff Reports, Bank Liquidity, Interbank Markets, and Monetary Policy (May 2009) (revised Sep. 2009), *available at* http://www.newyorkfed.org/research/staff_reports/ sr371.pdf.

the merits to improve its balance sheet, and not entering into a secret agreement with other Bank Defendants to hide their respective financials, abilities to obtain funds, and the interest rates they had to pay to obtain those funds. This fraud and collusion are precisely what the antitrust laws are designed to prevent.

356.    In addition, Defendants' fraudulent and collusive conduct artificially biased the competitive process for USD interest-rate derivatives and floating-rate MBS in favor of the Bank Defendants. As shown above, prices for OTC USD interest-rate derivatives and floating-rate MBS were set based on the expectation that Defendants would determine USD bbaLIBOR™ according to the published rules and governance mechanisms. By secretly agreeing to depress USD bbaLIBOR™, the Bank Defendants obtained a competitive advantage over their counterparties that artificially inflated the margins that the Bank Defendants would earn in transactions for USD pay-fixed interest-rate swaps and floating-rate MBS.

357.    Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™. From at least 1992, USD bbaLIBOR™ was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board from 2002-2006.[389] Eurodollars are time deposits in USD held in commercial banks outside the United States, primarily London. Eurodollar futures contracts, based on a notional $1 million three-month deposit, are traded on the CME.[390]

358.    In other words, prior to Defendants' fraud and collusion, a Eurodollar futures contract provided an estimate of USD bbaLIBOR™ in the future for the given maturity. The

---

389 *Ask Dr. Econ*, Fed. Res. Bank of S.F. (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

390 Barclays SOF, *supra* note 253, at ¶ 9.

Eurodollar Bid Rate represents the interest rate at which a bank would offer to lend money to another bank, while bbaLIBOR™ can be seen as the rate at which a Contributor Bank would ask to pay.[391] As a result, one would expect to see a small bid (Eurodollar)/ask (bbaLIBOR™) spread as reflected in the relationship that existed from 1992 through 2006.[392] From 1992 through 2007, the Eurodollar Bid Rate reportedly was a better predictor than bbaLIBOR™ rates of the following day's bbaLIBOR™ rates.[393]

359.    The relationship between the Eurodollar Bid Rate and bbaLIBOR™ fundamentally changed in the summer of 2007, with bbaLIBOR™ rates falling below the Eurodollar Bid Rate, sometimes dramatically, through late 2011.  These data confirm that the Bank Defendants' behavior changed in 2007 with regard to USD bbaLIBOR™ submissions at the same time that UBS, Barclays, RBS, and (on information and belief) other Bank Defendants secretly adopted policies to depress bbaLIBOR™ and maintain submitted rates within a narrow range.  From August 2007 through October 2011, every one of the Bank Defendants submitted USD bbaLIBOR™ submissions that were significantly lower than the Eurodollar Bid Rate. Defendants artificially depressed USD bbaLIBOR™ from August 8, 2007 through October 1, 2011.  Figure 5:  Difference Between 3M USD bbaLIBOR and 3M Eurodollar Bid Rate

---

391 Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* at 3, 7 (Apr. 10, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

392 *Id.* at 7.

393 *Id.* at 8.



360.    On a Defendant-by-Defendant basis, the average USD bbaLIBOR™/Eurodollar

Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to

35 basis points (JPMorgan, WestLB).[394]  Notably, there appears to be no distinction between the

Bank Defendants that have admitted submitting artificially depressed USD bbaLIBOR™s and

those that have not yet done so.  Barclays submissions were at the high end of the range at an

average 25 basis points spread, UBS and HBOS were in the middle with an average 29 basis

points spread.

361.    Similarly, focusing only on the last two weeks of September 2008, the average

USD bbaLIBOR™/Eurodollar Bid Rate spread generally ranged from 110 basis points (HBOS)

to 153 basis points (JPMorgan).[395]  The outlier was Barclays (87 bp), which has admitted that it

consistently submitted artificially low bbaLIBOR™ rates.  Similarly, the next highest

---

394 The remaining Bank Defendants are: RBC (26 bp), RBS (26 bp), Bank of America (30 bp), Credit Suisse (27 bp), HBOS (29 bp), UBS (29 bp), Lloyds (30 bp), Deutsche Bank (31 bp), Citigroup (32 bp), HSBC (32 bp), and Rabobank (32 bp).

395 The remaining Bank Defendants are: BTMU (120 bp), Bank of America (144 bp), Citigroup (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

submissions were provided by HBOS, which has also admitted to depressing bbaLIBOR™. The fact that these two Bank Defendants were at the high end of bbaLIBOR™ submissions confirms that the other Bank Defendants were all submitting artificially depressed rates at the time.

362.     The individual participants in the fraudulent and collusive conduct described in this Complaint would not have engaged in the conduct, which carries the potential for criminal penalties, absent a reasonable belief that the misconduct actually influenced the USD bbaLIBOR™ fixings.

363.     By collusively depressing USD bbaLIBOR™, Defendants distorted prices in the markets for financial products that incorporated interest-rate benchmarks (e.g. pay-fixed swaps and floating-rate MBS), and diminished the quality of financial products that incorporated interest-rate benchmarks.  The Unlawful Agreements also limited the choice of interest-rate benchmarks available to non-conspirators that negotiated for OTC interest-rate derivatives, floating-rate retail loans, and floating-rate MBS purchasers.  As the EC recently wrote:  "In order for users of benchmarks to make appropriate choices of, and understand the risks of, benchmarks, they need to know what the benchmark measures and their vulnerabilities."[396]

364.     The Bank Defendants falsely purported to fully compete in all of these financial product markets.  Further, to the extent that Defendants used false and dishonest USD bbaLIBOR™ submissions to inflate their apparent creditworthiness and their respective reputations, they artificially increased their ability to charge higher underwriting fees and obtain higher offering prices for financial products to the detriment of Freddie Mac and other consumers.

---

[396] EC Proposal, *supra* note 156, at 16.

365.     Freddie Mac engaged in numerous financial transactions with Bank Defendants and others involving products that incorporated USD bbaLIBOR™.  For example, Freddie Mac engaged in thousands of pay-fixed swaps and held billions of dollars in floating-rate MBS that paid monthly coupons tied directly to USD bbaLIBOR™.  Freddie Mac reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding USD pay-fixed interest-rate swaps and floating-rate MBS.  As a direct and proximate result of Defendants' unlawful conduct as described in this Complaint, and as will become clearer when information known only to Defendants is disclosed in discovery, Freddie Mac has been injured in its business and property and has suffered damages in an amount presently undetermined.

### G.     Barclays Admissions

366.     On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ.  As part of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the non-prosecution agreement.  Barclays further received conditional leniency from the DOJ's Antitrust Division for potential Sherman Act violations involving financial instruments that reference Euribor.  Barclays also entered into a settlement with the CFTC to resolve charges that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[397]

367.     According to these filings, Barclays through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD bbaLIBOR™ and other currencies.  More specifically, Barclays admitted that by falsely representing that its bbaLIBOR™ submissions were based on its perceived costs of borrowing

---

397 *See* Barclays SOF, *supra* note 253.

370.     In December 2012, UBS Securities Japan Co., Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343)[402] for secretly manipulating Yen bbaLIBOR™ and TIBOR.  UBSSJ admitted in its plea that false and misleading bbaLIBOR™ submissions were "material" from the perspective of counterparties to financial transactions.[403]

371.     In December 2012, the DOJ charged two former UBS traders—Tom Hayes and Roger Darin (collectively, the "UBS traders")—with wire fraud and conspiracy to commit wire fraud for secretly manipulating bbaLIBOR™ and other benchmark rates.[404]  In addition, the DOJ charged the UBS traders with a violation of Section 1 of the Sherman Act for conspiring with an unidentified employee at a major financial institution and others to fix Yen bbaLIBOR™, a key price component of Yen bbaLIBOR™-based derivative products.[405]

372.     On December 19, 2012, UBS and UBSSJ entered into a settlement with the CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7 U.S.C. §§ 9, 13b, and 13(a)(2).[406]  According to the CFTC's findings, from at least January 2005 through 2011, UBS by and through acts of dozens of employees, officers, and agents located around the world, engaged in systematic misconduct that undermined the integrity of certain global benchmarks, including USD bbaLIBOR™.  UBS admitted that its false submissions contained market information that affected or tended to affect USD bbaLIBOR™, and USD bbaLIBOR™ was a commodity in interstate commerce.[407]  Further, UBS continued its "rampant

---

402 UBS SOF, *supra* note 145, at Appendix B.

403 *Id.* at Appendix B, Ex. 3 ¶¶ 9-10, Ex. 4 ¶ 75.

404 Compl. at 1-2, *United States of America v. Alexander, et al.*, No. 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012), attached as Exhibit 24 and incorporated into this Complaint by reference.

405 *Id.* at 3.

406 UBS CFTC Order, *supra* note 289.

407 *Id.* at 4, 41, 52-53.

misconduct," including collusive conduct, long after it was on notice (in October 2008) of an investigation into its USD bbaLIBOR™ practices.[408]

### I.   RBS Admissions

373.   On February 5, 2013, RBS executed a Deferred Prosecution Agreement with the DOJ.[409]  Under the terms of that agreement, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to bbaLIBOR™ submissions.  The United States filed a two-count criminal information charging RBS with wire fraud and price fixing in connection with RBS' conduct and agreed to defer prosecution of that case pursuant to its agreement with RBS.[410]  In addition, RBS Securities Japan Ltd. pleaded guilty to one count of wire fraud for its participation in fraudulent and collusive practices relating primarily to Yen bbaLIBOR™.[411]

### J.   Rabobank Admissions

374.   On October 29, 2013, Rabobank settled bbaLIBOR™ investigations by the DOJ, CFTC, FSA and Dutch authorities.  Rabobank admitted to the CFTC that its manipulation of USD bbaLIBOR™, Pound Sterling bbaLIBOR™, Yen bbaLIBOR™ and EURIBOR violated the CEA and it paid a $475 million fine.[412]  Rabobank also entered into a deferred prosecution agreement with the Criminal Fraud Section of the DOJ to resolve charges of wire fraud based on

---

408 *Id.* at 5.

409 The agreements reached between (a) the United States and Barclays, (b) the United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation into misconduct for additional benchmark rates.  The United States has declined to reveal those benchmark rates.  On information and belief, USD bbaLIBOR™ is among the interest rates under investigation by the United States.

410 *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, ¶¶ 1-2 (Feb. 5, 2013).

411 *Id.* ¶ 3.

412 *In re Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.*, No. 14-02 (C.F.T.C. Oct. 29, 2013), attached as Exhibit 25 and incorporated into this Complaint by reference.

the manipulation of bbaLIBOR™ and EURIBOR and paid a $235 million fine. As part of the settlements, Rabobank admitted that more than two dozen of its traders, including its Global Head of Liquidity and Finance, participated in ongoing and pervasive manipulation of USD and Yen bbaLIBOR™ to favor its day-to-day trading positions.[413]

375.    According to these filings, Rabobank, through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD bbaLIBOR™ and other currencies. More specifically, Rabobank admitted that by falsely representing its bbaLIBOR™ submissions, it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Rabobank's bbaLIBOR™ submissions were false or misleading.[414]

### K.    Lloyds and HBOS Admissions

376.    On July 28, 2014, the FCA fined Lloyds and HBOS for colluding to manipulate USD, GBP, and JPY bbaLIBOR™, as well as the GBP repo rate. With regard to GBP and USD bbaLIBOR™, the FCA found that traders at Lloyds and HBOS had conversations and communications with other Contributor Banks to manipulate GBP and USD bbaLIBOR™ for profit on derivative transactions.

377.    From August 2007 through February 6, 2009, employees on the money-markets desks of Bank of Scotland and Lloyds Bank plc (as LTSB) were responsible for (1) contributing USD bbaLIBOR™ submissions and (2) entering into borrowing and lending transactions on behalf of Bank of Scotland and Lloyds Bank plc (as LTSB) at rates tied to USD bbaLIBOR™.

---

413 *United States v. Coöperatieve Centrale Raiffeisen Boerenleenbank, B.A.,* Deferred Prosecution Agreement, Attachment A, Statement of Facts ¶ 40 (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf, attached as Exhibit 26 and incorporated into this Complaint by reference.

414 *Id.* ¶ 97.

During that time, the USD bbaLIBOR™ submitters for both Bank of Scotland and Lloyds Bank plc (as LTSB) contributed USD bbaLIBOR™s that benefited their respective companies' derivatives positions instead of rates that complied with the definition of bbaLIBOR™.

378.    Employees of Bank of Scotland and Lloyds Bank plc (as LTSB) initiated USD bbaLIBOR™ derivatives transactions with banks and other financial institutions in the United States. By entering into these derivative transactions, Bank of Scotland and Lloyds Bank plc (as LTSB) sought to, and did, profit at the expense of their counterparties in the United States. According to the United Kingdom's Financial Conduct Authority ("FCA"), there was a "culture of seeking to take a financial advantage [of GBP and USD bbaLIBOR™] wherever possible" at both Bank of Scotland and Lloyds Bank plc (as LTSB).[415]

379.    In addition, the FCA found that in September and October 2008, an HBOS manager instructed HBOS traders to depress GBP and USD bbaLIBOR™ submissions to stay in line with other Contributor Banks, rather than comply with the published methodology for bbaLIBOR™.[416] Lloyds and HBOS management claimed that they did not discover the unlawful conduct until after they had been asked to investigate potential issues in 2010.[417]

380.    The FCA further found that Lloyds and HBOS colluded to manipulate the BBA Repo Rate. That rate, published by the BBA, served as a benchmark which purported to provide the rates offered by major banks in London for general collateral repo transactions of normal market size with other banks at 11 a.m. London time.[418] Both Lloyds and HBOS were Repo

---

415 Final Notice from the FCA to Lloyds Bank plc & Bank of Scot. plc ¶ 2.14 (July 24, 2014) (hereinafter "Lloyds Final Notice"), attached as Exhibit 27 and incorporated into this Complaint by reference.

416 *Id.* ¶¶ 4.48-59.

417 *Id.* ¶ 4.70.

418 *Id.* ¶¶ 2.2-2.9.

Rate Contributor banks.  In 2008, the Bank of England gave U.K. banks cash under a Special

Liquidity Scheme ("SLS"), in which the banks could swap illiquid securities with the United

Kingdom for U.K. Treasury bills, which the banks could then use as collateral to borrow cash in

secured transactions.[419]  The fee for participating in the SLS was measured by the difference

between three-month GBP bbaLIBOR™ and the three-month GBP Repo Rate.  Thus, banks had

an incentive to depress GBP bbaLIBOR™ and increase the Repo Rate.

381.    On July 28, 2014, Lloyds consented to entry of an Order Making Findings and

Imposing Remedial Sanctions with the CFTC and agreed to pay a $105 million fine.[420]  The

CFTC found that Lloyds and HBOS violated the published bbaLIBOR™ methodology from at

least 2006 through 2010.  The CFTC findings quote an HBOS USD bbaLIBOR™ submitter as

saying the following during an electronic chat with "an employee of another financial

institution"—"youll like this ive been pressured by senior management to bring my rates down

into line with everyone else."[421]  At the time, HBOS faced severe funding and liquidity issues.

382.    The CFTC also quoted an HBOS manager as complaining that GBP bbaLIBOR™

rates "could potentially create an issue with buyers of our paper."  The CFTC found that HBOS

was concerned that lenders might be unwilling to transact business or deal with HBOS or might

have demanded higher interest rates had HBOS submitted rates that complied with the

bbaLIBOR™ methodology.  In addition, the CFTC found that an HBOS bbaLIBOR™

supervisor instructed employees that they normally should not make bids for cash in the market

above the relevant bbaLIBOR™ rate.  The CFTC found that at least through the end of 2008,

---

419 *Id.* ¶ 4.9.

420 Lloyds CFTC Order, *supra* note 108, at 23.

421 *Id.* at 15.

HBOS made USD bbaLIBOR™ submissions that did not reflect the bbaLIBOR™ methodology and therefore conveyed false, misleading, or knowingly inaccurate reports concerning USD bbaLIBOR™.[422]

383.     The CFTC found that Lloyds and HBOS violated Section 9(a)(2) of the CEA by false market information that affected, or tended to affect, the price of commodities sold in interstate commerce.  The CFTC further found that this false information included information concerning the costs of borrowing funds in USD, the liquidity and stress conditions in the money markets, and Lloyds's and HBOS's ability to borrow funds.

384.     In the Consent Order, Lloyds agreed to abide by a set of principles to ensure the integrity and reliability of submissions in the market for benchmark interest rates.[423]

385.     The same day, Lloyds entered into an agreement with DOJ to pay an $86 million penalty for manipulating bbaLIBOR™ submissions.[424]  Lloyds Banking Group plc admitted in its Deferred Prosecution Agreement with the United States Department of Justice ("DOJ") that when USD bbaLIBOR™ submitters contributed rates that took trading positions into account, the bank was engaged in a deceptive course of conduct.[425]  Those USD bbaLIBOR™ submissions were published to investors and counterparties in the United States and elsewhere and were misleading because they artificially depressed USD bbaLIBOR™, which was incorporated into derivatives that Lloyds Banking Group plc traded for profit. Lloyds Banking Group plc further admitted that counterparties

---

422 *Id.*

423 *Id.* at 25.

424 Press Release, U.S. Dep't Justice, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

425 *United States v. Lloyds Banking Group plc,* Deferred Prosecution Agreement, Attachment A, ¶ 45 (July 28, 2014) (hereinafter "Lloyds SOF"), attached as Exhibit 28 and incorporated into this Complaint by reference.

to derivatives trades were harmed by the manipulation of USD bbaLIBOR™ by Lloyds employees.[426]

386.    "Lloyds's conduct undermined financial markets domestically and abroad," said Deputy Assistant Attorney General Brent Snyder of the DOJ's Antitrust Division.[427]  As one example, DOJ quoted an exchange on May 19, 2009 between a money markets trader who was a former USD bbaLIBOR™ submitter at a subsidiary of Lloyds, who wrote:  "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's," and a then-current USD bbaLIBOR™ submitter, who responded later that day:  "obviously we got the Libors down for you."[428]

### L.    Deutsche Bank Admissions

387.    On April 23, 2015, enforcement agencies from the United States, New York, and the United Kingdom publicly disclosed plea and deferred prosecution agreements, statements of facts, and a stipulated consent order, in which Deutsche Bank and various of its affiliates admitted to manipulating, or were found to have manipulated, USD bbaLIBOR™ and other interest-rate benchmarks.  Pursuant to these agreements, Deutsche Bank was fined the equivalent of approximately $2.5 billion.

388.    Deutsche Bank admitted that the purpose of its misconduct was to influence the ultimate rate published by and through the BBA,[429] and that bbaLIBOR™ manipulation affected USD bbaLIBOR™ and harmed contract counterparties in the United States.[430]

---

426 *E.g., id.* ¶¶ 41-42.

427 *Id.*

428 *Id.*

429 DB SOF, *supra* note 78, at ¶¶ 106-08.

430 *Id.* ¶¶ 109-12.

389.     The misconduct was "systemic and pervasive" according to the CFTC Order.[431]
Deutsche Bank reaped "tremendous profits" from its GFFX unit's trading strategy.[432]  Deutsche
Bank's primary USD bbaLIBOR™ submitter understood and was aware of GFFX trading
positions for products indexed to USD bbaLIBOR™ and routinely submitted USD
bbaLIBOR™s for the benefit of those trading positions.

390.     Germany's Federal Financial Supervisory Authority ("BaFin") found that
Deutsche Bank cultivated a "business culture" that favored "problematic" communications,
"especially . . . with regard to the LIBOR."[433]  Deutsche Bank's internal reporting lines were
"incomplete and contradictory and the everyday practice deviated from the prescribed
structure."[434]  BaFin (1) expressed "major doubts" about the truthfulness of individuals involved
in USD bbaLIBOR™ manipulation at Deutsche Bank, (2) found that Deutsche Bank enjoyed
"substantially higher earnings" between August 2007 and spring 2010 compared to earlier time
periods, (3) concluded that Deutsche Bank failed to properly retain important business records
and deleted potentially relevant audio files, and (4) found that Deutsche Bank executives
knowingly gave false information to regulators.[435]

391.     Enforcement agencies also found that in an effort to conceal its conduct, Deutsche
Bank (1) manipulated bbaLIBOR™ in all tenors "so that the manipulation was not
conspicuous,"[436] (2) destroyed 482 tapes containing "thousands of hours of potentially

---

431 DB CFTC Order, *supra* note 79, at 2.

432 *Id.* at 9.

433 Letter from Frauke Menke, *supra* note 80.

434 *Id.*

435 *Id.*

436 DB SOF, *supra* note 79, at ¶¶ 22-23.

responsive audio recordings" sought by authorities,[437] and (3) was "unacceptably slow and ineffective" in its response to inquiries of enforcement agencies, "prolong[ing] the process of formal investigation significantly."[438]

392.    One of the members of the GFFX unit was Mr. Curtler, a senior trader and USD bbaLIBOR™ submitter. In October 2015, Mr. Curtler agreed to plead guilty to criminal wire fraud and conspiracy charges in the Southern District of New York for manipulating USD bbaLIBOR™ in New York and elsewhere for the benefit of Deutsche Bank.[439] Mr. Curtler was one of Deutsche Bank's USD bbaLIBOR™ submitters who knowingly and intentionally submitted artificially low USD bbaLIBOR™s. Mr. Curtler also served as one of Deutsche Bank's delegates to the FX & MM Committee.

### M.    Citi Admissions

393.    On May 25, 2016, the CFTC issued an order filing and settling charges against Citibank and certain of its affiliates, relating to abuses of USD bbaLIBOR™.[440] Among other things, Citibank was charged with "the false reporting" of USD bbaLIBOR™ at times "to avoid generating negative media attention and to protect its reputation during the financial crisis."[441] The CFTC found that Citibank's submitters made USD bbaLIBOR™ submissions "based in whole or in part on a desire to avoid that negative scrutiny, rather than based on the fact that [Citibank], at times would have had to pay above LIBOR in the London interbank market,

---

437 *United States v. Deutsche Bank AG*, Deferred Prosecution Agreement ¶ 4.b (Apr. 23, 2015), attached as Exhibit 29 and incorporated into this Complaint by reference.

438 Final Notice from the Fin. Conduct Auth. to Deutsche Bank AG ¶¶ 2.3, 2.16, 4.118-121, 5.27-5.30 (Apr. 23, 2015) (hereinafter "DB Final Notice"), attached as Exhibit 30 and incorporated into this Complaint by reference.

439 Allocution Hr'g Tr. 3:20-4:18, *United States v. Curtler*, 15-cr-670 (VSB) (S.D.N.Y.), ECF No. 6.

440 Citi CFTC Order, *supra* note 252.

441 *Id.* at 2.

particularly in the longer tenors, when securing funding for the bank."[442] This desire came at a time when Citibank's parent, Citigroup, faced financial challenges that included concerns about liquidity.[443] Citi was ordered to pay a penalty of $175 million.

### N.   Société Générale Findings

394.    On June 4, 2017, the CFTC issued an order filing and settling charges against Société Générale and the DOJ released findings of fact regarding USD bbaLIBOR™ suppression.  Among other things, these regulators found that Société Générale systematically depressed its USD bbaLIBOR™ submissions from at least May 2010 through at least October 2011.

395.    On at least three occasions, Société Générale's CFO falsely assured unidentified people that Société Générale's submissions were accurate.  Société Générale sought to position itself as the sixth highest contributor, which necessarily involved advance coordination with other Bank Defendants.  Internal Société Générale documents made public state that concerns about reputation emanated from the United States, *e.g.*, "everybody is checking on the U.S. market" and "the American investors are really sensitive" to individual USD bbaLIBOR™ contributions.  Société Générale's Head of Treasury for the Americas, whose identity was not disclosed, was aware of and, on information and belief, participated in the directions to suppress USD bbaLIBOR™.  Even as late as September 2011, internal Société Générale communications indicate that "all our competitors" were suppressing USD bbaLIBOR™.

396.    In 2011, Société Générale sought to conceal the manipulation by lying to, or "play[ing] dumb" with, regulators investigating bbaLIBOR™ manipulation, providing false

---

442 *Id.* at 3.

443 *Id.* at 14-15.

attestations as to the adequacy of its systems and controls, and sending knowingly false bids for funding into the financial markets. Société Générale provided its executives with an "indemnification" in anticipation of questions from "the 'Americans'" investigating bbaLIBOR™ manipulation. Société Générale executives joked about going to jail because of its "specious LIBOR submissions." Société Générale was aware of lawsuits pending in the United States, yet continued its unlawful conduct through 2011. In March 2010, Société Générale conducted an internal audit that the CFTC termed "anemic" for its failure to identify "glaring improprieties with the LIBOR submission process and the rampant inconsistencies between the bank's LIBOR submissions and its costs of funding." The CFTC recites that employees of Société Générale is liable for the conduct of employees of its subsidiaries.

**THE FRAUD AND COLLUSION ALLEGED IN THIS COMPLAINT COULD NOT REASONABLY HAVE BEEN DISCOVERED BEFORE BARCLAYS'S ADMISSIONS OF INTENTIONAL MISREPRESENTATIONS OF MATERIAL FACT**

397. On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the CFTC and the DOJ in connection with investigations into bbaLIBOR™. This note marked the first public acknowledgment by any Defendant of the confidential CFTC investigation, which had begun in late 2008.[444] The Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate bbaLIBOR™ rates. Over the next months, the Bank Defendants, regulators, and media reports gradually revealed the scope of the investigation until Barclays admitted its participation in bbaLIBOR™ manipulation in June 2012. The claims Freddie Mac alleges in this Complaint arise from, among other things, the

---

444 Fin. Servs. Auth., Internal Audit Report: A Review Of The Extent Of Awareness Within The FSA Of Inappropriate Libor Submissions, Management Response ¶ 1.1 (Mar. 2013), *available at* http://www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf.

same wrongful acts and concern the same evidence, memories, and witnesses as the class actions filed in this MDL (11-MD-2262 (NRB)).

398.   The BBA, which had known of the investigation since late 2008, publicly claimed to be "shocked" by Barclays' disclosures.[445]  Just a few months earlier, the BBA deleted links on its website that detailed its involvement with setting bbaLIBOR™, including a statement that it "calculates and produces BBA LIBOR at the request of our members for the good of the market."[446]

399.   Throughout the conspiracy period, Defendants offered facially plausible pretextual explanations for so-called "dislocations" in bbaLIBOR™ and repeatedly denied the existence of any fraudulent or collusive conduct relating to bbaLIBOR™ submissions.  In particular, the BBA held itself and the FX & MM committee out as independent entities that exercised meaningful oversight of bbaLIBOR™, and on several occasions falsely represented that it had confirmed through investigation that bbaLIBOR™ submissions were honest and accurate.  Freddie Mac therefore did not know, and could not have known of the Unlawful Agreements.

400.   The day after Barclays' June 2012 disclosure, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization,[447] which is further evidence that market participants, including Freddie Mac, were unaware that Barclays had been propping up its creditworthiness through bbaLIBOR™ manipulation.

---

445 Rachel Cooper, *Barclays Libor Scandal:  As It Happened—June 28, 2012*, The Telegraph, June 28, 2012, http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9361646/Barclays-Libor-scandal-as-it-happened-June-28-2012.html.

446 Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs away from Rate*, Bloomberg Businessweek (Mar. 7, 2012), http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2.

447 Cooper, *supra* note 445.

401.   Until Barclays's disclosures in June 2012, Freddie Mac did not have access to any of the information that could have revealed the fraud and collusion, including, among other things, (a) the Bank Defendants' actual costs of borrowing, (b) internal communications at the Bank Defendants regarding fraud and collusion, (c) communications between and among the Bank Defendants regarding bbaLIBOR™, (d) communications between the Bank Defendants and government regulators, (e) documents produced in connection with the confidential investigations, (f) meetings of the FX & MM Committee, or (g) access to communications within the BBA or between Bank Defendants and the BBA.

402.   A reasonably diligent investigation would not have disclosed sufficient facts to state a viable fraud claim until, at the earliest, the Barclays admissions.  A reasonable investigation, prior to Barclays's admissions in June 2012, could have disclosed, at most, the following:

403.   **March 2008**:  A report published by the Bank for International Settlements ("BIS"),[448] titled *Interbank Rate Fixings During the Recent Turmoil*, analyzed the divergence between USD bbaLIBOR™ and the Eurodollar Bid Rate.[449]  Based on information available at that time, BIS found the "main causes of the divergence" were "[a] deterioration in market liquidity, an increase in interest rate volatility and differences in the composition of the contributor panels[.]"[450]  Based on a statistical study, the BIS Report concluded that alternative

---

448 BIS is the world's oldest international financial organization. Its members include central banks representing countries from around the world that together make up about 95% of world GDP.  It is an independent organization that routinely publishes analyses of monetary and financial stability issues.

449 Jacob Gyntelberg & Philip Wooldridge, *Interbank Rate Fixings During the Recent Turmoil*, BIS Quarterly Review (Mar. 3, 2008), *available at* https://www.bis.org/publ/qtrpdf/r_qt0803g.pdf.

450 *Id.* at 59.  That same article stated as follows: "Benchmark status is gained through competition; it is not conferred.  Therefore, it can also be lost" in a competitive market.  *Id.* at 60.

methods of estimating bbaLIBOR™ gave "*no indication that fixings were manipulated*."[451]
The BIS report noted that there were differences between USD bbaLIBOR™ and the Eurodollar
Bid Rate that might reasonably explain the divergence due to unprecedented conditions in the
financial markets (*e.g.*, the source and methodology).

404.   **May 16, 2008:**  A Reuters news article in which the Austrian Minister of Finance
was quoted as saying, "[t]here's more wind being made about this issue than is being merited by
the facts."[452]  In addition, Freddie Mac employees in Virginia received email invitations on this
same day to participate in a conference call being held by JPMorgan to discuss its attached
research note, *The Outlook for Libor*.[453]  According to the invitation, the "main conclusions" of
the note included:  "The Libor fixing process is not broken; BBA Libor broadly reflects the
borrowing costs of top tier large banks.  Differences between Libor and other indices can largely
be explained by the composition of the Libor panel.  The main limitations of Libor are due more
to lack of liquidity in the market rather than any bias in the fixing process."[454]

405.   **May 20, 2008**: A study by the NY Fed, part of the same Reserve Bank System
that published the Eurodollar Bid Rate, concluded that "it is difficult to find convincing evidence
of actual misreporting" beyond anecdotal evidence.[455]  The study noted that there were no
sources of data to compare USD bbaLIBOR™ submissions to a Contributor Bank's actual

---

451 *Id.* at 70 (emphasis added).

452 Reuters Staff, *Bankers work on Libor; ICAP Readies New Index*, Reuters, May 16, 2008,
http://uk.reuters.com/article/markets-rates/wrapup-1-bankers-work-on-libor-icap-readies-new-index-idUKN1643985220080516.

453 *See, e.g.*, T. Belton, *supra* note 103.

454 *Id.*

455 Cheun & Raskin, *supra* note 312, at 3.

interbank borrowing rates and that the Eurodollar Bid Rate is set based on a methodology that could respond differently to market stresses.[456]

406.    **May 29, 2008**: Analysts at Deutsche Bank Securities and J.P. Morgan Securities issued reports, and sent those reports to Freddie Mac,[457] explaining in detail why they believed that questions about USD bbaLIBOR™ were unconvincing.  For example, in separate emails sent to numerous employees of Freddie Mac in Virginia about a *Wall Street Journal* article published earlier that day, Deutsche Bank Securities wrote in one email that the article "purporting to estimate the mispricing of the LIBOR rate submissions" had "limited credibility," and J.P. Morgan Securities wrote in the other that the article is "deeply flawed," and criticized the article's comparisons of USD bbaLIBOR™ and CDS prices as akin to comparing apples and oranges.  The investment firm BlackRock later reiterated the bbaLIBOR™ versus CDS criticism, writing:  "The relationship between one year borrowing rates indicated by panel members in the LIBOR submissions and their one year [CDS] spreads is affected by several factors, any of which can account for meaningful differences between the two financial series."[458]

---

456 *Id.* at 2-3

457 Freddie Mac subscribed to the Bloomberg Professional service ("Bloomberg"), which provided, among other things, market data, news, financial analysis, and a method of communicating with other subscribers (often referred to as the "Bloomberg Terminal".  Numerous banks and financial institutions, including certain Defendants, subscribed to Bloomberg.  Subscribers received a unique message address, *e.g.*, Name@bloomberg.net. Bloomberg subscribers could also "chat" with each other via instant messages sent through Bloomberg.  It was common for Bloomberg subscribers, including subscriber Defendants, to send electronic messages to Freddie Mac in Virginia. Between 2007 and 2009, at least the following Defendants and/or their affiliates, subsidiaries, or internal groups collectively sent hundreds of thousands of electronic messages to employees of Freddie Mac in Virginia: Bank of America (Banc of America Securities; Merrill Lynch; CMBS Strategy; Interest Rate Strategy); Bank of Tokyo - Mitsubishi UFJ (Mitsubishi UFJ Securities); Barclays (Barclays Capital); Citibank (Citigroup Global Markets); Credit Suisse (Credit Suisse Securities); Deutsche Bank (Deutsche Bank Securities); HBOS/Bank of Scotland (HBOS TS); Lloyds (Lloyds TSB Bank PLC); JPMorgan (JPMorgan Securities; JPMorgan Credit Research; Global Sector Research; JPMorgan Technical Analysis Research); Rabobank (Central Banks Rabobank); RBC (RBC Capital Markets); RBS (Royal Bank of Scotland; RBS Securities Inc.; RBS GBM; RBS Greenwich Capital); and Société Generale (SG Americas Securities).

458 BlackRock Resp., *supra note* 154, at 9.

407.   **August 4, 2008**:  A group of independent U.S.-based economists published a study in the Journal of Banking and Finance titled, *LIBOR Manipulation?*[459]  The study attempted to confirm the "conjecture" published in several news articles that some Contributor Banks may have had intentionally manipulated their individual USD bbaLIBOR™ submissions.[460]  The study was aimed at "extend[ing] the Wall Street Journal's analysis by employing a wider array of comparative statistical techniques and more recent methodologies and to gain a greater understanding of the issues underlying such speculations."[461]  The authors of the study performed what they held out to be sophisticated statistical analyses that led them to conclude any "apparent anomalies within the individual quotes" suggest that the "evidence is ***not consistent*** with a material manipulation" of bbaLIBOR™.[462]  The authors found "questionable patterns" for a period of time ***ending*** on August 8, 2007.[463]

408.   The authors further found that "the ***empirical evidence is not consistent with the hypotheses that the Libor was materially manipulated downward***" (a finding that was subsequently shown to be false by Defendant admissions of manipulation and documents that were known only to Defendants).[464]  The authors specifically considered, and rejected, the supposition that CDS spreads are a useful comparator to infer manipulation of USD bbaLIBOR™ submissions.  In other words, as the United Kingdom's House of Commons Treasury Committee ("U.K. Treasury Committee") concluded years later, statistics at the time

---

[459] Rosa M. Abrantes-Metz et al., *LIBOR Manipulation?*, 36 J. Banking & Fin. 136, 138 (2012).

[460] *Id.*

[461] *Id.* at 136-137.

[462] *Id.* at 140 (emphasis added).

[463] *Id.* at 137.

[464] *Id.* at 149 (emphasis added).

"did not show that manipulation of LIBOR was successful."[465]  The authors of the study wrote

that the empirical methods of which they were aware were not capable of distinguishing

conditions of explicit collusion from conditions of tacit collusion.[466]

409.    **August 5, 2008**:  The BBA published its LIBOR Consultation Feedback

Statement, which found no intentional misrepresentations in USD bbaLIBOR™ submissions.

The Feedback Statement was based on input from, and carried the imprimatur of, numerous

independent sources and regulators, including the EC, the CME, the International Monetary

Fund ("IMF"), and the New York Stock Exchange.[467]

410.    **October 2008**:  The IMF published a 30-page report investigating (1) interbank

lending during the "current stress in interbank markets" and (2) whether USD bbaLIBOR™ was

"distorted."[468]  The report examined the relationship between USD bbaLIBOR™ and other

benchmarks, including the Eurodollar Bid Rate and CDS prices.  The report conducted empirical

analyses.  The report concluded that "[a]lthough the integrity of the U.S. dollar LIBOR fixing

process has been questioned by some market participants and the financial press, *it appears that*

*USD LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of*

*unsecured U.S. dollar term funding*."[469]

411.    **November 2008**:  The BBA published a document entitled, *LIBOR Governance*

*and Scrutiny*, which presented proposed enhancements to the benchmark.  The document

represented that the BBA had taken steps to ensure that (1) the proposed methodology for

---

465 U.K. House of Commons Treasury Comm., *Fixing LIBOR*, *supra* note 193, at 27.

466 Abrantes-Metz et al., *supra* note 459.

467 BBA, Libor Consultation Feedback Statement, *supra* note 354.

468 IMF Global Financial Stability Report, *supra* note 468, at 70.

469 *Id.* at 72 (emphasis added).

bbaLIBOR™ governance and scrutiny complied with competition and other laws and (2) the bbaLIBOR™ setting process operated to the "highest standards." The document also represented that all Contributor Banks formally reaffirmed their commitment to adhere to the published rules.[470]

412.     No private lawsuits or criminal or civil actions by enforcement agencies, alleging that the Contributor Banks intentionally submitted artificially low USD bbaLIBOR™ submissions, had been filed.  The first such lawsuits were not filed until mid-2011 in response to the first public disclosures of the fact of the CFTC's and DOJ's investigations into bbaLIBOR™ manipulation.

413.     As explained above, the Bank Defendants and the BBA offered facially plausible, pretextual explanations for "dislocations" and repeatedly denied the existence of any fraudulent or collusive conduct relating to USD bbaLIBOR™ submissions.  In particular, the BBA held itself out as an independent entity that exercised meaningful oversight of bbaLIBOR™ and, on several occasions, falsely represented that the BBA had confirmed that USD bbaLIBOR™ submissions were honest and accurate.  Freddie Mac therefore did not know, or have reason to know, that USD bbaLIBOR™ was false, and that Defendants made it so intentionally and knowingly, with intent to mislead, and/or pursuant to an agreement among the Bank Defendants and the BBA.  The claims alleged in this Complaint arise from, among other things, the same wrongful acts and concern the same evidence, memories, and witnesses as the class actions filed in this multidistrict litigation (11-MD-2262 (NRB)).

414.     Even with the benefit of hindsight, several reliable sources have confirmed that during the financial crisis, a reasonable investigation would not have uncovered evidence that the

---

470 BBA Libor, LIBOR Governance and Scrutiny, *supra* note 195.

Bank Defendants fraudulently submitted artificially low USD bbaLIBOR™ submissions.  The
U.K. Treasury Committee asked the Governor of the Bank of England why regulators had not
spotted bbaLIBOR™ manipulation earlier.  The Governor testified under oath that "we had no
evidence of wrongdoing."  He further testified that "there were plenty of academic articles that
looked in it and said that they could not see in the data any evidence of manipulation," and that
"if you go back to the inquiries that the regulators made, it took them three years to work out and
find the evidence of wrongdoing" and there was no reasonable way at the time to distinguish
manipulation from a market that was "dysfunctional."

415.    The FSA conducted an internal audit in 2013 regarding the extent of awareness
within the FSA of inappropriate bbaLIBOR™ submissions.  It found that bbaLIBOR™
"dislocation" manifested itself in five ways, including widening spreads between bbaLIBOR™
and other rates and that the combination of deteriorating market conditions and structural issues
in the bbaLIBOR™ fixing process would have caused dislocation "completely independent of
low-balling."[471]

416.    The Wheatley Report published in 2012 states: "One of the weaknesses in the
current regime that has been identified is the possibility that LIBOR can be manipulated by
individual banks changing their submissions.  This behaviour is difficult to police because of the
difficulty in corroborating submissions."[472]

417.    The admissions by Barclays, Lloyds, Rabobank, RBS, and UBS reveal some of
the efforts that the Bank Defendants undertook to conceal their fraudulent and collusive conduct.
For example, (1) a UBS trader scolded a manager for internally transmitting in writing a request

---

[471] U.K. House of Commons Treasury Comm., *Fixing LIBOR*, *supra* note 193.
[472] Wheatley I at 3.16

to manipulate a bbaLIBOR™ submission,[473] (2) a Barclays trader consciously sought to move bbaLIBOR™ submissions in small increments over time to avoid detection,[474] (3) a UBS derivatives desk manager instructed a bbaLIBOR™ submitter to lie when interviewed by UBS attorneys investigating bbaLIBOR™ manipulation,[475] and (4) in 2010, long after learning of the investigation into bbaLIBOR™, RBS traders continued their conduct but sought to avoid communicating in writing because "at the moment the FED [sic] are all over us about libors."[476] In or about 2007, Rabobank set up a separate "cash book" account and told its derivative traders, including traders located in New York, to log transactions, for which Rabobank paid interest rates higher than USD bbaLIBOR™, into that book to conceal those transactions.[477]

418.     On information and belief, the other Bank Defendants engaged in similar conduct to cover up their fraudulent and collusive activities involving USD bbaLIBOR™.  The evidence of such conduct is solely within the custody and control of the Bank Defendants, the BBA, and/or government regulators.

419.     The Bank of England's Governor confirmed in a June 2012 hearing before the U.K. Treasury Committee that he "had no suspicion until two weeks [prior to the hearing] that anything had been going wrong in the LIBOR market[.]" [478]  The former head of the FSA, Adair Turner, told Parliament on February 26, 2013, that there was "no information" of bbaLIBOR™ manipulation and that regulators could not have spotted the fraudulent and collusive conduct

---

473 UBS SOF, *supra* note 145, at ¶ 38.

474 Barclays SOF, *supra* note 253, at ¶ 44.

475 UBS SOF, *supra* note 145, at ¶ 39.

476 RBS Final Notice, *supra* note 125, at ¶ 52.

477 Defense Ex. 608C at 17, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

478 Uncorrected Tr. of Oral Evidence, U.K. House of Commons Treasury Comm., July 17, 2012.

even with "intensive supervision."[479]  The Deputy Governor of the Bank of England, Paul

Tucker, testified in 2012 that he did not suspect fraud or collusion in 2008 and that "[w]e would

not have dreamt of using LIBOR as part of the pricing structure for Bank of England operations

had we had doubts about what is now referred to as low-balling . . . ."[480]  He further testified that

"[w]e thought the underlying markets were dysfunctional, sporadically illiquid, much less

reliable than normal, but we did not have suspicions of dishonesty and we thought, as I said just

now, the pattern of LIBOR movements made sense."[481]  The former Deputy Governor of the

Financial Stability Board testified that he had no suspicions during the conspiracy period of

intentional fraud.  Similarly, former Chairman of the Federal Reserve Board Alan Greenspan

was quoted as saying the following: "Through all of my experience, what I never contemplated

was that there were bankers who would purposely misrepresent facts to banking authorities.  You

were honor bound to report accurately, and it never entered my mind that, aside from a fringe

element, it would be otherwise."[482]  The CFTC, which led the effort to expose the unlawful

conduct surrounding bbaLIBOR™, required twenty months to obtain actionable evidence of

manipulation.[483]

---

479 Huw Jones, *It Was Impossible To Spot Libor Rigging: UK Watchdog*, Reuters (Feb. 27, 2013), http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

480 Minutes of Evidence, U.K. House of Commons Treasury Comm., July 9, 2012, *available at* https://publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/120709.htm.

481 *Id.*

482 Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html. William Dudley, the President and Chief Executive Officer of the NY Fed, stated with respect to the bbaLIBOR™ investigation: "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner."  William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* https://www.bis.org/review/r141003a.htm.

483 Joe Nocera, *The Little Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html?_r=0.

## COUNT I:  VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS)

420.    Freddie Mac incorporates by reference the preceding paragraphs of this

Complaint.

### Agreement

421.    From on or about August 2007 and lasting through October 2011, Defendants

entered into a combination, conspiracy, and/or agreement that involved multiple horizontal and

vertical levels, the effects of which continued through October 2011.  In this case, the Complaint

alleges a set of agreements among Defendants that restricted competition in various markets.  As

shown above, the Unlawful Agreements consisted of the following:

- The Bank Defendants secretly agreed to (a) disregard the bbaLIBOR™ published rules to coordinate the interest rates that they submitted to the BBA for calculation, (b) keep those coordinated submissions below the actual rates at which they would be offered funds in the London interbank lending market for USD, and (c) keep those coordinated submissions within a narrow range.

- Defendants agreed to falsely hold USD bbaLIBOR™ out as a reliable interest-rate benchmark calculated according to its published methodology and conceal the fact that the Defendant Banks had agreed to disregard the published methodology for USD bbaLIBOR™.

- Defendants agreed to conceal the extent to which conditions in the London interbank loan market had deteriorated.

- Defendants agreed to publicly, and falsely, maintain that USD bbaLIBOR™ would be protected by a strict governance protocol, that it would be overseen by an "independent" committee of active market participants, and that the BBA would ensure compliance with bbaLIBOR™'s published rules.

422.    Defendants had a conscious commitment to common objectives, namely

insulating bbaLIBOR™ from the forces of competition so that Defendants could collectively

control the product standard in the market for USD interest-rate benchmarks.  Through control of

bbaLIBOR™, the Bank Defendants could manipulate it for their personal gain and

systematically depress it to unfairly profit from interest-rate derivative and MBS transactions,

among other transactions.  Certain Bank Defendants also had a common interest in manipulating bbaLIBOR™ to protect their respective credit ratings.

423.     As set forth above, Defendants had strong motives to conspire.  Because of the way that USD bbaLIBOR™ was calculated based upon the Bank Defendants' bbaLIBOR™ submissions, a single Contributor Bank acting unilaterally had little ability to affect bbaLIBOR™.  By cooperating, the Bank Defendants' collusion gave them the power to affect the USD bbaLIBOR™ fixing published by and through the BBA.  In addition, the unlawful scheme required collective action to avoid detection.  If any Bank Defendant deviated from the Unlawful Agreements on a sustained basis or disclosed that Defendants had agreed to disregard the bbaLIBOR™ rules, the scheme would have been exposed, bbaLIBOR™'s integrity and reliability would have been fundamentally undermined, and Defendants would have lost control of the dominant USD interest-rate benchmark.  Disclosure of the Unlawful Agreements would also have exposed bbaLIBOR™ to the forces of competition from other interest-rate indices, imperiling bbaLIBOR™'s position as the market standard for interest-rate benchmarks, and triggering government investigations and lawsuits.  In fact, these are precisely the consequences that followed Barclays' disclosure of systematic depression in 2012.

424.     There is abundant evidence that Defendants' conduct was the product of agreement and not independent action.  To date, three Bank Defendants (UBS, Barclays, HBOS) have admitted systematically submitting artificially depressed USD bbaLIBOR™ rates to the BBA.[484]  If any individual Contributor Bank unilaterally and systematically depressed its USD bbaLIBOR™ submissions, that Contributor Bank's submissions would have stood out as an

---

[484] In addition, as shown above, several other Defendants (RBS and Rabobank) have admitted manipulating USD bbaLIBOR™.

outlier below the rates submitted by the other Contributor Banks. In fact, however, the individual USD bbaLIBOR™ rates submitted by Defendants Barclays, UBS and HBOS were not noticeably lower than the other Bank Defendants.

425.    For example, Figure 6 below plots the submissions for 3-month USD bbaLIBOR™ during a two-month period in 2008 for the three Bank Defendants that have admitted to systematic depression (Barclays, UBS, and HBOS) and the submissions of Bank Defendants Bank of America, Citigroup, Credit Suisse, and JPMorgan. The chart shows that the latter four banks submitted USD bbaLIBOR™ rates that were within *or below* the range of the admittedly depressed rates. The submissions of other Bank Defendants show the same trend. This pattern of coordinated submissions cannot be credibly explained in the absence of conspiracy.

**Figure 6:  Comparison of bbaLIBOR™ Submissions**



426.     While few of Defendants' documents have been disclosed to Freddie Mac to date,

the sparse evidence that has been revealed confirms the existence of the Unlawful Agreements:

- A Rabobank bbaLIBOR™ submitter told federal investigators in 2014 that Rabobank was "low-balling" its USD bbaLIBOR™ submissions at a time when it was attempting to "hoard" cash by borrowing when available for longer terms regardless of cost and even though interest rates were going higher and higher.[485] Rabobank bbaLIBOR™ submitters asked a Rabobank executive whether Rabobank should start submitting bbaLIBOR™s at the much higher rates that were available in the market.  The executive responded that "doing so was a stupid idea and shouldn't be done," specifically related to USD.  In fact, Rabobank was paying much higher rates for longer-term USD borrowings than it reported in its bbaLIBOR™ submissions.

---

485 Defense Ex. 608C at 17, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

- In one message dated August 19, 2007, former trader for RBS, Tan Chi Min, wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong: "It's just amazing how Libor fixing can make you that much money or lose if opposite. It's a cartel now in London."[486]

- In October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[487]

- On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that all the Bank Defendants were doing this.[488] The Barclays manager specifically identified certain other Bank Defendants that were submitting bbaLIBOR™ rates lower than rates at which those banks could actually get funds.[489]

- On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that the Bank Defendants, including Barclays, were submitting false and dishonest submissions.[490]

- On April 11, 2008, a Barclays employee privately told an employee of the New York Fed that he was aware of Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[491] The Barclays employee noted "if we can't borrow money at that rate, then no one else could really. . . . I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[492]

- On October 24, 2008, a Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish," citing submissions by WestLB and Deutsche Bank as being too low.[493] The employee told the NY Fed that he

---

486 Andrea Tan, Gavin Finch & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012), http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

487 Email to Jason Miu, *supra* note 255.

488 Barclays SOF, *supra* note 253, at ¶ 43.

489 *Id.* ¶ 43.

490 *Id.* ¶ 45.

491 *Apr. 11 Barclays and N.Y. Fed Tr., supra* note 291, at 7.

492 *Id.* at 16.

493 *Oct. 24 Barclays and N.Y. Fed Tr., supra* note 373, at 000098, 000100.

was aware of banks that were making bbaLIBOR™ submissions that were below what they paid in comparable transactions.[494]

- In an internal email, a Barclays employee noted that Lloyds's USD bbaLIBOR™ submission was artificially low.[495]

427.    In addition, Defendant RBS has admitted that its employees participated in agreements to submit bbaLIBOR™ submissions that were inconsistent with the published definitions.  Although RBS did not admit systematic depression, the head of its money markets trading and the person responsible for USD bbaLIBOR™ submissions reportedly told a subordinate that Contributor Banks were setting bbaLIBOR™ "to where it suits their book" and that "LIBOR is what you say it is."[496]  This communication occurred in August 2007, within days of the admitted directives issued by Barclays and UBS executives.

428.    Because the BBA's instructions prohibited Contributor Banks from basing their USD bbaLIBOR™ submissions on submissions by other Contributor Banks, the Bank Defendants cannot claim that their conduct was merely the result of conscious parallelism without admitting that they secretly and fraudulently deviated from bbaLIBOR™'s published methodology.  Defendants' pretextual explanations for their artificially low USD bbaLIBOR™ submissions further confirm the existence of the Unlawful Agreements.

429.    Moreover, Defendants acted against their legitimate independent self-interest in several regards.  First, absent agreement with other Defendants, any Bank Defendant that unilaterally chose to deviate from the published bbaLIBOR™ rules would have exposed itself to civil and criminal sanctions and removal from the USD bbaLIBOR™ panel, which would have undermined the Bank Defendant's reputation.  Removal from the bbaLIBOR™ panel would

---

494 *Id.* at 000100.

495 Email to Pat Leising, *supra* note 254.

496 Vaughan & Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, *supra* note 482.

have harmed the Bank Defendant's perceived integrity, exposed it to investigation by government regulators, and led counterparties to terminate their business relationships with the Bank Defendant and possibly initiate civil actions.  Removal also could have proven catastrophic if the market interpreted the Bank Defendant's fraud as a desperate attempt to protect its reputation in the United States and hide its financial condition.

430.    Second, Bank Defendants with better credit ratings than their supposed rivals on the USD bbaLIBOR™ panel acted against their independent economic self-interest by submitting USD bbaLIBOR™ rates that were not significantly lower than their less creditworthy "competitor" banks on the USD bbaLIBOR™ panel and tolerating false submissions that created the appearance that all the Bank Defendants presented the same perceived credit risk.  The Bank Defendants admittedly did not all share the same incentive to unlawfully depress their USD bbaLIBOR™ submissions.  The Bank Defendants have claimed that some of them had AAA credit ratings and therefore no plausible reason to "help competitors mask their financial difficulties."  Yet that is precisely what happened, even though they unquestionably knew of the systematic depression as key players in the interbank loan market.  In the absence of collusion, the more creditworthy Bank Defendants would have used their stronger credit standing as a competitive advantage to obtain lower costs of funds than their rivals and to use those lower costs to compete on price in downstream markets for interest-rate derivatives, retail loans, and other financial products.

431.    Defendants had ample opportunity to conspire through, among other things, BBA and FX & MM Committee meetings, numerous interbank communications, electronic messages and chats, and telephone calls.  As shown above, even the minimal evidence publicly disclosed

to date in connection with government regulatory actions reveals a sustained pattern of illicit communications among the Bank Defendants.

432.     The economic evidence also supports the existence of the Unlawful Agreements in that the USD bbaLIBOR™'s relationship to the Eurodollar Bid Rate fundamentally changed during the alleged conspiracy period.  During the conspiracy, Defendants offered a number of explanations for that change, but the disclosures following Barclays' June 2012 admission of unlawful conduct confirm that the agreements alleged above caused that fundamental change.

## Restraint of Trade

433.     The purpose and effect of the Unlawful Agreements was to maintain control over the market standard for USD interest-rate benchmarks during the conspiracy period and limit competition in the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, floating-rate MBS, and wholesale funding.  Defendants achieved this objective by colluding to create the false impression that USD bbaLIBOR™ was suited for its intended purpose and that the London interbank loan market was a reliable source of data for the Bank Defendants' cost of unsecured funds.  Only Defendants knew whether they were following the bbaLIBOR™ methodology, the extent to which the opaque London interbank loan market was active, and whether the Bank Defendants were submitting rates consistent with the actual interest rates available in the London interbank loan market. Defendants' conspiracy harmed competition in numerous markets.

434.     Defendants foreclosed competition by alternative interest-rate benchmarks and shielded bbaLIBOR™'s dominant position as the market standard from the forces of competition.  Taking advantage of their significant, if not dominant, market positions (and pursuant to the Unlawful Agreements), Bank Defendants continued to incorporate bbaLIBOR™ into USD interest-rate derivatives, floating-rate loans, and floating-rate MBS, even though

Defendants knew that bbaLIBOR™ was not what they held it out to be. This conduct was intended to, and did, insulate bbaLIBOR™ from the forces of competition, which allowed Defendants to maintain bbaLIBOR™ as the market standard without even attempting to innovate its rules or improve its governance mechanism. In short, Defendants maintained USD bbaLIBOR™ as the standard in the market for USD interest-rate benchmarks and the leading reference interest-rate benchmark in markets for USD interest-rate derivatives, floating-rate loans and floating-rate MBS not by competing on the merits, but by entering into secret agreements to exclude competition.

435.    The Unlawful Agreements had especially pernicious effects because of the network effects on the market for USD interest-rate benchmarks. These network effects were driven by the widespread use of bbaLIBOR™ throughout the interconnected USD interest-rate derivative, floating-rate loan and floating-rate MBS markets, in which Bank Defendants were major players. Bank Defendants were among the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important users of USD interest-rate benchmarks. Thus, Defendants' agreements as dealers in the OTC interest-rate derivatives market necessarily diminished competition in the related floating-rate loan market, floating-rate MBS market, and in the upstream market for interest-rate benchmarks.

436.    Defendants knew, or should have known, that the Unlawful Agreements would affect the prices and returns on financial products tied to USD bbaLIBOR™. By agreeing to systematically and secretly depress bbaLIBOR™ into the future, Defendants harmed the competitive process.

437.     As explained in the Wheatley Report, an interest-rate benchmark serves two important purposes.[497]  First, it functions as the reference interest rate incorporated into financial contracts as a payment (and price) term.  Thus, depression of the benchmark will cause economic loss to companies that hold interest-rate derivatives, floating-rate loans, floating-rate MBS, and certain other products incorporating bbaLIBOR™.  Second, the benchmark functions as a discount rate used in negotiations to price products that incorporate the benchmark.  As explained above, an interest-rate swap is determined by applying the rules of the interest-rate benchmark to the notional value over the duration of the proposed swap to determine the net present value of those payments which, in turn, determines the fixed rate that the counterparty will pay.  Thus, the price of an interest-rate swap is set by the net present value of the interest-rate benchmark.  The net present value calculation is expressly premised on the reliability, predictability, and integrity of the interest-rate benchmark.

438.     By providing a benchmark supposedly tied to competitively determined interbank lending rates, bbaLIBOR™ purported to serve the price-discovery purpose in markets for, at least, interest-rate derivatives, floating-rate loans, and floating-rate MBS.  By foreclosing competition in the market for USD interest-rate benchmarks, Defendants harmed the competitive process by which parties discovered the price of interest-rate derivatives, floating-rate loans, and floating-rate MBS, and other products that incorporated USD bbaLIBOR™.[498]  As one District

---

497 Wheatley Final Report, *supra* note 150, at 45.

498 For example, assume a monopolist offers a product for $30 when its internal cost to produce and sell the product is just $10.  Absent competition, buyers will not know that $30 represents a three-fold increase over the seller's costs.  Now, assume instead that there are multiple sellers of the same product, all with similar costs.  Rather than lose a sale, the second seller will offer a price below $30, which should trigger a price reaction from the seller's rivals.  Eventually, through the competitive process, buyers will "discover" that the market price for the product is just above $10.  *See* Robert C. Marshall and Leslie M. Marx, The Economics of Collusion—Cartels and Bidding Rings 83-84 (2012).

Court observed: "Fraud and deceit are not legitimate market forces. Fundamentally, markets are information processing systems. The market price is only as 'real' as the data that inform the process of price discovery. By the same token, the market price is 'artificial' when the market is misinformed."[499]

439.    By artificially depressing USD bbaLIBOR™, Defendants caused purchasers of products that incorporated bbaLIBOR™ as an interest-rate benchmark to overpay for those products. Had purchasers known the true manner in which Defendants calculated, and intended to continue to calculate, USD bbaLIBOR™, purchasers would have chosen not to enter into the transaction at all or requested an alternative interest-rate benchmark. Similarly, purchasers, including Freddie Mac, suffered economic losses on financial products that incorporated USD bbaLIBOR™ as a price term. Market participants, including Freddie Mac, were not informed of the actual methodology that Defendants used to calculate USD bbaLIBOR™ and therefore the Unlawful Agreements prevented market participants from being able to make informed decisions whether to keep those financial products and, if so, whether to demand changes to the benchmark methodology. Through the Unlawful Agreements, the Bank Defendants artificially increased the profit margins that they earned in USD pay-fixed swaps, floating-rate MBS, and certain other products incorporating bbaLIBOR™, all to Freddie Mac's economic detriment.

440.    Second, Defendants also interfered with the ability of non-conspirator banks to fairly compete against Bank Defendants in the markets for interest-rate derivatives, floating-rate loans, floating-rate MBS, and other products incorporating bbaLIBOR™. Non-conspirator banks were unaware of the alleged fraud and collusion and therefore priced interest-rate

---

[499] *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006).

derivatives, floating-rate loans, and floating-rate MBS based on the reasonable expectation that USD bbaLIBOR™ would be determined according to the published rules.

441.    Third, each artificially depressed bbaLIBOR™ submission by an individual Bank Defendant enhanced that Bank Defendant's reputation and false public perception of its credit risk and liquidity.[500]  In the absence of collusion, banks with superior credit and liquidity profiles would have used their reputation as a competitive advantage and banks with lower reputations would have been forced to compete on the merits by providing better prices, improving efficiency, and shedding risk.  Numerous Bank Defendants, in fact, have admitted that individual bbaLIBOR™ submissions contained market information that affected or tended to affect prices of financial contracts and products that incorporated the interest-rate benchmark.[501]

442.    Fourth, Defendants stifled innovation and limited demand for alternative (competing) benchmarks.  Through their agreement to submit rates that appeared to be fair and honest reflections of interbank lending, Defendants maintained the façade that market forces determined bbaLIBOR™ and that a more reliable benchmark was unnecessary.  But for the collusion, Defendants would have been forced to compete on the merits by showing that bbaLIBOR™ served its intended purpose as a proxy for competition or by incorporating other floating interest-rate benchmarks into financial products they sold.  One benchmark provider recently acknowledged that "the existing LIBOR framework [has] failed to keep pace with market needs as they have developed over the past two decades."[502]

---

500 Business reputation is an "asset of significant value" in the banking sector.  Rosa M. Abrantes-Metz et al., *LIBOR Manipulation?*, 36 J. Banking & Fin. 137, 138 (2008).

501 *See, e.g.*, UBS SOF, *supra* note 145, at ¶ 97.

502 Rate Validation Servs., *Regulation of Benchmarks and Indices:  RVS Response to the EU Consultation Document*, at 10 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/ benchmarks/individual-others/rate-valuations-services_en.pdf.

443.    Finally, Defendants interfered with the supply/demand balance for wholesale funding.  The Bank Defendants treated their bbaLIBOR™ submissions as an upper limit on interest rates they would offer for other unsecured funding products.  Defendants Lloyds and HBOS have admitted that they instructed employees not to bid for cash at rates that were out of line with their bbaLIBOR™ submissions.  In a competitive environment, market forces determine interest rates and efficiently allocate money.

444.    The antitrust charges filed against subsidiaries of UBS and RBS confirm that agreements to manipulate bbaLIBOR™ constitute *per se* restraints of trade that harmed competition in the markets for USD interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS in violation of Sherman Act Section 1.  *Per se* treatment of the conspiracy is appropriate because the Unlawful Agreements were specifically related to price and quality.  Where, as here, a plaintiff alleges a *per se* violation of the Sherman Act, no allegations with respect to relevant product market, geographic market, or market power are required.  To the extent allegations may otherwise be necessary, the markets and harm to competition caused by the Unlawful Agreements are addressed below.

**Antitrust Injury and Damages**

445.    During the conspiracy period, Freddie Mac purchased and owned interest-rate derivatives, including pay-fixed, receive-floating interest-rate swaps, that incorporated USD bbaLIBOR™ as a price term.  In addition, Freddie Mac purchased and held floating-rate MBS and other financial products that incorporated USD bbaLIBOR™ as the interest-rate benchmark and that incorporated USD bbaLIBOR™ as a price term.  In the absence of the Unlawful Agreements, competitive market forces would have created overwhelming incentives for Defendants to calculate and publish USD bbaLIBOR™ in compliance with its published rules and to ensure that the London interbank market used to calculate USD bbaLIBOR™ was

-177-

sufficient to measure the Bank Defendants' cost of funds.  In addition, the Unlawful Agreements injected false information into financial markets that depended on interest-rate benchmarks for accurate information regarding the Bank Defendants' cost of funds.

446.    As a result, Freddie Mac paid artificially high prices for USD pay-fixed, receive-floating swaps, floating-rate MBS, and floating-rate loans.  Conversely, as a result of the collusion and anticompetitive effects, Freddie Mac received less from these derivatives, MBS, and floating-rate loans.  These damages flow directly from the Unlawful Agreements' interference with competitive market forces.

447.    In the absence of collusion, the Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased the profit margins that they were able to earn) in transactions for certain USD interest-rate derivatives and floating-rate MBS.

### **Rule of Reason**

448.    Alternatively, analyzed under either a "quick look" or full rule-of-reason framework, the Unlawful Agreements unreasonably restrained trade in the markets for USD interest-rate benchmarks, OTC USD interest-rate derivatives, USD floating-rate retail loans, and floating-rate MBS.  The Unlawful Agreements arose from "competitor collaborations" as that term is used in the United States' Guidelines for Collaborations Among Competitors[503] because the Bank Defendants were purported competitors in each of the defined markets as well as in the market for unsecured short-term wholesale funding.  As noted above, absent collusion, each Bank Defendant would have individually competed to submit the lowest rates to the BBA

---

503 U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors (Apr. 2000), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

consistent with the published bbaLIBOR™ methodology and prevented any other Bank Defendant from submitting artificially low rates to the BBA by disclosing such false rates to the BBA (which, in the absence of collusion, would have acted on that information) or otherwise publicly identifying the cheater.

449.     Even if the bbaLIBOR™ data gathering process, in fact, was intended to be a cooperative one, that does not mean that the actual submission process was intended to be collaborative and not competitive.  Even for collaborative ventures, agreements are evaluated based on their effects on competition in relevant markets.[504]  The Unlawful Agreements harmed the competitive processes in several markets and in several ways.

### A.     Relevant Market:  USD Short-Term Interest-Rate Benchmarks

<u>Market Definition</u>

450.     During the relevant period, there were no reasonable substitutes for USD short-term interest-rate benchmarks.  Interest-rate derivatives, floating-rate loans, and floating-rate MBS require an interest-rate benchmark.  The market for USD short-term interest-rate benchmarks was global.

451.     Defendants had substantial power in the market for short-term interest-rate benchmarks.  bbaLIBOR™ was by far the dominant short-term interest-rate benchmark and the phenomenon of network effects protected Defendants' market power.  Bank Defendants served on the supposedly independent FX & MM Committee responsible for overseeing and implementing bbaLIBOR™ during the conspiracy period.  Bank Defendants were in the very small minority of financial institutions that could provide upstream information on the unsecured costs of funds for the largest commercial banks in the world.  Bank Defendants were also among

---

504 *Id.* at 3-4, 24-25.

the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important downstream issuers of USD short-term interest-rate benchmarks.

452.    In addition, Bank Defendants were significant providers of floating-rate USD retail loans and floating-rate MBS, which increased their power in the market for USD short-term interest-rate benchmarks.  The phenomenon of network effects further increased Defendants' market power because users will tend to choose the same short-term interest-rate benchmark incorporated into floating-rate loans and MBS.

Harm to Competition

453.    The Unlawful Agreements harmed competition in the market for USD interest-rate benchmarks by creating the false impression that USD bbaLIBOR™ was suited for its intended purpose, could be reliably predicted based on the published rules, and was carefully governed by an "independent" overseer.

454.    One of the reasons that Defendants entered into the Unlawful Agreements was to foreclose competition by alternative benchmarks and thereby insulate themselves from the forces of competition.  The Bank Defendants benefited from maintaining control of the market standard interest-rate benchmarks, USD bbaLIBOR™, because it allowed them to profit on transactions involving interest-rate derivatives, USD floating-rate loans, and floating-rate MBS.  In addition, the BBA generated revenues through the licensing of USD bbaLIBOR™ and the Bank Defendants indirectly benefited from those licensing fees as BBA members.

455.    As shown above, had Defendants publicly disclosed their agreement to disregard the published USD bbaLIBOR™ methodology and governance mechanisms, market participants would have sought out, or developed, alternative benchmarks that would better serve the purpose of USD short-term interest-rate benchmarks, or at the very least negotiated lower prices that better reflected the additional uncertainty that would have been created by Defendants' self-

serving rules. In the absence of the agreement to secretly revise the USD bbaLIBOR™ methodology and governance, Defendants would have been forced to compete on the merits to protect the status of USD bbaLIBOR™ as the dominant USD short-term interest-rate benchmark.

456.    Real-world insights into the way competition would have encouraged innovation, integrity, and reliability can be gained from market developments following the conspiracy's end. Soon after Barclays admitted its participation in the bbaLIBOR™ manipulation, the BBA voluntarily sought to reassure users that USD Contributor Banks would adhere to the published methodology in the future.[505] The BBA stated that its top priority was to ensure the provision of a reliable benchmark which had the confidence and support of users.[506]

457.    In addition, the UK's Financial Conduct Authority ("FCA") sponsored a wide-ranging report overseen by Mr. Wheatley, that eventually recommended numerous improvements to "get back to what this reference rate is supposed to do."[507] The Wheatley Report reforms included stripping the BBA of its administrative role due to unresolvable conflicts of interest, imposing mechanisms to corroborate USD bbaLIBOR™ submissions with actual trade data, expanding the number of Contributor Banks, reducing the number of currencies, and delaying publication of individual Contributor Bank submissions by three months.

---

505 Press Release, BBA, Libor Statement—Thursday 28 June (June 28, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-statement-thursday-28-june/.

506 British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor, *supra* note 38.

507 Martin Wheatley, Managing Director, FSA, and CEO Designate, FCA at the Wheatley Review of LIBOR, Pushing the Reset Button on LIBOR (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/speeches/2012/0928-mw.shtml.

458.    In 2013, IOSCO drafted and published its Principles for Financial Benchmarks that outlined best practices for all indices, including bbaLIBOR™.[508]  Market participants advocated for a broader set of interest-rate benchmarks that could be adapted to a range of applications.  The news service Bloomberg, for example, demanded more alternatives to bbaLIBOR™.[509]  CFTC Chairman Gary Gensler advocated for the abolishment of bbaLIBOR™.[510]

459.    The BBA, in fact, implemented a number of the reforms recommended in the Wheatley Report.  In February 2014, the BBA handed control of USD bbaLIBOR™ over to a private benchmark provider, ICE.  ICE has since implemented additional screens to prevent manipulation, imposed additional measures to boost bbaLIBOR™'s reliability, and has vowed to continue to improve bbaLIBOR™.

460.    As shown, the Unlawful Agreements harmed competition in the market for short-term interest-rate benchmarks by deterring innovation, eroding product quality, limiting product choice, and increasing price.

461.    In addition, Defendants' agreement to conceal deterioration in the unsecured interbank loan market limited the ability of market participants to determine whether the interbank loan market was a trustworthy source of data.  In the absence of collusion, Defendants

---

508 IOSCO Principles, *supra* note 160.

509 Darrell Duffie & Jeremy Stein, *Libor Needs More Competition*, Bloomberg View (July 22, 2014), http://www.bloombergview.com/articles/2014-07-22/libor-needs-more-competition.

510 Gary Gensler, Chairman, U.S. C.F.T.C., Remarks of Chairman Gary Gensler on Libor Before the Global Financial Markets Association's Future of Global Benchmarks Conference (Feb. 28, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-133.

would have had an incentive to apprise users of this issue and clearly identify contingency measures to respond to it.[511]

462.    The Unlawful Agreements did not provide any pro-competitive benefits.

<u>Antitrust Injury</u>

463.    The reduction of competition in the market for USD interest-rate benchmarks was a direct and material cause of Freddie Mac's injuries.  Freddie Mac negotiated pay-fixed, receive-floating USD interest-rate swaps with Bank Defendants and others that incorporated USD bbaLIBOR™ as a price term.  In addition, Freddie Mac purchased floating-rate MBS that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  In a competitive market for interest-rate benchmarks, USD bbaLIBOR™ would have been calculated according to its published rules and not subject to manipulation and systematic depression.  In the absence of the Unlawful Agreements, the competitive process would have created overwhelming incentives for Defendants to reliably apply the published USD bbaLIBOR™ methodology and Freddie Mac would have received the consideration for which it bargained.

464.    In addition, but for the collusion, Defendants would have disclosed the extent of deterioration in the unsecured interbank loan market and identified methods to improve the reliability of the underlying data.  Virtually all of the recent proposals for improvement of interest-rate benchmarks would broaden the range of data to include actual transactions in unsecured wholesale funding markets.

465.    In its capacity as a purchaser of USD floating-rate loans, Freddie Mac was a consumer of USD short-term interest-rate benchmarks and therefore suffered a direct injury

---

511 *See* IOSCO Consultation Report, *supra* note 160, at 20-21 (benchmark providers should clearly disclose changes to the methodology so that users can determine whether it remains a suitable reference); IOSCO Principles, *supra* note 160, at 22-23 (benchmark providers should publish methodology in sufficient detail to allow users to understand how it is derived and its appropriateness as a reference for financial instruments).

because it was forced to participate in a non-competitive and non-transparent market for interest-rate benchmarks, paid artificially inflated prices for interest-rate derivatives that incorporated USD bbaLIBOR™ as a payment term for Freddie Mac, and received lower payments from derivatives, floating-rate loans, and floating-rate MBS where payments were determined by USD bbaLIBOR™.

### B.   Relevant Market:  OTC USD Interest-Rate Derivatives

<u>Market Definition</u>

466.    OTC USD interest-rate derivatives include instruments such as swaps, forwards, caps, floors, swaptions, and collars.[512]  During the conspiracy period, USD bbaLIBOR™ was the dominant interest-rate benchmark used in OTC USD interest-rate derivatives.

467.    The OTC interest-rate derivatives market differed from futures markets in a number of important respects.  Whereas futures and futures options were standardized agreements that traded on organized exchanges, the OTC market was an informal bilateral market consisting of broker/dealers that traded price information and negotiated transactions over electronic communications networks.  Although a great deal of contract standardization exists in the OTC market, dealers active in this market custom-tailor agreements to meet the specific needs of their customers. And unlike futures markets, where futures exchange clearinghouses guarantee contract performance through a system of margin requirements combined with the daily settlement of gains or losses, counterparties to OTC derivative agreements must bear some default or credit risk.[513]  The OTC USD interest-rate derivatives

---

512 Anatoli Kuprianov, *Chapter 16:  Over-the-Counter Interest Rate Derivatives*, *in* Fed. Reserve Bank of Richmond, Instruments of the Money Market 238, 238-39 (1998), *available at* https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/pdf/chapter_16.pdf.

513 *Id.*

market was opaque during the conspiracy period, even more so as a result of the Unlawful Agreements.

468.    OTC USD interest-rate derivatives are traded in a global market.  A small set of dealers—comprised primarily of Bank Defendants—dominated the market for OTC USD interest-rate derivatives during the conspiracy period.  According to a July 2010 ISDA market survey, the largest 14 dealers held 82% of interest-rate derivatives by notional amount.[514]  Of these 14 dealers, 10 were USD bbaLIBOR™ Contributor Banks:  Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, UBS.[515]  Similarly, the top five United States bank holding companies—Defendants Bank of America, Citigroup, JPMorgan, HSBC, and the investment bank Goldman Sachs, accounted for more than 95% of all OTC swaps and derivatives transactions in the United States.[516]

469.    There were no reasonable alternatives to OTC USD interest-rate derivatives because those products were the most efficient way for lenders and borrowers to transfer risk through customized contracts.

<u>Harm to Competition</u>

470.    Competition in the OTC USD interest-rate derivatives market depended on a reliable and predictable interest-rate benchmark.  As noted above, OTC dealers quote prices for interest-rate swaps in two parts:  (1) an interest-rate benchmark and (2) a fixed interest rate.  The fixed rate is calculated to provide the net present value today of the expected cash flows from the quoted benchmark over the life of the swap.  The potential purchaser of a pay-fixed, receive-floating derivative calculates the expected cash flows by applying the published rules of the

---

514 Mengle, *supra* note 174 at 1.

515 *Id.* at 2.

516 *Id.* at 1.

quoted benchmark to the predicted market conditions over the length of the swap to determine the price it will pay for that swap.

471.     The Unlawful Agreements harmed competition in the market for OTC USD interest-rate derivatives by undermining price transparency and excluding alternative benchmarks from being used to price OTC USD interest-rate derivatives.  In a competitive market, bbaLIBOR™ would have been a reliable benchmark or it would have been replaced by one or more alternative benchmarks that better served its intended purposes.

472.     The Unlawful Agreements did not provide any pro-competitive benefits in this market.

<u>Antitrust Injury</u>

473.     Freddie Mac's injuries arose from the harm to competition alleged above.  In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology and therefore would have been consistently higher throughout the conspiracy period.  These injuries flow directly from the substitution of collusion for competition in the market for OTC USD interest-rate derivatives.

**C.     Relevant Market:  USD Floating-Rate Retail Loans**

<u>Market Definition</u>

474.     USD floating-rate retail loans are loans made by banks, including the Bank Defendants, for mortgages and other consumer uses.  Retail loans were typically of longer duration.  There are markets for USD floating-rate retail loans worldwide. [517] During the conspiracy period, the Bank Defendants made billions of dollars' worth of USD retail loans,

---

[517] Wholesale loans are also referred to as "trades," with "buy" corresponding to borrow and "sell" corresponding to lend.

which Bank Defendants packaged for sale to investors such as Freddie Mac.  For example, in 2010, more than half of all mortgages in the United States were originated by three banks:  Wells Fargo, Bank of America, and JPMorgan.[518]  During the conspiracy period, these three banks and Citigroup were consistently among the top five mortgage originators.[519]  They were also, by far, the four largest commercial banks in the United States.[520]  In 2010, these four banks held $3.6 trillion in deposits at the end of the fourth quarter, whereas the next 46 institutions in the top 50 collectively held $2.68 trillion in deposits.

475.    There were no reasonable substitutes for USD floating-rate retail loans. Participants in the floating-rate loans market seek to transfer risk from the lender to the borrower for a price.  In fixed-rate loans, the lender typically cannot transfer interest-rate risk, which makes the loan more expensive to the borrower and an insufficient substitute.

Harm to Competition

476.    The Unlawful Agreements harmed competition in the market for USD floating-rate retail loans by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process.  The Bank Defendants were among the largest lenders and, as a result of their conspiracy, were uninterested in promoting competition for interest-rate benchmarks.  Also as a result of the conspiracy, lenders other than the Bank Defendants were unaware that bbaLIBOR™ no longer served its intended purpose and therefore non-defendant lenders had no incentive to demand alternative interest-rate benchmarks.

---

518 Press Release, Mortgage Daily, 3 Biggest Lenders Close Over Half of U.S. Mortgages (Feb. 15, 2011), http://www.mortgagedaily.com/PressRelease021511.asp.

519 *Id.*

520 *See, e.g.*, Aarti Kanjani, *Top 50 U.S. Banks and Thrifts by Assets*, SNL Fin., Mar. 21, 2011, http://www.snl.com/InteractiveX/article.aspx?CDID=A-12500123-14138&KPLT=2.

477.     The Unlawful Agreements did not provide any pro-competitive benefits in this market.

Antitrust Injury

478.     Freddie Mac's injuries arose from this harm to competition.  In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology.  Freddie Mac purchased USD floating-rate loans during the conspiracy period that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  As a result of the reduction of competition in the market for interest-rate benchmarks, Freddie Mac lacked adequate alternatives to USD bbaLIBOR™ and was deceived into believing that USD bbaLIBOR™ sufficiently served its intended purpose.  As a direct result of the competitive harms caused by Defendants' conduct, payments to Freddie Mac on floating-rate loans that incorporated USD bbaLIBOR™ were lower than they would have been in the absence of the conspiracy.

**D.     Relevant Market:  USD Floating-Rate MBS**

Market Definition

479.     The market for USD floating-rate MBS was a global one.  During the conspiracy period, the Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS.  For example, in 2009 Bank of America was the leading underwriter of U.S. mortgaged-backed securities with 17.5 percent of the total market.  Other Bank Defendants in the top 10 included Barclays, Credit Suisse, JPMorgan, Citigroup, RBS, and Deutsche Bank.[521]

480.     There were no reasonable substitutes for USD floating-rate MBS.  Participants in the market for USD floating-rate MBS sought exposure to interest-rate risk and the prices for

---

[521] Adam Quinones, *Bank of America Top MBS Underwriter in 2009.  What is an MBS Underwriter?*, Mortgage News Daily, Jan. 4, 2010, http://www.mortgagenewsdaily.com/01042010_bank_of_america_mbs_uw.asp.

floating-rate MBS reflected a discount from fixed-rate MBS because the buyer of the floating-rate MBS agreed to take on the interest-rate risk inherent in floating-rate products.

Harm to Competition

481.    The Unlawful Agreements harmed competition in the market for USD floating-rate MBS by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process.  The Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS and, as a result of their conspiracy, were uninterested in promoting competition for interest-rate benchmarks.  As a result of the conspiracy, purchasers of USD floating-rate MBS paid artificially high prices for products and received lower quality.

482.    The Unlawful Agreements did not provide any pro-competitive benefits in this market.

Antitrust Injury

483.    The harms to competition in the market for USD floating-rate MBS were a material contributing factor to Freddie Mac's injuries because Freddie Mac purchased billions of dollars of USD floating-rate MBS from Bank Defendants and others.  In a competitive environment, USD bbaLIBOR™ would have been calculated according to its published methodology and Freddie Mac would not have suffered its alleged injuries because the payments that Freddie Mac received from floating-rate MBS were less than they would have been in the absence of the conspiracy.

## COUNT II:  BREACH OF CONTRACT (DEFENDANT BANK OF AMERICA)

484.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

485.    On March 8, 1999, Freddie Mac entered into an ISDA Master Agreement with NationsBank, N.A., predecessor-in-interest to Bank of America, N.A. under which Freddie Mac entered into pay-fixed swaps with Bank of America ("BOA Master Agreement").[522]   In the BOA Master Agreement, the parties represented that the execution, delivery, and performance of the BOA Master Agreement did not violate or conflict with any law applicable to it.[523]   The BOA Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[524] The BOA Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the BOA Master Agreement or any Credit Support Document to which it is a party.[525]

486.    The BOA Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[526]   The BOA Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the BOA Master Agreement.[527]

---

[522] The BOA Master Agreement is attached as Exhibit 31 and incorporated into this Complaint by reference (hereinafter "BOA Master Agreement").

[523] *Id.* ¶ 3(a)(iii).

[524] *Id.* ¶ 3(d).

[525] *Id.* ¶ 4(c).

[526] *Id.* ¶ 5(a)(iv).

[527] *Id.* ¶ 11.

487.    The BOA Master Agreement states that all transactions between Freddie Mac and Bank of America are entered into in reliance on the fact that the BOA Master Agreement and all confirmations form a single agreement between the parties.[528] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

488.    During the relevant period, Freddie Mac entered into more than 150 pay-fixed swaps governed by the BOA Master Agreement.

489.    Bank of America knowingly breached and defaulted on the BOA Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

490.    As a result of Bank of America's breach of the BOA Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the BOA Master Agreement.

## COUNT III: BREACH OF CONTRACT (DEFENDANT BARCLAYS)

491.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

492.    On January 2, 1996, Freddie Mac entered into an ISDA Master Agreement with Barclays ("Barclays Master Agreement").[529] In the Barclays Master Agreement, the parties represented that the execution, delivery, and performance of the Barclays Master Agreement did

---

528 *Id.* ¶ 1(c).

529 The Barclays Master Agreement is attached as Exhibit 32 and incorporated into this Complaint by reference.

not violate or conflict with any law applicable to it.[530]  The Barclays Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[531]  The Barclays Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Barclays Master Agreement or any Credit Support Document to which it is a party.[532]

493.    The Barclays Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[533]  The Barclays Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Barclays Master Agreement.[534]

494.    The Barclays Master Agreement states that all transactions between Freddie Mac and Barclays are entered into in reliance on the fact that the Barclays Master Agreement and all confirmations form a single agreement between the parties.[535]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

---

530 *Id.* ¶ 3(a)(iii).
531 *Id.* ¶ 3(d).
532 *Id.* ¶ 4(c).
533 *Id.* ¶ 5(a)(iv).
534 *Id.* ¶ 11.
535 *Id.* ¶ 1(c).

495.     During the relevant period, Freddie Mac entered into more than 100 pay-fixed swaps governed by the Barclays Master Agreement.

496.     Barclays breached and defaulted on the Barclays Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

497.     As a result of Barclays' breach of the Barclays Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Barclays Master Agreement.

### COUNT IV:  BREACH OF CONTRACT (DEFENDANT CITIBANK, N.A.)

498.     Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

499.     On January 21, 1993, Freddie Mac entered into an ISDA Master Agreement with Defendant Citibank, N.A. The parties renewed the ISDA Master Agreement on April 1, 1994 ("Citibank Master Agreement").[536]  In the Citibank Master Agreement, the parties each represented that the execution, delivery, and performance of the Citibank Master Agreement did not violate or conflict with any law applicable to it.[537]  The Citibank Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[538]  The Citibank Master Agreement requires that the parties comply in all material respects with all applicable

---

536 The Citibank Master Agreement is attached as Exhibit 33 and incorporated into this Complaint by reference.
537 *Id.* ¶ 3(a)(iii).
538 *Id.* ¶ 3(d).

laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Agreement or any Credit Support Document to which it is a party.[539]

500.    The Citibank Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[540]   The Citibank Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Citibank Master Agreement.[541]

501.    The Citibank Master Agreement states that all transactions between Freddie Mac and Citibank are entered into in reliance on the fact that the Citibank Master Agreement and all confirmations form a single agreement between the parties.[542]   A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

502.    During the relevant period, Freddie Mac entered into more than 90 pay-fixed swaps governed by the Citibank Master Agreement.

503.    Citibank breached and defaulted on the Citibank Master Agreement through Citigroup's fraudulent and collusive conduct, Citigroup's failure to disclose the fraudulent and collusive conduct, Citigroup's intentional misrepresentation and manipulation of USD

---

539 *Id.* ¶ 4(c).
540 *Id.* ¶ 5(a)(iv).
541 *Id.* ¶ 11.
542 *Id.* ¶ 1(c).

bbaLIBOR™, and Citibank's underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

504.     As a result of Citigroup's breach of the Citibank Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Citibank Master Agreement.

## COUNT V:  BREACH OF CONTRACT (DEFENDANT CREDIT SUISSE)

505.     Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

506.     On March 29, 1993 (as modified by subsequent amendments), Freddie Mac entered into an ISDA Master Agreement with Credit Suisse Financial Products, predecessor-in-interest to Credit Suisse First Boston International, which in turn was predecessor-in-interest to CSI, under which Freddie Mac entered into pay-fixed swaps with CSI.  ("Credit Suisse Master Agreement").[543]  In the Credit Suisse Master Agreement, the parties represented that the execution, delivery, and performance of the Credit Suisse Master Agreement did not violate or conflict with any law applicable to it.[544]  The Credit Suisse Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[545]  The Credit Suisse Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability

---

543 The Credit Suisse Master Agreement is attached as Exhibit 34 and incorporated into this Complaint by reference.

544 *Id.* ¶ 3(a)(iii).

545 *Id.* ¶ 3(d).

to perform its obligations under the Credit Suisse Master Agreement or any Credit Support Document to which it is a party.[546]

507.     The Credit Suisse Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[547]  The Credit Suisse Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Credit Suisse Master Agreement.[548]

508.     The Credit Suisse Master Agreement states that all transactions between Freddie Mac and Credit Suisse are entered into in reliance on the fact that the Credit Suisse Master Agreement and all confirmations form a single agreement between the parties.[549] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

509.     During the relevant period, Freddie Mac entered into more than 200 pay-fixed swaps governed by the Credit Suisse Master Agreement.

510.     Defendant CSI breached and defaulted on the Credit Suisse Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

---

546 *Id.* ¶ 4(c).

547 *Id.* ¶ 5(a)(iv).

548 *Id.* ¶ 11.

549 *Id.* ¶ 1(c).

511.    As a result of CSI's breach of the Credit Suisse Master Agreement, Freddie Mac

has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to

enforce and protect Freddie Mac's rights under the Credit Suisse Master Agreement.

### COUNT VI:  BREACH OF CONTRACT (DEFENDANT DEUTSCHE BANK)

512.    Freddie Mac incorporates by reference the preceding paragraphs of this

Complaint.

513.    On April 10, 1997, Freddie Mac entered into an ISDA Master Agreement with

Deutsche Bank ("Deutsche Bank Master Agreement").[550]  In the Deutsche Bank Master

Agreement, the parties represented that the execution, delivery, and performance of the Deutsche

Bank Master Agreement did not violate or conflict with any law applicable to it.[551]  The

Deutsche Bank Master Agreement further states that "[a]ll applicable information that is

furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete

in every material respect."[552]  The Deutsche Bank Master Agreement requires that the parties

comply in all material respects with all applicable laws and orders to which a party may be

subject if failure so to comply would materially impair its ability to perform its obligations under

the Deutsche Bank Master Agreement or any Credit Support Document to which it is a party.[553]

514.    The Deutsche Bank Master Agreement provides that a party defaults any time that

it makes or repeats a representation that proves to be incorrect or misleading in any material

---

550 The Deutsche Bank Master Agreement is attached as Exhibit 35 and incorporated into this Complaint by reference.

551 *Id.* ¶ 3(a)(iii).

552 *Id.* ¶ 3(d).

553 *Id.* ¶ 4(c).

respect when made or repeated.[554]  The Deutsche Bank Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Deutsche Bank Master Agreement.[555]

515.    The Deutsche Bank Master Agreement states that all transactions between Freddie Mac and Defendant Deutsche Bank are entered into in reliance on the fact that the Deutsche Bank Master Agreement and all confirmations form a single agreement between the parties.[556]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

516.    During the relevant period, Freddie Mac entered into more than 300 pay-fixed swaps governed by the Deutsche Bank Master Agreement.

517.    Deutsche Bank breached and defaulted on the Deutsche Bank Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

518.    As a result of Defendant Deutsche Bank's breach of the Deutsche Bank Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Deutsche Bank Master Agreement.

---

554 *Id.* ¶ 5(a)(iv).

555 *Id.* ¶ 11.

556 *Id.* ¶ 1(c).

## COUNT VII:  BREACH OF CONTRACT (DEFENDANT HSBC)

519.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

520.    On October 25, 2001, Freddie Mac entered into an ISDA Master Agreement with HSBC Bank USA under which Freddie Mac entered into pay-fixed swaps with HSBC ("HSBC Master Agreement").[557]  In the HSBC Master Agreement, the parties represented that the execution, delivery, and performance of the HSBC Master Agreement did not violate or conflict with any law applicable to it.[558]  The HSBC Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[559]  The HSBC Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair a party's ability to perform its obligations under the HSBC Master Agreement or any Credit Support Document to which it is a party.[560]

521.    The HSBC Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[561]  The HSBC Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable

---

557 The HSBC Master Agreement is attached as Exhibit 36 and incorporated into this Complaint by reference.

558 *Id.* ¶ 3(a)(iii).

559 *Id.* ¶ 3(d).

560 *Id.* ¶ 4(c).

561 *Id.* ¶ 5(a)(iv).

out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the HSBC Master Agreement.[562]

522.    The HSBC Master Agreement states that all transactions between Freddie Mac and HSBC are entered into in reliance on the fact that the HSBC Master Agreement and all confirmations form a single agreement between the parties.[563] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

523.    During the relevant period, Freddie Mac entered into more than 20 pay-fixed swaps governed by the HSBC Master Agreement.

524.    HSBC breached and defaulted on the HSBC Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

525.    As a result of HSBC's breach of the HSBC Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the HSBC Master Agreement.

## COUNT VIII:  BREACH OF CONTRACT (DEFENDANT RBS)

526.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

---

562 *Id.* ¶ 11.
563 *Id.* ¶ 1(c).

527.    On April 7, 2006, Freddie Mac entered into an ISDA Master Agreement with RBS ("RBS Master Agreement").[564]  In the RBS Master Agreement, the parties represented that the execution, delivery, and performance of the RBS Master Agreement did not violate or conflict with any law applicable to it.[565]  The RBS Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[566]  The RBS Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the RBS Master Agreement or any Credit Support Document to which it is a party.[567]

528.    The RBS Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[568]  The RBS Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the RBS Master Agreement.[569]

529.    The RBS Master Agreement states that all transactions between Freddie Mac and RBS are entered into in reliance on the fact that the RBS Master Agreement and all

---

564 The RBS Master Agreement is attached as Exhibit 37 and incorporated into this Complaint by reference.

565 *Id.* ¶ 3(a)(iii).

566 *Id.* ¶ 3(d).

567 *Id.* ¶ 4(c).

568 *Id.* ¶ 5(a)(iv).

569 *Id.* ¶ 11.

confirmations form a single agreement between the parties.[570] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

530. During the relevant period, Freddie Mac entered into some 200 pay-fixed swaps governed by the RBS Master Agreement.

531. RBS breached and defaulted on the RBS Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

532. As a result of RBS' breach of the RBS Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the RBS Master Agreement.

## COUNT IX:  BREACH OF CONTRACT (DEFENDANT UBS)

533. Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

534. On May 1, 1996, Freddie Mac entered into an ISDA Master Agreement with Swiss Bank Corporation, predecessor-in-interest to UBS, under which Freddie Mac entered into pay-fixed swaps with UBS ("UBS Master Agreement").[571] In the UBS Master Agreement, the parties represented that the execution, delivery, and performance of the UBS Master Agreement did not violate or conflict with any law applicable to it.[572] The UBS Master Agreement further

---

570 *Id.* ¶ 1(c).

571 The UBS Master Agreement is attached as Exhibit 38 and incorporated into this Complaint by reference.

572 *Id.* ¶ 3(a)(iii).

states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[573] The UBS Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the UBS Master Agreement or any Credit Support Document to which it is a party.[574]

535.    The UBS Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[575] The UBS Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the UBS Master Agreement.[576]

536.    The UBS Master Agreement states that all transactions between Freddie Mac and UBS are entered into in reliance on the fact that the UBS Master Agreement and all confirmations form a single agreement between the parties.[577] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

537.    During the relevant period, Freddie Mac entered into more than 200 pay-fixed swaps governed by the UBS Master Agreement.

---

573 *Id.* ¶ 3(d).

574 *Id.* ¶ 4(c).

575 *Id.* ¶ 5(a)(iv).

576 *Id.* ¶ 11.

577 *Id.* ¶ 1(c).

538.     UBS breached and defaulted on the UBS Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD bbaLIBOR™, and its underpayments to Freddie Mac tied to the artificially depressed USD bbaLIBOR™.

539.     As a result of UBS's breach of the UBS Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the UBS Master Agreement.

## COUNT X:  FRAUD (ALL DEFENDANTS)

540.     Freddie Mac incorporates by reference the preceding paragraphs in this Complaint.

541.     Each Defendant owed a duty to Freddie Mac to honestly and accurately report USD bbaLIBOR™ and not to intentionally mislead Freddie Mac and others by secretly and collectively manipulating USD bbaLIBOR™ for their gain and to the detriment of others in the financial markets.  Defendants' duty arises from representations that they made, individually and/or through the BBA, that bbaLIBOR™ was "a reliable indicator of the state of the money markets," that it was a "reliable barometer of risk," that it reflected competitive rates in the London interbank lending market, and other such public representations.  The Contracting Defendants also have a separate and additional duty that arises from the contractual relationships they entered into with Freddie Mac, under which the Contracting Defendants owed a duty of good faith and fair dealing to Freddie Mac.  Freddie Mac reasonably relied on Defendants' fraudulent misrepresentations and conduct because, among other things, Defendants held USD bbaLIBOR™ out as a trustworthy, reliable benchmark and Defendants' fraud could only have been known to Defendants.

### Fraudulent USD bbaLIBOR™ Submissions (all Bank Defendants)

542.     As described above, beginning in August 2007 and continuing through October 2011, each Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition of bbaLIBOR™.

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Bank Defendants.

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

543.     The Bank Defendants made these representations knowing that they were false, or with reckless disregard for their truth.

544.     Each of these representations was material because it formed the basis for USD bbaLIBOR™ published by and through the BBA and affected the price of USD OTC interest-rate derivatives, floating-rate retail loans, floating-rate MBS, and other products incorporating USD bbaLIBOR™.  In addition, an individual bank's published submission provided information regarding its creditworthiness and liquidity.  When a Bank Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially low in relation to other Bank Defendants, that Bank Defendant's submission was material because it led market participants to believe that the Bank Defendant presented the same credit standing as the other Bank Defendants.  Had market participants and purchasers of USD interest-rate derivatives known the true credit risk and liquidity issues facing those Bank Defendants, they would have declined to do business with them.

545.     The Bank Defendants recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, the Bank Defendants

intended for Freddie Mac and others to rely on their false representations of material fact. Freddie Mac reasonably relied on these false representations of material fact in deciding whether to do business with a particular Bank Defendant.

546.     As a result of Freddie Mac's reasonable reliance on these false representations of material fact, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and receiving a lower quality product that did not generate the cash flows that would have been generated if Defendants had applied bbaLIBOR™'s published rules and governance mechanism.

### Fraudulent USD bbaLIBOR™ (all Defendants)

547.     As described above, beginning in August 2007 and continuing through October 2011, Defendants falsely represented on a daily basis that USD bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest submissions by the Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of bbaLIBOR™.

548.     Defendants made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because they (a) formed the basis for pricing pay-fixed USD interest-rate swaps, floating-rate USD retail loans, and floating-rate USD MBS and (b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending rates.  Defendants recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, Defendants intended for Freddie Mac and others to rely on their false representations of material fact.

549.     Freddie Mac reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to

continue holding USD pay-fixed interest-rate swaps and floating-rate MBS. Freddie Mac specifically relied on Defendants' false representations in calculating the expected future cash flows from USD bbaLIBOR™ and, consequently, the price it was willing to pay for pay-fixed swaps and floating-rate MBS.

550.   As a result of Freddie Mac's reasonable reliance on these false representations of material fact, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and lower interest-rate payments from Defendants and others from pay-fixed interest-rate swaps, floating-rate MBS, and floating-rate retail loans.

### The BBA's Fraud

551.   Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to Freddie Mac and others that it actively and independently monitored the Bank Defendants' USD bbaLIBOR™ submissions to ensure that they were consistent with the published definition of bbaLIBOR™. From 2007 through at least 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

552.   In April 2008, the BBA falsely represented that (a) it was closely watching USD bbaLIBOR™ submissions, (b) it would expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) it would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) it did not believe that Contributor Banks had submitted false rates.

553.   In June 2008, the BBA falsely represented that (a) the Contributor Banks' USD bbaLIBOR™ submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

554.    On August 5, 2008, the BBA falsely represented that rates submitted by Contributor Banks were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."

555.    The BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

556.    The BBA intended for Freddie Mac and others to rely on these false representations of material fact.  Freddie Mac reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding pay-fixed USD interest-rate swaps and floating-rate MBS.

557.    As a result of Freddie Mac's reasonable reliance on these false representations of material fact, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and lower interest-rate payments from Bank Defendants and others from pay-fixed USD interest-rate swaps and floating-rate MBS.

### Contracting Bank Defendants' Fraud

558.    As discussed above, Freddie Mac entered into contracts with certain Defendants for pay-fixed USD interest-rate swaps, floating-rate MBS and retail loans ("the Contract Defendants").  By virtue of these contractual relationships, the Contract Defendants owed a duty of good faith and fair dealing to Freddie Mac.

559.     Contrary to their duty, the Contract Defendants affirmatively misrepresented their credit risk and liquidity through fraudulent and collusive USD bbaLIBOR™ submissions. In addition, the Contract Defendants affirmatively misrepresented that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates. Further, the Contract Defendants failed to disclose the fraud and collusion relating to USD bbaLIBOR™. The Contract Defendants made these and other false representations and material omissions knowing that they were false, or with reckless disregard for their truth. The Contract Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with Freddie Mac under the pay-fixed swaps in order to induce Freddie Mac to enter into these transactions. Freddie Mac would not have entered into the pay-fixed swaps at the same prices if Freddie Mac had known the Contract Defendants intended to substitute collusion for competition in the setting of USD bbaLIBOR™.

560.     Freddie Mac reasonably relied on the Contract Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding pay-fixed USD interest-rate swaps and floating-rate MBS.

561.     As a result of Freddie Mac's reasonable reliance on the Contract Defendants' fraudulent misrepresentations and omissions, Freddie Mac suffered damages in the form of, among other things, higher prices for pay-fixed USD interest-rate swaps and floating-rate MBS and lower interest-rate payments from Defendants and others from pay-fixed USD interest-rate swaps and floating-rate MBS.

## COUNT XI: TORTIOUS INTERFERENCE WITH CONTRACT (ALL DEFENDANTS)

562.    Freddie Mac incorporates by reference the preceding paragraphs in this Complaint.

563.    Freddie Mac purchased MBS, entered into pay-fixed swaps, and entered into other financial contracts tied to USD bbaLIBOR™ with counterparties other than Defendants.

564.    Each Defendant knew that USD bbaLIBOR™ was incorporated into ISDA Master Agreements and other financial instruments.

565.    Defendants intentionally and fraudulently held USD bbaLIBOR™ out to the world, including Freddie Mac, as a trustworthy and reliable benchmark.

566.    Defendants knew, or should have known, that Freddie Mac had purchased MBS and entered into financial instruments that incorporated USD bbaLIBOR™.

567.    Defendants intentionally and improperly interfered with these contracts and agreements, as described above, and caused Freddie Mac to receive reduced payments from those contracts and/or a decrease in value.

568.    Each Bank Defendant and the BBA knew, or should have known, that Freddie Mac had entered into financial instruments with one or more of the other Bank Defendants, as well as counterparties other than Defendants, that incorporated USD bbaLIBOR™.  In fact, as detailed above, certain Bank Defendants were counterparties to similar contracts with Freddie Mac.

569.    The Bank Defendants and the BBA intentionally and improperly interfered with these contracts and agreements, as described above, including by their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about bbaLIBOR™'s

accuracy. The Bank Defendants' and BBA's tortious acts caused those contracts to be breached and Freddie Mac to receive reduced payments from those contracts and/or a decrease in value.

570.   As a result of Defendants' intentional interference with Freddie Mac's contracts and agreements, Freddie Mac suffered damages in the form of, among other things, receiving lower interest-rate payments from Defendants and others.

### PRAYER FOR RELIEF

WHEREFORE, Freddie Mac requests the Court to:

    a.    Enter judgment for Freddie Mac awarding Freddie Mac its full damages for all economic, monetary, actual, consequential, and compensatory damages that Freddie Mac suffered as a result of Defendants' unlawful and/or inequitable conduct.

    b.    Award punitive damages to the extent allowable by law.

    c.    Treble damages for violations of the Sherman Act.

    d.    Award attorneys' fees and costs of suit.

    e.    Grant such other further relief as allowed by law.

### JURY DEMAND

Freddie Mac requests a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  June 15, 2018

Respectfully submitted,

Zelle LLP

By:  */s/ James R. Martin*

James R. Martin
Jennifer D. Hackett
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC  20006
202-899-4100

*Attorneys for Plaintiff Federal Home
Loan Mortgage Corporation*

Richard J. Leveridge
Adams Holcomb LLP
1001 Pennsylvania Ave., NW
Washington, DC  20004
202-580-8817

*Attorneys for Plaintiff Federal Home
Loan Mortgage Corporation*

4835-7332-2090v1